

250 Vesey Street
27th Floor
New York, NY 10281

wmhwlaw.com
T: 212-335-2030
F: 212-335-2040

December 31, 2024

**VIA ECF**

Hon. Valerie E. Caproni
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

**Re: *United States v. Tal Alexander*, Docket No. 24-CR-00676 (VEC)**

Dear Judge Caproni:

We represent defendant Tal Alexander in the above matter. Mr. Alexander respectfully submits this letter requesting revocation of the detention order entered by the Honorable United States Magistrate Judge Lisette M. Reid in the Southern District of Florida on December 17, 2024 (the "Detention Order") pursuant to 18 U.S.C. § 3145(b), and reconsideration of bail. *See* 24-MJ-04544 (LMR) (S.D. Fla.), ECF No. 24. Magistrate Judge Reid found that Mr. Alexander's proposed bail conditions alleviated any potential danger to the community but could not ensure Mr. Alexander's return to court. *Id.* at 2. As set forth below, Mr. Alexander's proposed bail package more than ensures his appearance in this Court. To the extent the Court is not satisfied by the conditions considered by the Magistrate, we offer additional conditions that warrant reconsideration of releasing Mr. Alexander on bail. We further request a brief hearing at which we can present these conditions to the Court. The government opposes the relief requested in this motion.

In short, Mr. Alexander has known of the criminal investigation leading to this indictment as early as July 2024 and, as the government has conceded, has made no attempt or plans to flee since then. Mr. Alexander proposes an expansive bail package, including, among other conditions, a $115 million bond secured by four properties owned by himself and family members and by the entirety of his parents' assets, and home detention with around-the-clock private armed security and GPS monitoring, as described in greater detail below. Because these conditions eliminate any risk of flight or potential danger to the community, the Court should revoke the detention order and impose Mr. Alexander's proposed bail conditions.

## A. Procedural History

On December 11, 2024, the government unsealed an indictment in this Court charging Mr. Alexander with one count of Conspiracy to Commit Sex Trafficking, pursuant to 18 U.S.C. § 1594(c), and two counts of Sex Trafficking, pursuant to 18 U.S.C. § 1591. *See* 24-CR-00676, ECF No. 3. That day, Mr. Alexander was arrested at his parents' home in Miami Beach, Florida. When law enforcement officers arrived at Mr. Alexander's parents' home to place him under arrest, he voluntarily met them at the end of the driveway to surrender himself and complied with their

instructions. Later that day, Mr. Alexander made a first appearance in the Southern District of Florida. The government moved for pretrial detention.

Two days later, on December 13, 2024, a detention hearing was held before Magistrate Judge Reid (the "Detention Hearing"). Mr. Alexander offered an extensive bail package, which included: (i) $115 million bond secured by four properties owned respectively by Mr. Alexander, his parents Schlomo and Orly Alexander, and his brothers Oren and Alon Alexander who are codefendants in this matter (the "Codefendants"), (ii) surrender of his U.S. passport, and (iii) home detention with GPS monitoring at his parents' home in Bal Harbour, Florida with his wife and infant child.

At the hearing, the government called FBI Special Agent Justine Atwood as a witness. Prior to cross examination and again at the end of the hearing, Mr. Alexander requested Jencks material, including any reports prepared by Special Agent Atwood, pursuant to 18 U.S.C. § 3500(b) and as required by Fed. R. Crim. P. 46(j). At no point during or after the hearing did the government turn over the requested Jencks material. Magistrate Judge Reid stated that if there was any material in the Jencks disclosures that warranted further review, the hearing could be reopened or the material presented on appeal. 24-CR-04544 (LMR) (S.D. Fla.), ECF No. 28-1 ("Detention Hrg. Tr."), 6:3-7; 16:25-17:6.

At the conclusion of the hearing, the Court issued an order detaining Mr. Alexander, in which it found that the conditions offered alleviated any potential risk of danger to the community, but that there was a risk of flight pursuant to 18 U.S.C. § 3142(e). The Court stated that "[t]his family has, however, extensive resources that I am not, at this point, aware of exactly where the 115 million dollars is substantial for them as it is for some." Detention Hrg. Tr., 73:7-9.

