UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    v.                                                    24-00676-VEC

ALON ALEXANDER, OREN
ALEXANDER, and TAL ALEXANDER,

    Defendants.
_____/

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO THE TENTH AMENDMENT AND BASED ON SELECTIVE PROSECUTION

Defendant Alon Alexander, through counsel, respectfully moves to dismiss the indictment on the grounds of unconstitutional selective prosecution in violation of the Fifth Amendment and based on the improper assertion of jurisdiction exceeding the scope of the statute permitted under the Tenth Amendment. Counsel for Oren Alexander and Tal Alexander represent that they adopt the instant motion. Defendants further state:

The indictment charges conspiracy to commit sex trafficking, substantive sex trafficking, Mann Act counts, and party rape on the high seas. The defense has reviewed the discovery provided by the government in this matter and has been unable to ascertain why voluminous photos and videos of women partying and having sex (when there are no allegations that the sex was paid for, that the defendants profited off the sex, that any videos were sold, or any other indicia of commercial transactional activity alleged) support a sex trafficking conspiracy indictment. The allegations as vaguely characterized in the conspiracy count of the indictment (the only count that includes *any* factual allegations) plainly describe date rape or party rape: matters Congress has left to the states.

There is no basis for the expansion of federal jurisdiction into the state-regulated conduct alleged here. The government, in prosecuting this case, has used commercial sex trafficking statutes

to reach social-context sexual assault—crimes for which regulation involves complex challenges that Congress has deemed best left to the States in exercise of their police power. This intrusion on a state sphere of conduct violates the Tenth Amendment. And the arbitrary and selective prosecution of date rape—whether under the trafficking or any other theory—against these defendants violates their Fifth Amendment due process rights which incorporate equal protection. The Indictment must be dismissed.

Defendants further move for discovery in support of their selective prosecution claim.

**I. The Sex Trafficking Statutes**

The government has said, in defending its theory of prosecution in a recent argument before the Second Circuit, "I think we have to look specifically at Congress's intent in passing this particular act." 2d Cir. No. 25-222 (audio of 6/10/25 oral arg.) at 29:44. This is perhaps the only significant matter in this case on which the defense and the government agree.

The plain text of 18 U.S.C. § 1591 requires a *commercial* sex act, and the language of the statute is written to apply to the commercial sex industry. The Trafficking Victims Protection Act was never intended to apply to social-context rape— or even to forcible rape. When it was first introduced in Congress, one of the bill's principal drafters made clear that the "central principle" behind the Act was that "criminals who knowingly operate enterprises that profit from sex acts involving persons who had been brought across international boundaries for such purposes by force or fraud, or who force human beings into slavery, should receive punishments commensurate with the penalties for kidnapping and forcible rape." 146 Cong. Rec. H2675-01, 146 Cong. Rec. H2675-01, H2684, 2000 WL 561118. This statement made abundantly clear that the proposed legislation addressed conduct *distinct from forcible rape*. *See also* 2d Cir. No. 25-222 (trans. of 6/10/25 oral arg.) at 26:26 (Court states: "I'm just a little puzzled by it, that a woman who's held

down and screaming is engaging in a commercial sex act . . . . So how I mean? It just puzzles me.").

Section 1591 was first introduced in the House of Representatives on November 8, 1999, as H.R. 3244: "A bill to combat trafficking of persons, especially into the sex trade, slavery, and slavery-like conditions in the United States and countries around the world," through, among other things "prosecution and enforcement against traffickers." 145 Cong. Rec. H11702-01, 145 Cong. Rec. H11702-01, H11702, 1999 WL 1012053 (Nov. 8, 1999). The Act was the result of a bipartisan and bicameral effort to target international sex trafficking. The principal drafters of the legislation were United States Representatives Christopher Smith, R-NJ, and Samuel Gejdenson, D-Conn.; and United States Senators Samuel Brownback, R-Kan., and Paul Wellstone, R-Minn.

