UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ALON ALEXANDER, OREN ALEXANDER, and TAL ALEXANDER,<br><br>Defendants. | Case No. 24-CR-676 (VEC) |

**<u>DEFENDANTS' OPPOSITION TO THE</u>**
**<u>GOVERNMENT'S MOTIONS *IN LIMINE*</u>**

## TABLE OF CONTENTS

**PAGES**

I.  THE GOVERNMENT SHOULD NOT BE PERMITTED TO PREJUDICE THE DEFENDANTS BY ELICITING UNRELIABLE UNCHARGED ACCOUNTS OF OTHER ALLEGED SEXUAL MISCONDUCT ........................................................2

II.  THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO ADMIT THE 2009 VIDEO AS DIRECT EVIDENCE OF THE CONSPIRACY OR UNDER RULES 413 AND 404(b) ...............................................................27

III.  EVIDENCE AND ARGUMENT CONCERNING ACCUSERS' CIVIL PLAINTIFFS' ATTORNEYS IS ADMISSIBLE............................................34

    1.  *Mr. Torgan had the opportunity and incentive to influence his client's accounts and testimony.* ................................................. 38

    2.  *Mr. Torgan served as a de facto member of the prosecution team.*................ 39

IV.  THE DEFENDANTS' LACK OF RESPONSE TO A VIDEO IN A GROUP CHAT IS INADMISSIBLE.....................................................................44

    1.  *The government cannot establish that the defendants saw the video or that their lack of response acceded to the video.* ............................................ 46

    2.  *The video and message was ambiguous and cannot constitute a charge made against the defendants.* ........................................................... 47

    3.  *The video is extremely prejudicial and misleading to the jury.* ...................... 50

    4.  *The video has minimal probative value.* ......................................................... 51

V.  THE GOVERNMENT IS NOT ENTITLED TO BROAD PRETRIAL RULINGS THAT HEARSAY STATEMENTS BY CERTAIN DECLARANTS ARE ADMISSIBLE UNDER RULES 801(d)(2)(E)...................................................52

    A.  The Government's Rule 801(d)(2)(E) Arguments Are Premature And Overbroad ........................................................................52

VI.  GOVERNMENT'S REQUEST TO PRECLUDE EVIDENCE RELATING TO MINOR VICTIM-3'S VOLUNTARY CONDUCT SHOULD BE DENIED...................61

VII.  THE GOVERNMENT'S REQUEST TO PERMIT CERTAIN WITNESSES TO TESTIFY UNDER PSEUDONYMS UNDULY INFRINGES ON THE DEFENDANTS' AND THE PUBLIC'S CONSTITUTIONAL RIGHTS.......................63

    A.  Introduction.................................................................................63

B. The Government's Request Unduly Infringes On The Defendants' And The Public's Constitutional Rights .....................................................64

    1. *The government's request violates the defendants' Sixth Amendment right to confront witnesses.* ................................................... 64

    2. *The government's request unduly infringes the defendants' and the public's rights to a public trial.* ........................................... 66

C. Practical And Logistical Problems Further Undermine The Government's Request..............................................................................69

D. The Government's Request Is Extraordinary And Is Unsupported By Any Legitimate Interest ..............................................................................70

    1. *The government misstates the law and the heavy burden required to override the presumption of an open trial.* ................................... 70

    2. *The government's asserted harms to these witnesses are insufficient to justify pseudonymity.* ....................................................... 73

E. If The Court Finds That There Is A Basis For Some Alleged Victims To Testify Using A Pseudonym, The Court Should Instead Adopt A Fact-Specific Balancing Test That Weighs Harn To The Witness Against The Defendants' Confrontation Rights ..........................................................77

F. Defendants Request Reciprocal Anonymity For Defense Witnesses Called To Testify About Sexual Activity...........................................................78

VIII. THE DEFENDANTS SHOULD NOT BE PRECLUDED FROM CROSS-EXAMINING WITNESSES ON MATTERS RELEVANT TO CREDIBILITY OR TO THE ISSUES AT TRIAL ...........................................................79

IX. THE COURT SHOULD DENY THE GOVERNMENT'S MOTION TO PRECLUDE TESTIMONY FROM BOTH DEFENSE EXPERTS.................................80

A. The Defendants Have A Constitutional Right To Present A Complete Defense And To Fully Rebut The Government's Theory ....................................82

B. Dr. Strange's Testimony Is Relevant And Admissible Under Fed. R. Evid. 702.................................................................................................85

    1. *Dr. Strange's opinion fits the facts of this case.* ........................................... 87

    2. *The studies cited support Dr. Strange's proffered opinion* ........................... 90

    3. *Dr. Strange's proffered testimony is not a matter of lay opinion* .................. 92

    4. *Dr. Strange's proffered testimony regarding media influence is admissible.* ............................................................................. 93

C.  Dr. Aoun's Proffered Testimony Is Relevant And Admissible Under Fed. R. Evid. 702 ..................................................................................94

D.  The Basis For Both Opinions Can Be Established At A Daubert Hearing Or During Voir Dire.................................................................97

X.  THE GOVERNMENT'S OTHER ARGUMENTS REGARDING IRRELEVANT OR UNFAIRLY PREJUDICIAL TOPICS ARE WITHOUT MERIT..............................98

A.  The Court Should Deny The Government's Request To Exclude All Good Acts Evidence Or Evidence Of Consensual Sex Acts ...........................................98

B.  Defendants Will Not Argue To The Jury That The Prosecution Is Novel Or Otherwise Improper ...................................................................100

C.  Defendants Will Not Make Arguments Concerning Possible Punishment .........100

D.  The Court Should Deny The Government's Request To Exclude Evidence Or Argument Concerning #MeToo.......................................................100

E.  The Court Should Deny The Government's Request To Exclude Evidence Of The Defendants' Background .........................................................101

F.  The Court Should Deny The Government's Request To Exclude Evidence Of Improper Venue .................................................................102

XI.  THE COURT SHOULD NOT READ THE INDICTMENT TO THE JURY ...............104

CONCLUSION......................................................................................105

iii

The government moved <u>in</u> <u>limine</u> for pretrial rulings on a series of evidentiary issues. ECF 188 ("Mot."). As set forth below, the defendants oppose the motions, except where stated otherwise.

The government's motions <u>in</u> <u>limine</u> ask this court to unfairly tilt the courtroom in the government's favor. By asking to elicit the testimony of two-dozen purported victims, when the Indictment refers to a quarter of that number, for the admitted purpose of showing defendants' criminal propensity and character; by seeking to admit video footage of an unknown person with whom the government never spoke and a second GIF that was circulated in a group chat and never commented upon, solely to prejudice the defendants; by trying to keep from the jury that many of these victims share a lawyer and are coordinating their factual accounts; by proposing that central witnesses in a serious criminal trial be permitted to testify under false names; and by limiting the defendants' ability to cross examine witnesses on fundamental matters of credibility, the government seeks to eliminate these defendants' constitutional right to a fair trial. Accordingly, we make the following points.

In Point One, we oppose the government's proposal to introduce evidence relating to seventeen uncharged alleged sexual assaults, as they are neither evidence of the charged conspiracy nor admissible under Rule 413 or Rule 404(b).

In Point Two, we oppose the government's request to admit a highly prejudicial video from 2009 in which the identity of the woman depicted is unknown and where no further context is provided.

In Point Three, we explain why evidence relating to the identity and role of Evan Torgan, a civil plaintiff's attorney who represents fourteen of the accusers the government seeks to call at trial, is relevant and admissible.

1

In Point Four, we oppose the admission of an inflammatory video clip of violent pornography, which neither depicts the defendants or any other relevant individual, nor has any bearing on the charged conduct.

In Point Five, we ask the Court to defer ruling on the government's premature motion to admit hearsay statements under the co-conspirator exception.

In Point Six, we request that the Court defer a decision on the government's request to preclude any evidence or argument that Minor Victim-3 consented to sexual activity ██████ ████████████████████ motion has been briefed.

In Point Seven, we oppose the government's request for certain accusers to testify under pseudonyms.

In Point Eight, we address the government's motion to preclude cross examination on matters relating to witness credibility.

In Point Nine, we oppose the government's motion to preclude testimony from the defendants' expert witnesses.

In Point Ten, we address the government's various other requests to preclude certain evidence and argument.

And in Point Eleven, we request that the Court not read the "speaking" portion of the indictment to the jury.

## I.  THE GOVERNMENT SHOULD NOT BE PERMITTED TO PREJUDICE THE DEFENDANTS BY ELICITING UNRELIABLE UNCHARGED ACCOUNTS OF OTHER ALLEGED SEXUAL MISCONDUCT

The government seeks to admit what it wrongly claims are seventeen acts of alleged sexual assault involving unwanted sexual contact by either physical force or through the administration of some unknown substance that rendered the purported victim incapable of consenting (the

2

"Seventeen Other Acts").[1] Its theory for the admissibility of the Seventeen Other Acts oscillates among three options: (1) they are part of the charged conspiracy to commit sex trafficking in Count One; (2) they are admissible under Rule 413 because the defendants are accused of an offense of sexual assault; and (3) they are admissible under Rule 404(b) as being relevant to the defendants' motive, intent, absence of mistake, etc. As shown below, none of the Seventeen Other Acts are admissible under any of the theories advanced by the prosecution. Beyond being inadmissible individually, the overwhelming prejudice from the cumulative nature of the Seventeen Other Acts weighs heavily against admission.

### A.  Introduction To the Government's Proffered "Other Crimes" Evidence

It appears none of the Seventeen Other Acts are charged as part of the conspiracy in Count One. To the extent that the government offers them as evidence of the Count One conspiracy, none of the Seventeen Other Acts involve any allegation of sex on account of something of value, as required by the Sex Trafficking statute. Rather, each of the alleged victims claim falsely to have been raped either by force or being incapable of consent through being drugged. While the falsity of this testimony will be an issue left for trial, that there is not even the slightest allegation of sex in exchange for something valuable is an issue for these motions. Rape and Sex Trafficking are two entirely different crimes. The crime of Rape, traditionally a state offense, is made a federal crime by the crime of Aggravated Sexual Abuse, under Title 18, United States Code, Section 2241. Indeed, the Superseding Indictment charges this offense in Count Ten. The crime of Sex Trafficking is reflected in Title 18, United States Code, Section 1591. By seeking to elicit these

---

[1] Before proceeding further with the legal analysis as to why this proffered evidence is inadmissible, it should be clear up front that each of these uncharged events will be hotly contested. Simply, they did not happen. These defendants never used unwanted physical force or administered a drug to have nonconsensual sexual contact.

alleged rapes as part of a sex trafficking conspiracy, the government mixes apples and oranges. Sex Trafficking, on the one hand, and Aggravated Sexual Abuse or Rape or Sexual Assault, on the other, as well as the conspiracies to commit each, are entirely distinct offenses with different elements requiring different conduct. The government therefore cannot admit these seventeen uncharged rapes or sexual assaults as part of a sex trafficking conspiracy.

The sole object of the Count One conspiracy is to commit Sex Trafficking; no other object is alleged. As part of the statutory allegation of the conspiracy offense, the Indictment cites to the six substantive Sex Trafficking counts, each involving a different alleged victim, specifically Victim-1 (Count Two), Victim-2 (Count Three), Minor-Victim-3 (Count Five), Victim-4 (Count Six), Victim-5 (Count Seven) and Victim-6 (Count Eight). While the charge does not explicitly limit the conspiracy to these six victims, it does not refer to anyone else.

The government now claims that the conspiracy with which the defendants are charged involves not just six victims, but twenty-four. However, none of the twenty-four alleged victims remotely tell a story, or will tell one, of commercial sex as part of a Sex Trafficking offense. For instance, not one of them in any statement says that she had sex on account of something of value. More specifically, not one says that she had sex – willingly or not – in exchange for (i) a bus ride, (ii) staying at a "waterside mansion," (iii) a plane ticket, (iv) a ride on a boat, (v) a pool party, (vi) a cot, (vii) a spare bedroom, (viii) the services of a private chef, (ix) a ride on the Long Island Railroad, (x) an Uber ride, or anything at all. This case is devoid of anything that can be considered commercial sex, even under the term's absurdly broad definition.

The government's motions in limine spend twenty-four pages recounting the experiences of twenty-four women who claim they were involved in sexual activity with one or more of the Alexander brothers. Even taking the Government's factual allegations as true (which we do only

4

for the purposes of this motion), there is not a single alleged instance of sex in exchange for something of value. In fact, the statements of the witnesses are precisely the opposite, specifically that they had sex against their will, either because they were drugged, drunk or forced. No one in this case claims they had sex for something of value, and no one will ever plausibly make this claim because their statements have been recorded in hand-written notes and FBI 302 reports.

The government's grab bag of admissibility theories casts doubt on the admissibility of this evidence under any of the three theories. First, what is charged as part of the conspiracy in Count One?  What conspiracy did the grand jury vote?  Did the grand jury vote on a conspiracy that includes all twenty-four alleged victims?  If so, then we do not reach either Rule 413 or 404(b). The government does not get to choose what Count One charges. The Fifth Amendment grand jury clause requires that criminal defendants be tried on charges voted by a grand jury. If the grand jury was not asked to vote an indictment as to Count One based on the allegations concerning manner and means for all twenty-four women cited in the government's in limine motions, the government cannot now ask the court to include events as part of Count One that the grand jury did not vote. It is not the province of the prosecution and the court to fashion a charge against a defendant. Yet, the government asks the court to do just this.

If, on the other hand, the grand jury was presented with the accounts of all twenty-four women and voted an indictment on Count One that encompassed a conspiracy involving all such accounts, then Rules 404(b) and 413 are wholly irrelevant to any legal analysis as these events are voted upon and charged by the grand jury. Because the Superseding Indictment refers to only those substantive Sex Trafficking counts in the Indictment itself, it appears that the grand jury was not presented with, and did not vote on, the other acts.

5

The government's first fallback theory of admissibility is Rule 413. The government argues that these events are part of the charged conspiracy, but even if they are not, they are admissible under Rule 413. Rule 413 is entitled Evidence of Similar Crimes in Sexual Assault Cases. Rule 413(a) provides, "In a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant." The Rule was enacted by Congress as part of the Violent Crime Control and Law Enforcement Act of 1994, and it creates an exception for a limited class of crimes to Rule 404(b)'s prohibition against the use of "character evidence to show a defendant's propensity to commit crimes." Weinstein's Federal Evidence, Second Edition, Sec. 413.02(1).

Rule 404(b), which was part of the original federal rules of evidence enacted in 1975, permits so-called other bad act evidence to show a defendant's motive, intent, absence of mistake, etc. but it may not be used to show character or propensity. The federal rules of evidence largely reflected the rules in several states that prosecutors are not permitted to show evidence of an accused's bad character or propensity, but that prior bad act evidence can be admitted to show motive, intent, knowledge, identity, plan or scheme or lack of mistake or accident. See generally People v. Molineux, 168 N.Y. 264 (1901). Indeed, Rule 404(b)(1), reflecting this general rule, provides that "evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Rule 404(b)(2) lists the permitted uses of this evidence for other purposes so long as it is not used to establish criminal propensity or character.

Rule 413, enacted almost twenty years after the passage of Rule 404, and 93 years after the rule against criminal character evidence was established and became the norm, is a limited

6

exception from the general proposition of Rule 404(b) against the use of evidence of character or criminal disposition. By its terms, it is limited to sexual assault cases. It is also subject to a Rule 403 balancing test, as are other rules of evidence, to be more fully addressed below.

In terms of its applicability to this case, it bears noting that the only charged offense of sexual assault is Count Ten, charging Alon and Oren Alexander with Aggravated Sexual Abuse in connection with activity from January 2012 aboard a Bahamian flagged cruise ship that left Miami and never entered the territorial jurisdiction of the Southern District of New York, nor is alleged to have done so. It is notable that the government seeks to admit the Seventeen Other Acts when the indictment charges but one incident of sexual assault, that being in 2012 against Alon and Oren Alexander, but not Tal Alexander, as to which it has successfully manufactured venue in this District. Taking advantage of its manufactured venue, the government now uses this count to shoehorn in the Seventeen Other Acts.

The third theory of admissibility advanced by the government is Rule 404(b). These will be analyzed in turn.

### B.  Summary Of The Proffered Testimony

Because the Court must rule on the admissibility of the proffered victim testimony as part of the Count One conspiracy or based on Rules 413 and 404(b) on an individual basis, the defense addresses each of the Seventeen Other Acts. The result of this analysis shows that these uncharged accounts are not relevant to the conspiracy in Count One, and if relevant at all, are unduly prejudicial under Rule 403. The first seven purported victims are linked to substantive counts of the Superseding Indictment. The remaining seventeen are not linked to any substantive counts, and are alleged to be part of the conduct in Count One. However, these seventeen accounts are irrelevant to Count One and equally irrelevant under Rules 404(b) and 413.

### 1. *The Alleged Statutory Victims*

Victim-1 (Count 2) was invited by a friend to go to the Hamptons. She rode on the Long Island Railroad ("LIRR"). She went to a large house. She claims that someone gave her a glass of wine in a hot tub and that, fourteen years later, she recalls she drank half of it. After that, she felt strange and lost some of her memory. She claims to recall being in the sauna with Tal and another man and that she was raped and then was told to leave. Accepting this account, as set out in the government's motion, as true, there is no commercial aspect to whatever sexual activity did or did not occur. At no time, for instance, did Victim-1 say she had sex with someone because (1) she rode on the LIRR, or (2) the house was large, or (3) there was a hot tub. On the contrary, Victim-1 claims that she was drugged and had sex against her will.

Victim-2 (Counts 3 & 4) lived in Chicago. She and her friend were provided with travel to the Hamptons to stay at a "waterfront mansion." Victim-2 claims that Oren gave her a drink. She recalls she drank only part of it and then felt strange. She recalls that Oren had sexual intercourse with her and ignored her when she told him to stop. Victim-2 never told the government, nor will she presumably testify at trial, that she had sex with someone in exchange for the plane fare from Chicago or because she was at a waterfront mansion or because of anything else of value. Her testimony will be rather that she was drugged and forced to have sex against her will. Even according to the government's version, for purposes of this motion, this event cannot be admissible to prove a sex trafficking conspiracy where an element of the crime is sexual conduct "on account of" something of value for the simple reason that neither Victim-2's account nor any other evidence shows a correlation between sex and something of value.

Minor Victim-3 (Count 5) was invited by a party promoter to a "large home" in the Hamptons the Alexander brothers and others were renting. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Again, for purposes of this motion, there is no allegation that this person had sex on account of something of value, that she had sex because of some valuable item she would receive. She claims she was raped, not that she had any form of commercial sex.

Victim-4 (Count 6) and Victim-5 (Count 7) went to a house in the Hamptons the Alexander brothers and others were renting. At the house, Victim-4 saw cocaine. Victim-4 says she was offered a drink and then later, Alon Alexander brought her a drink in the hot tub, which made her feel tired. While in the hot tub, she was held down and raped. Victim-5 described the same weekend at the same house. She too says that one of the twins gave her drinks and that while she only has "flashes of memory" from that night, Alon and Oren had sex with her, and that when she tried to get up, they pinned her back down. Victims-4 and 5 left the house and took the LIRR to Manhattan. Again, there will be no testimony that Victims-4 or 5 had sex on account of something of value. These women claim they were raped. While the defense will show that is not true, for the purposes of this motion, there is nothing about these alleged actions that are relevant to the jury's consideration of a sex trafficking conspiracy.

Victim-6 (Counts 8 & 9) and Tal exchanged Instagram contact information. The following year, he invited her and her friend to the Hamptons. She says that he volunteered to pay for the flights but never did so. She and her friend flew to JFK Airport. In New York, she says Tal arranged ████████████████████████████████████████████ to the Hamptons

and then for a car to take them to a "waterfront mansion" where Oren and others were staying. She says a private chef was at the house to cook for the guests. The second night, Victim-6 says the people at the house "drank heavily" and that Tal and others passed out shots. Victim-6's friend began to act "erratically" after only half a glass of wine. As a result, Victim-6 put her friend to bed. The next morning, they packed up to leave. Tal asked where they were going, and then "tackled" Victim-6 onto the bed. She pushed him off and then took a shower. Tal followed her and had sex with her in the shower while she whispered "no, no, no" while her friend was in the next room. Again, while the government's account features a seaplane, a private chef and a waterfront mansion, none of these things played any role in Victim-6's motivation to have sex. On the contrary, she claims she didn't want to have sex at all, and that she was raped in the shower.

Victim-7 (Count 10) says that she travelled to a cruise which left Miami for the Bahamas. She met Oren and Alon ███████████████████████████████████████ ███████████████████████████████████████. She was offered a drink, from which she drank. She then recalls being naked on the bed being raped by Oren and Alon. This event is not charged as sex trafficking and is not relevant to Count One. Indeed, in the charging paragraph for Count One, the government refers only to those alleged victims in the substantive sex trafficking counts as being part of the charged conspiracy. Victim-7 is not listed as part of the conspiracy for Count One.

### 2. *The Seventeen Other Acts[2]*

The remaining alleged victims[3] are not connected to any substantive counts and are instead alleged to be direct evidence of the charged conspiracy in Count One or alternatively are admissible under Rules 413 and 404(b). For the reasons below, these accounts are not relevant for any purpose, are unduly prejudicial under Rule 403 and should not be permitted at trial.

Alleged Minor-Victims-8 and -25[4] and Victim-9 ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

---

[2] The government, in its Rule 413/404(b) disclosure, gave notice of its intent to introduce evidence relating to Victim-22's allegations, but the government's motions in limine did seek to admit this evidence or otherwise reference Victim-22. The government should, therefore, be precluded from admitting any evidence relating to Victim-22.