On December 16, 2024, Mr. Alexander filed a motion to reopen the detention hearing and stay removal to the Southern District of New York. *See* 24-MJ-04544 (LMR) (S.D. Fla.), ECF 22. Mr. Alexander sought to reopen the hearing to (i) cross examine the government's witness with Jencks material to be disclosed by the government, which Mr. Alexander had not received at the hearing (and still has not received); (ii) offer a comprehensive financial statement showing Mr. Alexander's family's assets to allay concerns raised by the Court regarding his means to flee (which could not have been prepared in the two days before the hearing); (iii) propose the bond be secured by entirety of Mr. Alexander's parents' assets; (iv) propose a condition of private security at the location of home detention (which also could not have been arranged in the time before the hearing), and (v) clarify the government's misstatement that Mr. Alexander could not be extradited from Israel. *Id.* The government opposed, and on December 20, 2024, the Court issued an order denying the motion. *Id.*, ECF No. 32.

On December 24, 2024, the defendant requested that this Court stay removal to the Southern District of New York so that Mr. Alexander could remain in custody in Florida and meet with counsel to assist in the preparation of the instant motion. 24-CR-00676, ECF No. 9. On December 30, 2024, the Court granted the request for a stay until the earliest of January 6, 2024, or the date on which an order of removal was issued for either of the Codefendants. ECF No. 13.

**B. New Proposed Bail Conditions**

Mr. Alexander proposes the following bail conditions and will be amenable to any modifications to this proposal imposed by the Court. As referenced above, this package includes conditions presented at the Detention Hearing and additional measures that Mr. Alexander proffered in his motion to reopen the detention hearing on December 16, 2024 (*see* ECF No. 22, 28), which Magistrate Judge Reid erroneously denied. *See* ECF No. 32. Also, as you will see below, there are several newly enhanced conditions (*see* (a)(vi), (c), (d), (e), (f)(i)-(iv)). These proposed conditions eliminate any concerns regarding danger to the community and ensure Mr. Alexander's appearance in this Court.

a. $115 million bond, co-signed by Mr. Alexander's parents, Shlomo and Orly Alexander, and secured by the equity in:
   i. Mr. Alexander's home located in Miami Beach;
   ii. Shlomo and Orly Alexander's home located in Bal Harbour;
   iii. Oren Alexander's home located in Miami Beach;
   iv. Alon Alexander's home located in Miami Beach;
   v. An office building owned by Shlomo and Orly Alexander located in Miami; and
   vi. The entirety of Shlomo and Orly Alexander's assets.[1]

b. Surrender of Mr. Alexander's U.S. passport, which is the only passport he has;

c. Surrender of Mr. Alexander's parents' U.S. and Israeli passports;

d. Execute waivers of extradition;

e. Home detention with GPS monitoring. Mr. Alexander is able to serve home detention in Miami at either his parents' or his Miami Beach home, at his apartment in Manhattan where he has a lease, or at any other location that is amenable to the Court;

f. Requirement that private armed security be stationed at the location of home detention at all times (24 hours per day, every day) to ensure Mr. Alexander cannot leave the premises and complies with the conditions imposed by the Court. This requirement includes the following conditions:
   i. Private security personnel will be present at the location of home detention 24 hours per day, every day;
   ii. Private security will install video cameras and door and window sensors and alarms, which they will monitor;
   iii. Private security will wiretap and monitor Mr. Alexander's phone and computer activity and report to the Court any violations of his bail conditions;

[1] We are prepared to submit Shlomo and Orly's financial statements under seal for the Court's review; the Government did not oppose a similar submission under seal for Alon Alexander during a December 30, 2024 detention hearing. *See* 24-MJ-04616 (EIS), ECF No. 14 (S.D. Fla.).