The purposes of the Act were "*to combat trafficking in persons, a contemporary manifestation of slavery*." H.R. Rep. 106-487 at 1 (emphasis added). Drafters noted that "[t]he sex industry has rapidly expanded over the past several decades. It involves sexual exploitation of persons, predominantly women and girls, within *activities related to prostitution, pornography, sex tourism, and other commercial sexual services*." *Id*. at 2 (emphasis added). "The rapid expansion of the sex industry" was a driving factor behind the legislation, along with the fact that human trafficking was "perpetrated increasingly by *organized and sophisticated criminal enterprises*" and described as the "*fastest growing source of profits*" for such enterprises "worldwide." *Id*. (emphasis added). The legislation was intended to address concerns that "trafficking networks, dominated by organized criminal groups, lure or force victims into the industry using various schemes," *id*. at 15, including "false promises of good working conditions at relatively high pay as nannies, maids, dancers, factory workers, restaurant workers, sales clerks, or models"; or "buy girls from poor families and sell them into prostitution." *Id*.

The drafters further explained the intent behind the legislation in floor debates. Rep. Smith

said that the Act was designed to focus "on the most severe forms of trafficking in human beings: on the buying and selling of children into the international sex industry, on sex trafficking of women and children alike by force, fraud, or coercion, and on trafficking into slavery, involuntary servitude, and forced labor." 146 Cong. Rec. H2675-01, 146 Cong. Rec. H2675-01, H2684, 2000 WL 561118.

The Act was designed to address a specific problem—"that current laws and enforcement strategies in the U.S. and other countries often punish the victims more severely than they punish the perpetrators." *Id*. "When a sex-for hire establishment is raided, the women and sometimes children in the brothel are typically deported if they are not citizens of the country in which the establishment is located, without reference to whether their participation was voluntary or involuntary, and without reference to whether they will face retribution or other serious harm upon return." 146 Cong. Rec. H2675-01, 146 Cong. Rec. H2675-01, H2684, 2000 WL 561118.

In a later floor debate, Sen. Wellstone would cite a comparator case as an impetus for the legislation, noting that "[i]n a Los Angeles case, traffickers kidnapped a Chinese woman, raped her, forced her into prostitution, posted guards to control her movements, and burned her with cigarettes. Nevertheless, the lead defendants received 4 years and the other defendants received 2 and 3 years." 146 Cong. Rec. S10164-02, S10168, 2000 WL 1509753.

As the sex trafficking legislation moved its way through Congress, lawmakers took care in the drafting of the interstate nexus purpose and findings. After the original bill cleared its first committee, the House judiciary committee added language that "trafficking in persons involving slavery-like labor practices substantially affects interstate and foreign commerce" and that "the United States must take action to eradicate the substantial burdens on commerce that result from trafficking in persons and to prevent the channels of commerce from being used for immoral and injurious purposes." 146 Cong. Rec. S7925-02, S7939, 2000 WL 1079590. Notably, the Senate

version of the bill, after amendments, included various changes to this provision:

"Trafficking in persons substantially affects interstate and foreign commerce. Trafficking for such purposes as involuntary servitude, peonage, and other forms of forced labor has an impact on the nationwide employment network and labor market. Within the context of slavery, servitude, and labor or services which are obtained or maintained through coercive conduct that amounts to a condition of servitude, victims are subjected to a range of violations." 146 Cong. Rec. S7925-02, S7939, 2000 WL 1079590. It also noted that "[i]nvoluntary servitude statutes are intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion. In *United States v. Kozminski*, 487 U.S. 950 (1988), the Supreme Court found that section 1584 of title 18, United States Code, should be narrowly interpreted, absent a definition of involuntary servitude by Congress. As a result, that section was interpreted to only criminalize servitude coerced through force, threats of force, or threats of legal coercion." 146 Cong. Rec. S7925-02, 146 Cong. Rec. S7925-02, S7939, 2000 WL 1079590. Sen. Wellstone (one of the principal Senate drafters along with Sen. Brownback) later remarked on the Senate floor that "[t]he statutory minimum for sale into involuntary servitude is only 10 years, whereas the maximum for dealing in small quantities of certain drugs is life." 146 Cong. Rec. S10164-02, 146 Cong. Rec. S10164-02, S10168, 2000 WL 1509753. The statute was plainly meant to address involuntary servitude—or, as relevant here, involuntary sex servitude. It was plainly not meant to address involuntary sex.