[3] For the purposes of this motion, the defense refers to these individuals as their Victim number for consistency with the government's motion; however, as noted, we strenuously disagree that any of these accusers are, indeed, victims.

[4] The government did not notice its intent offer Minor-Victim-25 at trial until November 4, 2025, nearly three weeks after the government's deadline to provide Fed. R. Evid. 413 Notice. For this reason alone, Minor-Victim-25 should be precluded from testifying at trial.

Alleged Victims-10 and -11 ███████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████, alleged Victim-12 █████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████

Victim-13, ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

Victim-14 ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████

I███████████████████    Victim-15,    ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████

Victim-16 ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

████████████████████████    Victim-17,    ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████    Victim-18    ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Victim-19    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████

Victim-20    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

14

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████ .

████ , Victim-21 ███████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████

██████████ 5, Victim-23 ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████

████████████████████ Victim-24 ██████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████

15

**C. The Proffered "Other Crime" Evidence Is Irrelevant To The Count One Conspiracy**

As noted, the sole object of the conspiracy in Count One is sex trafficking, which has two of the following elements[5]: first, "that the defendant knowingly recruited, enticed, harbored, transported, provided, obtained, or maintained a person by any means; second, that the defendant knew or recklessly disregarded the fact that force, threats of force, fraud, or coercion, or any combination of such means, would be used to cause the alleged victim to engage in a commercial sex act;" also, the term "commercial sex act" is defined as "any sex act on account of which anything of value is given to or received by any person." See United States v. Combs, 24-CR-542 (AS) (Jury Charge Tr.) at 8022, 8026. As indicated in the above summary accounts, no purported victim has stated or presumably will testify that she engaged in a commercial sex act or that she engaged in a sex act in exchange for something of value. While the government, at times, attempts to manufacture a quid pro quo to artificially create a commercial sex act in the form of "waterfront mansions," seaplanes, ██████████████████████████████████ and the like, none of the purported victims state, intimate or suggest that they had sex in exchange for or "on account of" any of these things.

In connection with several of the purported victims, the government cites to things like

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████, as an effort to conjure potential things of value for a commercial sex act. However, there is no view of the facts where any woman will testify that she had sex on account of a boat ride or due to an

---

[5] The third element is that this conduct must affect interstate or foreign commerce.

invitation on a private plane or because she was invited to ███████████████████

███. The government peppers the Superseding Indictment and its offer of proof with luxuries

and perks to give the false appearance of things of value. But it all comes crashing down because

the women do not say these things played any role in their decision to have sex with anyone.

Accordingly, these events are not relevant to the charged conspiracy, and even if marginally

relevant, are unduly prejudicial.

The government also claims that the "other crimes" evidence is relevant to show the

following: (i) that the defendants worked together to rape and assault victims, (ii) the defendants

drugged and incapacitated victims and (iii) the defendants used physical restraint to rape victims.

By offering those as reasons, the government appears to have forgotten that the object crime of the

conspiracy is sex trafficking, not rape or sex assault.  Testimony concerning rape, assault,

drugging, incapacitation and physical restraint, even if reliable (which it is not) is purely

prejudicial and not relevant to a sex trafficking conspiracy which requires commercial sex. The

government's motive is clear: they have no evidence of commercial sex, and they hope to inflame

the jury with false tales of rape and drugging so it will overlook the lack of commercial sex

evidence and convict anyway.

The government's proffered justification for this evidence is plainly pretextual. They do

not need to resort to false rape allegations to prove the Alexanders pursued sexual relationships

with women. This is undisputed and is apparent from a variety of sources including the defendants'

own written statements. The disputed issue is not likely to be whether the defendants had sex with

many women, or whether they were often together when they went out to clubs or other places

where young men meet young women. The Alexanders were interested in meeting women, and

they met women in virtually any place a man could meet a woman: nightclubs, bars, restaurants,

17

beach parties, pool parties, their own homes, the homes of friends, etc. The defense also does not contest that the brothers had consensual sexual contact with many women, and that, under the right circumstances and if there was consent on the part of all participants, there were times when various of the brothers engaged in sexual relations with more than one partner. To be clear, the defendants steadfastly deny that they ever drugged anyone.

Indeed, the "evidence" that someone was drugged is extraordinarily weak to the point of non-existent. There is absolutely no toxicology evidence. Not one person went to a doctor, the hospital, an urgent care or any medical provider and had a toxicological examination that resulted in a finding of any substance in anyone's body at any time. So, for starters, there is no scientific evidence of drugging. Next, there is no evidence that anyone saw the Alexander brothers or anyone else put something into a drink. So, there is no eyewitness evidence of a substance being placed into a drink. Also, the most several of the witnesses can say is that she had some number of drinks and she felt different than when she typically had that same number of drinks. To say this testimony is weak and fraught with uncertainty is an understatement. Even if the person is genuine and not lying or exaggerating, she can mis-remember how much she actually drank, in what period of time, and whether this was on a full or empty stomach. After all, since none of these women went to the police and reported these events at the time, we are left to their recollections of events years and sometimes more than a decade after the fact. Misrecollection years later is common for even the most consequential of matters. The details of what someone drank years earlier is likely little more than a guess, if that. Finally, it may be wishful thinking or outright fabrication that a person had far less to drink than she actually did.

The government is aware of the inherent weakness in its "evidence" of drugging, specifically that there is no such evidence. As a result, it puts a premium on quantity over quality.

18

In lieu of meaningful evidence that someone was drugged, the government seeks to offer the testimony of twelve people – Victim-8, Victim-9, Victim-12, Victim-14, Victim-16, Victim-17, Victim-19, Victim-20, Victim-21 (marijuana), Victim-23, Victim-24, and Victim-25 – who will variously tell the jury that they "felt strange," or that they don't usually feel this way after a few glasses of champaign, or that their memory was blurry, or that she couldn't think clearly or any one of a dozen indefinite, vague things that, the government suggests, mean they may have been drugged. It is clear that for each such person, an equally likely explanation is that they were experiencing the predictable effects of alcoholic beverages they voluntarily consumed.

The prejudice from the Seventeen Other Acts is even more severe than usual under the circumstances of this case because it merely recapitulates the stories of the statutory claims, without adding any actual hard evidence. For example, because there is no actual toxicology evidence, the jury will be left to speculate about what, if any, substance was placed in one or more statutory victim's drinks. The Seventeen Other Act evidence, though, does not include any toxicology evidence either. It is not as if one of the Seventeen Other Acts included a situation where an alleged victim describes symptoms similar to a statutory victim but also has a toxicology report to corroborate her account. Rather, the Seventeen Other Act evidence that describes supposed drugging is simply more of the same – vague and conclusory bits of information regarding feelings or sensations. The cumulative prejudice would therefore be severe if the Court simply allowed the Seventeen Other Act evidence to be placed next to that of the charged counts.

### D.  The Proffered "Other Crime" Evidence Is Not Admissible Under Rule 413

The government proffers the evidence under Rule 413, which is a limited exception to Rule 404's general ban on character and propensity evidence. In cases alleging sexual assault, Rule 413 allows evidence of the defendants' prior instances of sexual assault to prove their propensity for

sexual violence. However, as stated, Rule 413 only applies when a defendant is charged in a sexual assault offense—here, only two out of three of the defendants are charged in one sexual assault offense. The request to admit seventeen baseless uncharged incidents of sexual assault to show the defendants' criminal propensity to commit sexual assault in a case primarily charging sex trafficking would lead to an unconstitutional application of Rule 413. We recognize that the Second Circuit as well as the Circuits considering the issue have found that Rule 413, as tempered by Rule 403, is constitutional on its face. United States v. Schaeffer, 851 F.3d 166 (2d Cir. 2017). However, where, as here, the government seeks to admit some dozen-and-a-half purported victims intimating they may have been drugged all with the unabashed purpose of showing criminal propensity, or in other words, "if the Alexanders didn't do this, they did something else," this is an unconstitutional application of Rule 413.

Rule 413 comes with a constitutional warning label appended to the rule by both the U.S. Supreme Court and the Second Circuit. Justice Robert Jackson, in Michelson v. United States, 335 U.S. 469 (1948), warned against the undue prejudice coming from evidence of propensity, stating as follows:

> The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

Id. at 475-6. Even while upholding the constitutionality of Rule 413, a rule that explicitly creates the precise prejudice Justice Jackson warned against sixty-nine years earlier, the Second Circuit stated, "We share Justice Jackson's concern that propensity evidence may cause 'undue prejudice'

20

to a defendant and, as a result, threaten his right to a fair trial." Schaeffer, 851 F.3d at 180. The Schaeffer decision is highly critical of Rule 413, despite finding it facially constitutional, stating, "our conclusion that Rule 413 does not on its face violate the Due Process Clause does not turn on our assessment (much less our endorsement) of the Rule's underlying rationale." Id.  The Court also suggested that the rule operated inconsistent with the public good, writing, "the criterion of constitutionality is not whether we believe the law to be for the public good." Id. Though the Second Circuit has not had occasion to decide this issue, the issue in Schaffer was simply whether Rule 413 could survive a due process challenge. The Circuit upheld the rule, but held that district courts must rigorously apply Rule 403 to proffered Rule 413 evidence to ensure fair trials.

By proposing the testimony of twenty-four purported victims, where only seven are included in the statutory counts, the government is counting on creating the sort of prejudice that both the Second Circuit in Schaeffer, 851 F.3d at 166, and the Supreme Court in Michelson v. United States, 335 U.S. 469, warned against. Accordingly, the Court should deny the government's proffered "other crimes" evidence.

### E.  The Proffered "Other Crime" Evidence Is Not Admissible Under Rule 404(b)

The government asserts that the other crimes evidence is admissible under Rule 404(b) as probative of (i) the defendant's opportunity to commit the charged crimes by creating occasions to isolate and incapacitate victims, (ii) the defendant's intent and motive for sexually assaulting victims, including their own sexual gratification and desire to enhance their reputations by bragging about sexual acts, (iii) absence of mistake or accident and (iv) the defendant's idiosyncratic means of methods of sexual assault. The proffered "other crime" evidence is not relevant to any of these things. What the proffered evidence tends to demonstrate, in the

21

government's view, is a propensity for sexual violence and dangerous character evidence. This is what the government is trying to establish and it is the real purpose of this evidence.

First, the government's notice is patently deficient. The government does not provide an explanation of what the supposed proper purpose is as to any of the alleged incidents other than to state that it may seek to introduce this evidence at trial for knowledge, preparation, plan, motive, and modus operandi. This list of proposed purposes quoting the Rule's text does not comply with the requirement that the government "articulate in [its] notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose." Fed. R. Evid. 404(b)(3)(B).

The rule formerly required only a more generalized sort of notice, but the old rule was frequently abused by prosecutors, who merely provided boilerplate notice that they planned to admit a defendant's other bad acts. Such boilerplate made it impossible for district judges to assess admissibility. Thus, even before the amendment, courts around the country had ridiculed the so-called "laundry list" approach to determining admissibility under Rule 404(b), because "a mere recitation of the purposes in Rule 404(b)(2) is insufficient" and "supplies the defendant with little notice of the non-propensity purpose for which the evidence against him is being admitted, and it says nothing of how the evidence is probative of that purpose." United States v. Brown, 765 F.3d 278, 294 (3d Cir. 2014); see also United States v. Abou-Khatwa, 40 F.4th 666, 683-84 (D.C. Cir. 2022) (criticizing the "laundry list" approach to Rule 404(b) instructions; United States v. Hardwell, 80 F.3d 1471 (10th Cir. 1996) (same).

**F.  The Proffered "Other Crime" Evidence Is Unduly Prejudicial Under Rule 403**

Even if the evidence fits within Rule 413 and 404(b)(2)—which it doesn't—Rule 403 would still require its exclusion. As the Second Circuit held: "Where in a particular instance the

admission of evidence of prior sexual assaults would create 'undue prejudice' and threaten due process, district courts can and should, by operation of Rule 403, exclude that evidence and ensure the defendant's right to a fair trial." Schaffer, 851 F.3d at 180. Rather, by asking the Court to allow the testimony of twenty-four women, when the Indictment alleges incidents against seven, the government is hoping to convict these defendants based on the prejudicial impact of this testimony. In pursuit of that unlawful end, the government encourages the Court to view the conspiracy count in Count One as a dumping ground for every incident of alleged sexual misconduct that it could not otherwise charge as a substantive count. However, the government's approach violates the law of conspiracy as well as the rules of evidence.

First, the proffered evidence has low probative value. The government's proposal would swamp the actual allegations in the indictment, resulting in a trial more about what is not in the indictment than what is actually charged. The government's desire, it seems, is to create one undifferentiated mass of allegations, confusingly similar to each other but short on actual details or forensic evidence. The purported evidence supporting the alleged incidents is incredibly weak, and not probative of the actual charges. "Where a past act cannot be shown with reasonable certainty, its probative value is reduced," justifying exclusion under Rule 403. Johnson v. Elk Lake School Dist., 283 F.3d 138, 156 (3d Cir. 2002). Yet, if all the accounts are jumbled in a pile, it will be harder for the jury to do the work it actually must under the law:  Consider each allegation, and each defendant, independently. The Seventeen Other Acts therefore would make the jury's task harder, not easier.

Second, the evidence raises a substantial danger of unfair prejudice. The dangers of admitting a defendant's alleged prior bad acts are well known. As the Supreme Court has explained, one risk is that the evidence will "weigh too much with the jury" and thus "overpersuade

23

them as to prejudge" the defendant. <u>Michelson v. United States</u>, 335 U.S. 469, 476 (1948). Worse yet, the jury may view the uncharged acts as "calling for preventive conviction even if he should happen to be innocent" of the charged offenses. <u>Old Chief v. United States</u>, 519 U.S. 172, 180-81 (1997). The risk, in other words, is that a jury "uncertain of guilt … will convict anyway because a bad person deserves punishment." <u>Id.</u> at 181 (quoting <u>United States v. Moccia</u>, 681 F.2d 61, 63 (1st Cir. 1982) (Breyer, J.)).

Those risks remain even where evidence is offered under Rule 413. That rule allows propensity reasoning, but there is still a risk that the jury will give the propensity inference more weight than it deserves. Far worse is the risk that the jury will convict based on guilt for the other offenses. That is especially true here, where the charges require proof of technical elements of a sex trafficking conspiracy, about which the jury may well be confused and uncertain. If the prior acts come in, however, the jury will be left with little doubt that all three defendants are bad people deserving punishment. The risk of illegal preventive detention is acute.

Third, admitting uncharged acts will involve extensive mini-trials. Further militating against admission is the fact that the noticed acts will "wast[e] time" at trial and lead to time-consuming mini-trials. Fed. R. Evid. 403. The proffered testimony of all of the "other crimes" witnesses will be strongly contested because it is false. None of these women were drugged or raped or anything of the sort. Rather, those who engaged in sex with one or more of the Alexander brothers did so consensually. Years later, they either regretted their voluntary decision or, through communicating with other supposed victims, rewrote history or developed a perspective that was different from reality. As to many others, they are simply providing false information, either because they have a pending lawsuit or are intending to file one after the criminal case. As noted, it is no coincidence that many of the purported victims have the same lawyer. Each of these

24

purported victims would be its own mini-trial, complete with witnesses, written communications, other documents and other evidence.

Fourth, at a minimum, a preliminary hearing is necessary because no reasonable jury could find the proffered evidence is reliable. Even aside from the questions of admissibility under Rule 404, Rule 413, and Rule 403, the government's proffered evidence lacks the foundation for admissibility required by Rule 104(b). Simply put, the alleged prior incidents are only relevant and admissible if they in fact happened as the government describes. Such questions of conditional relevance are governed by Rule 104(b), which states: "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." The rule itself does not state the quantum of evidence necessary to support such a finding. In Huddleston v. United States, the Supreme Court interpreted Rule 104(b) as requiring that "the jury could reasonably find the conditional fact … by a preponderance of evidence." 485 U.S. 681, 690 (1988). The Huddleston standard applies regardless of whether the evidence is offered under Rule 404(b) or Rule 413. See Carroll v. Trump, 124 F.4th 140, 155-56 (2d Cir. 2024). Thus, this Court must "examine[] all the evidence" and "decide[] whether the jury could reasonably find the conditional fact—whether the defendant committed the prior act—by a preponderance of the evidence." Id. at 155 (quoting Johnson, 283 F.3d at 152). The government, as proponent, bears the burden of presenting sufficient evidence to support the standard of Rule 104(b) and Huddleston. United States v. Nektalov, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004). But the government's notice letters, and their Jencks Act material does not state what evidence it may offer at trial. Therefore, there is no way of knowing whether the government possesses sufficient evidence at this time such that a reasonable jury could find by a preponderance of the evidence that each alleged incident happened. For that reason, a preliminary hearing is necessary to determine the question of

preliminary admissibility. See Rule 104(c) ("The court must conduct any hearing on a preliminary question so that the jury cannot hear it if … justice so requires.").

Finally, the defense asks for a preliminary hearing concerning Minor Victim 3 as part of Count 5. Specifically, the defense asks that prior to Minor Victim 3 testifying before the jury that the Court conduct a Rule 104 hearing to determine whether the Government can sufficiently show that Minor Victim 3 engaged in a commercial sex act, as required by the Sex Trafficking statute.

Indeed, courts around the country have recognized that a hearing is particularly necessary in cases like this, where the prosecution seeks to admit highly prejudicial acts under Rule 413 and 404(b). See United States v. Guidry, 456 F.3d 493, 499 (5th Cir. 2006) (district court held preliminary hearing); United States v. Benally, 500 F.3d 1085, 1088 (10th Cir. 2007) (same); United States v. Morris, 2009 WL 10674857, at *2 (E.D. Tenn. Jan. 29, 2009); United States v. Ogden, 2021 WL 789861, at *4 (E.D. Okla. Mar. 1, 2021) ("[A]n evidentiary hearing is preferred"). Such hearings are necessary both to determine whether the conditional relevance standard is met and also whether the alleged prior acts count as "sexual assaults" under Rule 413. See United States v. Willis, 826 F.3d 1265, 1271 (10th Cir. 2016) (noting district court conducted a "pretrial evidentiary hearing," where claimed victims testified, "before ruling on the admissibility of the prior-acts evidence"); United States v. Boyajian, 2012 WL 4094977, at *4 (C.D. Cal. 2012) (concluding "evidentiary hearing is necessary to determine whether … prior conduct amounts to forcible sexual assault").

For the foregoing reasons, the government's proffered Rule 413 and 404(b) evidence should be excluded. In the alternative, the Court should hold a preliminary hearing pursuant to Rule 104.

II.     **THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO ADMIT THE 2009 VIDEO AS DIRECT EVIDENCE OF THE CONSPIRACY OR UNDER RULES 413 AND 404(b)**

The government seeks to introduce a single video recorded in 2009, depicting Oren, another male, and an unidentified woman engaged in sexual activity (the "2009 Video"). It claims this video constitutes background evidence of the alleged conspiracy and, alternatively, that it is admissible under Rules 413 and 404(b). Mot. at 38, 42. The Court should deny this request. The government cannot identify the woman in the 2009 Video; she has never been interviewed and she has never alleged that any crime occurred. More significantly, the government omits that there are contemporaneous videos and photographs from the same encounter that depict consensual sex and voluntary recreational drug use, belying its portrayal of an incapacitated or unwilling participant.

### A. Background

#### 1. *The government's detention-hearing proffer concerning the 2009 Video*

At the January 15, 2025 detention hearing, the government urged the Court to detain defendants based, in part, on its description of a single video recovered from a hard drive – the 2009 Video. It represented to the Court—with certainty and without qualification—that the video showed Oren, another male, and an unidentified woman engaged in sexual activity, and that the woman was "functionally unconscious," "incoherent," and incapable of consent. The government claimed this video was a "trophy" of sexual assault, consistent with its theory that defendants drugged and assaulted women and preserved footage as evidence of their crimes.[6] This representation was made without identifying the woman in the 2009 Video, without interviewing

---

[6] To put these videos further into context, the 2009 Video was apparently found on a hard drive amongst hundreds of other videos and photos—none of which appear to depict nonconsensual sex. The government insinuated at the hearing that review of these videos (which at the time had not been completed) would reveal behavior consistent with its theory. It has not.

her, and without disclosing the other videos and photographs from that same interaction. Those omissions were material.[7]

### 2. Subsequent evidence produced by the government contradicts that proffer

Nearly eight months later, on September 30, 2025, the government produced the entire contents of the hard drive it possessed at the January bail hearing, which included additional videos and photographs taken during the *same encounter* as the 2009 Video. Those materials fundamentally contradict the government's claims. Rather than depicting an incapacitated woman, the videos show her:

- Speaking clearly and engaging in conversation with both men, as well as the camera;

- Posing for photographs;

- Standing and moving independently;

- Smoking a cigarette;

- Kissing the other man voluntarily;

- Laughing and joking with Oren; and

- Affirmatively asking for MDMA (also known as "molly") after the sex, indicating voluntary recreational drug use, not incapacitation.

None of these recordings or photographs suggest that she was assaulted. To the contrary, in one video she indicates that she and Oren had sex multiple times that night and that it "felt good."[8]

---

[7] Based on the government's proffer, the Court detained the defendants.

[8] To the extent the government intends to argue, as it did at the detention hearing, that the videos were kept by defendants as "trophies," the metadata paints an equally damning picture of the government's earlier narrative. The materials on the hard drive, including the 2009 Video, had a "last accessed" date of 2012. None had been opened or viewed for more than a decade before the search warrant was executed in December 2024.