      iv. Private security personnel will accompany Mr. Alexander for any necessary travel away from home detention as described below; and

v. Mr. Alexander will pay for all private security services.

g. Access to the home will be restricted to a list of visitors approved by Pretrial Services, none of which will be non-family female visitors;

h. Authorization for the government to search the location of home detention at any time to ensure his compliance with his bail conditions;

i. Necessary travel for medical appointments and court appearances, limited to the Southern District of Florida and the Southern District of New York;

j. Requirement that Mr. Alexander have no contact with the Codefendants except in the presence of counsel, and no contact at all with any alleged victims or witnesses in the case;

k. Subject to pretrial supervision; and

l. Any other conditions the Court deems appropriate.

This stringent combination of conditions wholly alleviates the Government's and the Magistrate Judge's stated concerns with respect to the risk of flight. These conditions also reasonably ensure the safety of the community, as Magistrate Judge Reid found.

## C. Argument

A district court "conducts a *de novo* review of a magistrate judge's decision to release or detain a defendant pending trial." *United States v. Esposito*, 309 F. Supp. 3d 24, 30 (S.D.N.Y.), *aff'd*, 749 F. App'x 20 (2d Cir. 2018) (citing *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985)). When deciding whether to detain a defendant before trial, the Second Circuit has explained that "the court should bear in mind that it is only a limited group of offenders who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987). Indeed, the Bail Reform Act requires that the Court impose "the least restrictive . . . condition, or combination of conditions, that will . . . reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(c)(1)(B).

Although there is a presumption of detention in all sex trafficking cases, this presumption is rebuttable, as Mr. Alexander successfully does here. Initially, the presumption requires the defendant to meet a "burden of production," while the "burden of persuasion" remains with the Government. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). A defendant satisfies his burden by offering "evidence that he does not pose a danger to the community or a risk of flight." *Id.* If this burden is met, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *Id.*

A prior determination that a defendant should not be released on bail does not preclude the Court from reconsidering the decision in light of new information. To the contrary, a bail hearing "may be reopened . . . at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the

issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f).

In addition, courts in this district have also found that a district court may revisit a decision on bail pursuant to its own inherent authority, even in the absence of new information not known to the movant at the original hearing. *See, e.g., United States v. Maxwell*, 510 F. Supp. 3d 165, 169 (S.D.N.Y. 2020) ("A court may also revisit its own decision pursuant to its inherent authority, even where the circumstances do not match § 3142(f)'s statutory text."); *United States v. Rowe*, No. 02-CR-756 (LMM), 2003 WL 21196846, at *1 (S.D.N.Y. May 21, 2003) ("[A] release order may be reconsidered even where the evidence proffered on reconsideration was known to the movant at the time of the original hearing."); *United States v. Petrov*, No. 15-CR-66 (LTS), 2015 WL 11022886, at *3 (S.D.N.Y. Mar. 26, 2015) (recognizing the "Court's inherent authority for reconsideration of the Court's previous bail decision").

**1. The Proposed Bail Package Eliminates Any Risk of Flight**

Magistrate Judge Reid's detention order relied on her finding that the bail conditions proposed at the Detention Hearing could not reasonably ensure Mr. Alexander's return to Court. On the record before the Magistrate Judge, this decision, respectfully, is wrong. Mr. Alexander offered significant bail conditions, demonstrated very strong ties to the community, and showed that any connection to foreign jurisdictions is, at most, tenuous. Nonetheless, Mr. Alexander's additional proposed conditions offered in his motion to reopen the hearing, submitted on December 16, 2024, which the Magistrate Judge did not consider, addressed any lingering concerns regarding risk of flight. Moreover, the newly enhanced bail conditions set forth in Section B in this letter (*see* (a)(vi), (c), (d), (e), (f)(i)-(iv)) completely alleviate any flight concerns. We address each of these issues in turn.