Indeed, in a Senate floor debate, Sen. Wellstone noted that a "recent CIA analysis of the international trafficking of women into the United States reports that as many as 50,000 women and children each year are brought into the United States and forced to work as prostitutes, forced laborers and servants." 146 Cong. Rec. S7781-01, 146 Cong. Rec. S7781-01, S7781, 2000 WL 1079347.

In another floor debate, sex trafficking was described as "one of the largest manifestations of modern-day slavery internationally"; as for the legislation, it was characterized as "the largest anti-slavery bill that the United States has adopted since 1865 and the demise of slavery at the end of the Civil War"; and "our best opportunity to challenge the largest manifestation of slavery worldwide, known as 'trafficking.'" *Id.* 146 Cong. Rec. 146 Cong. Rec. S10164-02, 146 Cong. Rec. S10164-02, S10164, 2000 WL 1509753. The legislation characterized trafficking as involving the "coercive transportation of persons into slavery-like conditions, primarily involving forced prostitution," and was hailed as challenging "the myriad forms of slavery including sex trafficking, temple prostitution, and debt bondage, among other forms." *Id*. The sex trafficking industry, drafters said, was the third highest-earning illicit trade, "exceeded only by the international drug and arms trade." *Id*. The victims the legislation was designed to protect: those "enslaved into a devastating brutality against their will, with no hope for release or justice, while its perpetrators build criminal empires on this suffering with impunity." 146 Cong. Rec. S10164-02, 146 Cong. Rec. S10164-02, S10167, 2000 WL 1509753.

As for the sex trafficking statute, the final version of the bill passed the Senate by unanimous vote on October 11, 2000, after clearing the House by a vote of 371-1. *See* 2000 WL 1512324 (U.S. Senator Sam Brownback, R-KS Holds News Conference with Sen. Paul Wellstone, D-MN, on Sexual Trafficking Victims Protection Act Conference Report, Oct. 11, 2000). On October 28, 2000, President Clinton signed the bill into law, stating at the time that "the Act's anti-trafficking provisions represent a major step forward in my Administration's ongoing effort to eradicate modern-day slavery." Statement By the President On HR 3244 10/28/00, 2000 WL 1617225, at *2.

It is highly unlikely that legislation to make date and party rape a federal crime punishable by life in prison, without any statutory time bar, would pass with near-unanimity as did the

legislation establishing section 1591 *et seq*. And when Congress has legislated with respect to prosecution of dating violence and sexual assault, it has generally done so through grants to state prosecutors. *See, e.g.,* 34 U.S.C. § 10441, et seq.; § 10441(b) (Violence Against Women Act formula grant program; identifying purpose for which grant funding may be used as including "developing, training, or expanding units of law enforcement, officers, judges, other court personnel, and prosecutors specifically targeting violent crimes against women, including the crimes of domestic violence, dating violence, sexual assault, and stalking"; setting out other uses relating to that same purpose). This, combined with the clear intent reflected in the legislative history and the text of the sex trafficking statutes, makes it abundantly clear that Congress never intended, or even contemplated, that those statutes would reach the conduct as alleged here. With respect to the plain text of the statute, the government's theory "does seem counterintuitive just in terms of the ordinary meaning of the defined term commercial sex act." 2d Cir. No. 25-222 (audio of 6/10/25 oral arg.) at 29:32.