### 3. *The government's present theory of admissibility*

The government now asks this Court to admit the 2009 Video as background evidence of the alleged conspiracy, or alternatively under Rules 413 and 404(b). It does so despite possessing videos and photographs that directly undermine its claim that the 2009 Video depicts a woman who was drugged, incapacitated, and assaulted by one of the defendants. The assertion that this 15-year-old video demonstrates the means and methods of the alleged conspiracy, or corroborates other alleged assaults, is speculative at best and deliberately misleading at worst. Admitting it as evidence would invite the jury to convict based on prejudice, assumption, and conjecture.

### B. The 2009 Video Is Not Admissible As Direct Evidence Or Under Rules 413 Or 404(b)

#### 1. *The 2009 Video cannot serve as background evidence of the charged conspiracy*

While courts may admit background evidence to explain how a conspiracy developed, the relationships among co-conspirators, or the methods and means used to further a conspiracy, the 2009 Video has no nexus to the charged conduct or the conspiracy. The government cannot, as required, "sufficiently link this evidence with the charged offenses." United States v. Scott, No. 24-CR-158 (KAM), 2025 WL 1384301, at *4 (E.D.N.Y. May 12, 2025) (admitting evidence of coercive and violent tactics against uncharged victims as direct evidence of sex trafficking offenses); see also United States v. Kelly, 609 F. Supp. 3d 85, 161 (E.D.N.Y. 2022), aff'd, 128 F.4th 387 (2d Cir. 2025) (admitting videos involving uncharged conduct as direct evidence of one of the purposes of the enterprise because there was a direct link to charged offenses).

The 2009 Video depicts a consensual sexual encounter among adults who have never alleged wrongdoing. The government has never identified or interviewed the woman—and thus

29

cannot possibly demonstrate that she was a victim or connected to any alleged conduct in the case. What the government now brands as "direct evidence" of the conspiracy is a fragment of an hours-long encounter taken out of context. Moreover, the government's portrayal of the 2009 Video as depicting an "incapacitated" woman is contradicted by other videos and photos in its own possession. The subsequently-produced materials from the same interaction show volitional conduct, conversation, laughter, mutual interaction, post-sex physical autonomy, and requests for additional recreational drugs. That behavior is consistent with voluntary recreational drug use and consensual (albeit intoxicated) sex, and the government should not be permitted to manipulate it into direct evidence that defendants incapacitated their victims by drugging them. The government does not have any videos of the alleged assaults charged in the Indictment. Certainly, if they thought that the 2009 Video depicted a sexual assault, they would have included it in the Indictment. But the government knows it could not obtain a conviction based on the 2009 Video, and so now are attempting to use it improperly to prop up the actually-charged allegations, which cannot stand on their own.

### 2. The 2009 Video is not admissible under Rule 413

Rule 413 provides that "[i]n a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault." Fed. R. Evid. 413. Rule 413 defines "other sexual assault" as any crime under federal or state law involving specific types of conduct.[9] Fed. R. Evid. 413(d). Here, the government does not know

---

[9]  The definition is provided in subsection (d) of Rule 413, which states that "sexual assault" includes: "(1) Any conduct prohibited by 18 U.S.C. Chapter 109A; (2) Contact, without consent, between any part of the defendant's body—or an object—and another person's genitals or anus; (3) Contact, without consent, between the defendant's genitals or anus and any part of another person's body; (4) Deriving sexual pleasure or gratification from inflicting death, bodily injury, or physical pain on another person; or (5) An attempt or conspiracy to engage in conduct described in subparagraphs (1)-(4) [Federal Rules of Evidence Rule 413]."  Fed. R. Evid. 413.

whether the woman in the 2009 Video alleges she was assaulted or whether any crime occurred at all. To the contrary, the additional videos demonstrate the opposite: the woman was conscious, engaged, articulate, and affirmatively participating. She expressed that the sex "felt good," asked for drugs after, and interacted with both men voluntarily.

Nothing in Rule 413 authorizes the admission of consensual sexual activity among intoxicated adults, involving a woman that the government has not spoken to and who has not alleged rape. A video cannot be evidence of another sexual assault when the government cannot even establish that a sexual assault occurred.[10]  Nor can Rule 413 be used to invite the jury to speculate that a sexual assault occurred simply because the government says so.[11]  Indeed, where admission of specific Rule 413 evidence would create "undue prejudice" and threaten due process, district courts can and should, by operation of Rule 403, "exclude that evidence and ensure the defendant's right to a fair trial."  Schaffer, 851 F.3d at 180; see also United States v. Spoor, 904 F.3d 141 (2d Cir. 2018) ("The district court should also consider the potential for unfair prejudice, including the possibility that prior act evidence will lead the jury to convict out of passion or bias or because they believe the defendant is a bad person deserving of punishment.").

The government also attempts to admit the 2009 Video under Rule 413 to corroborate the anticipated testimony of two accusers who believe they saw a camera during their alleged assaults. Mot. at 42. This theory of admissibility should similarly be rejected. The government has spent

---

[10] The Government has also failed to make any showing that the woman in the video is a "similarly situated" victim under Rule 413. See Mot. at 43 (citing United States v. Schaffer, 851 F.3d 166, 178 (2d Cir. 2017)).

[11] As the government itself points out: "the evidence that each rape and sexual assault was non-consensual depends on the testimony of each victim," Mot. at 42, and yet it asks this Court to sidestep this very process and admit the 2009 Video as Rule 413 evidence to corroborate accusers who will testify that they were unknowingly drugged and incapacitated at the time of their alleged assault.

nearly a year searching for "corroboration" that defendants filmed alleged sexual assaults. It has found none. Now, it seeks to use the 2009 Video as a substitute for evidence it does not have. But a consensual sex video—found among hundreds of other videos and photos, none of which appeared to depict nonconsensual conduct—proves nothing about whether defendants filmed purported assaults with different people in different locations. The government should not be permitted to introduce the 2009 Video and ask the jury to speculate otherwise.

### 3.    The 2009 Video is not admissible under Rule 404(b)

Because the 2009 Video cannot be offered as another sexual assault under Rule 413, the government pivots to Rule 404(b), asserting that it is relevant to opportunity, knowledge and intent, absence of mistake, and common scheme or plan. Mot. at 43. This fails for three reasons. First, Rule 404(b) requires a legitimate non-propensity purpose. The government suggests that because Oren engaged in intoxicated consensual sex with an adult in 2009, Defendants must have known years later that other alleged victims were "too impaired to consent." Id. at 38. This argument is nothing more than a backdoor propensity argument, which the Court should reject. Second, the government's factual premise is wrong. The woman in the video was conscious, communicative, and physically autonomous. The government's interpretation collapses in the face of the full record. Third, Rule 404(b) permits conduct that is "sufficiently similar to the conduct at issue" so that the jury may "draw a reasonable inference" about knowledge or intent. United States v. Zhong, 26 F.4th 536, 552 (2d Cir. 2022). However, it does not enable the government to present misleading evidence that create a false impression. Here, the government seeks to admit one video while ignoring the surrounding recordings showing consensual conduct. Rule 404(b) is not a vehicle for offering distorted, incomplete, or speculative narratives under the guise of "knowledge" or "intent."

32

### C.  Rule 403 Bars Admission Of The 2009 Video

Even if the Court were to conclude that the 2009 Video had some minimal relevance, Rule 403 requires exclusion. The danger of unfair prejudice, misleading the jury and confusion of the issues is acute and unavoidable, and dwarfs any conceivable probative value. The government seeks to show the jury a highly charged sexual video, strip it of context, and then present it as "visual evidence of the drugged sexual assaults that were the hallmark of the defendants' conspiracy." Mot. at 38. It does so even though the government has never interviewed the woman in the video and there is contemporaneous evidence supporting consensual sex and voluntary recreational drug use. The Supreme Court has long cautioned that Rule 403 prohibits admission of evidence that "lure[s] the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief, 519 U.S. at 180.

The government's inflammatory mischaracterization heightens the prejudice; its motion still fails to acknowledge that videos and photos from the same encounter contradict its narrative. This portrayal of the conduct as nonconsensual is purely speculative. Offering the jury a single video while withholding the surrounding context would mislead it into believing that the video depicts a rape when it demonstrably does not. Rule 403 exists to prevent exactly this type of prejudicial presentation of evidence.

Additionally, the Second Circuit has recognized that evidence with low probative value or speculative foundations may be excluded under Rule 403 to prevent unnecessary mini-trials that distract the jury from the issues at hand. See Spoor, 904 F.3d at 155 (excluding graphic and potentially inflammatory testimony to avoid a "trial within a trial" and to limit undue prejudice); United States v. Jeffers, 402 F. App'x 601, 603 (2d Cir. 2010) (affirming preclusion of cross-examination about prior domestic abuse to avoid unnecessary mini-trial); United States v. Dickinson, 16 F. Supp. 3d 230, 234-35 (W.D.N.Y. 2014) (excluding evidence of prior sexual abuse

because it was unduly inflammatory and risked diverting the jury's attention from material issues).

Here, if the 2009 Video were admitted, the jury would be forced to resolve a collateral mini-trial

about whether an unidentified woman was drugged and assaulted over 15 years ago. The defense

would have to explain who she is, what the surrounding videos show,[12] what the metadata means,

and why the government's interpretation is wrong. A trial within a trial such as this would be time

consuming and distract from the actual charges.

## III.   EVIDENCE AND ARGUMENT CONCERNING ACCUSERS' CIVIL PLAINTIFFS' ATTORNEYS IS ADMISSIBLE

Evan Torgan, a civil plaintiffs' attorney with demonstrable financial incentives tied to the

outcome of this case, represents 14 of the 24 accusers the government intends to call as witnesses

at trial. The government moves to preclude any mention of his name and any argument concerning

his role, even though none of this information is protected by attorney-client privilege. See Mot.

at 87. Whether or not the government wants to admit it, Mr. Torgan is at the center of this case.

Evidence of his representations, fee arrangements, and role in the investigation is highly relevant

and probative to the accusers' credibility, motive, bias and integrity of the investigation, and the

government offers no credible bar to its admission.

The accusers' credibility undoubtedly will be the most significant issue at trial. The

government's case, as it has acknowledged, relies primarily on the number of accusers and the

purported similarity in their allegations. The throughline connecting these accusers is their shared

lawyer. Mr. Torgan is the reason the accusers came forward at the same time, and the jury is

entitled to know that Mr. Torgan orchestrated their participation, attended their interviews, decided

---

[12] If the government introduces only one video without calling the alleged "victim" to provide context, the rule of completeness requires the introduction of additional videos and photos from that occurrence to prevent misleading the jury. Fed. R. Evid. 106; see also United States v. Davis, 531 F. App'x 65, 70 (2d Cir. 2013) (finding that the admitted footage was sufficient to ensure a fair understanding of the events depicted).

what documents to turn over and what information to withhold or redact, and stands to profit from a conviction. It is no surprise that the government wants to conceal his role and impact from the jury. The Court should admit this evidence, as it is highly relevant, narrowly tailored, and not privileged.

### A. Background

As detailed in Tal's motion to dismiss the indictment, Mr. Torgan and other plaintiff's attorneys were active participants at the inception of the government's investigation in June 2024. See ECF 76, at 4-7. Mr. Torgan filed the first two sexual assault lawsuits against Oren and Alon in November 2023. The Real Deal covered those filings extensively, publishing seven articles between June 8, 2024 and June 18, 2024—six of which quoted Mr. Torgan directly. The New York Times and Wall Street Journal followed suit on June 17, 2024, and June 18, 2024, also quoting Mr. Torgan. Only after this wave of publicity did the government initiate its criminal probe. From that point forward, Mr. Torgan operated as a de facto investigator and strategic partner with the government, recruiting alleged victims and funneling them to the government.

But that was just the tip of the iceberg. Jencks Act materials and recent disclosures from the government confirm Mr. Torgan's entanglement with the prosecution runs far deeper than previously known. Mr. Torgan now represents 14 of the 24 accusers the government proposes to call at trial. He or his law partner attended nearly all of their clients' interviews with the government where the clients recounted details of their alleged attacks. And Mr. Torgan served as a conduit for "evidence" that the government itself never collected—submissions from his clients and others who reached out to Mr. Torgan after seeing his name in the press. In short, the government outsourced part of its investigation to a private attorney whose financial prospects depend on a conviction.

That reality goes to the heart of this case. It is the foundation upon which the government's witness pool—and much of its evidence—rests. The Court should permit the jury to hear this evidence.

### B.  Mr. Torgan's Role Is Central, Not Collateral

The government's claim that Mr. Torgan's involvement is "irrelevant" and that any mention of his name would "confus[e] the jury" is as baseless as it is revealing. Mot. at 88. This case turns on the credibility of the accusers. The jury has the right to know that one of the common denominators for the supposed similarities in their stories is a lawyer who recruited them, met with them, attended their interviews, and stands to profit from their participation. Mr. Torgan's role impacts the credibility of the accusers in several critical ways, none of which has anything to do with him being an "experienced attorney," as the government asserts. Mot. at 88.

#### 1.  *Mr. Torgan is the source of the accusers' financial motivation.*

First, Mr. Torgan has presented his clients with real financial motivation. Mr. Torgan is not simply a lawyer representing a witness in a case, as the government attempts to paint him; he is a lawyer with a distinct financial stake in the criminal prosecution. He shares that financial motivation with his clients, which certainly can influence an accuser who meets with Mr. Torgan before and after sitting for an interview with the government.

From the outset, Mr. Torgan has operated under the theory that the more accusers he brings to the government, the stronger the criminal prosecution will be and the greater chance he has to recover monetary damages in his filed civil suits and in potential future litigation.[13]  As the news

---

[13] The government argues that only five of the 14 accusers Mr. Torgan represents have filed lawsuits (Mot. at 89, n.25), but that is of no moment regarding the financial incentive to Mr. Torgan and his clients. Others remain eligible to file suit after the criminal trial. Additionally, of Mr. Torgan's clients who have not yet sued, several have nevertheless contacted others for assistance or to participate in their eventual civil litigation.

of the civil suits initially broke in June 2024, Mr. Torgan appeared in and provided quotes in nearly every media article as a mechanism to generate more clients and business. Clearly, he has been successful in doing so.

Moreover, Mr. Torgan and his clients may reap a windfall if defendants are convicted on certain statutory counts. Mr. Torgan, and other plaintiff's attorneys who sued defendants on behalf of statutory victims, surely would attempt to invoke the collateral estoppel doctrine in their civil cases, whereby a conviction could be used to preclude defendants from re-litigating the issue of liability. "Where a criminal conviction is based upon facts identical to those in issue in a related civil action, the plaintiff in the civil action can successfully invoke the doctrine of collateral estoppel to bar the convicted defendant from relitigating the issue of his liability."[14] Kennedy v. Hubsher, 193 A.D.3d 705, 146 N.Y.S.3d 288, 289 (2d Dep't 2021) (granting summary judgement for plaintiff on issue of liability for medical malpractice claims following criminal conviction of doctor who sexually abused patients); Lili B. v. Henry F., 235 A.D.2d 512, 512, 653 N.Y.S.2d 34, 35 (2d Dep't 1997) (granting summary judgment for plaintiff following criminal conviction for sexual abuse). The Court should permit evidence on this issue, or take judicial notice of the legal principle of collateral estoppel, as it is highly relevant to the accusers' financial motivation or bias.

---

[14] ████████████████████████████████████████████████████ Mr. Torgan also represents Victim-2, another statutory victim, who has not yet filed a lawsuit.

37

###### 1.    *Mr. Torgan had the opportunity and incentive to influence his client's accounts and testimony.*

Equally troubling is Mr. Torgan's attendance at nearly every government interview of his clients. Since July 2024, Mr. Torgan or his partner, Brendan Brown, have been present for at least 46 meetings with the government. Basic investigative protocol demands that witnesses be interviewed separately to prevent contamination or cross-pollination of their accounts. By placing himself in the room for each interview, in addition to his own meetings with his clients outside of the government's presence, Mr. Torgan effectively put all of his clients in the same room. He has heard each client's allegations; he presumably met with them before, during, and after their meetings with the government; he observed what details resonated with the government; and he knows which facts might increase the value of their civil claims. That dynamic vitiates the independence of each witness and undermines the integrity of the investigation.

For the same reason that it is permissible for the jury to consider whether witnesses spoke to one another about their recollections or testimony, the jury should hear that the accusers have the same plaintiff's attorney. See United States v. Eisen, 974 F.2d 246, 261 (2d Cir. 1992) (approving cross-examination into "cross-pollination" of witness testimony and noting that "[i]f, on cross-examination a defendant had been able to expose that prosecution witnesses had changed their testimony in response to the testimony of other witnesses, that fact would have been devastating to the Government"); see also Fed. R. Evid. 615 ("At a party's request, the court must order witnesses excluded from the courtroom so that they cannot hear other witnesses' testimony."); U.S. Dep't of Justice, Victims and Witnesses: Understanding Your Rights and the Federal Court System, available at https://www.justice.gov/media/1243761/dl?inline (explaining rule that witnesses generally cannot watch court proceedings "to ensure a witness's testimony is

based solely on his/her own knowledge and not on things he/she heard another witness testify about.").

This is particularly problematic where Mr. Torgan represents multiple accusers that allege they were assaulted as part of the same event. In particular, Mr. Torgan represents Victims-4 and -5, whose allegations serve as the basis for Counts 6-7 in the S3 Indictment. They traveled together to the Hamptons on the same night in 2009 and both allege assaults at the same house. Mr. Torgan also represents Minor-Victim-8 and Victim-9, ███████████████████████████████ ████████████████ . ████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████ . The government surely intends to argue that these respective accusers corroborate each other. Yet their shared representation by the same plaintiff's attorney— one who was present at each interview—cuts to the core of their credibility.

### 2.    *Mr. Torgan served as a de facto member of the prosecution team.*

In addition to influencing the credibility of the accusers, Mr. Torgan played an active and influential role in the government's investigation, which his communications with the government demonstrate. Evidence that shows the incompleteness or one-sidedness of an investigation is permissible at trial. See, e.g., Alvarez v. Ercole, 763 F.3d 223, 232 (2d Cir. 2014) (trial court erred in precluding cross-examination of law enforcement agent to demonstrate incompleteness of investigation); Watson v. Greene, 640 F.3d 501, 512 (2d Cir. 2011) (trial court permitting "inquiry into the thoroughness of the investigation").

Here, the government's investigation would not have materialized without Mr. Torgan. His lawsuits generated the publicity that attracted clients. Indeed, no accuser reported their allegations to law enforcement before Mr. Torgan entered the picture. Over the next year, he brought a steady stream of clients to the government and facilitated their investigation. For example, he wrote to

the government on July 3, 2024: "I have probably two people I can bring in relatively soon, and another three shortly thereafter"; on December 5, 2024, he reported: "I got a new call today from a woman raped in Manhattan by Oren . . . . She is interested in speaking to you. . . We can also do the 16-year-old we discussed . . . We also have someone willing to speak with you who was present when he[r] girlfriend was raped in the Hamptons . . ."; on January 5, 2025, he told the government, "I have two victims eager to speak with you whom I represent. . . . Let me know. They are both Oren."; and on February 4, 2025, Mr. Torgan's partner, Brendan Brown, wrote to the government that he "can confirm that all of [Victim-15's] friends are willing to speak with [the government]. She just received confirmation from them all."

In numerous instances, Mr. Torgan was responsible for gathering and providing the government with evidence, instead of the government using its subpoena power or FBI agents to obtain records, as would be expected in a criminal investigation. For example, on July 13, 2024, he reported his progress in helping Victim-21 ████████████████████████████████

████████████████████████████████████████████████████████████████

On January 23, 2025, Mr. Torgan's partner reported that he was "putting [Victim-12's] messages together for [the government] as discussed." The government's search warrants, a key part of their investigation, also relied heavily on Mr. Torgan's clients ████████████████████████

████████████████████████ See ECF 76, at 5. In the Miami-Dade State Attorney's Office investigation, which preceded the federal investigation, Mr. Torgan similarly served as an arm of the prosecution team. For example, when state prosecutors had concerns that law enforcement outreach to certain accusers might scare them off, Mr. Torgan handed them "a new

victim in Miami Beach." ECF 77-10. Prosecutors, in turn, referred potential clients to him. ECF 77-7.

At times, Mr. Torgan even offered the government his insight and analysis from his experience as a plaintiff's lawyer. To explain why Victim-21's medical records were inconsistent with her account, Mr. Torgan opined: "I just read the record. It's not so bad. It is pretty typical that historical inaccuracies in hospital records are recorded incidentally in our regular personal injury and med Mal cases as the providers are more concerned about treatment than typing out the histories the patients give."

In sum, a significant portion of the evidence in this case originated with Mr. Torgan and his clients. The critical role he played cannot simply be erased from the trial. For all of these reasons, evidence of and argument concerning Mr. Torgan's representations and role is highly relevant.

### C. The Evidence Is Not Privileged And Does Not Require Privileged Information To Rebut

Despite the government's concerns, none of the evidence the defense seeks to admit is privileged.

First, the fact that Mr. Torgan represents certain accusers is not privileged information. "In general, the fact of retainer and identity of the client are not privileged, because they do not qualify as confidential communications made for the purpose of securing legal advice." Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A., 258 F.R.D. 95, 101 (S.D.N.Y. 2009) (citing United States v. Pape, 144 F.2d 778, 782 (2d Cir. 1944); In re Grand Jury Subpoena Served Upon Doe, 781 F.2d 238, 247 (2d Cir. 1986) (client identity not privileged). Certainly, with respect to

those accusers that have filed lawsuits, Mr. Torgan's identity is not privileged and is publicly known.