***a. Mr. Alexander did not flee after learning of this criminal investigation.***

Critically, Mr. Alexander knew of the criminal investigation that led to this indictment since July 8, 2024, when it was reported in the Wall Street Journal.[2] Since that date, Mr. Alexander made no attempt or plans to flee. The government's witness at the Detention Hearing, Special Agent Atwood, admitted as much. Detention Hrg. Tr., 28:13-17.

Moreover, had the government given Mr. Alexander the opportunity to voluntarily surrender, we would have promptly complied. As Special Agent Atwood testified at the Detention Hearing, Mr. Alexander was in New York City the day before he was arrested. Detention Hrg. Tr., 37:9-16. Instead of allowing Mr. Alexander to surrender while he was in New York or arresting him there, the government waited until he flew to Miami to effectuate the arrest.[3] Even

[2] Emily Glazer and Katherine Clarke, "FBI Probing Rape Allegations Against Star Real-Estate Brokers," THE WALL STREET JOURNAL (Jul. 8, 2024), https://www.wsj.com/us-news/fbi-probing-rape-allegations-against-star-real-estate-brokers-482fbab9.

[3] At the Detention Hearing, the government falsely proffered that Mr. Alexander routinely travels "at a moment's notice" and that "he is sitting here in the Southern District of Florida today because it was not a planned trip." Detention Hrg. Tr. 51:6-9. Mr. Alexander's travel on December 10, 2024, from New York to Miami with his wife and infant son was not a last minute, eleventh-hour escape. Mr. Alexander had previously planned to spend several weeks in Miami with his family.

so, when law enforcement officers arrived at Mr. Alexander's parents' home to place him under arrest, he voluntarily met them at the end of the driveway to surrender himself, as Special Agent Atwood conceded, and fully complied with their directions. *Id.*, 29:7-9.

***b. Mr. Alexander has very strong ties to the United States, including New York City.***

It is not disputed that Mr. Alexander has longstanding roots in the United States. He was born and raised in Miami, Florida and has lived between Miami and New York City for nearly his entire life. He attended high school in Miami, and then Hofstra University in New York from 2004 to 2008. In 2022, Mr. Alexander co-founded Official Partners, a real estate firm that operates in New York and Florida. Prior to that, he worked at Douglas Elliman for a decade, which is also based in Florida and New York. Most significantly, he has a newborn son and a wife who also owns and runs a successful business and has significant ties to the local community.

Mr. Alexander also maintains a strong connection to his friends and family in the United States. At the Detention Hearing, over 15 family members, friends, and community members appeared in the courtroom in support of his release.

To clarify a point in the government's detention letter, the government's assertion that Mr. Alexander and his brothers purchased a private jet is false. *See* ECF No. 4 at 11 n.7. Neither Mr. Alexander nor his family members own a private jet. At the Detention Hearing, Special Atwood conceded this fact. Detention Hrg. Tr., 29-13-21 ("They do not have their own private jet."). Although one of Mr. Alexander's brothers owns a seaplane, Mr. Alexander does not, and none of the brothers has access to it as it is leased to an operator, Tropic Air. This Court can order Tropic Air to place the brothers on an internal no-fly list and to deny them access for the duration of this case.

***c. The government's assertion that Mr. Alexander has foreign ties is tenuous at best.***

The government has repeatedly attempted to sow concern regarding risk of flight because of Mr. Alexander's family's purported ties to Israel. *See, e.g.*, ECF 4 (asserting defendants have "significant foreign ties, particularly to Israel"); Detention Hrg. Tr., 67:16-17 ("[W]e have confirmed with OIA that if he flees we can't get him back."); *Id.*, at 51:19-24 ("The fact that his parents are Israeli, the fact that he has traveled back to Israel, the fact that we have conferred with OIA and they have indicated that if he does flee there, which has happened in the past, that they are not going to be able to extradite him back and that is not a sure thing."). These fears are speculative and grossly overstate any potential risk of flight to a foreign jurisdiction. Mr. Alexander only has citizenship in the United States, where he was born and has lived his entire life.