## II. Legal Argument

Section 1591 did not result from a bargaining chip hastily tacked on to landmark legislation to gain consensus—a scenario in which legislative intent can be difficult if not impossible to discern. It was the landmark legislation. It was carefully thought out, meticulously reviewed by attorneys, and aimed at addressing specific problems. At every stage of the process, Congress made clear precisely what conduct the legislation was designed to reach. And that intent is reflected in the plain text of the statute as enacted. *See United States v. Gayle*, 342 F.3d 89, 94 (2d Cir. 2003) ("As a general matter, we may consider reliable legislative history where, as here, the statute is susceptible to divergent understandings and, equally important, where there exists authoritative legislative history that assists in discerning what Congress actually meant").

Of course there is some wiggle room with respect to what Congress intended and how broadly the law as written may be applied. But the government's theory of the case here exploits more than wiggle room—it is so far from congressional intent that it is not even a viable extrapolation from the scope of conduct contemplated under 18 U.S.C. § 1591. This conceptual disconnect is directly relevant to both the Tenth Amendment and selective prosecution analysis.

### A. The prosecution violates the 10th Amendment

"[A]n individual may 'assert injury from governmental action taken in excess of the authority that federalism defines,'" including when a federal prosecutors charge conduct that "reaches a purely local crime." *Bond v. United States*, 572 U.S. 844, 853, 848 (2014) (citation omitted).

"[O]ur constitutional structure leaves local criminal activity primarily to the statues," and the Supreme Court has "declined to read federal law as intruding on that responsibility, unless Congress has clearly indicated that the law should have such reach." *Id*. The federal sex trafficking statutes "contain[ ] no such clear indication," and thus do not cover the counts charged in the indictment, which alleges sexual assault offenses covered by the State's police power. *Id*.

"In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *Id*. at 854. "The States have broad authority to enact legislation for the public good." *Id*. "The Federal Government, by contrast, has no such authority and 'can exercise only the powers granted to it.'" *Id*. (citing *McCulloch v. Maryland*, 4 Wheat. 316, 405 (1819). "[L]acking a police power, 'Congress cannot punish felonies generally.'" *Id*. (citing *Cohens v. Virginia*, 6 Wheat. 264, 428 (1821)). "A criminal act committed wholly within a state 'cannot be made an offence against the United States, unless it have some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States.'" *Id*. (citing *United States v. Fox*, 95 U.S. 670, 672 (1878)).

The Supreme Court has repeatedly recognized principles of statutory construction that are "grounded in the relationship between the Federal Government and the States under our constitution," including the "well-established principle that 'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' the 'usual constitutional balance of federal and state powers. *Id*. at 857-88 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (in turn quoting *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 243 (1985). "[I]f the Federal Government would radically readjust the balance of state and national authority, those charged with the duty of legislating must be reasonably explicit about it." *Id*. at 858 (cleaned up) (quoting *BFP. v. Resolution Trust Corporation*, 511 U.S. 531 (1994). *See also United States v. Bass*, 404 U.S. 336, 339 (1971) (Where legislation affects "the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision").

The legislative history described above provides a clear answer to this question. Congress in no way intended to bring the conduct charged here—social-context sexual assault, which necessarily involves regulation in a grey area, into the federal sphere, thereby disrupting the balance of state and national authority. Rather, Congress was specific in its intent to command the alternate conclusion: that the sex trafficking statutes were designed to reach a $7 billion illicit trade that involved forcing women and girls into involuntary commercial sex servitude. Whatever one may say about alleged improper sexual excess in the Hamptons, and whatever improprieties that may or may not have occurred there, it is left to the state to determine the appropriate response when all that is alleged is sexual assault in the course of a dating or partying interaction. It is not appropriate for the federal government to expand the reach of the sex trafficking statutes so far that they are implicated whenever a group of 20- and 30-somethings go on vacation and one side of the romantic

equation funds part of the vacation. "Perhaps the clearest example of traditional state authority is the punishment of local criminal activity." *Bond*, 572 U.S. at 858. For that reason, the Supreme Court has said it "will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction.'" *Id*. at 858-59 (citing *Bass*, 404 U.S. at 349). Nor can such assumptions be made here. There is nothing in the text or legislative history of the sex trafficking statutes that suggests Congress meant to cause the sea change in the federal-state balance that is effectuated by the instant prosecution.