Likewise, the financial terms of Mr. Torgan's engagements are unprotected. The Second Circuit has held that, "absent special circumstances, client identity and fee information are not privileged." In re Grand Jury Subpoena, 144 F.2d 778 at 782. Engagement letters and retainer agreements are also non-privileged to the extent they set forth "fees, payment structure, [and] the general extent of the services." Newmarkets Partners, LLC, 258 F.R.D. at 101 (S.D.N.Y. 2009); Farrell v. United States Olympic & Paralymic Comm., No. 20-CV-01178 (FJS) (CFH), 2023 WL 4033290, at *10 (N.D.N.Y. June 15, 2023) (engagement letter not privileged where it "does not involve the giving or receiving of legal advice, nor does it reveal any legal strategies"). Attorney invoices are no different, where they do not reveal client confidences or legal strategy. See Renner v. Chase Manhattan Bank, No. 98 CIV. 926 (CSH), 2001 WL 1356192, at *1–2 (S.D.N.Y. Nov. 2, 2001) ("If production of [attorney invoices] will necessarily reveal client confidences, then redactions will be ordered to protect the privileged material while allowing discovery of the nonprivileged material."); Bernstein v. Mafcote, Inc., 43 F. Supp. 3d 109, 115 (D. Conn. 2014) (time entries describing general subject matter and tasks not privileged).

Even more plainly, Mr. Torgan's presence at government interviews and communications with the prosecution team, which are numerous, are not privileged under any conceivable theory. These communications and related testimony are probative of bias and go directly to the defense theory that the investigation was one-sided, tainted by coordination, and incomplete.

The government's position that it cannot possibly rebut any defense argument regarding Mr. Torgan's representations without breaching privilege is grossly overstated. Mot. at 90. The government is free to call Mr. Torgan as a rebuttal witness to explain, if true, any steps he took to

ensure that he did not cross-pollinate his clients' accounts. Testimony, for example, that he did not share details from Victim-4's government interview with Victim-5, if true, would not violate any privileges. See United States v. White, 950 F.2d 426, 430 n.2 (7th Cir. 1991) (lawyer's statement to prosecutor that "no one disclosed any information" was "not a client communication[], but lack of communication" and therefore not privileged). Moreover, the government already intends to rehabilitate its witnesses' credibility through other avenues. Indeed, it moved in limine to admit prior consistent statements of its witnesses to rebut claims of "recently fabricated testimony" and motivation for financial gain. Mot. at 70. Either way, the notion that the government is "unfairly hamstrung from presenting a rebuttal" to the problems Mr. Torgan's involvement raises is inaccurate.[15]  Id. at 90.

### D. Preclusion Of Mr. Torgan's Identity And Role Violates The Defendants' Right To Present A Complete Defense

Preclusion of Mr. Torgan's identity and role would also violate the Defendants' Sixth and Fourteenth Amendment rights, which guarantee "a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1986). This presentation right is violated when a court prohibits an "entire line of questioning," such that the defendant is left without "any supporting evidence" and "without any support for his theory of the case." Alvarez, 763 F.3d at 232-33 (right violated where defense strategy was to "introduce enough suspicion about the

---

[15] The government's reliance on United States v. Gaines is misplaced. There, the Court found it permissible for the government to elicit that the defendant referred his attorney to an individual to rebut the defendants' claim that he "barely knew" that individual. 170 F.3d 72, 82 (1st Cir. 1999). The Court took issue with disclosing the identity of the lawyer because the lawyer was representing the defendant at trial and testimony about the referral "has arguable Sixth Amendment right-to-counsel implications." Id. Here, of course, Mr. Torgan does not represent any party in the action and his clients have no Sixth Amendment rights. And, the purpose of admitting evidence of his role is directly relevant to the most critical issue in the trial—the accusers' credibility. Aside from this inapposite case, the government cites no other support for its motion to preclude evidence and argument related to Mr. Torgan.

thoroughness of the . . . investigation to plant a reasonable doubt that the government met its burden of proof" but trial court barred cross-examination on information in investigative reports). The government effectively asks to limit cross-examination on the topic of financial motivation to five accusers who have filed lawsuits and to eliminate Mr. Torgan's identity from the trial. Mot. at 91. But that removes an "entire line of questioning" with respect to the remaining nine accusers Mr. Torgan represents and any questioning relating to each of the highly relevant topics discussed above.

At bottom, Mr. Torgan's impact should not be removed from the trial. His role is highly relevant to the key issue in the case, the accusers' credibility, and there is no bar to its admission.

## IV. THE DEFENDANTS' LACK OF RESPONSE TO A VIDEO IN A GROUP CHAT IS INADMISSIBLE

The government moves to admit a highly prejudicial and inflammatory video—with none of the defendants depicted—sent by a third-party in a ten-person group chat under the theory that the defendants' purported silence after the video was sent constitutes an adoptive admission under Rule 801(d)(2)(B). This video not only fails to meet the requirements under the hearsay exception, but also decidedly does not satisfy Rule 403's balancing test. It is highly prejudicial and presents a distinct risk of misleading the jury, while having low probative value. For the reasons discussed below, the Court should reject this attempt to present inflammatory hearsay evidence to the jury.

### A. Background

The government alleges that the defendants were part of a WhatsApp group chat with over ten members (the "Group Chat"). The Group Chat lasted from around October 2016 to May 2018 and consisted of approximately 1,168 messages in that period. As with just about any group chat amongst friends that have known each other since childhood, the Group Chat consisted heavily of jokes, boasting, exaggeration, and members making fun of each other.

In the nearly two-year period of the Group Chat's existence, the government has cherry-picked a video clip of pornography sent on March 7, 2017, by a third-party whom the government has never interviewed (referred to as "CC-2"). With no context at all, CC-2 sent this fictionalized and dramatized video along with the message, "Old days at the Alexanders."  As the government described the video, "four almost entirely unclothed men surrounding a naked woman, with at least one other man slightly offscreen. One man had the woman by the neck, another grabbed her hair, and all of the men violently pulled her back and forth until the man who had the woman by the hair pulled her off the ground while another man covered her mouth with his hand."  Mot. at 62.

As previously noted, no defendant, accuser, or anyone involved in this case is depicted in the video or had anything to do with its filming. Nor was any further context or time period given to glean the meaning of the "old days."  No one in the Group Chat responded to the video. And, no one in the Group Chat sent any further messages that day or the next day. Oren and Alon each sent messages two days later but only after CC-2 sent photographs on a different topic. Tal's next message in the Group Chat was not until March 18, 2017, 11 days after the video was sent. Moreover, Oren and Alon's last messages before the video was sent were on February 22, 2017 (13 days before), and Tal's last message was on February 19, 2017 (16 days before).

### B.  The Video Does Not Qualify As An Adoptive Admission

The government's attempt to wedge the video and accompanying message into the hearsay exception for adoptive admissions should be rejected. Rule 801(d)(2)(B) provides a hearsay exception where "[t]he statement is offered against an opposing party and is one the party manifested that it adopted or believed to be true."  To determine whether a party adopts a statement, "[t]he general rule is to look at the circumstances to see whether it was more reasonably probable that a man would answer the charge made against him than that he would not."  United States v. King, 560 F.2d 122, 134 (2d Cir. 1977). An admission by silence may be admissible only if "there

45

are circumstances which render it more reasonably probable that a man would answer the charge made against him than that he would not." United States v. Aponte, 31 F.3d 86, 87 (2d. Cir.1994).

The government has not, as required, "established sufficient foundation facts for a jury to reasonably conclude that the defendant did actually hear, understand and accede to the statement." United States v. Ayala, No. 85-CR-847 (PKL), 1986 WL 982, at *2 (S.D.N.Y. Jan. 15, 1986). As discussed below, the government has failed to demonstrate that the Defendants (i) saw the video or reasonably should have responded given the nature of the group chat; or (ii) understood the ambiguous video and message to be a specific accusation against them that warranted a response.

**1.**     ***The government cannot establish that the defendants saw the video or that their lack of response acceded to the video.***

The government's motion ignores that the video was sent in a social group chat with over ten members. This group messaging forum greatly reduces the likelihood that the defendants saw the video and diminishes any meaning derived from not responding. "Adoptive admissions are about ordinary expectations regarding the way people converse with each other." United States v. Thomas, No. 14-CR-00031 (RNC), 2015 WL 237337, at *3 (D. Conn. Jan. 17, 2015). Tellingly, the government cites no case where a defendant's silence following a message in a group chat, let alone one with so many members, constitutes an adoptive admission.

For anyone who has ever participated in a social group chat, it is an entirely different social construct than one-on-one text messaging, speaking to a person on the phone, or conversing face-to-face. In a social group chat, people pay less attention, respond less, and miss messages significantly more than when communicating one-on-one. While it may not be socially acceptable to ignore a one-on-one text message or someone speaking to you face-to-face, not seeing or ignoring group chat messages is common. Stated differently, in a group chat, the expectation that a participant will see and respond to a message is significantly less than in a one-on-one setting.

46

Against that backdrop, the Group Chat here was seldom used, despite the government's efforts to argue the contrary. Members went weeks at a time or more without responding or participating. There was a total of 1,168 messages sent over 20 months, which breaks down to approximately 57 messages a month, or less than two messages per day.  For Tal, for example, the video was sent in the middle of a 27-day period in which he did not participate in the chat at all (February 19, 2017 to March 18, 2017). Unsurprisingly, given this level of communication, no one responded to the video and accompanying message, not just the defendants. And no one messaged on the Group Chat after the video was sent until two days later when CC-2 changed the topic by sending other photographs. Requiring an affirmative denial or rebuttal to every joke told on a group chat, lest it be construed as an admission, is unreasonable and defies social constructs.

### 2. *The video and message was ambiguous and cannot constitute a charge made against the defendants.*

Courts have admitted adoptive admissions by silence where a defendant did not respond to a "charge made against him." Aponte, 31 F.3d at 87. But the video and accompanying message here was not a clear charge against the defendants relating to a specific event. It was an ambiguous clip of pornography involving professional actors, which did not depict any of the Defendants or anyone involved in this case.

The accompanying message, "Old days at the Alexanders," provides little further context. It is not clear what period or event this message refers to as the "old days"—whether before the alleged conspiracy or during. Moreover, something that occurred "at the Alexanders" does not imply that the defendants had involvement in a similar incident to what was depicted in the video. The evidence at trial will show that the defendants frequently hosted parties, and this video could have multiple meanings. It is far from a direct accusation of "being involved in a crime" to which an innocent person "will ordinarily deny such involvement."  United States v. Tocco, 135 F.3d

116, 128 (2d Cir. 1998). Even under the government's theory, the meaning of the "old days" message relies on CC-2's purported perception of prior events. However, the government does not appear to intend to call CC-2 as a witness, and therefore he will not provide any context to clarify what he meant, nor will the defendants have an opportunity to confront him.

The government cites two cases where lack of response to text messages were found to be adoptive admissions, but neither case provides support for the defendants' purported adoption of a video that the government claims may refer to an assault in 2009, eight years earlier. Mot. at 64. In United States v. Rosado, the Court admitted text messages between two individuals (not a group chat) which occurred during the commission of a kidnapping. 21-CR-516 (RMB) (S.D.N.Y.), ECF 100, Sept. 22, 2023 Tr. at 21-23. There could be no ambiguity concerning the accusation being made. In United States v. Ho, similarly, the adopted admission (text messages between two people) occurred as part of the commission of a bribery scheme where there was no ambiguity as to what the message referenced. See 984 F.3d 191, 209 (2d Cir. 2020). Neither of these examples involved a purported reference to allegations occurring eight years earlier. In order to "understand" and "accede" to the statement, the defendants would have to know what the statement referenced, which is not clear from the ambiguous video and "old days" message. Ayala, 1986 WL 982, at *2.

The government also entirely ignores the nature and context of this particular group chat, which is critical. First, the Group Chat is comprised almost entirely of people who have known each other since childhood. Accordingly, the members of the chat were not concerned about making a first impression or defending themselves amongst people they have known forever. Moreover, as would be expected amongst longtime friends, the Group Chat is rife with jokes, exaggeration, and messages poking fun at one another. It certainly is devoid of anything serious, let alone accusations to be taken seriously by members within the chat necessitating a response.

As support for its position that the defendants "did not hesitate to speak up . . . when they disagreed with what others were sending," the government misguidedly points to a screenshot of a message from an unknown Instagram user expressing disdain for Oren, to which Tal and Alon responded. Mot. at 63. This type of accusation though, having originated from an unknown person outside the Group Chat, is entirely different and more serious than an ambiguous video sent by a known member of the Group Chat, as demonstrated by the response to the screenshot. CC-13 wrote, "Who is this psycho," and Tal responded "Who's that." Id. The Instagram user not being known caught the attention of the members of the Group Chat and necessitated a response, unlike CC-2's video which was nothing more than a joke that fell flat. Not only did the Defendants not respond to the video, but no one did.

The ambiguity of the video, coupled with the casual and social group forum in which it was sent, are "circumstances that render it more probable that a person would not respond . . . than that he would." Tocco, 135 F.3d at 129.

### C.  The Video Should Be Excluded Under Rule 403

Even if the Court finds that the video constitutes an adoptive admission, it should be excluded under Rule 403. Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Here, the danger of admitting this highly inflammatory video decidedly outweighs its low probative value. The Court should preclude the video to ensure the Defendants receive a fair trial.

49

### 3.     *The video is extremely prejudicial and misleading to the jury.*

The government wants to admit a clip of fictionalized pornography showing four men violently assaulting a woman with other men watching and attribute this conduct to the defendants. The highly prejudicial nature of this video cannot be overstated.

Contrary to the government's position, the video is certainly more inflammatory than any testimony the jury will hear from accusers. See United States v. Cunningham, 694 F.3d 372, 390 (3d Cir. 2012) (reversing conviction where District Court abused discretion in admitting two videos depicting sexual violence); United States v. Dickinson, 16 F. Supp. 3d 230, 235 (W.D.N.Y. 2014) (excluding testimony and video of sexual abuse of defendant's daughter as unfairly prejudicial, inflammatory, and different from the alleged conduct). The video shows four men violently assaulting a woman with additional men watching. The video depicts hair pulling, choking, and violently yanking a naked woman back and forth by her head and neck, none of which any accuser will describe. The jury will hear no such evidence from other accusers. The age and large size of the men in the video also differs and is significantly more imposing and threatening than any evidence that will be presented at trial. Finally, the video is also far more violent when compared to typical pornography. Courts have considered the level of violence a video depicts in comparison to that which jurors are likely familiar. See United States v. Abu-Jihaad, 630 F.3d 102, 133 (2d Cir. 2010) (admitting excerpt of video depicting violence as it was "less gruesome than many seen on nightly news dispatches from Baghdad."); United States v. Dore, No. 12-CR-45 (RJS), 2013 WL 3965281, at *7 (S.D.N.Y. July 31, 2013) (admitting video depicting "far less violence than is routinely shown on television").

In addition, the video presents a grave risk of misleading or confusing the jury. See United States v. Rivera, No. 13-CR-149 (KAM), 2015 WL 1757777, at *6 (E.D.N.Y. Apr. 17, 2015) (reserving decision on admissibility of video without further government proffer in light of

"defendants' contention that the fictionalized and dramatized nature of some of the videos, where individuals may be boasting about the excesses of a certain lifestyle that may glamorize criminal conduct, should be excluded because it is overly prejudicial and is likely to confuse the jury"). There is a distinct danger that the jury will conflate this video with the accusers' testimony. The government does not intend to admit any video evidence of the charged sexual assaults. Without video evidence, the only evidence of the alleged assaults will come from testimony of the accusers. However, if the prejudicial video is admitted, the only image that will come to mind when the jury hears accusers' testimony is the inflammatory, dramatized clip of violent pornography. Exclusion of this video would prevent this risk of confusion.

### 4. *The video has minimal probative value.*

While the video is highly prejudicial, its probative value is low. The video and accompanying message bear no direct connection to the charged conduct or a specific alleged incident. It is precisely the type of generalized depiction of violence that courts have routinely excluded. See United States v. Perez, No. 23-CR-99 (LJL), 2025 WL 551567, at *3 (S.D.N.Y. Feb. 19, 2025) (excluding violent music video and song lyrics "as it consists of generic references to violence that can be found in many rap songs"); United States v. Donald, No. 21-CR-8 (VAB), 2023 WL 6958797, at *26 (D. Conn. Oct. 20, 2023) (excluding rap music videos "about violence and "generalized criminal behavior" under Rule 403).

The court's analysis in Perez is useful. There, the government sought to admit three rap music videos and their respective lyrics as evidence of the defendants' participation in a RICO enterprise and to corroborate specific acts of violence. 2025 WL 551567, at *2-3. The court admitted the first video because the song lyrics described the commission of the charged crime and therefore had "a direct and specific nexus to the charged conduct." Id. at *3. The court admitted the second video because it depicted certain defendants together and relevant gang signs

to show the existence of a RICO enterprise. Id. But the court excluded a third video because the song lyrics and video were unconnected to any charged crime and merely contained "generic references to violence that can be found in many rap songs." Id. It therefore was "not highly probative." Id. Here, the video and accompanying message bears no direct nexus to the charged crimes. The video does not show a charged crime; the defendants are not depicted; and the defendants did not even make the statement, "Old days at the Alexanders."

The video here is nonspecific, ambiguous, and has no connection to the charged crimes. Because the video has minimal probative value but is nonetheless highly prejudicial, the Court should exclude it under Rule 403.

## V.    THE GOVERNMENT IS NOT ENTITLED TO BROAD PRETRIAL RULINGS THAT HEARSAY STATEMENTS BY CERTAIN DECLARANTS ARE ADMISSIBLE UNDER RULES 801(d)(2)(E)

The government's request for a categorical pretrial ruling admitting hearsay statements under the co-conspirator exception is premature and should be denied. The government *may* be able to satisfy the conditions for admissibility for some of these statements, but it has not yet done so. This Court should rule after hearing the evidence regarding each statement in the context of the trial testimony.

### A.    The Government's Rule 801(d)(2)(E) Arguments Are Premature And Overbroad

The government has not satisfied the conditions necessary for the Court to rule now that broad categories of statements by numerous different uncharged declarants are admissible under Rule 801(d)(2)(E)'s coconspirator exception to the hearsay rule. The Court should deny the government's premature request to apply the exception, and instead follow the procedures applied by Chief Eastern District Judge Margo Brodie in United States v. Ng, 18-CR-538 (S-1) (MKB) (E.D.N.Y.) and Judge Arun Subramanian in United States v. Combs, 24-CR-542 (S-3) (AS)

52

(S.D.N.Y.). In both proceedings, the court heard arguments from the defense and prosecution regarding the anticipated statements "at the start or at the end of the trial [day]" before admitting the statements—after the government proffered further context and evidence. See Ng at 12/9/21 minute entry; id. at 12/7/21 Tr.14; See Combs at 4/25/25 Tr.16. This is also consistent with the Court's individual rules, which state that it:

> [S]trongly prefers to resolve objections to exhibits prior to the time that trial sessions begin each day. If the parties anticipate prolonged arguments regarding the admissibility of any evidence, they are urged to raise the issue with the Court in advance, so that the Court can hold a conference prior to the time that the trial session is scheduled to begin.

Court's Individual Rules p. 5.

A pretrial ruling now would be premature. Rule 801(d)(2)(E) requires an actual evidentiary basis, not just aspirational statements from the government as to what it hopes to prove or what the out-of-court statements might mean. But the latter is all the government offers on a "non-exhaustive" and broad variety of statements apparently regarding (1) having sex with women; (2) the recreational use and procurement of drugs during the charged conspiracy; (3) statements describing past events; and (4) statements regarding covering up alleged assaults. Gov't MIL at 50-52. "Before admitting a co-conspirator's statement … under Rule 801 (d)(2)(E), a court must be satisfied that the statement actually falls within the definition of the Rule." Bourjaily v. United States, 483 U.S. 171, 175 (1987).

For a statement to qualify, the government must demonstrate, and "the court must find," "(1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a) during the course of and (b) in furtherance of the conspiracy." United States v. Tracy, 12 F.3d 1186, 1196 (2d Cir. 1993). In other words, the government must identify the statements, and show—as to each specific statement—sufficient evidence to warrant its admission. This further requires sufficient evidence

53

that the relevant declarants were members of the alleged conspiracy at the time the statements were made. For example, although the government may allege that defendants were involved in a drug trafficking conspiracy, this does not automatically permit the wholesale admission of any text, call, or conversation which referenced drug use or procurement during the time of the alleged conspiracy. See United States v. Stover, 329 F.3d 859, 869 (D.C. Cir. 2003). The government must make an actual showing, pursuant to Bourjaily, that the specific, identifiable statement at issue was made in furtherance of the conspiracy, as opposed to being part of an unrelated conversation. See id. ("An indictment may not be offered as evidence to satisfy that burden.")

These prerequisites are "[p]reliminary questions" concerning the admissibility of evidence, Fed. R. Evid. 104(a), and must be proven by a preponderance of the evidence, see Bourjaily, 483 U.S. at 175. "The district court should, whenever reasonably practicable, require the showing of a conspiracy and of the connection of the defendant with it before admitting declarations of a coconspirator." United States v. James, 590 F.2d 575, 582 (5th Cir. 1979). The government has not met this burden—nor can it before offering actual *evidence* satisfying the requirements. See United States v. Piper, 298 F.3d 47, 54 (1st Cir. 2002) (the government is "not entitled to a free pass" and instead "[a] judicial determination that a coconspirator's statement tended to further the conspiracy must be supported by some plausible basis in the record.").

As addressed below, many of the statements offered by the government, on their face, reflect mere "casual conversation about past events" "which amount[] to no more than idle chatter," United States v. Lieberman, 637 F.2d 95, 103 (2d Cir. 1980), or are "mere[] narrative account[s] by one [individual] of the facts of [another's] past activities," United States v. Heinemann, 801 F.2d 86, 95 (2d Cir. 1986) (cleaned up). Such statements do not satisfy the rule's

54

"in furtherance" requirement. Accordingly, we urge the Court to wait until trial to make a ruling on these broad categories of evidence.