The government's apparent basis for their reliance on foreign ties is that Mr. Alexander's parents emigrated to the United States from Israel in 1975, nearly 50 years ago. The government fails to recognize, though, that his parents were naturalized as U.S. citizens in 1983, before Mr. Alexander was born. The government also ignores the substantial and longstanding ties to United

States that the family has developed over the last 50 years. Mr. Alexander's parents attended the University of Miami. All three brothers are U.S. citizens having been born in Miami. They have nearly 40 family members in the Miami area alone and are active in their neighborhood and community.

Even if there was a risk of flight to Israel, Israel has an extradition treaty with the United States and Mr. Alexander proposes to execute a waiver of extradition as part of his bail package. Israel will grant extradition where an individual has been charged or convicted of a felony and where—like here—the conduct at issue is a criminal offense in both the requesting country and Israel. Under the extradition treaty, Israel extradites not only United States citizens, like Mr. Alexander, but also its own citizens to the United States for certain offenses. *See United States v. Samet*, 11 F. App'x 21, 22 (2d Cir. 2001) (granting defendant's motion for remand to reconsider detention where "district court erroneously assumed that Israel does not extradite Israeli residents"); *United States v. Kresler*, 392 F. App'x 765, 768–69 (11th Cir. 2010) ("[T]he United States Attorney was under the mistaken belief that Israel would not extradite one of its citizens.").

For example, in *United States v. Rosenstein*, the United States Attorney's Office for the Southern District of Florida successfully extradited an Israeli citizen from Israel in a drug trafficking prosecution. *See* 04-CR-21002, Dkt. 18 (S.D. Fla. April 12, 2006). There, the government requested that the defendant be detained, and the court set a $10 million bond. *Id; see also United States v. Shai Cohen*, 16-CR-00114, Dkt. 9 (E.D.Va.) (documenting the extradition of an Israeli citizen charged with conspiracy to defraud, money laundering and alien smuggling).[4]

Mr. Alexander is a United States citizen who has substantial family and business ties in the United States and has no history of flight or intentions to flee. He does not hold citizenship in any other country, including Israel, and has not visited Israel in at least three years. We are aware of no case where a court has held that a defendant, who is a United States citizen since birth, was more likely to flee because of Israeli ancestry.

***d. The newly proposed bail conditions address any remaining flight concerns.***

In the Southern District of Florida, Mr. Alexander sought to reopen the detention hearing to present additional information and bail conditions he was not able to present at the initial hearing. 24-MJ-04544 (LMR) (S.D. Fla.), ECF No. 22. Specifically, at the conclusion of the Detention Hearing, Magistrate Judge Reid sua sponte raised concerns about Mr. Alexander's family's means beyond the $115 million offered to secure the bond. Detention Hrg. Tr., 73:7-9 ("This family has, however, extensive resources that I am not, at this point, aware of exactly where the 115 million dollars is substantial for them as it is for some."). In the two days prior to the hearing, Mr. Alexander, who was detained, was not able to prepare a comprehensive financial statement of his family's assets. As well, Mr. Alexander was not able to confirm in the two days before the hearing whether he could arrange for and pay for full-time private home security. With

---

[4] A Google search turns up numerous cases where defendants have been extradited from Israel for prosecution in the United States. *See, e.g.,* https://www.washingtonpost.com/local/public-safety/israel-extradites-accused-russian-computer-hacker-to-united-states/2019/11/12/e40f84ca-057b-11ea-8292-c46ee8cb3dce_story.html; https://archives.fbi.gov/archives/miami/press-releases/2013/fbi-announces-the-extradition-of-a-fugitive-from-israel.

the benefit of more time, he sought to reopen the hearing to present this information to the Court. This request was denied. *Id.*, ECF No. 32. Nevertheless, Mr. Alexander requests this Court to consider these two key additional measures and the additional enhancements in Section B of this letter, which together eliminate any reasonable risk of flight.

***First***, Mr. Alexander's parents will offer the entirety of their assets to secure the bond. In support of this proposal, we will present a comprehensive financial statement for the Court's in camera review to provide visibility into Mr. Alexander's family's financial condition. This new information and Mr. Alexander's parents' offer to put up all that they own to secure the bond are substantial steps to alleviate any concerns regarding risk of flight.