"It is appropriate to refer to basic principles of federalism embodied in the Constitution to resolve ambiguity in a federal statute." *Id*. at 859. Principles of federalism easily resolve the question whether the phrase "any sex act, on account of which anything of value is given to or received by any person," 18 U.S.C. § 1591(e)(3) reaches paying for a date or hosting a date on vacation. The plain text of that statutory language also makes clear it does not reach such conduct, as two members of a panel of the Second Circuit recently suggested it may not. 2d Cir. No. 25-222 (audio of 6/10/25 oral arg.).

There is no clear indication in the text of 18 U.S.C. § 1591, *et seq*., or in its legislative history, that it was meant to reach years-old allegations of sexual misconduct that no one ever viewed as commercial—because they were not. Nor is there any such indication in the Mann Act, charged in Counts 4 and 9 of the Indictment, 18 U.S.C. § 2422, was intended to apply to a scenario in which a woman takes a train from New York to New Jersey to go on a date and then claims a decade later sexual impropriety during the date, conduct of which occurred entirely in New Jersey.

Federal prosecution of a traditionally local crime such as this illustrates how a criminal law applied in this manner "may effectively displace a policy choice made by the State." *Jones v. United States*, 529 U.S. 848, 859 (2000) (Stevens, J., concurring). That reality is pertinent here, where there

are instances of relevant state authorities declining to charge and where legislation addressing social context sexual assault necessarily involves emotionally and politically charged policy questions. In its "in its zeal to prosecute" these defendants, *Bond*, 572 U.S. at 865, the federal government has barged into a state regulatory arena to impose a top-down and draconian response to a very difficult policy question of how to appropriately address belatedly raised and uncorroborated allegations such as those in this case. Whatever one may deem the appropriate manner of handling decade-old allegations of date and party sexual assault, "[t]he global need to prevent" commercial sex trafficking "does not require the Federal Government to reach into" social gatherings; thus, the indictment should be dismissed. *Id*. at 846.

### B. The selective prosecution of date rape in this case violates the Fifth Amendment

The selective prosecution of date rape in this case is impermissible under the Fifth Amendment's due process clause. The federal statutes charged here have never been used in this manner to pursue years-old claims of date and party rape.

While "United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws," that discretion is 'subject to constitutional constraints,'" including the Fifth Amendment. *United States v. Armstrong*, 517 U.S. 456, 464 (1996). The decision to prosecute may not be based on an unjustifiable standard or arbitrary classification, *Oyler v. Boles*, 368 U.S. 448, 456 (1962), as it was here. The decision to prosecute the defendants for belated allegations of sexual misconduct in the course of social interactions, when no others—and statistics show there are many, with all handled by the states, without federalizing the matter—are not so prosecuted, violated their Fifth Amendment rights.

To obtain discovery on a selective prosecution claim, defendants need only produce some evidence in support of their claim. *Armstrong*, 517 U.S. at 468. The government violates a

defendant's Fifth Amendment rights when the prosecution has both a discriminatory purpose and a discriminatory effect—that is, when a defendant is "singled out" for prosecution; and when the government's prosecution has been "invidious or in bad faith" within the meaning of the case law. *United States v. Fares*, 978 F.2d 52, 59 (2d. Cir. 1992) (citing *United States v. Moon*, 718 F.2d 1210, 1229 (2d. Cir. 1983). Defendants satisfy that prima facie showing.