### 1. The government's proffered conspiracies are overbroad.

The government's argument as to the existence of a drug conspiracy and its alleged members is too broad to support application of the exception outright. The government broadly proclaims that the "defendants' conversations with each other and with others concerning these drugs, regardless of whether those individuals are aware of the defendants' scheme to drug and rape women, are admissible as co-conspirator statements in furtherance of a conspiracy to traffic drugs." Mot. at 53. Yet, the government seeks to admit the drug discussions in order to try to prove a conspiracy "that the defendants used these kinds of drugs to incapacitate women to further their sex trafficking scheme." Id. at 54. Those types of arguments do not suffice. Rather, before admitting the statements, the Court must find, "in each instance," "the existence of a specific criminal conspiracy" or "a conspiracy with some specific criminal goal." United States v. Gigante, 166 F.3d 75, 83 (2d Cir. 1999); United States v. Perry, 624 F.2d 29, 31 (5th Cir. 1980) ("mere presence or association is not sufficient to establish membership in a conspiracy"). Recognizing "the breadth with which Rule 801(d)(2)(E) can sweep statements into evidence," courts have found that "the requirement that an agreement existed to achieve some end provides an important limiting principle." United States v. Musaibli, 42 F.4th 603, 618 (6th Cir. 2022). Without it, "a conspiracy could be defined at such a general level—'organized crime' or 'terrorism' or just 'breaking the law'—to include statements that shared no other purpose than the one superimposed on them after the fact by prosecutors." Id.

The Court cannot rely on the government's broad allegations alone, and must instead hold the government to their burden, which is to show the existence of a conspiracy and the connection

55

of each defendant to it. See James, 590 F.2d at 582. Endorsing the government's arguments "at such a general level" would "lead to the admission of statements that shared no other purpose than the one superimposed on them after the fact by prosecutors." United States v. Yandell, 2024 WL 129804, at *3 (E.D. Cal. Jan. 11, 2024).

Moreover, the government's motion is not substantiated by any actual evidence. There must be "proof the speaker and listener were part of the same ongoing conspiracy and there was a connection between that conspiracy and statement." Yandell, 2024 WL 129804, at *2. The government cannot "use a hearsay statement to provide the sole foundation for its own admission." United States v. Tellier, 83 F.3d 578, 581 (2d Cir. 1996). The Court has not yet heard the evidence as to each statutory victim, has not ruled on whether the government's proffered Fed. R. Evid. 413 or 404(b) evidence is admissible, and therefore, should rule on whether the context or purpose of the specific statements the government seeks to offer.

### 2. The proffered statements are not in furtherance of a conspiracy, absent additional context.

As for the government's arguments that certain statements are "in furtherance" of the sex trafficking conspiracy requirement, more context is needed. Mot. at 50. Many of the statements at issue pertain to narrative descriptions of past events. The Court should ultimately preclude their admission pursuant to Rule 801(d)(2)(E).

A statement "in furtherance" of a conspiracy "must be more than a mere narrative description by one coconspirator of the acts of another. . . . Rather, the statements must be such as to prompt the listener—who need not be a coconspirator—to respond in a way that promotes or facilitates the carrying out of a criminal activity." United States v. Maldonado-Rivera, 922 F.2d 934, 958 (2d Cir. 1990) (internal citations and quotation marks omitted); see also United States v. Gupta, 747 F.3d 111, 125 (2d Cir. 2014) ("Statements designed to induce the listener's assistance

56

with respect to the conspiracy's goals satisfy the Rule's in-furtherance requirement."); United States v. Rivera, 22 F.3d 430, 436 (2d Cir. 1994) ("the statements must in some way have been designed to promote or facilitate achievement of the goals of that conspiracy"); United States v. Rahme, 813 F.2d 31, 35 (2d Cir. 1987) ("Statements by a coconspirator are in furtherance of the conspiracy within the meaning of Rule 801(d)(2)(E) if they prompt the listener to respond in a way that facilitates the carrying out of criminal activity.").

Statements which offer a narrative description of past events are not always admissible pursuant to Rule 801(d)(2)(E), as they often fail to prompt the carrying out of criminal activity. To be admissible, the government must show that the backward-looking statements were made to update someone on the progress of a conspiracy[16]. See United States v. Malka, 602 F. Supp. 3d 510, 534 (S.D.N.Y. 2022) ("The Second Circuit has held that co-conspirator statements that 'provide reassurance, or seek to induce a co-conspirator's assistance, or serve to foster trust and cohesiveness or inform each other as to the progress or status of the conspiracy' further the ends of the conspiracy, *United States v. Desena*, 260 F.3d 150, 159 (2d Cir. 2001), as do statements 'that apprise a co-conspirator of the progress of the conspiracy,' United States v. Rahme, 813 F.2d 31, 36 (2d Cir. 1987)").

Here, the government cannot meet its burden of demonstrating that the alleged co-conspirator statements were made "in furtherance of" a conspiracy. All the government has done is posit a laundry list of ways in which the anticipated statements *could be* construed as being in

---

[16] The government's motion argues that "[t]heir statements regarding past assaults serve as . . . bragging rights to increase their status among one another and their male friends, perpetrating the conspiracy, cf. United States v. Velez, 170 F. App'x 146, 147 (2d Cir. 2006) (bragging about crimes evidence intent to maintain or increase position in enterprise)." Mot. at 52. Velez is a one-page decision which relates to a sufficiency of the evidence challenge following a conviction for murder in aid of racketeering. The case is entirely unrelated to a Rule 801(d)(2)(E) analysis or the question of whether statements are made "in furtherance of" a conspiracy.

"furtherance" of the alleged conspiracy, but such blanket claims are insufficient. For example, the government argues that statements regarding drug discussions are admissible because the defendants used these drugs to sedate women. There has been no evidence of that and the Court cannot conclude as much without considering the context of the statements and the speakers' purposes. See Stover, supra. (the mere fact that a defendant was accused of dealing drugs does not support the conclusion that any statement regarding drug-dealing during the time period of the conspiracy is automatically in furtherance of it).

Moreover, any discussion surrounding past events, sexual encounters, social gatherings, etc. are not in furtherance of any conspiracy. This is because the statements offered no "progress" on the status of a conspiracy and also failed to prompt the listener to do anything that would facilitate the continued carrying out of criminal activity. Cf. United States v. Lozano-Reyes, 101 F.3d 686 (2d Cir. 1996) (conversations which are designed "to outline future conspiratorial actions and the anticipated profits" are in furtherance of the conspiracy); United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994) (co-conspirator statement about the status of a loan in the midst of a loan-sharking conspiracy was made in furtherance of that conspiracy); United States v. Simmons, 923 F.2d 934, 945 (2d Cir. 1991) (discussions surrounding a gang-related murder "and the reasons for it, may well have served to promote the criminal activities of the [enterprise] by enforcing discipline among its members"); United States v. Rastelli, 870 F.2d 822, 837 (2d Cir. 1989) (statement that defendant was receiving proceeds of extortion was in furtherance of conspiracy).

Rather, the statements can only be described as casual banter. As the government notes in its citation of United States v. Thai, co-conspirator statements meet the in-furtherance requirement only "if they serve some current purpose in the conspiracy." 29 F.3d 785, 813 (2d Cir. 1994) (emphasis supplied). There was simply no current purpose served to further a conspiracy by the

58

alleged statements which did nothing more than reflect on an isolated social event, gathering, or sexual encounter.

### 3. Many of the statements are merely idle chatter.

In addition to failing to meet their burden as to the statements being "in furtherance" of the conspiracy, many of the statements at issue are merely idle chatter or personal, casual conversations. Such statements are plainly inadmissible pursuant to Rule 801(d)(2)(E). In the context of a Rule 801(d)(2)(E) review, "idle speech and casual conversations about past events are inadmissible." United States v. Bin Laden, No. 98-CR-1023 (LBS), 2001 WL 1160604, at *8 (S.D.N.Y. Oct. 2, 2001), aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 93 (2d Cir. 2008); see also United States v. Diaz, 176 F.3d 52, 85 (2d Cir. 1999) ("in furtherance" requirement is "not met by a narrative conversation that amounts to mere 'idle chatter.'"); United States v. Paone, 782 F.2d 386, 390 (2d Cir. 1986) (same); United States v. Means, 695 F.2d 811, 818 (5th Cir. 1983) ("mere idle conversation" not in furtherance of the conspiracy).

In Diaz, for example, statements about the fact that a murder had been committed, instructing a co-conspirator "to bring him clothes when he was on the run," and informing him that the gun used had been sold, were found not to be "mere idle chatter." Diaz, 176 F.3d at 85. In Desena, the court agreed that "it is difficult to construe casual storytelling in a bar, more than two years after the event, as anything but 'mere idle chatter.'" United States v. Desena, 260 F.3d 150, 158 (2d Cir. 2001). The court did note, however, that "statements to fellow Pagans while presiding over a club meeting could be understood as informing other coconspirators about the status of the conflict between the two gangs." Id.

59

For all of the reasons discussed above, conversations surrounding social events the defendants hosted, parties they attended, drugs they consumed or procured, and reflections on past sexual encounters, are nothing more than casual conversation and idle chatter. These statements could not, and did not, advance the goals of any conspiracy or prompt further action by any co-conspirator in furtherance of the conspiracy's objectives.

### 4. The Court should not decide the government's motion at this stage.

Finally, the Court should resist any ruling now and reject the government's premature, categorical request, as courts in this district and elsewhere routinely do. See United States v. Ilori, 2022 WL 2452258, at *2 (S.D.N.Y. July 5, 2022) (denying government motion "in limine for blanket permission to admit out of court statements made by certain purported co-conspirators," because "[c]ourt cannot make blanket rulings in advance of hearing the proffered evidence and any objection or knowing the context in which the statement is offered"); United States v. Carter, 2024 WL 183198, at *2 (S.D.N.Y. Jan. 17, 2024) ("The Government has provided a brief description of the messages it seeks to admit …. Without more, the Court is unable to grant blanket approval to potentially over 1000 exchanges at this preliminary stage."); Yandell, 2024 WL 129804, at *2 (denying government motion in limine in racketeering conspiracy case for same reasons).

Instead, the Court should withhold decision and hear proffers from the government, preferably at the beginning or end of the trial day before the government seeks to offer any statements. See Ng, 18-CR-538 (MKB) (E.D.N.Y.), at 12/9/21 minute entry; Combs, 4/25/25 Tr.16. While one practice in this district is to conditionally admit the statements at trial subject to later connection, see United States v. Geaney, 417 F.2d 1116 (2d Cir. 1969), that practice would be unworkable here. Because the statements the government seeks to admit constitute "so large a

proportion of [its anticipated] proof," if the evidence falls short of satisfying Rule 801(d)(2)(E), a later corrective instruction would be "of doubtful utility" and a mistrial would be required. Tracy, 12 F.3d at 1199. As Justice Jackson explained, "a conspiracy often is proved by evidence that is admissible only upon assumption that conspiracy existed. The naive assumption that prejudicial effects can be overcome by instructions to the jury all practicing lawyers know to be unmitigated fiction." Krulewitch v. United States, 336 U.S. 440, 453 (1949) (concurring).

The procedure used in Ng and Combs is a practical, efficient alternative that would not inconvenience the Court or the parties. This is especially necessary here, where the government has not yet produced its exhibits, but instead has proffered snippets of conversations in a 141-page memorandum. Once the government produces exhibits, for example. Conducting a hearing at the beginning or end of each trial day would ensure that the government makes a proper showing as to each statement and that the Court has proper context to rule. And it avoids imposing on the jury the mental gymnastics required by the Geaney procedure. The Court should deny the government's in limine request and follow the procedure used in Ng and Combs here.

## VI.    GOVERNMENT'S REQUEST TO PRECLUDE EVIDENCE RELATING TO MINOR VICTIM-3'S VOLUNTARY CONDUCT SHOULD BE DENIED

The government seeks a sweeping pretrial ruling barring any evidence or argument that Minor Victim-3 consented to sexual abuse.[17] Mot. at 72-74. This request fundamentally conflates two distinct concepts:

(1) "Consent" as an affirmative legal defense to alleged unlawful sexual activity, and

(2) Evidence of an accuser's voluntary acts or conduct, which may bear directly on issues the jury must decide—such as a defendant's knowledge, intent, or opportunity to observe.

---

[17] It bears noting that the Indictment does not charge "sexual abuse." The relevant charged offense, Count Five, alleges "sex trafficking."

Defendants do not intend to argue that if Minor Victim-3 consented to sexual contact, then the federal sex trafficking statute was not violated. It is well-settled that a minor cannot consent to sexual activity, and defendants will not suggest otherwise. See, e.g., United States v. Corley, 679 F. App'x 1, 4 (2d Cir. 2017) ("the victims could not consent because they were minors"). The purpose of 18 U.S.C. § 1591(b)(2) is to protect minors from exploitation, not to invite a consent defense.

But the government's motion goes far beyond that. By seeking to exclude all evidence of Minor Victim-3's voluntary acts, it would prevent defendants from presenting evidence relevant to the *mens rea* requirement of §1591.

## B. The Government's Other Arguments Are Without Merit

The government additionally asserts that (i) "the probative value of such evidence is significantly outweighed by the danger of prejudice," and (ii) any such evidence would intentionally be "aimed at jury nullification." Mot. at 73-74. Both arguments fail.

First, Rule 403's "unfair prejudice" standard protects defendants, not the government. See United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980) ("Rule 403 requires the trial court to make a conscientious assessment of whether the probative value of the evidence on a disputed

issue in the case is substantially outweighed by the prejudicial tendency of the evidence to have some other adverse effect <u>upon the defendant</u>.") (emphasis added). The government cannot suffer "unfair prejudice" within the meaning of the Rule. ██████████████████████

████████████████████████████████████████████████████

██████████

Finally, the suggestion that counsel for the Alexanders might invite jury nullification is unfounded. Counsel understand and will follow the rules of evidence and the prohibition on such argument. The government's motion is overbroad and ████████████████████████

██████████████████ it is premature. The Court should therefore decline to issue the blanket exclusion the government seeks and instead consider any specific evidence under the proper ████

████ and Rule 403 frameworks at the appropriate time.

## VII.    THE GOVERNMENT'S REQUEST TO PERMIT CERTAIN WITNESSES TO TESTIFY UNDER PSEUDONYMS UNDULY INFRINGES ON THE DEFENDANTS' AND THE PUBLIC'S CONSTITUTIONAL RIGHTS

### A.    Introduction

The government seeks to permit certain witnesses to testify under pseudonyms to "protect the dignity and privacy" of the victims. Without any legitimate basis, the government seeks a pseudonym for certain alleged victims because of unspecified speculative future harm. Yet, the use of a pseudonym here would unduly infringe on the defendants' constitutional rights and is unsupported by any legitimate interest.

What the government describes as "narrowly" tailored measures to accommodate its witnesses' privacy interests are, in fact, a blatant violation of the defendants' Sixth Amendment rights to confront witnesses and to a public trial—a violation that may well prevent potential witnesses from coming forward to testify on the defendants' behalf. The government's request would also contravene the public's and press's First Amendment and common law rights of access

63

for a trial of immense public interest in which there could not be a stronger need to enforce these rights.

The government's proposal would also create a logistical nightmare that would confuse witnesses and the jury. Here, we would be conducting a trial with Anonymous Alleged Victims interspersed with references to legitimately named witnesses.

If constitutional rights and logistical concerns don't foreclose pseudonymity here, the government's request should also be rejected because it cannot carry its heavy burden to justify this extraordinary relief. Pseudonymity is a very rare exception to the universal presumption of open trials and doesn't apply here. These Anonymous Alleged Victims are predominantly adults who merely fear the stigma and embarrassment of public testimony, with one alleged victim who was a minor at the time of the incident, and there are no undercover agents who would be in danger if identified.

The Court should deny the government's motion in its entirety.

**B.      The Government's Request Unduly Infringes On The Defendants' And The Public's Constitutional Rights**

       **1.      *The government's request violates the defendants' Sixth Amendment right to confront witnesses.***

Concealing the identities of the Anonymous Alleged Victims would violate the defendants' Sixth Amendment right "to be confronted with the witnesses against" them. The Anonymous Alleged Victims would constitute many of the government's main trial witnesses, and its case will to a large extent rise or fall on their credibility—which the defendants are entitled to vigorously challenge on cross-examination. Indeed, the Confrontation Clause's "main and essential purpose" is "to secure . . . the opportunity of cross-examination," Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986), which "is the principal means by which the believability of a witness and the truth of his testimony are tested," Davis v. Alaska, 415 U.S. 308, 316 (1974).

Although the defendants and the jury will know the true identities of these witnesses, pseudonyms prevent "full[] and adequate[]" cross-examination, Doe v. Skyline Automobiles Inc., 375 F. Supp. 3d 401, 407-08 (S.D.N.Y. 2019), which is why "[t]he case law recognizes a defendant's interest in confronting an identified accuser," Doe v. Delta Airlines, Inc., 310 F.R.D. 222, 225 (S.D.N.Y. 2015) (emphasis added), aff'd, 672 F. App'x 48 (2d Cir. 2016). A witness who testifies under her own name "may feel more inhibited than a pseudonymous witness from fabricating or embellishing an account." Delta Airlines, 310 F.R.D. at 225. "[O]pen examination of witnesses . . . is much more conducive to the clearing up of truth, than the private and secret examination . . . where a witness may frequently depose that in private, which he will be ashamed to testify in a public and solemn tribunal." Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 597 (1980) (Brennan, J., concurring) (quoting 3 William Blackstone, Commentaries *373 (13th ed. 1800)).

In Smith v. Illinois, for example, the Court reversed the defendant's conviction because a prosecution witness was permitted to testify pseudonymously. While "there was not, to be sure, a complete denial of all right of cross-examination," the defendant was nonetheless "denied the right to ask the principal prosecution witness . . . his name," and "when the credibility of a witness is in issue, the very starting point in exposing falsehood and bringing out the truth through cross-examination must necessarily be to ask the witness who he is." 390 U.S. 129, 131 (1968). "To forbid this rudimentary inquiry at the threshold," therefore, "[was] effectively to emasculate the right of cross-examination itself." Id. Similarly, in Alford v. United States, the Supreme Court reversed a conviction because the defendant was prohibited from inquiring into identifying information on cross examination. 282 U.S. 687, 692-94 (1931).

The Court should not permit this drastic limitation on the defendants' confrontation rights.

65

## 2.    *The government's request unduly infringes the defendants' and the public's rights to a public trial.*

Allowing alleged victims to use pseudonyms would infringe the defendants' Sixth Amendment right to a public trial—another important fair trial safeguard. See Gannett Co. v. DePasquale, 443 U.S. 368, 380 (1979). Nothing could be more unfair than requiring the defendants' to publicly defend themselves while many of the government's accusers wear a "cloak of anonymity." E.g., Skyline Auto. Inc., 375 F. Supp. 3d at 407. The defendants' risk suffering the same reputational damage and mental harms the government invokes to justify pseudonymity for these witnesses. Yet the government seeks to have them hide behind fake names while the defendants endure the immense public indignity of facing lurid sex-crimes accusations.

In another highly publicized prosecution in Pennsylvania against Jerry Sandusky, the court found that allowing alleged victims to testify anonymously violated a defendant's right to an open trial. See Commw. v. Sandusky, 14-CR-2421, 14-CR-2422 (Pa. Commw. Ct. June 4, 2012). There, the court rejected the motions of five adult victims to proceed using pseudonyms when testifying to incidents that occurred when they were minors.[18] The victims argued that "exposing their names would subject them to shame, ridicule and harassment," with one even submitting an affidavit from his psychologist stating that disclosure of his name "could trigger symptoms of post-traumatic stress disorder and interfere with the young man's treatment and recovery." Id. The court, however, denied the request, finding that while state law allowed child victims of sexual assault to shield their identities, there was no parallel for adult victims. Id.[19] Rejecting arguments that requiring the

---

[18] Michael Rubinkam, "Accusers to be unmasked at Penn State trial," NBC NEWS (June 4, 2012). Available at https://www.nbcnews.com/id/wbna47727682.

[19] The court issued its opinion in 2012, years after the 2004 enactment of the Crime Victims' Rights Act, which applies to victims of federal and state crimes alike.

witnesses to use their identities was particularly harmful in sex offense cases because it would chill

victims' willingness to come forward, the court held that alleged victims of sex offenses were not

entitled to special protections:

> Arguably any victim of any crime would prefer not to appear in court, not to be subjected to cross-examination, not to have his or her credibility evaluated by a jury - not to put his name and reputation at stake, … [b]ut we ask citizens to do that every day in courts across the nation.[20]

"Courts are not customarily in the business of withholding information," the court noted,

finding that the defendant's interest in an open trial trumped the potential harm to alleged victims

and that "secrecy is thought to be inconsistent with the openness required to assure the public that

the law is being administered fairly and applied faithfully." Id.

Crucially, fully identifying the government's witnesses may also lead other potential

"witnesses to come forward" with testimony or other helpful information. Waller v. Georgia, 467

U.S. 39, 46 (1984). The potential benefit is especially high in a highly publicized trial like this one.

A public trial in which witnesses are identified helps advance the trial's truth-seeking function—

but the government's request does the opposite, further impairing the defendants' rights. Where

witnesses are identified, members of the public can help provide the defense information about

those witnesses which help with cross-examination.[21] However, keeping their identities shielded

---

[20] Brad Segall and Ben Simmoneau, "Judge In Jerry Sandusky Case Denies Accusers' Bid For Pseudonyms; Bans Tweeting," CBS NEWS (June 4, 2017). Available at https://www.cbsnews.com/philadelphia/news/judge-in-jerry-sandusky-case-denies-accusers-bid-for-pseudonyms-bans-tweeting/.