***Second***, Mr. Alexander proposes to retain a private security company to provide around-the-clock armed security services at the location where he serves home detention. Mr. Alexander will pay for these services, but the security company will take direction from, enforce the conditions imposed by, and report to the Court only. The security company will, among other things, install in and around the residence video cameras and door and window sensors and alarms, monitor Mr. Alexander's phone and computer activity, and ensure that armed security professionals will be present to guard Mr. Alexander at the location of home detention 24 hours per day, every day. On top of these security measures, Mr. Alexander will also submit to GPS monitoring.

The Second Circuit has recognized that for defendants whose means raise concerns regarding the risk of flight, the condition of private armed security in conjunction with home detention is a way to ensure the defendant's return to court. *See United States v. Sabhnani,* 493 F.3d 63, 75 (2d Cir. 2007) (holding that court may release a defendant subject to conditions of home confinement in which, among other things, the defendant pays for private armed security guards). Private home security "may be appropriate where the defendant is deemed to be a flight risk primarily *because of* his wealth." *United States v. Boustani*, 932 F.3d 79, 82 (2d Cir. 2019) (emphasis in original); *see also Esposito*, 309 F. Supp. 3d at 32 (ordering private home security for defendant with significant means).

For example, in *United States v. Ng Lap Seng*, Dkt. 15-CR-706 (S.D.N.Y.), a Magistrate Judge set bail at the defendant's arraignment in the amount of $50 million personal surety bond secured by $20 million cash and property in New York City, with the defendant's presence to be secured by a company. The government's appeal to the District Court and request for detention was denied, but the District Court imposed increased conditions, which were adhered to by the security service provider. *Id.*, ECF No. 53.

As another example, in *United States v. Jeffrey Webb*, 15-CR-252 (RJD) (E.D.N.Y.), the defendant was arrested abroad on charges of racketeering conspiracy, wire fraud, and money laundering and waived extradition to return to the Eastern District of New York. The court set bail under the following conditions: $10 million bond secured by signatures of ten sureties, properties in Pennsylvania, Georgia, Florida, and the Cayman Islands, and a partnership interest in a P.C.; home detention with electronic monitoring at a family apartment within 20 miles of the courthouse and thereafter at his family residence in Georgia; surrender of passports; private security service

to monitor the defendant's physical location, 24 hours per day, 7 days per week, at both the initial location near the courthouse and later in Georgia. *Id.*, ECF No. 65.

As a third example, in *United States v. Ludwigsen*, 99-CR-520 (ERK), ECF Nos. 207, 236, 304 (E.D.N.Y.), the court approved a bail package including private home security for a defendant arrested in the Southern District of Florida on an indictment charging racketeering (murder) conspiracy in the Eastern District of New York. Over the government's objection, the court approved the defendant's release setting conditions including a multi-million-dollar personal surety bond, surrender of passport, house arrest, and a private security guard to monitor all entries into and exits from the home. *Id.*

Revoking the detention order would not implicate the concerns of a "two-tiered bail system" explained in *Boustani*. 932 F.3d at 82. Rather, it fits squarely within the scenario the Second Circuit described as appropriate for private security. "[A] defendant may be released on such a condition only where, *but for* his wealth, he would not have been detained." *Id.* With all of the other bail conditions Mr. Alexander has proposed, if not for Mr. Alexander's wealth, he would not be considered a flight risk. Indeed, the government's position on risk of flight rests almost entirely on Mr. Alexander's means. The condition of private security addresses this concern and does not foster inequality.