The prosecution of these defendants had a discriminatory effect. Statistics demonstrate that allegations of social-context party and date rape is widespread—yet federal punishment via the sex trafficking statutes is unprecedented. There were an estimated 139,815 rapes reported to law enforcement in 2019. *See* FBI, Uniform Crime Report, *Crime in the United States* (2019), available at: https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/rape (last accessed June 15, 2025). Statistics estimate that 51.1 percent of female victims report being raped by an intimate partner and 40.8 percent by an acquaintance. *See* National Sexual Violence Resource, National Intimate Partner and Sexual Violence Survey: 2010 Summary Report (Nov. 1, 2011), available at https://www.nsvrc.org/sites/default/files/2021-04/NISVS_Report2010-a.pdf (last accessed June 15, 2025). This means that an estimated 91.9 percent of the estimated 139,815 rapes, or roughly 128,489 rapes, are of the type alleged in this case—yet the government has never before charged a sex trafficking conspiracy of this nature. This demonstrates discriminatory effect.

Discriminatory intent is also demonstrated. The prosecution also has acted in bad faith throughout the prosecution—misleading the neutral magistrate into issuing a search warrant when it had no evidence of probable cause of any federal crime; violating privilege by illegally accessing materials prepared and shared with counsel to defend against claims, and then using it to build its case against the defendants and to detain them; refusing to turn over *Brady* evidence to which the defendants are entitled; and, worst of all, abusing the grand jury process in furtherance of animus

against the defendants. Notably, the government's straining to charge Count 10 of the indictment (an alleged party cruise ship rape on the high seas), and its declining to include it in the conspiracy charge when the facts alleged are the same, reflects the government's *awareness* that its allegations do not amount to commercial sex trafficking.

When confronted by the defense with that reality at the detention hearing, the government created a ruse indictment, deputized the grand jury to perform a law enforcement function, and kept a third superseding indictment hidden from defendants for over a month, only releasing it immediately prior to a dispositive motions deadline. This was all done to add a purely date rape charge, for which the government manufactured venue. *See* Motion by Oren Alexander to Dismiss for Grand Abuse. The government's reaching, and going outside of the law and process, to this degree simply to charge an offense of party rape on the high seas—which would be left to the states if it occurred anywhere else—reflects the discriminatory motive of the prosecution.

From the beginning of this prosecution, the government has attacked the defendants for their wealth and high-profile status, revealing a prosecution driven by discriminatory motive rather than principles of justice. The charges were announced at a loud press conference where the defendants, in derogation of the presumption of innocence, were described to the media as "predators" and "heinous." *See* Youtube.com, USAO Southern District of New York, "Announcement in connection with the indictment of Alon Alexander, Tal Alexander, and Oren Alexander," available at https://www.youtube.com/watch?v=3Q77_xFuyN8 (last accessed June 16, 2025). Their wealth was mentioned three times by the government during the press conference, leading a reporter to remark that the former United States Attorney had "multiple times" in the past been at the podium talking about "wealthy" men. *Id*. This reflects a pattern of discrimination by the office against those with wealth or status.

All of this provides "some evidence" of discriminatory intent sufficient to meet the defendants' prima facie burden. The federal government in this case has stretched the federal sex trafficking statutes beyond recognition to pursue a anti-wealth agenda. Whatever one may think of the merits of that platform—and reasonable minds are sure to differ—the Fifth Amendment prohibits it from being used to prosecute wealthy individuals for conduct when other individuals are not so prosecuted.

The government's "invidious" and "bad faith," *Fares*, 978 F.2d at 59, efforts to prosecute these defendants has resulted in repeated violation of important constitutional rights—including the Sixth Amendment right to counsel as reflected in the attorney-client privilege; the Fifth Amendment right to indictment by a grand jury; and also the Fifth Amendment right to equal protection under the law, which includes the right to be free from selective and unconstitutionally motivated prosecution. Defendants have met their prima facie burden. They therefore request discovery and dismissal of the indictment due to selective prosecution.

    Respectfully submitted,

BLACK SREBNICK
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131
(305) 371-6421

/s/ Howard Srebnick
HOWARD SREBNICK
Florida Bar No. 919063
HSrebnick@RoyBlack.com
*Counsel for Alon Alexander*