[21] Just this week, one member of the public has already shared with counsel information about an alleged accuser who has publicly filed a lawsuit under her own name. We expect that this will continue if accusers are made to testify under their own names, as with every other witness in criminal trials across the country.

from the public allows the witnesses to get on the witness stand without the public checking and scrutinizing their stories.

That is because in addition to the defendants' Sixth Amendment right to a public trial, pseudonymity would contravene the public's First Amendment right of access. "The people have a right to know who is using their courts," Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 189 (2d Cir. 2008), and a heightened interest in knowing the identities of accusers in high-profile cases, e.g., Doe v. Weinstein, 484 F. Supp. 3d 90, 97 (S.D.N.Y. 2020) (Harvey Weinstein). This case also presents "concrete and factual" issues of interest to the public rather than abstract legal issues, which further militates in favor of an open trial. See, e.g., Doe v. Gong Xi Fa Cai, Inc., 2019 WL 3034793, at *3 (S.D.N.Y. July 10, 2019); Doe v. Townes, 2020 WL 2395159, at *6 (S.D.N.Y. May 12, 2020).

The government's request to seal exhibits containing these witnesses' names is a particularly flagrant violation of the public's—and the press's—right of access. "Media outlets have a constitutional right to publish stories about this case," Doe v. Combs, 2024 WL 4635309, at *3 (S.D.N.Y. Oct. 30, 2024), and enjoy in independent common law right of access to judicial records, Nixon v. Warner Comms., Inc., 435 U.S. 589, 597-98 (1978). The government, however, asks the Court to impose an unconstitutional prior restraint on publishing the names of the anonymous accusers. Although the government invokes the "privacy-interest exception" to the common law right of access (Mot. at 136), it is seeking to block publication of witness names, not anything "traditionally considered private," United States v. Amodeo, 71 F.3d 1044, 1051 (2d Cir. 1995)—like financial or health records.

68

### C.    Practical And Logistical Problems Further Undermine The Government's Request

The government's "narrowly tailored" request should be rejected for the independent reason that pseudonymity would in reality be exceptionally disruptive and mark a jarring departure from standard trial practice.

"[M]ost witness examinations begin with an introduction of the witness to the fact finder, including the witness's name"—information that is "widely accepted, welcomed, and expected in the courtroom." Wright & Miller, 30 Fed. Prac. & Proc. Evid. § 6408 (2d ed. 2024). This is a case where names and relationships will be particularly important. The testimony will frequently delve into who met, spoke with, or interacted with who; and these discussions will be extremely confusing without the real names for three pivotal witnesses. Witnesses will forget who they can refer to by real or fake name, or misidentify one of the pseudonymous witnesses. Jurors will spend less time listening to the testimony than trying to figure out who the Anonymous Alleged Victims actually are, or wondering why some accusers remain anonymous and others say their real name. Giving the jurors their real names, as the government proposes (Mot. at 135 n.47), will only heighten the confusion.

Concealing the identities of the anonymous accusers would also risk bolstering the veracity or credibility of their claims against the defendants, undermining the presumption of innocence. It would send a message to the jury that the Court and parties have made the determination that these accusers are, indeed, victims. The jury may come to believe that these witnesses have, in fact, already been determined to be sex-crimes victims who are in need of special protection from the defendants.

**D.** **The Government's Request Is Extraordinary And Is Unsupported By Any Legitimate Interest**

**1.** *The government misstates the law and the heavy burden required to override the presumption of an open trial.*

The government seems to suggest that pseudonymity is a relatively routine measure that the Court can and should permit any time a prosecution witness would rather not be identified. For example, the government repeatedly claims that the defendants must present a "particularized need" to use the Anonymous Alleged Victims' real names. Mot. at 126, 128, 135.

This gets it completely backwards. The Sixth Amendment "presumes open trials as a norm," Gannett Co. v. DePasquale, 443 U.S. 368, 385 (1979), and there is also a "uniform rule of openness" protected by the First Amendment, Globe Newspaper Co. v. Sup. Ct., 457 U.S. 596, 605 (1982). Only in extremely rare circumstances can the government carry the heavy burden required to rebut this presumption of openness. United States v. Marti, 421 F.2d 1263, 1266 (2d Cir. 1970). That is why "pseudonyms are the exception and not the rule," United States v. Pilcher, 950 F.3d 39, 45 (2d Cir. 2020), and why witnesses have been "explicitly authorized witnesses to testify anonymously . . . only in a narrow band of cases," Wright & Miller § 6408.

The government cannot carry its heavy burden in this case—as illustrated by the decisions the government itself cites. The government primarily relies on decisions involving minors and witnesses who would be in actual danger if publicly identified. The government also relies on inapposite cases in which the courts allowed witnesses to testify using their first names. These precedents only underscore the extraordinary nature of the government's ask: that adult witnesses who would not be endangered by identification be referred to by fake names at trial.

Minors. As the government notes, special solicitude is shown to minors because they are considered more vulnerable than adults like the witnesses the government seeks to "protect"—as Congress has recognized. See 18 U.S.C. §3509(d)(3)(A) ("Child Victims' and Child Witnesses'

70

Rights") (authorizing courts to issue pseudonymity orders for children). Courts in this District routinely conclude, however, that adults like the majority of the Anonymous Alleged Victims here are less likely to need their privacy interests protected, and that the rule of open trials must be adhered to. See, e.g., Doe v. Townes, 2020 WL 2395159, at *5 (S.D.N.Y. May 12, 2020); Doe v. Skyline Automobiles Inc., 375 F. Supp. 3d 401, 406 (S.D.N.Y. 2019); Weinstein, 484 F. Supp. 3d at 96.

Among the government's many inapt precedents involving minors is United States v. Maxwell, where the court allowed pseudonyms for alleged victims of the "sexual exploitation and abuse of multiple minor girls by Jeffrey Epstein." 20-cr-330 (AJN), ECF 187, S2 Indictment ¶ 1, ECF 465, Hr'g Tr. 5-6 (S.D.N.Y.). The court reached the same conclusion in United States v. Kelly, when the alleged victim was a "minor under the age of 18" who "contracted an incurable sexually transmitted disease at the age of 17." 19-cr-286 (AMD), ECF 121, Memo of Law in Supp. of Gov't Mot. in Limine at 3-4, ECF 255, Order at 19-21. The government cites a handful of other distinguishable cases involving minors. Mot. at 128-136 (citing United States v. Daskal, 2023 WL 9424080, at *1-2 (E.D.N.Y. July 12, 2023); United States v. Kidd, 385 F. Supp. 3d 250, 255 (S.D.N.Y. 2019); United States v. Terranova, 750 F. Supp. 3d 15, 26-28 (E.D.N.Y. 2024); United States v. Paris, 2007 WL 1484974, at *1-2 (D. Conn. May 18, 2007)).

Endangered Witnesses. There has also been precedent in this district for anonymous victims where the case involves witnesses who might have been in physical danger, which is also not the case here. See United States v. Zhong, 2018 WL 6173430, at *1-2 (E.D.N.Y. Nov. 26, 2018) (victims of alleged forced labor conspiracy and their families potentially faced reprisals); *United States v. Urena*, 8 F. Supp. 3d 568, 570-73 (S.D.N.Y. 2014) (undercover police officer's safety and future effectiveness would've been endangered by violent gang); United States v.

71

Schulte, 436 F. Supp. 3d 698, 706-07 (S.D.N.Y. 2020) (need to protect safety and effectiveness of undercover CIA officers); United States v. Hernandez, 2013 WL 3936185, at *2-3 (S.D.N.Y. July 29, 2013) (legitimate concerns for safety and efficacy of undercover DEA special agent).

National security risks and genuine threats of drug, gang, and other violence are a far cry from the vague fears of embarrassment and humiliation that the government attributes to the Anonymous Alleged Victims. Caselaw recognizes the difference and carves out a limited exception to the presumption of open testimony only for the former type of case. But this is not such a case.

First Name Only. The government also erroneously relies on decisions permitting witnesses to testify using their first names—not pseudonyms.

For example, the court in United States v. Raniere told the jury that it had "instructed the parties to refer to those individuals by their first names only." No. 18-CR-204 (NGG), ECF 826, Trial Tr. 249 (E.D.N.Y.); see also United States v. Marcus, 2007 WL 330388, at *2-3 (E.D.N.Y. Jan. 31, 2007) (two witnesses permitted to testify with first names); United States v. Graham, 2015 WL 6161292, at *10 (S.D.N.Y. Oct. 20, 2015) (similar). There is a big difference between using first names and the government's proposal here, where witnesses would testify under fake names and all other witnesses would have to refer to them by those fake names.

In Raniere, the defense was not as prejudiced by the first name only requirement as the defendants would be here. First, the only minor victim in the case was referred to by her actual first name, not by a fake name. Second, the defense was still able to gather information from the public on the testifying alleged victims who were referred to by their first name, because members of the public who would be able to provide information on these individuals were all aware of who they were. This is true of United States v. Combs as well. The two witnesses who went by

72

pseudonyms were recognizable to the public and to potential defense witnesses; therefore, the defense was not as prejudiced, as they were able to develop significant information on the prosecution witnesses with the help of the public.

### 2. *The government's asserted harms to these witnesses are insufficient to justify pseudonymity.*

The government points to a range of amorphous and unsubstantiated harms that it fears the accusers would suffer if identified at trial. Given the "media coverage" generated by this case, the government says, identifying these witnesses would avoid "the real personal and professional costs that testifying in this type of trial will pose to each woman." Mot. at 131. Further, they argue that testifying under their true names would be an unnecessary public disclosure that would cause "harassment," "embarrassment," and other unspecified "adverse consequences." Id. at 137.

1. None of these conclusory and speculative fears—whether considered alone or together— warrants concealing the identities of these witnesses. Courts in this District routinely recognize that litigants in sex offense cases cannot avoid being identified based on generalized and uncorroborated fears of stigma, embarrassment, humiliation, harassment, or negative professional ramifications. "Were it otherwise, virtually all claims of adult sexual assaults would ipso facto proceed anonymously." Doe 1 v. Branca USA, Inc., 2022 WL 2713543, at *2 (S.D.N.Y. July 13, 2022); see, e.g., Skyline Automobiles Inc., 375 F. Supp. 3d at 405 ("potential for embarrassment or public humiliation" insufficient to justify pseudonymity); Townes, 2020 WL 2395159, at *5 (same for "[e]vidence of . . . social stigmatization, and economic harm"). Court in this District have "explained time and time again, assertions of this variety fall well short of establishing cognizable risk that the disclosure of one's identity would result in harm." 25-CV-2077 at 6.

The likelihood of mental harm cannot be supported by the government's own say-so, but must be backed by medical documentation or other particularized evidence—which the

73

government doesn't even attempt to offer. See, e.g., Branca USA, Inc., 2022 WL 2713543, at *2, 5 (no pseudonymity when there was "no evidence of specific and concrete harm, such as in the form of opinion from mental health professionals"); Gong Xi Fa Cai, Inc., 2019 WL 3034793, at *2 ("exacerbat[ion] [of] emotional distress" insufficient "absent more direct evidence linking disclosure of her name to a specific . . . mental injury"). As one civil case denying anonymity for an accuser against the defendants held, "[a]nonymity is not a privilege that is granted as a matter of course, but rather one that is reserved for cases in which there is 'evidence of real (and not conclusory) harm that is substantial and that will flow directly from and is directly linked to disclosure of the party's name.'" Alexander, 2025 WL 784913, at *4 (quoting Branca USA, 2022 WL 2713543, at *2). In another civil case denying anonymity, the plaintiff asserted that disclosure of her identity would have serious ramifications and consequences to her everyday life—a similar claim made by the government here. 25-CV-2077 at 6. There, the Court held that this assertion was "simply too vague and conclusory to justify anonymity." The plaintiff's claim that public disclosure would result in "unwarranted psychological harm is not supported by any particularized evidence such as 'corroboration from medical professionals that detail the risk to [her]." Id. quoting Doe v. Combs I, 2025 WL 950685, at *3.

One of the statutory victims in this case filed a lawsuit originally as a Jane Doe and argued for anonymity due to risk of retaliation. In denying the plaintiff's request for anonymity, ███

███

███

███

███ Since the Court ordered that

Jane Doe file under her own name, she has not received any threats and has not been subject to any intimidation.

Moreover, at least one of the alleged accusers who has sued all three defendants anonymously has told the government that she "expects her case will be dismissed because it is filed anonymously" and if the "suit is dismissed because of [her] Jane Doe status," she will use her real name. 3528-009. She made no mention of any asserted harm, or fear of retaliation or embarrassment if she were to use her real name.

The government's argument for anonymity for their testifying witnesses here is "mere speculation." The government has not specified any <u>real</u> or <u>potential</u> harm that will flow directly from any of the witnesses having to testify under their own names, nor can they.

2. Pseudonymity is improper even in cases involving sex-offense allegations against high-profile defendants. <u>See</u> <u>Doe v. Shakur</u>, 164 F.R.D. 359 (1996) (Tupac); <u>Weinstein</u>, 484 F. Supp. 3d 90 (Harvey Weinstein); <u>Rapp v. Fowler</u>, 537 F. Supp. 3d 521 (S.D.N.Y. 2021) (Kevin Spacey). Though the government argues that the case has already received significant press coverage, "these generalized concerns are present in every high-profile criminal case," <u>Maxwell</u>, 2021 WL 5967913, at *2, and cannot justify pseudonymity.

For these reasons, many Southern District courts have rejected pseudonymity or anonymity requests from the many civil plaintiffs alleging similar claims against the defendants. <u>See</u>, <u>e.g.</u>, <u>Doe v. Alexander</u>, No. 25-CV-1631 (JAV), ECF 13 (S.D.N.Y. Mar. 12, 2025); <u>Doe v. Alexander</u>, No. 25-CV-2077 (JPC), ECF 36 (S.D.N.Y. Mar. 13, 2025); <u>Doe v. Alexander</u>, No. 25-CV-2107 (LJL), ECF 19 (S.D.N.Y. Apr. 16, 2025); ███████████████████████

███████████████

75

In one illustrative case, the court held that neither the sensitive nature of the allegations nor the unwanted media attention entitled plaintiff to the exceptional remedy of anonymity. The court held that "in the absence of particularized evidence of a risk of psychological or physical harm, Doe's generalized concern regarding unwanted media attention cannot carry the day either." Doe v. Alexander, No. 25-CV-2077 (JPC), ECF 36 at 7. This is because, as many other courts have explained, "the threat of significant media attention—however exacerbated by the modern era—alone does not entitle a plaintiff to the exceptional remedy of anonymity." Id. quoting Rapp, 537 F. Supp. 3d at 527-28; Weinstein, 484 F. Supp. 3d at 95. The government's request fares no better.

3. The government invokes the interest in protecting the identities of alleged sex crimes victims so others will not be deterred from coming forward. Mot. at 134. According to this logic, pseudonymity would be required for every alleged sex-crimes victim—but that is not the law. "[F]urthering this interest does not require maintaining the anonymity of every person who alleges sexual assault or other misconduct of a highly personal nature." Id. at *4.

The interest in not deterring the reporting of sex crimes must be balanced against the defendants' interest—indeed, constitutional right—to confront their accusers, and both their and the public's interest in an open trial. Any alleged chilling effect is also belied by both the numerous civil plaintiffs who were denied pseudonymity in suits against the brothers, and the many other plaintiffs who have sued the defendants under their own names. See, e.g., Doe v. Alexander, No. 25-CV-1631 (JAV), ECF 13 (S.D.N.Y. Mar. 12, 2025); Doe v. Alexander, No. 25-CV-2077 (JPC), ECF 36 (S.D.N.Y. Mar. 13, 2025); Doe v. Alexander, No. 25-CV-2107 (LJL), ECF 19 (S.D.N.Y. Apr. 16, 2025);

76

███████████████████████████████████████████████████

███████████████████████████████████████████████████

The presumption of open trials is even stronger in criminal cases because, unlike civil defendants, criminal defendants have Sixth Amendment rights to a public trial and the confrontation of witnesses. This stronger rule of openness virtually always outweighs victims' statutory "right to be treated with fairness and with respect" for their privacy (18 U.S.C. § 3771(a)(8))—and this case is no exception.

E.  **If The Court Finds That There Is A Basis For Some Alleged Victims To Testify Using A Pseudonym, The Court Should Instead Adopt A Fact-Specific Balancing Test That Weighs Harn To The Witness Against The Defendants' Confrontation Rights**

If the Court rejects the defense argument that no pseudonyms should be permitted in any instance and finds that the government has made enough of a showing to allow for pseudonyms, we urge the Court to consider, in the alternative, a fact-specific balancing test that weighs the specific articulable harm to the witness against the defendants' confrontation and public trial rights. We respectfully submit that, at a minimum, there is a presumption of full disclosure absent codified protections for alleged victims of sex offenses.

This was the approach that Judge Subramanian took in United States v. Combs, ordering that if the government "wishes to have [two victims] testify using pseudonyms, it should furnish evidence to support an actual risk of harm to these witnesses if they testify using their names." 4/22/2025 Order. Following that Order, one alleged victim expressed that she did not indeed need to testify using a pseudonym, and the other alleged victim was permitted to testify using a pseudonym.

Here, the government cannot rebut a presumption of full disclosure by showing that there is a compelling need to protect the identities of the Anonymous Alleged Victims. Numerous factors

counsel in favor of disclosure of their identity. First, many of these individuals did not bring up to the government the desire to testify anonymously. From the defense's review of the Jencks Act material disclosed thus far, the idea of pseudonymity was first posed by government prosecutors who asked alleged victims whether they would want to testify under the cloak of a fake name. Second, many of these individuals have availed themselves of public scrutiny by suing one or more of the defendants civilly over the past two years. Third, none of the Anonymous Victims have articulated a particular harm if they were to testify publicly.

If the media cannot report the Anonymous Alleged Victims' names, individuals with information that may impeach their credibility may be prevented from coming forward. Such a situation is not just hypothetical: in past cases, several witnesses have discussed with the defense information about alleged victims after their names were published in news articles in connection with the case. This is distinguishable from United States v. Marcus, where the court found that the victim witnesses could use pseudonyms because "the defendant's contention that there may be witnesses who come forward during trial with information after learning the witnesses'[] full names [wa]s purely speculative." 2007 WL 330388, at *2 (E.D.N.Y. Jan. 31, 2007) (two witnesses were permitted to testify using their first names only). For these and all the reasons set forth in our opposition to the government's Motion, we object to Anonymous Alleged Victims testifying under pseudonyms.

### F.    Defendants Request Reciprocal Anonymity For Defense Witnesses Called To Testify About Sexual Activity

If the Court grants anonymity to government witnesses and/or accusers, then defense witnesses who will be called upon to testify about sexual activity should receive equal protection and be permitted to testify under a pseudonym as well. The reasons the Court may provide for granting anonymity will apply equally whether the person is an accuser or a defense witness.

Allowing defense witnesses to testify under a pseudonym ensures parity in the protection the Court affords witnesses who testify about sexual activity and will not prejudice the government, as the government will know the witness' true name. Allowing only the accusers to testify under a pseudonym will lead the jurors to the inescapable inference that the Court has concluded that they are victims of crime.

**VIII.  THE DEFENDANTS SHOULD NOT BE PRECLUDED FROM CROSS-EXAMINING WITNESSES ON MATTERS RELEVANT TO CREDIBILITY OR TO THE ISSUES AT TRIAL**

The government seeks an order precluding the defense from cross-examining witnesses on matters that are "irrelevant to the issues on trial" and "have no bearing on the witness's credibility." Mot. at 91-92. This request is premature, and the Court should reserve decision until trial, when the Court can assess the relevance of the proposed cross-examination.

For example, the government seeks to preclude cross-examination of alleged Minor Victim-3 about her arrest ████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████

With respect to Friend-2's three DUIs—in 2007, 2012, and 2016—the government contends that this evidence is irrelevant because Friend-2's "testimony will be limited to [her] observations of events surrounding the charged incidents and, to the extent that it is relevant and admissible, certain prior consistent statements made by victims in this case." Mot. at 97. But

79

Friend-2's DUIs—including one in 2012, which is the same year as the offense charged in the indictment—suggest a habit of alcohol abuse that may be relevant to Friend-2's ability to observe or recollect events. Similarly with respect to Victim-1's DUI conviction (between 2008 and 2011, arising during the same period as her allegations in the indictment (2011)) and Friend-1's DUI conviction (2008), their alcohol abuse may be relevant to their trial testimony as well, undermining the narrative of minimal alcohol intake during the charged incident and reflecting a demonstrated willingness to place their own impulses ahead of the safety of others.

Whether impeachment evidence will be admissible will depend on the context in which it arises and the purpose for which it is offered. Defendants respectfully request that the Court defer ruling until trial.

## IX.    THE COURT SHOULD DENY THE GOVERNMENT'S MOTION TO PRECLUDE TESTIMONY FROM BOTH DEFENSE EXPERTS

The government has moved to preclude testimony from both of the defense experts. Both motions should be denied. "[T]he rejection of expert testimony is the exception rather than the rule," Fed. R. Evid. 702, Advisory Committee Notes to the 2000 Amendments, and this evidentiary principle has firm roots in the constitutional right to present a complete defense.

There are some common themes across the government's Daubert[22] objections—particularly with respect to the government's repeated assertions that the proffered expert testimony is a matter of lay opinion. The government's own arguments belie this conclusion and reflect a misapprehension of the scientific literature they seek to distinguish. To be sure, almost everyone has memories. Many of us have gotten drunk—fewer, but still many, of us have blacked out; and perhaps even fewer, but still many, of us have experimented with various other recreational drugs.