**2. Mr. Alexander Does Not Pose a Danger to the Community**

Under the proposed bail conditions, Mr. Alexander poses no danger to the community, as Magistrate Judge Reid found.[5] Detention Hrg. Tr., 73:19-22 ("With respect to danger to the community, I will find that there are conditions and some combination of conditions that could alleviate the danger to the community. So that is not my area of concern."). Mr. Alexander has no criminal history and has never been arrested. The indictment also charges conduct ending in 2021. There are no allegations of any criminal activity, let alone any allegations posing a danger to anyone, after 2021. Home detention with GPS monitoring, private armed security, restrictions on communications, and a Pretrial Services approved list of permitted visitors more than ensures that Mr. Alexander does not pose any danger to the community.

In addition, there is no credible evidence that Mr. Alexander intimidated or threatened potential witnesses. In fact, the proof is so lacking on this issue that the government has highlighted instances where Mr. Alexander once filed a police report alleging harassment by a potential accuser, and on another occasion considered filing a defamation lawsuit after an accuser spread falsehoods. *See* ECF No. 4 at 7.

The government further relies heavily on the purported weight of the evidence in this case. However, the indictment, although intended to be a "speaking indictment" (Detention Hrg. Tr.,

[5] On December 30, 2024, United States Magistrate Judge Eduardo I. Sanchez, of the Southern District of Florida, presided over a detention hearing for Codefendant Alon Alexander, and found that a substantially similar bail package satisfied the Court with respect to assuring the safety of the community. *See* 24-MJ-04616 (EIS) (S.D. Fla.). The hearing was adjourned to January 3, 2025, for the Court's decision on risk of flight.

19:16-25), is entirely vague, and nearly boilerplate in its allegations. The government's detention letter and witness called at the Detention Hearing provided little more information, other than general references to anticipated testimony, number of potential victims interviewed, electronic devices that were collected, and certain text messages, which on their face, do not show criminality. *See* ECF No. 4. Moreover, as noted above, the alleged conduct occurred a very long time ago, which undermines the purported strength of the case, especially for sexual assault allegations. Count 2, for example, charges an incident that allegedly occurred in the summer of 2011, over 13 years ago. The most recent specific date provided in the indictment is September 2016, under Count 3, which is over 8 years ago.

Even if Mr. Alexander were a danger to the community or a risk for witness intimidation, the proposed bail conditions completely account for any of these concerns. Mr. Alexander would be subjected to around-the-clock private security, have a restricted Pretrial Services-approved visitor list which would not include any non-family female visitors, and his calls and computer activity would be monitored. With these proposed conditions, the Court should find, as the Magistrate Judge did on less restrictive measures, that Mr. Alexander is not a danger to the community.

**3. The Government Failed to Produce Required Jencks Material**

This Court should also consider that the government did not, and still has not, produced Jencks material relating to the witness it called at the Detention Hearing in violation of its obligations under 18 U.S.C. § 3500(b) and as required by Fed. R. Crim. P. 46(j). As a result, Mr. Alexander was deprived of the opportunity to conduct a meaningful and fair cross examination of Special Agent Atwood, the government's only witness. The Court should order the government to disclose this material.

The government should not have been permitted to bypass its statutory obligations, as was permitted before Magistrate Judge Reid. Rule 46(j) of the Federal Rules of Criminal Procedure requires a party to produce Jencks material for a witness it calls at a detention hearing. Rule 46(j) provides that "Rule 26.2(a)–(d) and (f) applies at a detention hearing under 18 U.S.C. §3142, unless the court for good cause rules otherwise." Rule 26.2(a) states that "[a]fter a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, must order an attorney for the government or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony." If the government fails to abide by these requirements, "the court must not consider that witness's testimony at the detention hearing." Fed. R. Crim. P. 46(j)(2).

Courts in the Southern District of Florida, which employs the practice of requiring testimony at detention hearings instead of proceeding only by proffer, require disclosure of Jencks material in these circumstances. *See, e.g.*, *U.S. v. Comas*, No. 13-CR-20850, 2014 WL 129296, at *1 (S.D. Fla. Jan. 14, 2014) (requiring government to disclose Jencks material of federal agent who testified at pretrial detention hearing); *United States v. Wang*, No. 6:23-CR-188-RBD-RMN, 2023 WL 6446084, at *2 (M.D. Fla. Oct. 3, 2023) (requiring government to disclose grand jury testimony of officer called as witness at detention hearing); *United States v. Diaz Guillen*, No. 18-

CR-80160, 2022 WL 4119741, at *1 n.2 (S.D. Fla. Sept. 9, 2022) (continuing detention hearing to second day to address Jencks issues with respect to government witness).