---

[22] Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993).

But our own personal understanding of experiences with memory or mind-altering substances is not a substitute for a well-researched, empirically studied, and scientifically supported understanding of such experiences. Indeed, the risk that jurors will conflate *their own personal experiences* with what has been observed in the scientific literature and clinical studies is precisely why expert testimony on these matters is so important. The adage "you don't know what you don't know" (Socrates) is apt here. We don't know which of our own memories have been shaped by external factors. We don't know how substances we voluntarily consumed affected our ability to encode memories or affected our interpretation of events while we were under the influence. We don't know what other factors can affect our ability to accurately encode memories. And neither do jurors. The science of how memories are formed and how substances affect the brain is relevant and admissible under Fed. R. Evid. 401 and 702.

Notably, the government does not challenge the qualifications of either defense expert. The government argues instead that the proffered testimony is irrelevant or unnecessary. Neither is true: the government misapprehends the test for relevance in asserting that the expert testimony does not fit with its own one-sided and disputed version of the facts. Expert testimony that tends to advance the defense's evidence-based theory of the case is eminently relevant and must be admitted. See United States v. Gramins, 939 F.3d 429, 446, 453 (2d Cir. 2019) (relative significance of facts is for the jury to decide "in light of the opposing theories advanced by the two sides and the evidence that each side marshal[s] to support them"); United States v. Abu-Jihaad, 630 F.3d 102, 132 (2d. Cir. 2010) (to be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt); United States v. Quattrone, 441 F.3d 153, 188 (2d. Cir. 2006) ("so long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the

81

threshold relevance inquiry"); 3 Mueller & Kirkpatrick, Federal Evidence § 6:89 (4th ed. & 2023 update) (when one party introduces evidence to prove a point that matters to the case, "[c]ounterproof is admissible if it contradicts" that point).

<strong>A.      The Defendants Have A Constitutional Right To Present A Complete Defense And To Fully Rebut The Government's Theory</strong>

The Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. Holmes v. South Carolina, 547 U.S. 319, 324 (2006). "The right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment." Washington v. Shriver, 255 F.3d 45, 56 (2d. Cir. 2001). "Few rights are more fundamental than that of an accused to present witnesses in his own defense." Chambers v. Mississippi, 410 U.S. 284, 302 (1973) (citing Webb v. Texas, 409 U.S. 95 (1972); Washington v. Texas, 388 U.S. 14, 19 (1967); In re Oliver, 333 U.S. 257 (1948). "[W]here constitutional rights directly affecting the ascertainment of guilt are implicated," court rules "may not be applied mechanistically to defeat the ends of justice." Id.

These principles apply with full force to defense expert witnesses. It is "an abuse of discretion to exclude the otherwise admissible opinion of a party's expert on a critical issue, while allowing the opinion of his adversary's expert on the same issue." United States v. Graham, 123 F. 4th 1197, 1266 (11th Cir. 2024) (vacating racketeering convictions due to improper exclusion of defense expert testimony) (citation omitted). See also United States v. Sellers, 566 F.2d 884, 886 (4th Cir. 1977) (stating the same); United States v. Parshall, 757 F.2d 211, 214 (8th Cir. 1985) (abuse of discretion to exclude certain expert testimony); Breidor v. Sears, Roebuck and Co., 722 F.2d 1134, 1141 (3d. Cir. 1983) (district court abused its discretion in excluding expert testimony; exclusion affected plaintiffs' substantial rights). Expert testimony can likewise be used to counter

82

an opponent's fact or lay opinion testimony. See Panger v. Duluth, Winnipeg & Pac. Ry. Co., 490 F.2d 1112, 1117 (8th Cir. 1974) ("the defendant should have been accorded the right to counter that evidence with either factual evidence of its own or properly proffered expert testimony"). See also United States v. Wheat, 2025 WL 2400444, *3 (N.D. Ga. Aug. 19, 2025) (noting that "[i]n the background of these evidentiary rules" is "the principle that criminal defendants must be permitted to offer a fulsome case in their defense").

Where the government presents evidence to support a certain theory, a defendant is entitled to rebut that theory with evidence with evidence of his own. Graham, 123 F.4th at 1266; United States v. Rahm, 993 F.2d 1405, 1414 (9th Cir. 1993) (reversing based on exclusion of defense expert testimony; noting that exclusion "deprived Rahm of her sole intended defense"). An error going "to the heart" of the defense and its ability to respond "to the core of the prosecution's case" is not harmless. United States v. Blum, 62 F.3d 63, 68-69 (2d. Cir. 1995).

Here, the government seeks to introduce expert testimony about why alleged victims of sexual assault "may remain in contact with perpetrators for a broad range of reasons," including testimony that alleged sexual assault victims "may engage in flirtatious behavior or consensual sexual activity with a perpetrator after a sexual assault." The government's theory is that engaging in repeated sexual contact and communication with someone is evidence that a person was raped. The defense theory is that engaging in repeated sexual contact and communication with someone is evidence that someone was not raped. To buttress this theory, the defense must be allowed to introduce evidence of why someone would now say they were sexually assaulted when at the time the incident allegedly occurred their conduct indicated otherwise. Dr. Strange's testimony regarding reinterpretation of memories based on external factors provides this crucial link.

Similarly, the government seeks to call its expert, Dr. Rocchio, to testify that victims use post-rape coping mechanisms such as "avoidance, compartmentalization, <u>directed forgetting</u>, making excuses for others, self-blame and denial, and <u>non-labeling of the experience as rape or sexual assault</u>." (Emphasis added.)  If the government is calling an expert to testify that "directed forgetting" and "non-labeling of the experience as rape or sexual assault" is evidence of (*i.e.*, consistent with) rape, then the defense must be permitted to rebut that testimony with testimony regarding reinterpretation of memories, and testimony regarding how external factors and influence can lead to an experience originally "non-labeled" as rape or sexual assault to be recharacterized (*i.e.*, mischaracterized) as rape or sexual assault. Dr. Strange's testimony provides a direct rebuttal to Dr. Rocchio. <u>See</u> <u>United States v. Maxwell</u>, No. 20-CR-330, ECF 516 (S.D.N.Y. Nov. 21, 2021) ("Much like Dr. Rocchio may inform jurors that victims of sexual assault often delay disclosure, [the defense expert] may inform jurors that the literature indicates that false accusations can result from suggestive activities or false memory creation").

Meanwhile, Dr. Aoun's testimony directly rebuts the testimony of the government's drug expert Stacey Hail. Per the government's request, the defense will be supplementing their expert disclosure as to Dr. Aoun. Dr. Hail will be testifying that various drugs are "date rape" drugs. Dr. Aoun's testimony will explain various non-date-rape uses for the drugs and will rebut in various ways the government's narrative that drugs were used to facilitate date rapes. Moreover, the evidence in this case will include evidence that various government witnesses voluntarily ingested various substances. The government is going to assert that the charged events occurred as the result of involuntary intoxication; the defense must be permitted to counter that with a theory of voluntary intoxication.

84

"Daubert neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance." Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments (quoting Ruiz-Troche v. Pepsi Cola, 161 F.3d 77, 85 (1st Cir. 1998)). It is for the jury to decide which expert is correct. Id. ("[P]roponents 'do not have to demonstrate to the judge by a preponderance of their evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable . . . The evidentiary requirement of reliability is lower than the merits standard of correctness." (quoting In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 744 (3d. Cir. 1994)).

### B.    Dr. Strange's Testimony Is Relevant And Admissible Under Fed. R. Evid. 702

The government objects that Dr. Strange's testimony is irrelevant, unsupported by the scientific literature, and a matter of lay opinion. All of these arguments fail. Another court in this district has previously allowed Dr. Strange to testify, finding over government objection that similar testimony to that proffered here was admissible. See United States v. Paduch, No. 23-CR-181, ECF 126 (S.D.N.Y. May 3, 2024) (allowing Dr. Strange to testify to: her opinion "that information acquired over time can change how people interpret earlier events"; her opinion "that the information that people learn from others can influence how they later recall an event"; "her opinion that the influence of other sources such as media, retelling of a story, therapy, and dreams can lead to the formation of false memories"; and her opinion "that a history of trauma can increase the likelihood of memory distortion"). Such testimony as was allowed in the Paduch case must be permitted here as well; as in Paduch, this case involves accusers making allegations years after the alleged events took place, after reading, hearing, and speaking about the events with others, flooded by media coverage, and motivated by monetary gain.

The defense does not seek to call Dr. Strange to opine that specific witness accounts are false memories. Dr. Strange will identify factors that can lead to the reforming and reshaping of

memories. She will testify as to memory's inherently malleable and unreliable nature, especially when external influences such as social media; mainstream media; conversations with attorneys; and conversations with friends, therapists, and parents are present. Dr. Strange can identify those external influences and testify about the extent to which they are present in this case based on her review of the evidence. Dr. Strange can offer opinions that such external influences <u>could</u> have shaped witness's own recollection of the events. This is essential information for the jury to consider in a case where it is asked to determine the reliability of witness recollections. It is up to the jury to determine whether those external influences are present in this case; whether to credit the science; and whether to credit the witness's retelling of their own memory. <u>See</u> Advisory Notes, Fed. R. Evid. 702 (encouraging the use of expert testimony in non-opinion form when counsel believes the trier itself can draw the requisite influence, but noting that the use of opinions is not abolished by the rule and "[i]t will continue to be permissible for the experts to take the further step of suggesting the inference which should be drawn from applying specialized knowledge to the facts"). "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703. Here, Dr. Strange's review of the facts has made her aware of potential sources of suggestive external influence that could have contributed to memory distortion.

There is a difference between testifying that memory weakens over time and testifying that memory overtime becomes more susceptible to suggestion. The defense seeks to call Dr. Strange to testify to the latter. While the principle that memory weakens over time may be a matter of common understanding, the link between time elapsed and susceptibility to suggestion is not.  This is a case where a defense memory expert is essential, "both because of the long period of time that has elapsed since the charged conduct and because of the public attention that conduct has

86

received." Maxwell, No. 20-CR-330, ECF 16. (admitting defense expert opinions about how memories can become contaminated over time; how false memories can be created through suggestive activities; and how alleged victims can testify to false memories they believe to be true). See also United States v. Smith, 621 F. Supp. 2d 1207, 1216-17 (M.D. Ala. 2009) (discussing the influence of post-event information on memory); United States v. Jordan, 924 F. Supp. 443, 449 (W.D.N.Y. 1996) (highlighting issues stemming from stress and its impact on memory in a case that lacked physical proof, thus emphasizing the "singular importance" of victim testimony").

Nor does the defense seek to call Dr. Strange to testify that jurors are susceptible to pretrial publicity. The point was included in her expert disclosure to help demonstrate that even courts recognize that jurors can be influenced by external factors such as media. These same external factors that shape jurors' views of the case likewise can shape memory. The defense does not seek to ask Dr. Strange to make this direct comparison before the jury, but the conceptual principle helps to illustrate the similar principle that has been observed in the psychological research: external factors can lead to perception distortion.

Dr. Strange is qualified, and is offering opinions based on a reliable methodology. The government is "free to evaluate critically h[er] further qualifications upon cross-examination or in argument," United States v. Rahm, 993 F.2d 1405, 1412-13 (9th Cir. 1993), and is similarly free to contest that the external influences indisputably present in this case had no impact on its witness's recollection. But the government's argument that those external influences are unpersuasive "go to the weight of her testimony rather than to its admissibility." Id.

### 1.    *Dr. Strange's opinion fits the facts of this case.*

First, the government contends that Dr. Strange's opinions do not fit the facts of this case. This is a case where the government has proffered its own expert to testify about why an accuser may delay disclosure; the defense must be permitted to counter with expert testimony of its own.

87

The circumstances present in this case counsel in favor of allowing a defense memory expert to testify. See, e.g., United States v. Heine, No. 3:15-CR-00238-SI-2, 2017 WL5260784, at *2 (D. Or. Nov. 13, 2017) (expert testimony regarding memory would be allowed if the case involved issues of suggestive questioning, drug use, hallucinations, or repressed or recovered memories). Testimony about the extent to which external factors can inform the shaping or reshaping of memories—where a long time has elapsed since the events charged, where the alleged conduct was not reported as wrongdoing at the time, and where external suggestive factors exist—is a clean fit with the facts of the case.

The government's arguments misunderstand the significance of the articles cited in the disclosure as well as the scientific findings that can be extrapolated from them, precisely because government attorneys are not experts in the field as is Dr. Strange. Opinions on suggestive activities and creation of false or reinterpreted memories are beyond the knowledge of the average juror and thus an appropriate topic of expert testimony. Maxwell, ECF 516 (S.D.N.Y. Nov. 21, 2021) (citing Doe v. Hartford School District, 2018 WL 1064572 (D. Vt. Feb. 26, 2018). The government's analysis of the studies cited in the expert disclosure is neither dispositive nor persuasive. Dr. Strange's opinion is not solely based on these studies but also on her relevant education, training, skills, knowledge, and professional experience. To the extent that Dr. Stange's opinions are informed by these studies as "relevant scientific literature in her field," they need not test the exact same set of facts in order to be properly relied upon by a trained expert in forming opinions.

As to the government's attempt to isolate studies involving purposeful deception, the expert can explain on cross-examination that experimental researchers use deception in their studies because when attempting to examine a particular issue they have to take it to an extreme in order to extrapolate relevant findings. They have to use deception to see if the wholesale creation of a

false memory <u>can even happen</u> in the laboratory. From that extreme finding is derived the narrower principle that <u>if even false memories can be created, then lesser external influences can result in reinterpretation</u>. This is consistent with the research cited. It is Dr. Strange's expertise, and her understanding of 100 years of psychological literature, that enables her to understand the significance of the studies she cites and their application to a given set of facts. As Dr. Strange's expert disclosure makes clear, the studies reflect the use of "controlled laboratory research as a means of identifying basic scientific principles." Dr. Strange, and not the government, has expertise in identifying which principles are appropriately derived from the research and which are not.

Dr. Strange can testify that memory is malleable <u>even up to an extreme where false memories are plausible under certain circumstances</u>. This research buttresses the idea that external factors can shape or distort a memory. The government applies a common-law legal reasoning approach to distinguish the facts in the studies cited by Dr. Strange. But our approach to reading cases and developing law is fundamentally different from a scientific approach to extrapolating lessons from clinical studies. Notably, the government cites no scientific literature to support its argument that reinterpretation is <u>not</u> happening.

The government also makes several presumptions of established fact in areas where facts are disputed. Just because a fact is not relevant to the government's <u>theory</u> of the case does not mean it is irrelevant to the jury's ultimate determination. For example, the government asserts that "none of the [alleged] victims in this case are expected to testify that they interpreted their sexual assault or rape by the defendants as 'benign' at the time." Mot. at 114. Yet the witnesses' testimony does not present a closed world of the facts of the case. The question whether the interactions with the defendants were viewed as benign at the time is a disputed fact. If a witness did not report any

89

wrongdoing to police, to medical professionals, to friends, or to anyone else, until years later, that is relevant evidence that tends to prove the interaction was indeed viewed as benign by all parties at the time. The government may disagree, but the burden falls on the government to prove otherwise at trial. The jury can decide how much to credit the witnesses' belated accounts, just as it can decide how much to credit the defense's theory of the case and how much to credit Dr. Strange's testimony. The government's attempt to limit the relevant evidence to its <u>own one-sided characterization of disputed facts</u> misstates the <u>Daubert</u> standard and the Fed. R. Evid. 401 standard. "<u>Daubert</u> neither requires nor empowers trial courts to determine which of several competing theories has the best provenance." Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments (quoting <u>Ruiz-Troche v. Pepsi Cola</u>, 161 F.3d 77, 85 (1st Cir. 1998)).

### 2. *The studies cited support Dr. Strange's proffered opinion*

The government next challenges Dr. Strange's opinion that "information acquired over time can change how people interpret earlier events." Mot. at 114. The government argues without apparent scientific basis or expertise that the studies cited do not support the trained expert's opinion—however, in so arguing, the government cites only two of the studies cited by Dr. Strange. It notably disregards the other citations in the same portion of the disclosure which demonstrate that reinterpretation does happen. <u>See</u> Conway & Pleydell-Pearce, <u>The construction of autobiographical memories in the self-memory system</u>, Psychological Review, 107(2), 261-268 (2000); Sanitioso, <u>Motivated recruitment of autobiographical memories</u>, Journal of Personality and Social Psychology, 59(2), 229-241 (1999); McDonald and Hirt, <u>When expectancy meets desire: Motivational effects in reconstructive memory</u>, Journal of Personality and Social Psychology, 72(1), 5-23 (1997) (cited in the disclosure for the principle that "motivations can lead to remembering the past in a distorted manner beyond simply biasing memory selection and search"); Callan et. al, <u>The effects of justice motivation on memory for self- and other-relevant events</u>,

Journal of Experimental Social Psychology 45 (2009) 614-623.  None of these citations, though included in the disclosure, were included in the batch of articles the government provided to this Court.

And even the studies the government attempts to distinguish plainly support the conclusion reached by Dr. Strange: that reinterpretation is happening. The title of the Clancy and McNally article, for example, is "Who needs repression? Normal memory processes can explain forgetting of childhood sexual abuse."  See Clancy and McNally, Who Needs Repression? Normal Memory Processes Can Explain "Forgetting of Childhood Sexual Abuse (2005-2006) (emphasis added). The study does not limit itself to situations involving childhood sexual abuse—it takes a normal memory process and examines it in the context of childhood sexual abuse. If the government wants to advance on cross-examination a theory that reinterpretation is limited to child sexual abuse, it is welcome to do so. It has provided no scientific basis for rejecting Dr. Strange's opinion under Daubert nor to limit that opinion to childhood sexual abuse.

As Dr. Strange can explain on cross-examination, the Clancy and McNally article discussed by the government speaks specifically to the idea of reinterpretation being a possibility—that memories were not repressed but rather simply reinterpreted. See id. Memory is malleable, and the Clancy and McNally article observes the broader scientific principle that memories can be reinterpreted with a new lens over time. The government lifts only part of the study to support the limitation it advances—but it disregards the other studies, cited above and in the disclosure, that show that reinterpretation is happening. The government seeks only to distinguish the facts as if it were distinguishing a legal opinion. Clinical studies, however, are not to be read like legal opinions, and that is part of why expert testimony is important.

91

None of these studies is going to test directly the specific facts of this case, because that is not how psychological research works. Psychologists do not take a case from the real world and conduct an experiment around those facts. Instead, psychologists take what they understand from their experience and review of 100 years of psychological literature to form expert opinions as to what the building blocks suggest about human nature. A trained expert can then apply those principles to the facts of a particular case. Notably, the government does not challenge Dr. Strange's qualifications to engage in such application and interpretation of the research. Nor do they challenge her methodology. They take no issue with the *research*; they just say it does not apply here. Yet Dr. Strange's expert interpretation, based on her training and experience, is sufficiently reliable under <u>Daubert</u> to justify its application here, as this Court previously found in <u>Paduch</u>. <u>See</u> <u>Paduch</u>, No. 23-CR-181, ECF 126.

### 3.      *Dr. Strange's proffered testimony is not a matter of lay opinion*

The government is wrong to suggest that highly technical testimony regarding the encoding of memories and the various factors that influence reinterpretation is a matter of lay opinion. <u>See</u> Daniel J. Simons, Christopher F. Chabris, <u>What People Believe about How Memory Works: A Representative Survey of the U.S. Population</u>, PLOS One (2011); Tanja Rapus Benton, David F. Ross, Emily Bradshaw, W. Neil Thomas, and Gregory S. Bradshaw, <u>Eyewitness Memory Is Still Not Common Sense: Comparing Jurors, Judges and Law Enforcement to Eyewitness Experts</u>, Appl. Cogn. Psychol. 20, 115-129 (2006). <u>See also</u> <u>Webster v. Daniels</u>, 784 F.3d 1123, 1143 (7th Cir. 2015) (detailing the "dangers of relying on 'common sense' when social science reveals that common assumptions are wrong"); <u>United States v. Bartlett</u>, 567 F.3d 901, 906 (7th Cir. 2009) ("It will not do to reply that jurors know from their daily lives that memory is fallible. The question that social science can address is <u>how</u> fallible").

"Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier." Advisory Notes to Fed. R. Evid. 702 (citing Ladd, Expert Testimony, 5 Vand L.Rev.414, 418 (1952) (describing inquiry as whether the untrained layman would be qualified to determine <u>intelligently and to the best possible degree</u> the particular issue without enlightenment from those having a specialized understanding of those involved in the dispute") (emphasis added). The government's argument that "everyone knows we forget things" does not enable untrained layman to determine <u>intelligently and to the best possible degree</u> the types of scenarios in which reinterpretation can occur. For example, jurors in shooting cases can also understand that a shooting causes serious bodily injury. Yet in such cases, the government is allowed to call a doctor to testify about the extent of the injuries and to offer scientific expertise on why such injuries were serious and life-threatening.

### 4. *Dr. Strange's proffered testimony regarding media influence is admissible.*

The government also takes issue with the proffered expert opinion regarding media influence, specifically the opinion that "hearing other people's stories in tv reports, reading comments on social media, seeing adverts, hearing radio interviews, can all lead people to claim those details as a personally experienced memory to the extent that it has 'realistic' characteristics." The government's primary concern is that the defense expert disclosure does not contain a citation after every sentence. The statement in the disclosure to which the government objects (on the theory that it is not supported by a citation) is supported by the citation <u>in a closely preceding sentence of the same paragraph</u>. See Johnson et al., <u>Source Monitoring</u>, Psychological Bulletin, 1993 Jul;114(1):3-28 (1993). The statements contested in the government's motion are based on the findings from that article, combined with Dr. Strange's professional knowledge and expertise. This

is sufficient under <u>Daubert</u>. The government omitted the <u>Johnson</u> article as well from the batch it provided this Court and discussed in its motion.