In addition, Magistrate Judge Reid made no finding of good cause to relieve the government of its obligations under Fed. R. Crim. P. 46(j). The Court expressly stated that it "need not rule on whether *Jencks* should have been produced to make its determination as to whether to reopen this detention proceeding." 24-MJ-04544 (LMR) (S.D. Fla.), ECF No. 32 at 6. The Court should consider that Mr. Alexander did not receive statutorily-required material for use at the hearing and that Magistrate Judge Reid made no finding of good cause as to why it should not be disclosed.

As just one example of key testimony that Mr. Alexander did not have the opportunity to confront, Special Agent Atwood testified at the Detention Hearing that she did not know when the last alleged act of the sex trafficking conspiracy charged in Count 1 occurred. She claimed it was in 2021 but could not state in what month it occurred. She testified: "I have interviewed multiple women. So I would have to go back to my notes. I don't have that with me now." Detention Hrg. Tr., 21:19 – 22: 4. These notes constitute Jencks material and would clearly have given clarity to when the alleged conspiracy ended. This is critical to a statute of limitations defense and speaks directly to the weight of the evidence in this case, a Section 3142(g) factor that the Magistrate Judge should have considered in deciding whether to detain Mr. Alexander.

**4. The Conditions of Metropolitan Detention Center Favor Releasing Mr. Alexander**

This Court may also consider, as other courts in this district have, that the conditions at Metropolitan Detention Center in Brooklyn ("MDC") are not fit for pre-trial detention. In *United States v. Chavez*, 710 F. Supp. 3d 227, 228 (S.D.N.Y. 2024), the court described the conditions at MDC as "dreadful" and "longstanding" and observed that issues with food contamination, "near-perpetual lockdowns," and hazardous physical conditions were an "ongoing tragedy." At least four inmates have died by suicide at MDC in the last four years. *Id.* "It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable." *Id.* at 229; *see also United States v. Morgan*, 19-CR-209 (RMB) (S.D.N.Y. May 5, 2020), Dkt. 90, Tr. 12-15 (describing the MDC as "dirty," "infested with drugs," and plagued by violence); *United States v. Boyd*, No. 21-CR-486 (SHS), 2022 WL 790771, at *2 (S.D.N.Y. Feb. 3, 2022) (finding "exceptional reasons militating against [defendant's] detention pre-sentencing" due to MDC conditions, including overcrowding, staffing issues, and lockdowns); *United States v. Days*, 19-CR-619 (CM) (S.D.N.Y. Apr. 29, 2021), Dkt. 35, Tr. 19 (describing MDC conditions during COVID-19 pandemic as "disgusting [and] inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that").

Courts in the Eastern District of New York have expressed similar concerns and adjusted sentences accordingly. *See United States v. Forbes*, 22-CR-97 (RK) (E.D.N.Y.) (MDC's condition as one factor in sentencing defendant to non-custodial sentence); *United States v. Colucci*, 23-CR-417 (GRB) (E.D.N.Y. Aug 5, 2024) (sentencing defendant to nine months in prison, but ordering that if BOP designated the defendant to the MDC, the Court would vacate the sentence and resentence to home incarceration.).

**D. Conclusion**

For the reasons set forth above, we respectfully move this Court to revoke the detention order issued by the Magistrate Judge and release Mr. Alexander under the conditions proposed above. We also respectfully request a hearing to present evidence relating to the additional conditions stated herein. Thank you for your consideration.

Respectfully submitted,

*/s/ Milton L. Williams*

Milton L. Williams
Deanna Paul
Alexander Kahn
*Attorneys for Defendant Tal Alexander*

cc: All counsel via ECF