The government's rigid insistence that each sentence in an expert disclosure must be followed by a citation stands in contrast to its own expert disclosure which contained <u>no</u> citations following the myriad opinions it offered. If the only permissible expert testimony were that which had previously been written verbatim in an article, there would be no need for expert witnesses—the parties could just read scientific literature into the record. The purpose of calling an expert is to explain the significance of the research and its broader application. Finally, the government's asking this Court to reject the proffered testimony based on the Court's own experiences with memory amounts to improper argument and does not rebut the scientific literature nor demonstrate that it is inadmissible under Fed. R. Evid. 702.

### C.    Dr. Aoun's Proffered Testimony Is Relevant And Admissible Under Fed. R. Evid. 702

This district has previously held similar proffered testimony from Dr. Aoun to be admissible. In <u>United States v. Combs</u>, 24-CR-542 (S.D.N.Y. May 5, 2025), the court held that it would allow Dr. Aoun to testify "about the expected and unexpected effects of various drugs and what a person may experience under certain circumstances, including certain blackouts and other intoxication episodes and what the predictable result of certain drug combinations might be." <u>Combs</u>, 5/5/25 Tr. Here, the government raises three challenges to Dr. Aoun's proffered testimony, none of which is sufficient to preclude him from offering the opinions in the expert disclosure.

First, the government seeks to condition Dr. Aoun's testimony on testimony from the defendants that they "believed that their victims were sober."  Mot. at 121. "In effect, the government suggests that [the defendant] [i]s required to take the stand to present h[is] 'story' before [ ]he could present defense evidence to 'corroborate' it. The rule the government suggests

would eviscerate several constitutional rights." United States v. Rahm, 993 F.2d 1405, 1413-14 (9th Cir. 1993). Defendants cannot be forced to choose between their constitutional right not to testify and their constitutional right to present a complete defense.

Some witnesses at this trial are expected to testify that they had trouble remembering parts of the nights that form the basis for the charges. The government and defense dispute whether that is the result of voluntary or involuntary intoxication; and, relatedly, whether the defendants, to the extent they interacted with any witnesses, knew certain witnesses were blacked out. Expert opinion about alcohol blackout, and how it can appear to an outside observer, is relevant to the question whether defendants knew the intoxication level of any witnesses at the time they may have interacted with them.

The government again seeks to use jurors' personal experience—this time with respect to alcohol—as a substitute for scientific expertise regarding such experiences. The government's only citation in support of this argument is Grayson v. Thompson, 257 F.3d 1194 (11th Cir. 2001), an ineffective-assistance-of-counsel decision. The petitioner argued that "trial counsel was ineffective in failing to gather and present a defense expert regarding intoxication and alcoholism and their effects on an individual's ability to appreciate and understand the consequences of his actions." Id. at 1221. The court held that "[g]iven the limited resources available, both financial and temporal, counsel's approach to the intent issue at the guilt/innocence phase of Grayson's trial and failure to retain and present expert testimony regarding alcoholism was reasonable." Id. And, importantly, the court there conceded that "detailed expert testimony regarding the effects of alcohol on an individual's appreciation of consequences may have been helpful to the jury[.]" Id. The court's holding there dealt with the reasonableness of counsel's strategic decision, and not with the admissibility of expert testimony. Indeed, if anything, the court's analysis seems predicated on the

95

notion that such evidence, if presented by defense counsel, would have been admissible. See id. at 1221 n.14. Grayson supports the admission of such evidence here; it does not preclude it.

In arguing that the proffered testimony is inadmissible on this basis, the government in fact demonstrates the extent to which the average person does not understand the science of blackout. The government in its motion conflates the concept of intoxication with blackout. Getting drunk or consuming alcohol is not the same as blacking out. Blacking out is an amnestic disease which happens as a result of severe alcohol intoxication. Despite this intoxication, Dr. Aoun will explain, people may not look drunk and may engage in activities that on the surface appear to outsiders to be logical and reasonable. The term intoxication is a clinical term, and the fact that jurors have experience with alcohol is not a substitute for Dr. Aoun's scientific understanding of both intoxication and of the two types of blackouts that can occur—complete blackouts and fragmentary blackouts. In complete blackouts, the memories are never retrieved. In fragmentary blackouts, memories can come back overtime but are fuzzy—leading to problems with reliability in retrieved memory after blackouts. The scientific understanding of these types of events is appropriate expert testimony, notwithstanding the government's argument that some of the jurors may have previously consumed alcohol.

Dr. Aoun's opinions regarding GHB are supported by the scientific literature. See Jacqueline K. Le and John Richards, Gamma-Hydroxybutyrate Toxicity, available at https://www.ncbi.nlm.nih.gov/books/NBK430781/. The government's arguments do not rebut the science: GHB is a short-acting drug. The government can cross-examine Dr. Aoun on the various factors that relate to precisely how short-lasting GHB is in a given individual; indeed, in Dr. Aoun's own opinions, he acknowledges that it is varied, with elimination half-lives ranging from 20 minutes to 60 minutes. Under the government's view, the fact that all drug half-lives depend to

96

some degree on personal characteristics would preclude in any case expert testimony about the short- or long-acting nature of a given drug. Yet surely there are cases where the government would seek to call an expert about the <u>long-acting</u> nature of a given drug—for example, to prove intoxication hours after ingestion. The fact that drugs affect different people differently based on weight and other factors does not change the scientific reality that some drugs are short-lasting and other drugs are long-lasting. This is an admissible opinion, and the government's arguments in this respect are fodder for cross-examination not a basis for exclusion under Fed. R. Evid. 702.

As for the government's other objections, and particularly given the government's more recent disclosure of a new drug expert, the defense agrees to supplement its disclosure as to Dr. Aoun.

### D.    The Basis For Both Opinions Can Be Established At A <u>Daubert</u> Hearing Or During Voir Dire

In seeking to exclude the testimony, the government does not request a <u>Daubert</u> hearing. <u>See</u> <u>United States v. Shay</u>, 57 F.3d 126, 134 (1st Cir. 1995) (finding error in district court's exclusion of defense expert testimony and remanding because the "district court did not hold an evidentiary hearing on these issues, nor did the court make any findings that would support the exclusion of evidence for the reasons cited by the government"). If the government wishes to voir dire the defense experts on specific matters, it may seek to do so when the defense calls them to the stand at trial. But the government's apparent contention that the defense expert testimony should be excluded without a hearing is untenable, particularly given the government's intention to call dueling experts to offer counter-testimony on the same topics sought to be offered by the defense. The government's criticisms go squarely to weight and not to admissibility.

X.    **THE GOVERNMENT'S OTHER ARGUMENTS REGARDING IRRELEVANT OR UNFAIRLY PREJUDICIAL TOPICS ARE WITHOUT MERIT**

A.    **The Court Should Deny The Government's Request To Exclude All Good Acts Evidence Or Evidence Of Consensual Sex Acts**

The government moves to preclude any defense evidence "that the defendants engaged in certain consensual sexual encounters, including group sex or orgies, with women other than the testifying victims." Mot. at 74. It further moves to preclude any defense evidence "of other unrelated good acts—including good acts involving their employment, charitable or volunteer work, philanthropic giving, or other similar deeds . . . ." Id. at 76. The government's request should be denied.

Good acts evidence is usually not admissible because its relevance normally turns on impermissible propensity inferences that Rule 404(b)(1) prohibits. See, e.g., United States v. Dawkins, 999 F.3d 767, 792 (2d Cir. 2021). For example, the government is correct that the defendants cannot argue that "because other women purportedly consented to sex acts or group sex with them, the victims in this case must have also consented." Mot. at 74. However, evidence of the defendants' other sexual conduct is relevant and admissible when offered for another purpose. Indeed, good acts evidence "may be relevant" in a case like this one "where it is alleged the defendant has 'always' or 'continually' committed 'bad acts,' or where such 'good acts' 'would undermine the underlying theory of [the] criminal prosecution.'" United States v. James, 607 F. Supp. 3d 246, 257 (E.D.N.Y. 2022) (quoting United States v. Balboa, 2013 WL 6196606, at *3 (S.D.N.Y. Nov. 27, 2013) (citing United States v. Damti, 109 F. App'x 454, 455-56 (2d Cir. 2004))); United States v. Santos, 201 F.3d 953, 962 (7th Cir. 2000) ("good acts" evidence is relevant when it "cast[s] doubt on the government's theory").

Here, Defendants' prior consensual sexual activity, group sex, and orgies, is probative and admissible to negate the government's allegations that "for well over a decade," S3 ¶1, the

98

defendants engaged in a "persistent pattern" of "sex assault," Mot. at 3, and have a "history" and "pattern" of "drugging victims" to "engage in sex acts against their will." Id. at 44. The evidence is also probative and admissible to show that the defendants' pattern of consensual sexual activity is inconsistent with and disproves the government's claim that the defendants engaged in a pattern of coercion "constituting a modus operandi." Id. at 45.

Evidence of consensual group sex, orgies, or other consensual sexual encounters is intertwined with the 12-year conspiracy alleged in Count 1 and with some of the substantive counts. The evidence will show that not unlike other young men, Defendants spent time and energy trying to win the attention of single women and went about this in eminently typical ways: they rented share houses in the Hamptons, they threw parties, they met women on internet sites. Because they were three brothers, they were able to create a party atmosphere, which made them popular among other young people looking for exactly this. The parties sometimes involved consensual group sex / orgies, as may be reflected by videos, photographs, texts, and chats that may be offered in evidence.

Evidence of consensual group sex / orgies is also probative and admissible to show that the mere fact that sexual activity involved multiple participants or occurred in a group setting does not inherently indicate force, intimidation, or coercion.

The Court should assess so-called "good acts" evidence just like any other "other acts" evidence. If its purpose is "to prove material facts other than . . . propensity," it is relevant and admissible. United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992). That is the case here, and the Court should reserve decision. See United States v. Fiumano, 2016 WL 1629356, at *7 (S.D.N.Y. Apr. 25, 2016) (reserving "decision on whether any ['good acts'] evidence the Defendant seeks to introduce is, in fact, inadmissible 'good acts' evidence").

99

**B.    Defendants Will Not Argue To The Jury That The Prosecution Is Novel Or Otherwise Improper**

Defendants have no intention of arguing to the jury that the prosecution or the charges are vindictive, novel, or otherwise improper. However, Defendants reserve the right to revisit this position if additional information or disclosures provide a good-faith basis for such an argument. Thus, the government's request is moot. Obviously, evidence and argument that the Government's investigation was inadequate or defective is relevant and admissible. See Kyles v. Whitley, 514 U.S. 419, 446, n.15 (1995). As is evidence of any preferential treatment, promises made, or favors given by the government to individuals involved in the case.

**C.    Defendants Will Not Make Arguments Concerning Possible Punishment**

Defendants do not intend to make reference to the potential punishments they would face upon conviction. However, if the government calls any cooperating witnesses at trial, Defendants should be able to cross-examine these witnesses about any cooperation agreements with the government and plea allocutions, and to cross-examine these witnesses about their plea agreements, the statutory maximum sentences they face, and the benefits they hoped to gain from cooperation. See, e.g., United States v. Graziano, 558 F. Supp. 2d 304, 328-29 (E.D.N.Y. 2008) (permitting cross examination on "penalties that the cooperating witnesses face and any potential bias resulting from the benefits of cooperation"); United States v. Watts, 934 F. Supp. 2d 451, 491–92 (E.D.N.Y. 2013). This line of questioning is relevant to the witnesses' credibility, potential biases, and motives to testify favorably for the government.

**D.    The Court Should Deny The Government's Request To Exclude Evidence Or Argument Concerning #MeToo**

To the extent that the emergence of the #MeToo movement in 2006 and its awareness campaign over the years would have encouraged women to report that they were sexually assaulted, evidence that an accuser did not report her alleged assault may be relevant to credibility.

100

Questions about #MeToo may also be relevant to the cross-examination of the government's expert (Dr. Rocchio), who proposes to testify about the delayed disclosure of sexual assault. The Court should reserve decision until the Court can evaluate the evidence in the context of the trial.

### E. The Court Should Deny The Government's Request To Exclude Evidence Of The Defendants' Background

The Defendants will not be making jury nullification arguments nor attempting to elicit sympathy by referring to their personal circumstances. However, the government's request to preclude any discussion of the Defendants' personal background should be denied. The Defendants' arguments, including in opening statement, will focus on the evidence.

A defendant is not precluded from providing the jury with some background information about his life and experiences. Indeed, we anticipate that some of the government's witnesses will testify about the defendants' background, stature in the community, and wealth. This Court has "wide discretion concerning the admissibility of background evidence." United States v. Blackwell, 853 F.2d 86, 88 (2d Cir. 1988). This includes the customary "evidence concerning [a defendant's] . . . education and employment," and other relevant background. Id. Accordingly, motions like the government's motion are routinely denied. See United States v. Kosinski, No. 16-CR-148 (VLB), 2017 WL 4953902, at *6 (D. Conn. Oct. 31, 2017) (denying without prejudice government's motion to exclude general personal background such as defendant's age, basic information about his employment, and family background); United States v. Calonge, 20-CR-523 (GHW), ECF 42 (S.D.N.Y. 2021) (denying "Government's motion in limine requesting that the Court exclude all evidence or argument regarding the Defendant's family background, health, age, or any other similar factors").

It is highly likely that evidence of the defendants' background and family circumstance will be directly relevant in this case. For example, the government has alleged a conspiracy from

2009 through 2021 where "the defendants worked together and with others known and unknown, to repeatedly and violently drug, sexually assault, and rape dozens of female victims." S3 ¶1. But in 2018, Alon entered a monogamous relationship with his future wife, publicly declared his engagement to her in 2019, and married her in 2020. Alon intends to argue that if the conspiracy charged in Count 1 existed, he withdrew from it when he publicly declared his monogamous relationship with his wife; this is supported by the fact that the government does not allege any sexual assault by Alon after 2017.

Additionally, the government has noticed Dr. Rocchio's proposed testimony as to all defendants on topics relating to interpersonal and intimate partner violence.

The Court will need to decide the relevance of personal background evidence in the context of the trial evidence.

Finally, the Court's jury charge will likely incorporate the usual instruction that irrelevant factors such as sympathy are not to be considered by the jury, an instruction the jury is capable of following.

### F.    The Court Should Deny The Government's Request To Exclude Evidence Of Improper Venue

Venue is a constitutional right and, when disputed, a factual question for the jury. See generally Smith v. United States, 599 U.S. 236, 240 (2023). The Sixth Amendment provides that a trial shall be held in the "district wherein the crime shall have been committed, which district shall have been previously ascertained by law." For offenses on the high seas, 18 U.S.C. § 3238 provides that trial shall be in the district in which the offender is "arrested or is first brought," which makes the actual arrest location the dispositive fact for determining proper venue. Courts have interpreted this language to mean the district where the defendant is first placed in federal custody and his liberty is restrained for the offense at issue. United States v. Erdos, 474 F.2d 157,

102

161 (4th Cir. 1973); United States v. Provoo, 215 F.2d 531, 537 (2d Cir. 1954). The government must prove proper venue by a preponderance of the evidence. United States v. Smith, 198 F.3d 377, 382 (2d Cir. 1999).

A factual dispute exists over venue and the jury must therefore be permitted to determine where the defendants' arrest occurred. Defendants argue that venue is proper in the Southern District of Florida, where they were first arrested, or in the Eastern District of New York, "where the defendant[s were] first restrained of [their] liberty [by the U.S. Marshal] in connection with the offense charged [i.e., the arraignment on Count 10].'" United States v. Catino, 735 F.2d 718, 724 (2d Cir. 1984) (citation omitted).

The government argues that the arrest did not occur until the defendants landed in the SDNY courthouse for arraignment, at which time federal agents handed them the warrant for Count 10.

Under Fourth Amendment jurisprudence, the defendants contend that they were "arrested" by U.S. Marshals at MDC Brooklyn for transport to the SDNY Courthouse, even before they were handed the arrest warrant. "[T]o constitute a seizure of the person, just as to constitute an arrest, the quintessential 'seizure of the person' under Fourth Amendment jurisprudence, there must be *either* the application of physical force, however slight, *or,* where that is absent, submission to an officer's 'show of authority' to restrain the subject's liberty." California v. Hodari D., 499 U.S. 621, 624 (1991).

Federal venue doctrine applies these same principles. The Second Circuit has recognized that courts "consistently have interpreted 'arrested' in § 3238 to mean that venue is in the district where the defendant is first restrained of his liberty in connection with the offense charged." United States v. Catino, 735 F.2d 718, 724 (2d Cir. 1984). This interpretation of § 3238 makes

103

clear that an arrest occurs at the moment of the first restraint on liberty for the relevant charge, not when a copy of the warrant is handed to the arrestee or when the arrestee defendant later arrives in the district where the government proposes to prosecute him.

Defendants are mindful of the Court's Order observing that "[t]he place of arrest 'generally rests entirely within the executive's discretion." United States v. Adams, 777 F. Supp. 3d 185, 205 (S.D.N.Y. 2025)," and the Court's finding that "[d]efendants were arrested in connection with the S3 Superseding Indictment when they arrived at the Southern District [of New York] Courthouse for their arraignment on the S2 Superseding Indictment." Sealed Order (Oct. 17, 2025) at 24, 26. But as the U.S. Magistrate made clear when the defendants appeared in the SDNY Courthouse on June 10, 2025 in the custody of the U.S. Marshals: "we are here for the arraignment on the third superseding indictment." Transcript (June 10, 2025) at 2 (emphasis added). These facts support an argument and jury finding that venue does not lie in the Southern District of New York because, before the defendants were handed the arrest warrant in the SDNY Courthouse, "the defendant[s were] first restrained of [their] liberty [by the U.S. Marshal] in connection with [the S3 Superseding Indictment charging Count 10]," Catino, 735 F.2d at 724, at MDC Brooklyn, in the Eastern District of New York. The U.S. Marshals took custody of the defendants (i.e., arrested them) solely on account of the charges in the S3 Superseding Indictment, including Count 10.

At the trial, therefore, the jury should decide the factual dispute after being instructed that the government must prove, by a preponderance of the evidence, that defendants were first arrested on Count 10 in the SDNY. Defendants should be permitted to present evidence and argument that their arrest on Count 10 occurred before they were handed the arrest warrant.

## XI.    THE COURT SHOULD NOT READ THE INDICTMENT TO THE JURY

Defendants respectfully request that the Court not read the entire S-3 Indictment (the "Indictment") (ECF 86) to the jury at the opening of trial. The Indictment does not simply recite

104

the statutes that Defendants are alleged to have violated but is rather in the nature of a "speaking" indictment, with a prejudicial narrative written by the prosecution. In similar situations, Courts in this district have elected to read to the jury only a summary of the relevant statutory counts during opening proceedings. See, e.g., Watts, 934 F. Supp. 2d at 491-92 (granting the defendant's motion to preclude the court from reading the entire speaking indictment to the jury at the trial's opening).

In United States v. Esso, the Second Circuit wrote as follows:

> [W]hile it is permissible … to send the indictment into the jury room, the practice is hardly mandatory, and not all trial judges follow it, particularly when the indictment does not merely state the statutory charges against the defendant, but additionally contains a running narrative of the government's version of the facts of the case, including detailed allegations of facts not necessary for the jury to find in order to address the elements of the charged offenses. In most cases, the judge's instructions regarding the issues to be addressed by the jury and the elements of the offenses charges, which may include a reading of the legally effective portions of the indictment, will more than suffice to apprise the jury of the charges before them.

684 F.3d 347, 352, n.5 (2d Cir. 2012); see also United States v. Tuzman, 301 F. Supp. 3d 430, 454 (S.D.N.Y. 2017) ("it is not this Court's practice to give 'speaking' indictments . . . to the jury").

Here, the 15-page indictment contains a 4.5-page narrative of the government's view of the alleged conspiracy. The government's theory of the alleged conspiracy should be sufficiently covered in its opening statement. Accordingly, under Esso, Defendants request that the Court advise the jury of the nature of the case by giving them the law, the statutory portion of the indictment, or a neutral summary of the charges, and not read the argumentative indictment in this case. For the same reasons, Defendants similarly request that the narrative portion of the Indictment not be provided to the jury during deliberations.

## CONCLUSION

For the reasons set forth above, the government's motions in limine should be denied.

105

Dated:   New York, NY             Respectfully submitted,
         November 18, 2025

*/s/ Milton L. Williams*

Milton L. Williams
Deanna M. Paul
Alexander Kahn
Walden Macht Haran & Williams LLP
250 Vesey Street, 27th Floor
New York, NY 10281
Tel: (212) 335-2030
mwilliams@wmhwlaw.com
dpaul@wmhwlaw.com
akahn@wmhwlaw.com

*Counsel for Tal Alexander*

*/s/ Marc Agnifilo*

Marc Agnifilo
Zach Intrater
Teny Geragos
Agnifilo Intrater LLP
140 Broadway, Ste. 2450
New York, NY 10005
Tel: (646) 205-4350
marc@agilawgroup.com
zach@agilawgroup.com
teny@agilawgroup.com

*Counsel for Oren Alexander*

106

/s/ Howard Srebnick

Howard Srebnick
Jackie Perczek
Black Srebnick, P.A.
201 South Biscayne Blvd., Suite 1300
Miami, FL 33131
Tel: (305) 371-6421
hsrebnick@royblack.com
jperczek@royblack.com

Jason Goldman
The Law Offices of Jason Goldman
275 Madison Avenue, 35th Floor
New York, NY 10016
Tel: 212-466-6617
jg@jasongoldmanlaw.com

*Counsel for Alon Alexander*

107