PC5BALEC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                         24 Cr. 676 (VEC)

5  ALON ALEXANDER, *et al.*

6                                     Conference
                Defendants.
7  ------------------------------x

8
                                     New York, N.Y.
9                                    December 5, 2025
                                     1:00 p.m.
10

11 Before:

12                  HON. VALERIE E. CAPRONI,

13                                     District Judge

14                        APPEARANCES

15 JAY CLAYTON
        United States Attorney for the
16      Southern District of New York
   BY:  MADISON SMYSER
17      ANDREW JONES
        ELIZABETH ESPINOSA
18      KAIYA ARROYO
        Assistant United States Attorneys
19

20 BLACK SREBNICK, P.A.
        Attorneys for Defendant Alon Alexander
   BY:  HOWARD SREBNICK
21

22 AGNIFILO INTRATER, LLP
        Attorneys for Defendant Oren Alexander
   BY: MARC AGNIFILO
23      TENY GERAGOS
        JENNY WILSON

24

25

PC5BALEC

1                          APPEARANCES (Continued)

2

3   WALDEN MACHT HARAN & WILLIAMS, LLP
         Attorneys for Defendant Tal Alexander
4   BY:  MILTON WILLIAMS
         DEANNA PAUL
5        ALEXANDER KAHN

6

7   Also Present:

8   Justine Atwood, Special Agent, FBI
    Antonio Pagan, Detective, NYPD
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PC5BALEC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, note your appearances for

3   the record.

4          MS. ESPINOSA:  Good afternoon, your Honor.

5          Elizabeth Espinosa, Madison Smyser, Kaiya Arroyo and

6   Andrew Jones for the government.  We're also joined at counsel

7   table by Special Agent Justin Atwood and Detective Antonio

8   Pagan.

9          THE COURT:  Good afternoon, everybody.

10         MR. SREBNICK:  Good afternoon, your Honor.

11         For Alon Alexander, Howard Srebnick.

12         THE COURT:  Good afternoon, Mr. Srebnick.

13         MR. AGNIFILO:  Good afternoon, your Honor.

14         Mark Agnifilo for Oren Alexander, and with me is Teny

15  Geragos and Jenny Wilson in the jury box.

16         THE COURT:  Good afternoon.

17         MR. WILLIAMS:  On behalf of Tal Alexander, Milton

18  Williams, Deanna Paul and Alexander Kahn.

19         Good afternoon, your Honor.

20         THE COURT:  Good afternoon.  So we're here to finish

21  up on what we started, whenever that was last week, where I

22  have marked from my list is that we were talking about the

23  issue of what the defense wants to do.  The government wants to

24  preclude you from asking about civil representation, and I

25  think my question was, what is it that you want to get in?

PC5BALEC

1    Who's addressing this?

2              MR. WILLIAMS:  Me, your Honor.

3              THE COURT:  Okay.

4              MR. WILLIAMS:  Your Honor, just in terms of order, do

5    you want to know why or do you want to know what first?

6              THE COURT:  Why don't we start with what because at

7    some level that's more important than why.  I think I'd be able

8    to figure out why.

9              MR. WILLIAMS:  Your Honor -- and I can go into this if

10   your Honor ask me, but there are two cases.  One is a Second

11   Circuit case from 1992 *Eisen*.  And the other is the *Paduch* case

12   which was tried here in front of Judge Abrams in 2024.  And

13   based on what was allowed, defense was allowed to adduce in the

14   *Paduch* case, we're asking for -- where there were victims who

15   were represented by plaintiffs attorney, we're asking the

16   following.  We'd like to be able to identify the identity of

17   the plaintiffs' lawyers, who they're representing, whether or

18   not they filed a lawsuit.  Because in this case, it's our

19   position that because of the doctrine of collateral estoppel,

20   there happens to be a conviction, that there is very likely,

21   given Mr. Torgan's activity and the fact that he filed lawsuits

22   against Alon and Oren Alexander back in March 2024, that there

23   are going to be additional civil suits filed on behalf of the

24   victims who haven't filed as of this date.

25              We're also looking to adduce the fact that Mr. Torgan

PC5BALEC

1   was present at all the meetings with his clients with the

2   government.  There's 14 of them, or 13 of them, and there's

3   over 52 meetings that he attended at the Southern District of

4   New York with the prosecutors in terms of prep and also

5   preliminary discussions.

6           Also, we seek to adduce evidence that the -- and this

7   happened in this case -- the victims -- and in *Paduch* it was

8   allowed.  What I'm enumerating is what was allowed *in* the

9   *Paduch* case hoping your Honor might consider it.  The victims

10  contacted the plaintiffs' lawyers after seeing advertisements

11  seeking victims of the defendant in *Paduch*, and we seek to do

12  that here.  And also the defense in the *Paduch* case -- and we

13  would like to do this here, or would seek to do it -- would

14  call the case agent.  And the case agent there testified that

15  the FBI open the investigation after learning of the civil

16  suit, which is really what happened here.

17          There were several civil suits filed against Oren and

18  Alon Alexander in March of 2024, against Tal Alexander I

19  believe in June of 2024.  Those were the earliest lawsuits.

20  And then on July 3, Mr. Torgan met with the prosecutors in the

21  Southern District of New York; and it happened to coincide with

22  press coverage I believe in Bloomberg and the New York Times

23  that a criminal investigation had been opened.  So we're

24  seeking to ask those items, as well as the financial fee

25  arrangements of the representations Mr. Torgan has with his

PC5BALEC

1  clients, the fact that he sourced victims for the government,

2  brought them to the government.

3      THE COURT:  Wait a minute. All of this sounds like you

4  want to put Mr. Torgan on trial.  I understand -- and I am

5  somewhat sympathetic to lines of inquiry that are designed to

6  show that the witnesses have a motive to not be truthful, but

7  we're not trying Mr. Torgan.

8      MR. WILLIAMS:  I'm not seeking to do that, your Honor.

9      THE COURT:  It sure sounds like it.

10      MR. WILLIAMS:  That's why I wanted to start maybe with

11  the "why," but we've given you the list.  Let's look at the

12  *Eisen* case which was back in --

13      THE COURT:  *Eisen* is very different.

14      MR. WILLIAMS:  In *Eisen* -- and I'm talking about the

15  cross-pollination of witnesses.

16      THE COURT:  Hang on a second.  Let me talk to the

17  government for a second.  Let's narrow down what's in dispute

18  Who's handling this for the government?

19      MR. JONES:  Your Honor, it's me.

20      THE COURT:  Mr. Jones, it seems to me that certain

21  areas of inquiry are fair grounds.  It's fair grounds whether

22  any of your witnesses have sued the defendant.  You agree with

23  that?

24      MR. JONES:  Absolutely.

25      THE COURT:  It seems to me it's fair ground whether

PC5BALEC

1    any of your witnesses have been told by their lawyer or by

2    anybody else what some other witness says happened to her.

3         MR. JONES:  I think, yes, with the idea though that

4    the question needs to be one that's not decided to elicit

5    privileged information.  Has anybody told you the specific

6    account of -- in the realm of, has another person, yes.

7         THE COURT:  Okay.  And then we get to the question of

8    whether it's fair ground to have them identify who their lawyer

9    is.  That is to allow the defense to make the argument they're

10   all represented by the same lawyer.  Yes, they deny that

11   anybody had ever told them what anybody else said; but come on,

12   they're represented by the same lawyer.

13        MR. JONES:  That's the problem.  Among other things,

14   that's the problem.  I think the first one is, your Honor, the

15   arguments made to the jury require a factual basis to make

16   them.

17        THE COURT:  That's true, but they're trying to raise

18   reasonable doubt.  They're not trying to establish what

19   happened.  They're just saying, take their testimony on these

20   points with a big grain of salt because they have a financial

21   motive here.

22        MR. JONES:  I think we just heard of the portion of

23   the defense closing that Evan Torgan orchestrated this

24   conspiracy theory.  Everything about that is in service of that

25   the argument.  And so that whole thing, this lawyer one, Evan

PC5BALEC

1  Torgan, represents 10, 13 witnesses testifying, his specific

2  name being tied to any of it is only for the purpose of putting

3  him and his motivation and his bias on trial.  To take a couple

4  of examples, the fee arrangement point for example.

5          THE COURT:  The fee arrangement is not coming in.

6          MR. JONES:  I think it highlights what they want to do

7  with it.

8          THE COURT:  You want to be heard on fee arrangement?

9          MR. WILLIAMS:  I have some more to cover so your Honor

10  understands that I'm not putting Mr. Torgan on trial.

11          THE COURT:  No, you're not.

12          MR. WILLIAMS:  I know you wouldn't let me, but I'm not

13  even attempting to.  What we're seeking to adduce is some

14  evidence of prejudice; in other words, raising a reasonable

15  doubt.

16          THE COURT:  Your evidence of prejudice -- that's why I

17  started with, do you have a lawyer, and have you sued these

18  people.  That is your grounds for prejudice.  That is, they

19  have a financial motive to testify; and to your argument, to

20  testify falsely against the Alexanders.  That's their motive.

21  What Torgan's motive is -- Torgan's motive is to make money,

22  the same as your motive.  It doesn't mean we're going to ignore

23  arguments you make because you have a financial motive to get a

24  fee.

25          MR. WILLIAMS:  I'm just looking in the *Eisen* case,

PC5BALEC

1   your Honor.  That involved personal injury lawyers if you

2   remember.

3           THE COURT:  Correct.

4           MR. WILLIAMS:  I think Mr. Torgan actually worked for

5   the *Eisen* firm.  This is what I would seek to adduce, but it

6   was actually a witness at that trial.  But the point I'm making

7   is, the idea of cross-pollination of witnesses --

8           THE COURT:  That's why the question would be

9   permissible, has anyone, anyone, including your lawyer, but

10  anyone told you what another witness has said.  That is a fair

11  question.  But if the answer is no, the answer is no.

12          MR. WILLIAMS:  What about this, your Honor.

13  Mr. Torgan represents 13 of the 23 victims here.

14          THE COURT:  So what.

15          MR. WILLIAMS:  He is the common nucleus, the common

16  denominator.

17          THE COURT:  That's irrelevant if no one has been told

18  what anyone else said.  You know what another common nucleus

19  is, everybody that's sitting at this table.  And they

20  understand that they're not supposed to tell witness A what

21  witness B said.  And if they do and it comes out on

22  cross-examination, it's going to look terrible.  So you can ask

23  that question.

24          MR. WILLIAMS:  Your Honor, in terms of listening to

25  what your Honor's saying, and may be limiting, I gave you the

PC5BALEC

1  laundry list that we wanted, and obviously we'd love to have

2  everything.  But if I had to pick certain ones, it would be

3  that he represents 13 of the 23 victims and who he represents.

4  Those two items for certain.

5          THE COURT:  That would mean you ask them, are you

6  represented.  Yes.  Who's your lawyer, Torgan; or the people

7  say something else.  And you can ask whether they were ever

8  told anything of what anyone else said.

9          MR. WILLIAMS:  That seems fair.  I have one more

10  slight ask.  Okay.  And the "ask" is this.  Would there be the

11  possibility that either through you in judicial notice that the

12  jury would be apprised that because of the substantial

13  pecuniary interest that the victims have in this case, and

14  because if there happens to be a conviction here due to

15  doctrine of collateral estoppel, it would be a substantial

16  advantage in a civil litigation.

17          THE COURT:  No.

18          MR. WILLIAMS:  You would not.  Okay.  Understood.

19          THE COURT:  And I don't know that these victims have a

20  financial incentive.  Some have sued.  Some haven't.

21          MR. WILLIAMS:  Your Honor, I would just point out, if

22  Mr. Torgan who filed lawsuits -- and I appreciate what I think

23  your Honor may be giving us, very grateful for it.  Just let me

24  be heard on this additional point.

25          Mr. Torgan has been omnipresent, has had an

PC5BALEC

1   omnipresent involvement in this matter.  Just because the

2   victims have not sued yet, I would submit to the Court there's

3   a high likelihood that they are going to sue at some point; and

4   therefore, that's where the doctrine of collateral estoppel

5   would come into play in any civil litigation.  But I understand

6   your Honor is not inclined to instruct that.  Understood.

7           THE COURT:  Mr. Jones.

8           MR. JONES:  I just want to make sure.  I can respond

9   to the collateral estoppel point or I cannot.

10          THE COURT:  If you'd like to, but we're not going

11  there.

12          MR. JONES:  Then I'm not going to spend anybody's time

13  on it.  The fact is, your Honor -- look, I appreciate they've

14  made a narrower ask, but the name of their lawyer and trying to

15  say 13 people have the same lawyer still is all going to

16  Torgan's motivation.  It's not going to any individual

17  witness's motivation at all; that is, she's not motivated the

18  way that Evan Torgan is motivated through that.  The reason to

19  elicit that fact is because they want to imply the argument

20  that your Honor is telling them they can't make expressly.  And

21  so I don't think, even though it is a much narrower ask, I

22  think that narrower ask still crosses the line of what's a

23  permissible question here.

24          THE COURT:  I'll take the government's argument under

25  consideration.  My inclination is to allow them to bring out

PC5BALEC

1    that some of them are represented by Torgan.  Some of them

2    aren't, which undercuts the whole theory that this is all

3    concocted by a lawyer, a plaintiff's lawyer versus what's

4    actually going on where one lawyer has simply consolidated a

5    bunch of cases against the same defendants.  And they can ask

6    whether they have sued or whether they plan to sue the

7    defendants.  And they can ask whether they've ever been told

8    anything about what anybody else said.  That's what I'm

9    inclined to, but I'll take under advisement the issue of

10   whether they should be able to name that lawyer.

11            MR. JONES:  The question here is, I haven't heard

12   Mr. Williams articulate the rationale that the name of the

13   lawyer or that the multiple names of the lawyer goes to an

14   individual witness's motivation or bias to lie.

15            THE COURT:  Good point.

16            MR. JONES:  So I think that's what makes it

17   inappropriate.

18            THE COURT:  Why is it appropriate?

19            MR. WILLIAMS:  Your Honor, again, he is the common

20   denominator amongst 13 victims.  And so even if going to the

21   theory as articulated in the concept in *Eisen*, if everything's

22   done aboveboard and he's completely ethical -- and I'm not

23   arguing that he's not going to be -- the idea, your Honor, that

24   he has 13 witnesses is subtly or inadvertently because he knows

25   everything that's being said at all the meetings.  He could

PC5BALEC

1   influence their testimony.  That's something that the jury

2   should know about.  And I appreciate what your Honor is

3   inclined to allow the defense to inquire into.  I would just

4   ask that we also be allowed to ask Mr. Torgan if he were to

5   take the stand, how many victims did Mr. Torgan attend the

6   meetings with, with the government.

7               THE COURT:  No.

8               MR. WILLIAMS:  Okay.  Thank you.

9               MR. SREBNICK:  Your Honor, may I add for

10  Mr. Alon Alexander?

11              THE COURT:  Sure.

12              MR. SREBNICK:  I believe Mr. Torgan is operating under

13  a contingency fee arrangement, not on an hourly basis.

14              THE COURT:  I'm confident he has.

15              MR. SREBNICK:  And he has a vested interest in the

16  actual verdict here. The rest of us do not work on a

17  contingency fee basis as lawyers.  He attends the debriefings,

18  so he uniquely has access to the testimony or the proffers

19  given by people who were at the meeting, his clients.  Some of

20  whom haven't sued yet, but interestingly have a lawyer

21  attending debriefings.

22              THE COURT:  You're entitled to a lawyer.

23              MR. SREBNICK:  Of course.  Some witnesses want to have

24  a lawyer.  It just happens that it's the same lawyer who

25  represents the people who do --

PC5BALEC

THE COURT:  You're doing the same thing Mr. Williams did with all due respect.  We are not trying Mr. Torgan, and I will cut you off at the knees if you try to do that in front of a jury.

MR. SREBNICK:  I would not do it without your permission.  That's why I'm asking for that permission.

THE COURT:  You're not getting my permission.

MR. SREBNICK:  Understood. The record will reflect that I'm asking for permission and I've been denied.

THE COURT:  Correct. Let me be clear.  We're trying the three Alexander men.  We're not trying Mr. Torgan.  He is not a defendant in this case.  He has his practice of law.  The fact that he represents multiple victims is neither here nor there.  That is not uncommon in the world of this kind of work.  The fact that he's working on a contingency gives him an incentive.  It doesn't give his clients an incentive.  His clients incentive is to tell the truth; or if they have a financial motive, that's their motive.  The fact that they're paying their lawyer on a contingency basis doesn't increase their incentive to not be truthful.

MR. SREBNICK:  I think one of the most important things we want to establish -- and it's strong circumstantial evidence, Torgan is present and is the common connection between presumably accusers who otherwise don't have a relationship with each other.

PC5BALEC

1    THE COURT:  The biggest common denominator is your

2    clients.

3    MR. SREBNICK:  And that's the government's theory.

4    And our ability to challenge the credibility and the testimony

5    of the accusers who coincidentally, 13 of them share the very

6    same lawyer who attended the debriefings by his clients, the 13

7    witnesses that are coming.  We think the jury needs to know

8    it's the same human being, his law firm is at those meetings,

9    helping those witnesses prepare with the government to testify

10   against our clients.  Thank you, Judge.

11   THE COURT:  Okay.  Mr. Jones, you have anything to say

12   about that?

13   MR. JONES:  I don't think anything new was said, so

14   I'm not going to say anything else.

15   THE COURT:  Is that it?  Nobody else wants to be heard

16   on this point?  Good.

17   MR. AGNIFILO:  I'm sorry to stand up after your Honor

18   said good. One very quick thing.

19   MS. PAUL:  Your Honor, can the attorneys confer on

20   this briefly?

21   THE COURT:  Yes, briefly.  You want to confer before

22   he gets to talk?

23   MR. AGNIFILO:  I have a point that I don't think

24   anyone is going to conference me on.

25   Here's what we're saying in the discovery, so I want

PC5BALEC

1    to be more granular.  Let's say for instance we see that a

2    certain specific potential witness gives a story, and we know

3    that because we get it in the 3500, represented by Mr. Torgan.

4    Neither here nor there, but it will become more relevant later.

5    We see that Mr. Torgan represents the second person.  Second

6    person goes into the government makes a statement.  The certain

7    elements in this second statement that weren't in the first

8    statement. Lo and behold what do we start seeing?  We start

9    seeing that the person who went in there first adds something

10   along the lines of what the second person said to the

11   government, the common denominator being Mr. Torgan.

12            So here's the question.  And your Honor's clear as a

13   bell and I don't want to keep thinking that -- I don't want you

14   to think that I don't hear the ruling.  I think there might be

15   a more factual proffer that we could make that might give your

16   Honor a different perspective on it.  Because it's not so

17   much -- your Honor's right. If we ask one witness, did anybody

18   tell you what another person said.  That's just not the way

19   this is done probably. And I don't even know that it's done

20   nefariously.  I think it's done maybe with the best of

21   intentions.  Hey, well, did you feel dizzy? Yeah, you know, I

22   kind of did feel dizzy.  So all of a sudden that's in a later

23   statement.

24            So the thing that I'd like to maybe put a pin in is if

25   we could develop this in a way where your Honor says, you know

PC5BALEC

1   what, it sounds like there might be something to it, I would

2   just like to keep the door open that crack.  And knowing that

3   your Honor's ruling might stay the same, but there is something

4   a little more granular that I think is worth sort of focusing

5   that at least from my perspective didn't come forward as

6   clearly as hopefully I made it now.  That's it.

7           THE COURT:  Mr. Jones.

8           MR. JONES:  Look, I think that was very broad and it's

9   tough to say exactly what's going on here.  For the most part

10  if there comes through the cross-examination a basis for some

11  additional cross-examination, maybe we can deal with it in the

12  middle of trial, but I don't think that this changes any sort

13  of pretrial ruling.

14          THE COURT:  I don't think it does either.  Obviously

15  if something comes up that changes things, then you know how to

16  raise it at sidebar.

17          MR. WILLIAMS:  Your Honor, just so I'm clear.  At this

18  point you're inclined to allow us to ask the victims the name

19  of the attorney.

20          THE COURT:  The name of the attorney is under

21  advisement. That they're represented, yes or no.  Have they

22  sued, yes or no.  Do they intend to sue if they haven't already

23  sued, yes or no.  And have they ever been told anything about

24  what anybody else said, either by their lawyer or anybody else.

25          MR. WILLIAMS:  Thank you, your Honor.

PC5BALEC

1          THE COURT:  Okay.  That brings us to the issue of

2    preclusion.  Something in one of your letters said you want to

3    reconsider or you wanted to be heard further on 413.

4          MR. AGNIFILO:  That might be my letter.  413, I think

5    your Honor decided 413.

6          THE COURT:  I thought the 403 aspects of the 413

7    rulings.

8          MR. AGNIFILO:  We do want to be heard more only on the

9    403 part.

10          THE COURT:  Okay.

11          MR. AGNIFILO:  I think my colleague is --

12          MR. SREBNICK:  There is one additional argument that

13    there are two 413 type witnesses that relate accounts that

14    occurred outside the United States.  One I believe in Israel.

15    The other in the Bahamas.  I took a look at the Second

16    Circuit's decision in *Trump v. Caroll*.  It's a long opinion.

17    And I don't think it addressed -- the Second Circuit did not

18    address whether that kind of evidence, evidence regarding an

19    allegation of some sort of assault that occurs outside the

20    territory of the United States, outside of any state, outside

21    of an airplane within the United States.  We'd like to have the

22    Court consider whether 413 even allows the administration of

23    events that occurred in a foreign country.  The statute seems

24    to focus specifically on the territory of the United States, a

25    state, federal, but it does not seem to open the door to events

PC5BALEC

 1    occurring in foreign jurisdictions.  And in the case of *Trump*

 2    *v. Caroll*, president Trump raised the issue -- and it appeared

 3    that the court did not reach it because it found that when he

 4    was on his airplane, it was still within the United States.

 5    And that's what got us thinking it appears that's still an open

 6    question in the Second Circuit.  And to the extent it is still

 7    an open question, we would argue that the event must have

 8    occurred within the jurisdiction of the United States, no

 9    extraterritorial application of rule 413.

10         THE COURT:  Okay, but then the government will say, I

11    suspect, well then it's admissible under 404(b), or they'll

12    seek to admit it under 404(b).

13         MR. SREBNICK:  I understand 413 to allow evidence

14    broader than 404(b) would allow, because it's being used for

15    propensity.

16         THE COURT:  Okay.

17         MS. ESPINOSA:  Your Honor, I think we would say

18    there's nothing in 413 that limits it to the territory of the

19    United States.  There's no extraterritoriality bar in 413.

20         THE COURT:  There's not, except what he's talking

21    about is it defines sexual assault with reference to federal

22    law or state law.

23         MS. ESPINOSA:  It also defines sexual assault through

24    a list of descriptions of what sexual assault is, including the

25    non-consensual contact between any part of a perpetrator's body

PC5BALEC

1  and a victim's genitals.  Those are conduct based descriptions.

2          THE COURT:  Yeah, but the lead in paragraph D which

3  leads into that list says, In this rule, and rule 415, quote,

4  sexual assault, close quote, means a crime under federal law or

5  under state law.  State is defined in 18 U.S.C. Section 513

6  involving, quote.  So it seems to constrain it by, it's either

7  a federal or state crime.

8          MS. ESPINOSA:  Well, your Honor, there's also no

9  extraterritoriality bar on federal sex trafficking If a portion

10  of the offense takes place outside of the United States, we're

11  entitled to introduce that evidence that took place outside the

12  United States in a trial here in this court as well.

13          THE COURT:  In particular they're talking about --

14  these are both non-substantive victims, right.  So this was

15  Israel -- so victim 13.  So my ruling was that it's admissible

16  under 413 as to Alon. And I don't have my full notes about what

17  the ruling is.  I don't have a chart yet.  That's victim 13.

18  And what was the other one, the Bahamas?

19          MR. AGNIFILO:  Yes, Judge, the Bahamas.

20          THE COURT:  I don't know which one that is.

21          MR. AGNIFILO:  Victim 15, your Honor.

22          THE COURT:  15?

23          MR. AGNIFILO:  Yes, 1-5.

24          THE COURT:  That was Bahamas, yeah.  That came in as

25  413 as to Oren.  So I understand your argument as to those two,

PC5BALEC

1   that would be 13.  I think both of those were on the 404(b)

2   list as well.

3           MS. ESPINOSA:  That's right, your Honor.

4           THE COURT:  I don't see any reason why it wouldn't

5   come in as 404(b).  I was not focusing on that.  So you can

6   count that, Mr. Srebnick, as a victory, but a pyrrhic victory.

7           MS. ESPINOSA:  We haven't had the chance to focus on

8   this specific issue either, so we would like the opportunity to

9   look into it and write on it if there's anything else --

10          THE COURT:  If there's anything else you want to say,

11  I'll take whatever you have to say.

12          MS. ESPINOSA:  Thank you, your Honor.

13          THE COURT:  Okay.  That's it for those.  Wait a

14  minute.  Ms. Geragos, right?

15          MS. GERAGOS:  Yes.  I think on the defense side we

16  were a bit confused.  We argued the 413 point at the last

17  hearing.  We didn't get the chance to argue 403 as it relates

18  to each alleged victim, and so we wanted the opportunity to do

19  so today, or to at least to brief it, because it's not clear as

20  to whether your Honor's going to rule on how many or which of

21  the alleged victims are going to be able to testify prior to

22  trial; or if that's going to be -- the decision will be made

23  mid-trial.  We have 412 motions to do, and so we're trying to

24  get an understanding of how many and who are going to be

25  testifying.

PC5BALEC

1          THE COURT:  Right.  So I think what I said was, sort

2     of individually, each one of them passes, based on what you've

3     briefed to me so far, the 403 test.  What doesn't pass 403 is

4     collectively.  Eventually it's cumulative, and eventually it

5     therefore becomes a waste of time and would be excluded on that

6     ground.  I can't make that decision until I know what the

7     government is actually putting in, and I don't know if the

8     government has made that decision yet.  Has the government made

9     that decision of who you're actually calling?

10          MS. ESPINOSA:  While we certainly have an idea, your

11     Honor, we have not made a final decision yet.

12          MS. GERAGOS:  So once we get the witness list, then we

13     will be able to further brief 403?  Is that what I'm hearing?

14          THE COURT:  I'm guessing not cause I'm guessing

15     they're going to put everybody on the list.

16          MS. ESPINOSA:  Yes, your Honor.

17          THE COURT:  I think we're going to have to do it as

18     the trial goes because it's not going to be a way to decide in

19     the abstract where that line is.  I'm happy to hear from you,

20     but I don't know how you want me to decide that.  I haven't

21     seen any of these people.  I have no idea how that testimony is

22     gonna come in.  What I'm telling the government -- and they're

23     on notice, is that they're not putting them all on because

24     that's wildly cumulative.  So at some point I'm going to say,

25     we're done.

PC5BALEC

1          Y'all are going to be raising bloody murder and you're

2     going to say, enough.  We can't do this again.  It's unduly

3     prejudicial.  It's repetitive, et cetera, et cetera. And at

4     some point I'm going to agree with you. If you do it after the

5     first witness, I probably won't agree.

6          MS. GERAGOS:  I think just based on how other trials

7     have gone in this building; for example, *Paduch* we mentioned

8     earlier.  Pretrial, it was noticed, the government was on

9     notice they had five.  And so we think that based on other

10    cases where 413 victims are allowed to testify, that we would

11    be able to better prepare for trial having an understanding of

12    how many are being called, and who are being called.

13         MS. ESPINOSA:  Your Honor, if I could just respond on

14    that. I was one of the AUSAs on the *Paduch* case.  And in that

15    particular case, there's one very significant distinction which

16    is that Darius *Paduch* was a lone defendant.  He was not charged

17    in a conspiracy.  And while Judge Abrams did limit the number

18    of 413 victims that we could call, there she did not identify

19    which particular victim.  She did not dictate to the government

20    which victim we could call, but I think that it is a material

21    difference, that that was a single defendant case.

22         Here there are three defendants.  They are each

23    charged with being members of the conspiracy; in addition to

24    numerous substantive counts as to each one.  And while we

25    certainly appreciate and understand that there is a point at

PC5BALEC

1    which the evidence becomes cumulative, we've been clear -- and

2    I'll emphasize it again.  We are not going to call every single

3    one of the victims that we have moved on.  It is important for

4    us to be able to put on sufficient evidence to meet our high

5    burden as to each of the defendants as individuals.

6         So here, a limit like in *Paduch* is simply not

7    applicable. The cases are very distinct, and the ways in which

8    the crimes were carried out are different*.  Paduch* was acting

9    alone.  There was no conspiracy charged, and so those things

10   are very different.  But we are certainly mindful, not only of

11   the cumulativeness point, but also of the interest of

12   efficiency and the best use of the Court's time, the jury's

13   time, and the parties' time.  So we're going to be keeping that

14   in mind as we move through with each victim and making

15   appropriate decisions to limit as necessary to keep things

16   moving along.

17        But we're not in a position to necessarily decide

18   exactly which victims we will put on because there are

19   distinctions between them, and certain may become more relevant

20   dependent on defense arguments and depending on other decisions

21   as we go along.  So to some extent this decision is going to be

22   dependent on events that have not yet occurred.  And while we,

23   like I said, we're very committed to ensuring that we do not

24   cross the cumulativeness line, that we keep things moving

25   efficiently, we just don't think that it is appropriate for a

PC5BALEC

1  limiting decision to be made now.

2         MS. GERAGOS:  Your Honor, in terms of the conspiracy

3  point that Ms. Espinosa just made.  They have seven -- eight

4  now statutory victims that they can rely on with respect to the

5  conspiracy.  And in terms of the cumulative point --

6         THE COURT:  My recollection is that I ruled that some

7  of those other victims are admissible as direct evidence of the

8  conspiracy.

9         MS. GERAGOS:  Yes, that's correct.

10         THE COURT:  So you're focusing I presume on the people

11  who are only testifying as 413 witnesses and maybe the two

12  404(b) witnesses that Mr. Srebnick has succeeded in.

13         MS. GERAGOS:  Of which there are many.

14         THE COURT:  No, they're only two.

15         MS. GERAGOS:  Of the 413 is what I meant to say.

16         THE COURT:  There are, but, look, I don't have a

17  chart, and I didn't create a chart.  Some of them are

18  admissible to some defendants and some against others. It's a

19  real mix and match.  But the bottom line is, to the extent

20  you're arguing I should set a numerical limit, I'm not.

21         MS. GERAGOS:  If I could make a few more points with

22  your Honor's permission and patience.  I think it's confusing

23  to the jury that there's some admissible to some defendants and

24  some that are admissible to all.  It's a confusing point.  I

25  also want to make the point for your Honor --

PC5BALEC

1          THE COURT:  What do you want me to do about that?

2      Focus on that.  What am I supposed to do?

3          MS. GERAGOS:  You could preclude it based on 403.

4          THE COURT:  So I'm going to preclude it because some

5      of it's admissible against one and some admissible against the

6      other the jury's going to have to keep it straight?

7          MS. GERAGOS:  Yes, because it misleads and confuses

8      the jury.

9          THE COURT:  No, it won't.  This is three defendants.

10     We have tried cases with eight defendants, and we trust the

11     jury to keep the evidence separate.

12         MS. GERAGOS:  Understood.  However, we have many

13     statutory victims here, and now many 413, 404(b), and direct

14     conspiracy victims as well.  It's hard to keep track of, even

15     for the lawyers.  But if I can also make the point.  Some of

16     these alleged victims, also the government is going to bring in

17     other witnesses.  We can tell already from the 3500 who they

18     believe are corroborating witnesses to each of these.  It's

19     going to lead to mini trials for each of these alleged events

20     that we think is just confusing to the jury and will prejudice

21     them against our clients.  Because they're going to think,

22     well, if this rape happened, they had to have done Count One,

23     Two, Three, Four and Five.  It's exactly what 403 bar is for.

24         THE COURT:  Yeah, no.  That's evidence that is

25     prejudicial in exactly the reason it's supposed to be

PC5BALEC

1 prejudicial because it tends to prove the defendants are

2 guilty.

3      MS. GERAGOS: That's propensity evidence which is

4 exactly what 413 precludes.

5      THE COURT: No, 413 expressly permits propensity

6 evidence.

7      MS. GERAGOS: But 403 acts as a bar. All we were

8 asking -- I understand that your Honor has ruled, is that we

9 had an opportunity to brief as to each and every one of the

10 victims. Because we think that having a ruling prior to trial

11 will make this streamlined.

12      THE COURT: Knock yourself out. If you want to write

13 a brief on that point, happy to receive it. I'm telling you,

14 I'm not going to rule in advance. And the reason I'm not going

15 to rule in advance is that it is impossible to do this in the

16 abstract. Until I have seen -- somebody might testify for ten

17 minutes, they're on and off the stand. Next person comes in,

18 it's five minutes, not a lot of cross, whatever. Nobody's

19 really contesting what they're saying. That's entirely

20 different from if we're spending hours with someone, they

21 implicate all three men. I just can't do it in the abstract.

22 I'm sorry. I'm not going to try to do it in the abstract. If

23 you want to write a brief to that point, again, knock yourself

24 out.

25      MS. GERAGOS: Thank you, your Honor.

PC5BALEC

1          THE COURT:  Okay.  That comes to the preclusion of

2     cross-examination of victims on certain topics.  The defense

3     has asked for this issue to be deferred until trial.  I think

4     any final decision will have to be deferred, but let me give

5     you where I am on this.  And the defense needs to raise at

6     sidebar before asking questions where I'm telling you that my

7     inclination is to say it's not permissible.  Does anybody want

8     to be heard on this before I tell you what my thoughts are?

9          MR. AGNIFILO:  No, I'd much rather hear your Honor's

10    thoughts than my own.

11         THE COURT:  So minor victim-3, tell me if these

12    numbers have changed because I don't have names to go with

13    these people.

14         MS. ESPINOSA:  The only number that has changed, your

15    Honor, is that prior minor victim-8 is now minor victim-26.

16    All the rest are the same, and I apologize for that.

17         THE COURT:  That's okay.  But thank you for telling

18    me.  I'm never going to keep it straight.  But minor victim-3

19    is still minor victim-3?

20         MS. ESPINOSA:  Correct, your Honor.

21         THE COURT:  You're standing up.

22         MS. PAUL:  Yes, your Honor. As to minor victim-3. We

23    conferred with the government yesterday.  This is something

24    that we will be briefing in our 412 motion for your Honor which

25    is due on Monday.  It's due on Monday.  So that will be briefed

PC5BALEC

1    in full then.

2            THE COURT:  So you want to put in other information

3    about minor victim-3.  Does that have anything at all to do

4    with the citation for trespassing, criminal impersonation and

5    providing a false name and date of birth 17 years ago.

6            MS. PAUL:  No, it does not, your Honor.

7            THE COURT:  Do you still want to put that information

8    in, in cross-examination?

9            MR. SREBNICK:  Yes, Judge.

10           THE COURT:  Okay. My view is that this will be

11   governed by rule 608.  There will be no extrinsic evidence that

12   would be admissible, but the whole thing seems way too remote

13   in time to be probative of the witnesses' character for

14   truthfulness at this point.  It's also not relevant, other than

15   maybe the criminal impersonation is theoretically relevant to

16   truthfulness.  And because there's limited relevance, even if

17   it weren't so old, I think it would be excluded under rule 403

18   because of the danger of confusion and wasting the jury's time

19   substantially outweighs its probative value, so I'm inclined to

20   exclude those arrests.

21           MR. SREBNICK:  Judge, just so you know, I wasn't

22   intending on getting into the fact of an arrest.  That the cops

23   decided to arrest is not my point.  That back then, which is

24   when the alleged event occurred, so her lying to law

25   enforcement occurred more or less at the same time of the event

PC5BALEC

1  in question.  We would want to elicit that she was willing to

2  lie to law enforcement, and in particular one of the lies is

3  about her age.

4          THE COURT:  Yeah.  I got what you want to do.  I'm

5  incline to exclude it.  It's way to old to be of much probative

6  value.  And to the extent it has probative value, it's

7  outweighed.  Victim-1 is still victim-1?

8          MS. ESPINOSA:  Yes, your Honor.

9          THE COURT:  Has a DUI conviction in 2008.  It's too

10 old.  DUI does not go to truthfulness.  To the extent there is

11 any marginal relevance, the relevance is outweighed by the risk

12 of confusion and wasting the jury's time.

13         MR. SREBNICK:  On that point, if can't get in the fact

14 of the conviction, the fact that she was using and to some

15 degree abusing alcohol, the use of alcohol is documented as

16 something that goes to someone's ability to perceive events.

17 The person is an alcohol abuser during the questioned events.

18 We believe it's relevant to the jury's consideration of whether

19 the witness has an adequate recollection.  I think there's

20 going to be expert testimony about this when we get to that

21 issue, but use of alcohol does affect memory.

22         MR. AGNIFILO:  Can I add one thing to that, Judge?

23         THE COURT:  Sure.

24         MR. AGNIFILO:  I think if the issue is what happened,

25 did she voluntarily drink too much and become intoxicated of

PC5BALEC

1    her own volition, or was something put in her drink like a drug

2    or something that she would make that involuntary.  I think her

3    behaviors then, I think the fact that it's a crime or not a

4    crime is totally relevant.  But her behaviors back then around

5    alcohol, her knowledge of her capacity to drink alcohol, the

6    fact that she drank alcohol is all relevant because that's the

7    time period where she either drank too much volitionally or was

8    given a drug not volitionally.  So her alcohol use then we

9    think is relevant, not because she's a liar or not a liar now;

10   but because it shines a light as to what she was doing with

11   alcohol at the relevant time.

12         THE COURT:  I could be wrong, but is this woman going

13   to testify that she never drank other than the one time she was

14   with whichever Alexander it was?

15         MS. ARROYO:  No, your Honor.

16         THE COURT:  You're not going to need the fact that she

17   has an arrest for DUI to prove that the woman drank.  That's

18   what you want to prove.  You just told me that.  I stand by my

19   ruling.  Friend number one who's not even a victim.  Right.

20   She's not to alleged to be a victim?

21         MS. ARROYO:  That's right, your Honor.

22         THE COURT:  She has a 2008 conviction.  I don't even

23   know what this meets for, quote, Wet, W-E-T, Wet and reckless

24   driving under influence.

25         MS. ARROYO:  Yes, your Honor.  That is a lesser

PC5BALEC

1  included offense of a DUI.

2          THE COURT:  In what state?

3          MS. ARROYO:  It's in California, your Honor.

4          THE COURT:  Of course it's California.  Okay.  Same

5  ruling.  It's too old.  It doesn't go to truthfulness.  To the

6  extent there's any marginal relevance, its relevance is

7  outweighed by the risk of confusion and wasting the jury's

8  time.  Mr. Agnifilo, I take you to say dido in terms of why you

9  want to do it.  My question is, is this woman going to say

10  otherwise?  She never drank?

11          MS. ARROYO:  No, your Honor.

12          THE COURT:  So you'll have other ways of getting in

13  the fact that the woman drank alcohol from time to time.  That

14  brings us to friend number-2.  She has three DUIs in 2007, 2012

15  and 2016.  All except the one in 2016 are ancient history.  The

16  2016 conviction is within the ten-year period, but a DUI

17  conviction does not go to truthfulness; therefore, the

18  probative value is quite low.  Is friend number-2 someone who

19  is gonna acknowledge drinking alcohol?

20          MS. ARROYO:  Yes, your Honor.

21          MR. AGNIFILO:  I think we're pass the realm of

22  drinking.  If someone has three driving while intoxicated

23  convictions, if that person was to appear before a judge, the

24  judge wouldn't be satisfied, oh, you drink alcohol the way many

25  people drink alcohol.  This is someone who abuses alcohol.

PC5BALEC

1   They have a history of that.

2           THE COURT:  Hang on a second.  What's the date of the

3   event that she's testifying about?

4           MS. ARROYO:  Friend-2 is going to be testifying

5   regarding victim-7 which happened in January of 2012.  She's

6   not going to be testifying as a percipient witness.  She's

7   going to be testifying essentially as --

8           THE COURT:  She's an outcry witness?

9           MS. ARROYO:  Yes, your Honor.  She had some

10  observations after the assault had occurred and the defendants

11  were no longer there that morning.  But the government doesn't

12  believe that that's relevant.  The drinking that she did

13  several months after this event really has nothing to do with

14  what she was able to perceive at the time.  And a DUI doesn't

15  mean that you abuse alcohol.  It means that on a particular

16  date you drank more than the legal limit.

17          THE COURT:  Let me say, I would agree with

18  Mr. Agnifilo that if you got three DUIs, you got an alcohol

19  problem.  But I still don't -- all of that said, she's not

20  going to deny that she drinks alcohol.

21          MR. AGNIFILO:  If that happens, I think this is best

22  off as a contextual thing.  I hear the government.  I hear your

23  honor.  If these people are going to be forthcoming about

24  alcohol use, then the DUIs really don't matter.  So today I'm

25  the pin guy.  So maybe we can put a pin in this and see what

PC5BALEC

1   she says.

2         THE COURT:  For all of these.  If you think that they

3   say something during the course of their testimony that

4   legitimately means I should reconsider these rulings, you're

5   welcome to raise the issue.  But you now have my preliminary

6   rulings.  So do not ask a question in front of the jury that

7   runs afoul of these.  We're skipping over experts. I'm going to

8   get to them all at once.

9         This is the issue of victims testifying under

10  pseudonyms. Would the government like to be heard on this

11        MS. ARROYO:  Yes, your Honor.  The government is

12  asking the Court to allow the victims who have not publicly

13  sued to maintain their anonymity while testifying at trial.

14  Courts in this jurisdiction regularly allow this relief in

15  cases with the type of subject matter that's at issue here and

16  for very good reason.  There are multiple compelling interest

17  justifying this relief. The first is the incredibly important

18  public interest concern in allowing this type of relief.

19  Protecting the identity of sexual assault victims is critical

20  so that other victims will not be deterred from coming forward

21  to law enforcement.

22        THE COURT:  Let me ask you something.  Why this can't

23  be accomplished by letting them testify under their first

24  names?

25        MS. ARROYO:  Some of them the victims have incredibly

PC5BALEC

1   identifiable names.  Especially, each of the victims are going

2   to be testifying about certain background information about

3   themselves, generally where they live, what they do for a

4   living.  The first name itself can be enough to identifying who

5   these individuals are.  And so we believe that just their first

6   name is insufficient to protect their identities.

7           THE COURT:  How many victims are in that category

8   where their first name is that identifying?

9           MS. ARROYO:  If I could have one moment, your Honor.

10  I think eight to nine, your Honor.

11          THE COURT:  Eight to nine. You don't have any Susans

12  and Cindys?

13          MS. ARROYO:  We have no Susans or Cindys, but we do

14  have a lot of people with very unique names.  And we believe

15  that the specific circumstances of the assaults which the

16  victims will be testifying about in open court is enough in

17  combination with their first name to make them identifiable.

18  This is not a situation in which victims had long-term

19  interactions with these individuals.  They were at a specific

20  place and specific time.  And anyone who knows they were at

21  that place at that time would be able to put two and two

22  together and figure out who they were.

23          THE COURT:  Okay.  But this was all a long time ago.

24  And if the other person wasn't victimized, is it really going

25  to be significant to them that at some party on some day in the

PC5BALEC

1    Hamptons who was there.

2           MS. ARROYO:  Yes, your Honor.  I believe that is

3    because sexual assault cases are just fundamentally different.

4           THE COURT:  I think it's important for them, for the

5    victims, but some other person who wasn't victimized on that

6    particular weekend who knows who all was there, are they gonna

7    remember that it was, oh, yeah on Memorial Day '06 Jane was

8    there.

9           MS. ARROYO:  I think it's very possible.  This isn't a

10   situation where there's going to be no press.  There's going to

11   be press here.  You can see that there's press here right now.

12   There are going to be people talking about this, providing it

13   to the public.  And individuals reading about it will be like,

14   okay, if that's the name of the person, then I know exactly who

15   this is.  And they have that ability to know who they are.  And

16   I think also it's not just that people in the public could

17   identify them.  I think it's very possible that potential

18   employers, people in their social circles, potential clients --

19   and I can get into this -- would be able to make that

20   connection, especially for the people who have readily

21   identifiable names.

22          THE COURT:  My concern is, if they're testifying under

23   pseudonyms, particularly because you got in a bunch of these

24   situations, multiple people are going to be testifying about

25   the same event, that it is going to be extremely difficult for

PC5BALEC

1    everybody to keep things straight.  Is friend testifying under

2    friend's name, or is friend testifying under a pseudonym?

3            MS. ARROYO:  Friend is testifying under their first

4    name.

5            THE COURT:  My friend who I know as whoever, I'm

6    supposed to be calling somebody else.

7            MS. ARROYO:  Yes, your Honor.  That is the

8    government's burden, and we can make sure that that happens.

9    Fortunately -- not fortunately, but in these situations there's

10   incredibly limited interactions between the victims and the

11   defendant.  So anyone who is testifying about this isn't going

12   to have to testify about years and years of interactions that's

13   going to go on for days and days.  The individuals themselves

14   will know what they're testifying under, and then any outcry

15   witnesses or percipient witnesses would primarily be talking

16   about a limited period of time.  It's not like they're going to

17   have to remember this for days and days.  It's just for the

18   purpose for why they're there.  It's not going to be a long

19   drawn out time, and the individuals who are doing this are

20   willing to do it.  This was what happened in *Combs*, and it has

21   happened in other cases where someone is using a pseudonym.  It

22   works just fine.

23           The government intends to provide information to the

24   jury to provide the faces under seal for each individual so

25   that we can keep track.  We don't believe that this is going to

PC5BALEC

1   be a concern for people not being able to understand.  And that

2   would be my position on that.

3          THE COURT:  Okay.  Anything else?

4          MS. ARROYO:  I have so much more to say.  I think your

5   Honor understands the significant public interest in allowing

6   individuals to testify pursuant to pseudonyms, but it's

7   particularly important in cases like this where we're asking

8   for pseudonyms for individuals who have not come forward and

9   sued themselves.  This is a case where the government is

10  bringing criminal charges against a defendant and are asking

11  individuals in the public to come forward and provide

12  testimony.  They are going to be testifying in open court.  But

13  as I discussed, sexual assault cases are just simply different.

14         THE COURT:  I understand that.  I really do.  I

15  totally understand.  I understand the reason why you're seeking

16  it.  My concern is the defense argument that it's going to make

17  it very difficult to defend the case.  That's my concern.

18         MS. ARROYO:  In this situation there's really no

19  difference between using the first name of a pseudonym and the

20  individual's first names themselves.  It's going to be

21  complicated because there are so many people anyway.  It

22  doesn't matter if it's Amanda, Betty and Kerry, or it's

23  Anastasia, Bethany and Sam.  It's going to be complicated to

24  keep people's names straight either way, so long as the

25  individuals on the stand are able and willing to use the

PC5BALEC

1  pseudonym there shouldn't be any confusion.

2         THE COURT:  Okay.  I hear you.  Let me hear from the

3  defense.  Okay.

4         MS. GERAGOS:  Thank you, your Honor.

5         I know that you've read my brief, so I really just

6  want to address the points that were made today and some other

7  ones that I neglected to include.  The first thing is that

8  there's been no indication thus far that there's any need for

9  any of these people to actually testify under a pseudonym.  The

10 government has made the argument that this will chill victims

11 willingness to testify, but we don't have that in this case.

12 Several of the alleged victims emailed the FBI tip line

13 themselves, came to law enforcement either through the tip line

14 or through Evan Torgan.  There's no indication that they need a

15 pseudonym to testify.  There's also been no indication --

16        THE COURT:  What would you like?  What do you want in

17 terms of a need?  I mean a need, that's an odd verb here.

18        MS. GERAGOS:  I don't think so, and only because I've

19 done this before.  In *Combs*, for example, we consented to a

20 pseudonym for one of the alleged victims, and the others we

21 fought it, and we actually won.  The reason is because if

22 there's actual particularized need legitimate interest, which I

23 think is the term of art, for someone to testify under a

24 pseudonym, we would consider it. But here in every single case

25 that the government wants to use the pseudonym for each victim,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

PC5BALEC

1   the government has been the one to suggest it to the alleged

2   victim.  That doesn't make any sense to us.  Why is the

3   government suggesting this to each alleged victim and they're

4   not saying it.  They're not saying, I'm scared to testify

5   because something will happen to me at work or something will

6   happen to me with my friends.  Nobody's saying that.  The

7   government is instead coming to every single alleged victim who

8   didn't sue under their name and saying, we're going to ask for

9   you to testify under a pseudonym.  And, like, you can consider

10  whether or not you want to do that.  That's just not what the

11  criminal justice system is for.

12      These people have levied horrible allegations against

13  the defendants and they should get up and say what those are

14  without the government saying we want to shroud you in

15  anonymity.  So for that point, it seems like there are cases --

16  and we've had them.  I've done it now in two cases where it

17  makes sense.  There may be a legitimate need for somebody to be

18  anonymous.  But here, I have not seen anything in the wealth of

19  3500 material where people are saying that there's a reason for

20  it.

21      Additionally, there are at least two victims, allege

22  victims that I can think of who are saying, okay, we've sued

23  anonymously; but if our case was dismissed based on the

24  anonymity, we would come forward with our true name.  And

25  that's important because it shows someone's willingness to

PC5BALEC

1    testify.  We have not seen thus far in any of the 3500 material

2    that someone won't testify if they can't go under a pseudonym.

3    Additionally, the point is, we've been talking about how it

4    should be anonymous.  The point of having a witness on the

5    stand is they should be able to say their true name for many

6    reasons, and I can say this from personal experience.  When

7    someone gets on the stand, they say their true name and there's

8    media and they've put that in an article or a Facebook post or

9    Instagram, it helps the defendants because other people can

10   come forward with other information about the witness, and

11   that's important for us.  It's important for us to be able to

12   investigate each and every one of these witnesses.

13          THE COURT:  But you've got their names.

14          MS. GERAGOS:  We don't know every person they've ever

15   interacted with.

16          THE COURT:  But you know who they are and presumably

17   you've been investigated the witnesses.

18          MS. GERAGOS:  We've started our investigations since

19   we've learned their names, but I can give you two specific

20   examples.  In *Raniere* for example, Mr. Agnifilo and I tried

21   that case.  They went by their first names or their first

22   initials of their first names.  Yes, we objected, but the

23   prejudice there was much lower because in that case there was

24   an allegation basically of a cult; and so everybody in the

25   so-called cult was able to identify who those individuals were

PC5BALEC

1  and were able to provide information to Mr. Agnifilo and I that

2  could be helpful to cross-examine each of those alleged sex

3  trafficking victims.

4       In *Combs*, for example, there were two people who

5  testified under a pseudonym.  One of them was so identifiable

6  that many people actually gave us impeachment information, and

7  we were able to use it and introduce it on our

8  cross-examination and ended up being one of the best

9  impeachment materials that we had throughout the case.  That's

10 a specific concrete example of information we receive from the

11 public that we didn't have that we didn't get from our

12 investigation.  And so we are prejudiced if someone gets on

13 there and testified unanimously.

14      This is not a case where anybody's going to be able to

15 tell who they are from the media, and so we're left here in a

16 situation where people are able to get up on the stand under

17 the shroud of anonymity and be able to lie without any

18 repercussions.  Again, I know I made the point as to each and

19 every witness.  They don't say that they need to use a

20 pseudonym.  They just say we're interested in it.  And in one

21 case I think you had mentioned to Ms. Arroyo are you going to

22 have the friend testify under a pseudonym. For alleged

23 victim-7, for example, they're seeking to have the sister

24 testify under a pseudonym.  There's several layers here of side

25 pseudonymity that we're up against.

PC5BALEC

1        THE COURT:  Pseudonymity?

2        MS. GERAGOS:  Pseudonymity is the word that I've now

3   with 10 years of dealing with this have -- it's prejudicial to

4   the defendants.  And again, I know you've read our briefing.  I

5   appreciate that you understand how difficult this would be for

6   us.  It's not just the logistical nightmare.  It's also that it

7   makes the jury think that the Court has already determined that

8   our clients are guilty.  It undermines the presumption of

9   innocence, and for that reason we oppose it.

10       THE COURT:  I think that piece can be dealt with

11  through a limiting instruction, but I hear your point more

12  generally.  Ms. Arroyo.

13       MS. ARROYO:  I want to address each of the arguments

14  that were just made.  To start that there's no indication that

15  there is a need, and that each of these individuals either came

16  through a tip line or through Evan Torgan.

17       THE COURT:  No.  No.  No. Let me tell you of the

18  arguments the one that I would say you need to address, which

19  is what's the legitimate need, as opposed to the general policy

20  of we want to protect victims of sexual assault and encourage

21  them to come forward.  Witnesses testify under their true name

22  all the time, including in high profile cases.  What's the

23  need?  What's the sort of individualized need for this

24  particular group of victims to testify under a pseudonym?

25       MS. ARROYO:  Yes, your Honor.  I want to start

PC5BALEC

1  probably about why sexual assault is different in high profile

2  cases than it is in other cases.  So I completely understand

3  that victims of violent crime do testify using their own name

4  all the time.  Sexual assault is different.  There's just a

5  difference between saying, yes, I was kidnapped and taken

6  somewhere; or, yes, I was the victim of an assault or a

7  robbery; and, yes, he took off my clothes.  This is what

8  happened to my body.  This is how my body was used without my

9  consent in these ways.  This is how the men switched while I

10  was there.  That being in the public, they're going to have to

11  testify about that.

12          All of these women are going to have to testify about

13  the worst moments in their lives. It's going to be transcribed,

14  and it's going to go to the pubic.  That's a fundamentally

15  different harm than something else.  We live in the society

16  that we live in.  That information out there is damaging in and

17  of itself.  If they were to use their real names and a

18  potential employer were to Google their name, as literally

19  every employer does at this point, the first thing that's

20  likely going to come up because this case is going to have more

21  media than probably their own personal lives, they're going to

22  be associated with their attacker for the rest of their lives,

23  whenever an employee looks for them; whenever a potential

24  client looks for them.  Whenever their mom, child, potential

25  partners Google their name, this is what they're going to be

1   associated with.  That is an incredibly long harm.  If your

2   Honor would like, I can go through each individual victim and

3   talk about why it is a harm specifically to her, and I'm

4   prepared to do that right now.

5           THE COURT:  Well, here's the thing.  I don't want to

6   do that right now because it's two o'clock and we've already

7   been going an hour, but I want to see that; that is, I want

8   that in writing.

9           MS. ARROYO:  Yes, your Honor.  I know that it's very

10  important for everyone to know exactly whether we're going to

11  be using pseudonyms or not.  Can we get that to you -- as soon

12  as possible we'll write that up immediately.  Would your Honor

13  like additional argument about that, or is there anything else

14  we can address now?

15          THE COURT:  Whatever other points of Ms. Geragos did

16  you want to address?  The legitimate need or the lack of

17  legitimate need was the one that I wanted you to focus on, but

18  there may be other points that she made that you want to

19  answer.

20          MS. ARROYO:  The second is judicial efficiency.  I

21  want to address this argument that the defendants have a right

22  to open source their investigation.  And essentially what

23  they're arguing is that -- and they say this in their brief --

24  identifying government witnesses may lead potential witnesses

25  coming forward with testimony or other helpful information.

PC5BALEC

1    But in this situation, the victims are going to be on the stand

2    for an hour or at the outset two hours.  What they're hoping

3    for is essentially that their names are said so that the press

4    can do an investigation so they can then go out and, what,

5    we're going to stop the court for the day the witness is going

6    to -- we're going to break after every direct examination.

7            THE COURT:  No.

8            MS. ARROYO:  Exactly.  So because that's not

9    happening, because they're not going to have two or three days

10   for the press to investigate and then get back to us, there's

11   no actual likelihood of them getting information that is

12   actually relevant.  Not just dirt on the victim or something

13   embarrassing that they've done in the pass, but that someone is

14   going to hear their name, hear the information, understand the

15   specific isolated incident of this sexual assault, reach out to

16   either the defense counsel or the press to get back to the

17   victim, or to get back about the victim for something that is

18   relevant and useable in this case is vanishingly small.

19           On the other side.  The likelihood that a victim who

20   testifies under her own name is going to suffer the

21   consequences of that one to two hours for the rest of her life

22   is almost guaranteed.  And so the defense hasn't articulated or

23   presented a single case where there is a right of the

24   defendant, not of the press or of the public to investigate,

25   but of the defendant to receive this helpful information.  We

PC5BALEC

1   don't see how that outweighs the victim's statutory rights

2   under the Criminal Victim Rights Act or the incredibly

3   important public interest.

4           Finally, I want to note that the defense mentioned

5   that we were going to ask for friend-2 or other family members

6   to testify under pseudonyms.  That is not something that we've

7   asked for.  We didn't brief that in our motion, and we're not

8   asking for that.  The individuals who are gonna be testifying

9   as outcry witnesses will be using their own names because it is

10  different and they're not going to suffer those same harms.

11  Thank you.

12          MS. GERAGOS:  If I could ask, your Honor, I know you

13  ask them to brief it.

14          THE COURT:  I don't want a brief.  I just want to

15  understand sort of the particularized need.

16          MS. GERAGOS:  I believe that the alleged victims

17  themselves should lay that out in an affidavit similar to what

18  Judge Subramaranian inquired of the alleged victims in the

19  *Combs* case.  Because without the victim themselves saying I'm

20  afraid I'm going to suffer consequences, because the actual

21  history of this case is that many of the alleged victims in

22  this case have had to be unmasked for lack of a better term and

23  they have not suffered any consequences.

24          THE COURT:  Well, the ones that have been unmasked,

25  we're not talking about them.  We're talking about the ones

PC5BALEC

1     that are anonymous at this point.

2              MS. GERAGOS:  My point is that those who have been

3     unmasked have not suffered consequences.  The government's

4     point is, if they have to go under their true name, they're

5     going to have to suffer consequences.

6              THE COURT:  It depends on what you mean by suffer

7     consequences.  Right.  What Ms. Arroyo is saying is not you're

8     going to lose your job, not that you're going to be thrown out

9     of your house.  It is that you are forever associated with

10    this.  This becomes your online presence that you were a victim

11    of an Alexander brother.

12             MS. GERAGOS:  But what about the defendants?  Many

13    other courts in this building have analyzed this exact issue in

14    the civil cases, and said yes --

15             THE COURT:  Civil cases are different.

16             MS. GERAGOS:  But it's not because somebody's making

17    an allegation, coming to the court system and making an

18    allegation.  It's not different than the people here who've

19    either gone to the FBI tip line or gone to Evan Torgan to go to

20    the US government.  It's pretty much exactly the same.

21             THE COURT:  No. With all due respect, you're better

22    than that.  It's not exactly the same.  It's nowhere close to

23    the same.

24             MS. GERAGOS:  They know they're using the court system

25    for this case.  That's what I mean to say.

PC5BALEC

1          THE COURT:  In a civil case the plaintiff is using the

2     court system.  In a criminal case people who are called are

3     victims or they're witnesses and they're being called by the

4     government.  The government is using the court system.  That

5     distinction is significant.

6          MS. GERAGOS:  I understand that it's different than

7     somebody actually bringing a civil matter.

8          THE COURT:  Those are using the court, and they can

9     chose.  They can chose to seek redress, in which case they have

10    to sort of reveal themselves and be a plaintiff like everybody

11    else unless they're a child.  Virtually everybody rules these

12    virtually the same way.  That's different from being called by

13    the government to testify in a criminal case.

14         MS. GERAGOS:  My point, your Honor, and I apologize if

15    it got lost, is that many of these individuals came to the

16    government themselves asking to be apart of this case, which

17    shows they are not afraid of the consequences.  I'm using the

18    term that the government is using.  They're not afraid of the

19    consequences of using their own name at this trial.  And I'm

20    not asking to crowd source our defense, and I'm not asking to

21    stop a trial for two hours.  I'm obviously not asking for that.

22         THE COURT:  You know that's not going to happen.

23         MS. GERAGOS:  And I know that won't happen, but we

24    have to also think about our defense case.

25         THE COURT:  Understood.

PC5BALEC

MS. GERAGOS:  That's what I'm talking about with
respect to -- we have the right to have a public trial because
the public has a right to see what's happening in court and so
that is what I'm talking about with respect to having somebody
come in here say their true name and they were not afraid to do
so.

I guess what I'm trying to have your Honor understand
is that they were not afraid to do so when they all came to the
government and they never once mentioned to the United States
government, we want to use a pseudonym until it was brought to
them by the AUSA attorneys in this case.  And so that's why
it's fundamentally different than some of the other cases.
This was suggested by the prosecutors, and it's something that
they've said, okay, we prefer to use a pseudonym; but there's
no particularized need in this case to do so and we know that.
And that's why I'm saying, we know that based on other
plaintiffs who have been unmasked and have not suffered
consequences.  And consequences can't be just online presence.
That's just not enough.  When their online presence is
obviously destroyed at this point, and they have their lives
that they're fighting.  They're fighting for their liberty.
And so liberty versus online presence doesn't seem like it's on
the same pane.

THE COURT:  That's not the balance.  It's not
revealing the names of the victims or the witnesses is not

PC5BALEC

1   gonna give them freedom. I understand your confrontation clause

2   argument, but it's not the law that all witnesses have to

3   testify under their own names or the confrontation clause

4   rights of the defendants are being violated.

5           MS. GERAGOS:  We do believe that -- I think the case

6   is *Smith v. Illinois* that witnesses could come and testify

7   under their true names based on Supreme Court precedent. I

8   don't think *Raniere* is -- it's an unpublished case. I don't

9   believe that it's binding first of all in terms of what

10  *Smith v. Illinois* says. And in *Raniere*, again, they testified

11  under their first name, and it did not prejudice us as much

12  because there were hundreds of people who knew who those were

13  who were able to help Mr. Agnifilo and I in our defense

14  investigation.

15          THE COURT:  I understand your point.  Here's what I

16  want.  I want from the government -- today's Friday.  I'm not

17  insisting on affidavits from the victims.  I want you to

18  respond to Ms. Geragos' statement that this all came from the

19  government.  You're the ones that are asking for -- no one

20  suggested to you that they would prefer not to have their name

21  in public.

22          MS. ARROYO:  We are happy to.  Just for the record, we

23  do not believe that's accurate in any way.

24          THE COURT:  Well, you should know.

25          MS. ARROYO:  If I could address.  It sounded like you

PC5BALEC

1    wanted for us to write it, but I'd like to say very quickly.

2    What happened was that victims came to us.  They spoke to the

3    government confidentially.  And during those conversations,

4    they would express -- they would ask questions.  They would

5    express concerns.  Well, what happens next.  I told you many of

6    the victims said, I need for law enforcement to know.  And when

7    we discussed like what could happen next in an investigation,

8    there was often conversation like, would I have to testify in

9    public.  What would happen to X, Y or Z things.  The government

10   wasn't starting out its conversation saying, hey, we'd love it

11   if you testified for us anonymously.

12          These cases as I've mentioned -- and I apologize for

13   belaboring the point -- are very intimate. They are personal.

14   There are individuals who were fine testifying under their own

15   name.  They've also sued.  That's the case.  But individuals

16   who' come forward and ask us, like what's going to happen next,

17   is my name going to be out there.  We explain what the process

18   is.  We've never, never guaranteed that anyone could testify

19   pursuant to a pseudonym.  We would tell them, look, in this

20   jurisdiction, this is how it worked.  We would petition the

21   Court to see if that's something that we can do after they'd

22   tea express in some way concern.

23          THE COURT:  Got it.  Okay.

24          MS. GERAGOS:  I would ask that your Honor direct

25   either the prosecutors or the agents who are taking notes to

PC5BALEC

1    properly transcribe all prior statements because none of that

2    is in the 3500.  Instead what's in the 3500 is that we're

3    interested in a pseudonym.

4            THE COURT:  In the interest of time, that's not go

5    down routes that you know are not going to be granted.  Here's

6    what I want.  I want a sealed presentation, not ex parte, but

7    sealed presentation that includes their names, and the reason

8    why there's a need, beyond what you've already told me.  The

9    notion of they'll be forever connected in social media with the

10   worst night of their life.  I want to understand specifically

11   what is the need.  Can you get me that by Saturday, close of

12   business Saturday?  There's no business.  Say 6:00 o'clock

13   Saturday.

14           MS. ARROYO:  Your Honor, we think we would need to

15   speak to some victims just to make sure that we have

16   everything.  I had things to talk to you about today, but if

17   we're submitting to the Court, I would like to make sure that

18   every victim has an opportunity to be heard on this.  Is it

19   possible for us to get it to you a little bit later.

20           THE COURT:  6:00 o'clock Sunday.  Does that work or do

21   you need Monday?

22           MS. ARROYO:  We would love Tuesday because there's

23   exhibits due on Monday night.  If your Honor says Sunday night,

24   We'll do Sunday night.

25           THE COURT:  Let it's do Sunday night.  And then if the

PC5BALEC

1    defense wants to take issue, you've got until 6:00 o'clock

2    Monday night.

3              MS. GERAGOS:  Thank you.

4              THE COURT:  And I certainly understand that you need

5    an answer on this, so I'm taking that request under advisement.

6    The defense at some point in one of your briefs, you had a

7    request that if the witnesses are gonna testify under

8    pseudonyms, you want to allow defense witnesses to testify

9    about their sexual activity under a pseudonym.  What are you

10   talking about?

11             MR. SREBNICK:  There's at least one prospective

12   witness who has expressed reservation about exposing his sex

13   life in public having been present at one of the events that's

14   alleged in the indictment.  We reached out to him.  He has

15   helpful testimony to offer, but he shares the same kind of

16   concerns that the government expresses that the so-called

17   victims are concerned about, which is having their sex lives

18   broadcast.

19             THE COURT:  They're not concerned about their sex

20   life. They're concerned about their sexual assault.  Is he a

21   the victim of a sexual assault?

22             MR. SREBNICK:  No.

23             THE COURT:  I thought they were all proud of the

24   number of women they were sleeping with.

25             MR. SREBNICK:  I'm talking about a witness who

PC5BALEC

1    observed what the government witness claims, the accuser claims

2    it was nonconsensual sex.  The defense witness was present that

3    weekend and observed that person, that accuser, having

4    consensual sex.

5              THE COURT:  In the same event?

6              MR. SREBNICK:  Yes.

7              THE COURT:  Okay.

8              MR. SREBNICK:  And so that person would then be also

9    exposing his presence and his relationship to the event

10   publicly, and obviously it's going to affect him as well.

11             THE COURT:  I don't think these are at all analogous.

12             MR. SREBNICK:  It's a similar concern about having

13   one's private life exposed to the public.  I understand the

14   accuser claims it's nonconsensual.  I understand that's the

15   accusation they're making.  The witness will say it was not

16   rape.  It was not an assault.

17             THE COURT:  Okay.

18             MR. SREBNICK:  And at the end of the trial if the jury

19   finds the defendants not guilty, if the jury says that the

20   witness was not -- the government witness accuser was not

21   telling the truth, that person's name will have been protected

22   even though the jury didn't believe her.  And we have a witness

23   who would like his name to be protected from all of this drama.

24             THE COURT:  Yeah.  Okay.  It's not the same.  And I'll

25   take your request under advisement as well.  There was a new

PC5BALEC

1   request that was in one of the defense responses to the

2   government's motion *in limine* about reading the indictment to

3   the jury.  My normal practice is, I don't read indictment to

4   jury, and I don't send them that to the jury room.  So that's

5   moot.  That brings us to the defense motions.  You want to

6   preclude testimony from A.B., which I gather is witness

7   number-1 about what she overheard in the Hamptons and the fact

8   that she wrote "rapist" on the door of the house.  So this is

9   the defense motion.  Who's arguing it?

10          MS. PAUL:  I am, your Honor.

11          THE COURT:  Before you start, can I just ask a factual

12  question so I make sure that I have the facts right in my head.

13  Is the government's theory that the woman who was assaulted in

14  the jacuzzi that witness number-1 hears is minor victim

15  number-3?

16          MS. SMYSER:  No, your Honor.

17          THE COURT:  So it's just somebody else?

18          MS. SMYSER:  Yes.

19          THE COURT:  Okay.  Got it.

20          MS. PAUL:  Thank you, your Honor.  Just by way of

21  background, the government originally represented that this

22  witness was a percipient outcry witness to minor victim-3'S

23  assault.  Its own investigation has since proven that that in

24  fact not accurate at all.  Minor victim-3 says that her assault

25  happened during the day inside of the house in a bedroom.  This

PC5BALEC

1  witness says that at the end of the night after a night of

2  clubbing, she overhears a group of people outside of the house

3  by a jacuzzi yelling.  She was explicit in what she told the

4  government that she never at any point heard an assault inside

5  of the house during the day.  The government now does concede

6  that in fact minor victim-3 and this witness are not talking

7  about the same thing whatsoever.  And so the government is

8  trying to rebrand her testimony as either direct evidence of a

9  conspiracy or as under rule 413 and rule 404(b) which your

10 Honor should preclude.  I'll start with direct evidence of the

11 conspiracy.

12          THE COURT:  I precluded it?  I didn't preclude it.

13          MS. PAUL:  We are asking.

14          THE COURT:  You're seeking to preclude it?

15          MS. PAUL:  Yes, your Honor.  As to the direct evidence

16 of the conspiracy.  To be clear, this witness did not witness

17 an assault.  She did not see any of the defendants do anything.

18 She didn't hear any of the defendants do anything.  And her

19 interview notes couldn't be clearer that she wasn't sure -- I

20 quote, she was not sure what they were doing, but was assuming

21 the girl was being sexually assaulted.  That assumption is

22 based on her overhearing yelling outside of the house in a

23 shared house occupied by dozens of people.  Which by her own

24 account, people were going in and out of the house throughout

25 the course of the weekend.  And she didn't know who was

PC5BALEC

1   actually outside at the time of this hypothetical assault.  The

2   reality --

3           THE COURT:  I thought she saw Tal and one of the twins

4   dragging an incapacitated woman out of the house and then heard

5   the woman screaming.

6           MS. PAUL:  That's what the government's brief says.

7   The 302 at no point mentions Tal by name anywhere, and we can

8   submit that to your Honor as well.

9           THE COURT:  That's what they're proffering.

10          MS. PAUL:  That's not what the government notes that

11  have been provided to us in discovery say.  This witness says

12  that she heard outside this woman yelling the word "stop." For

13  ail we know this group of people outside might have been

14  throwing her into a pool and she didn't want to get her hair

15  wet.  The reality is we just don't know what happened outside.

16  This witness did not see anything.  And so the government now

17  seeks to offer this as direct evidence of the conspiracy in

18  order to prove in part that all three of the defendants drugged

19  and incapacitated women.  And to offer this testimony about

20  something this witness didn't see, doesn't even know if she

21  heard for such a broad purpose, would be an abuse of what the

22  rules permit.

23          I'm going to move on to Rule 413 and 404(b).  As an

24  initial matter, the government didn't properly notice us under

25  413, and it should be precluded for that purpose alone.  As to

PC5BALEC

1    rule 413.  It's obvious that this is impermissible as

2    propensity evidence, which is why our motion papers didn't even

3    consider it.  Rule 413, as Ms. Espinosa pointed out last week,

4    gives a very clear explanation about what is permitted.  It

5    must be something that falls into the definition of sexual

6    assault and it has to survive a 403 balancing test. The

7    government cannot satisfy either of those two things.

8         This witness can't identify a victim.  She can't

9    identify any sort of corroboration that any assault even

10   occurred.  There's no evidence that any of the defendants were

11   involved in this.  She admittedly saw nothing outside.  The

12   women was not yelling help.  I'm being raped.  She heard the

13   word "stop."  There's noting about this that meets the

14   definition of sexual assault under 413.  And under 403, if I

15   may argue 403 about this. The absence of a victim, the absence

16   of corroboration, all of that undercuts any sort of probative

17   value, and it raises concerns about unfair prejudice, confusion

18   and reliability.  The government should not be allowed to

19   introduce an assault under 413 simply because a third party

20   suspects that something occurred.

21        I'm going to move onto 404(b) because the government

22   offers two purported non-propensity purposes. Knowledge and

23   corroboration.

24             THE COURT:  You might want to talk a little slower.

25             MS. PAUL:  Yes. First as to knowledge.  The government

PC5BALEC

1   says that because this witness wrote the word "rapist" on a

2   door, that that should -- that should show that the defendants

3   knew that the acts were nonconsensual.  To be clear,

4   speculation is not evidence that any of the defendants had any

5   knowledge or intent.

6          Second as to corroboration.  The government argues

7   that this witness corroborates minor victim-3 simply because

8   they were occupants of a share house over the same weekend.

9   Corroboration is not just coincidence of place and time.  There

10  has to be some sort of factual overlap.  The fact that this

11  witness's assumption about something that she overheard outside

12  after a night of clubbing by a jacuzzi does not corroborate

13  minor victim-3's account that she was assaulted in the house

14  much earlier in the day.  Calling that corroboration invites a

15  jury to speculate and infer pattern or propensity which is

16  exactly what 404(b) prohibits.

17         I'm going to move on now to 403.  I covered why the

18  testimony under 413 is not admissible under rule 403.  As to

19  the photos.  It's just as true for the photos.

20         THE COURT:  What as to the photos?

21         MS. PAUL:  The 403 analysis is just as true for the

22  photos.  The government says that the photos are no more

23  prejudicial than the allegations in this case, and that ignores

24  the evidentiary distinction here.  The word "rapist" written on

25  a door is not evidence of a crime.  It's evidence of this

PC5BALEC

1    witness's speculation in a crowded house filled with dozens of

2    people.

3            THE COURT:  But isn't that matter for

4    cross-examination?

5            MS. PAUL:  No, your Honor.  It's not.  And that's what

6    the government says the remedy should be, but rule 403 requires

7    the court to act before prejudicial evidence is put before a

8    jury, not after.  The common phrase is, we can't un-ring a

9    bell, and that's very true here where the evidence is a photo

10   of a door with a huge handwritten word "rapist" in front of it.

11   Where all that is, is this witness's speculation about what she

12   thinks she may have overheard outside.  So unless your Honor

13   has other questions, that is all I have to say on this.  It's

14   also hearsay, your Honor.

15           THE COURT:  Okay.  Who's arguing this?

16           MS. SMYSER:  I am, your Honor.  I just want to be

17   clear upfront.  The defense has stressed here that witness-1

18   did not see anything.  She did not hear anything, and that just

19   simply is not true.

20           THE COURT:  Am I right that what the witness -- what

21   the testimony will be is that the witness saw Tal and one of

22   the twins dragging an incapacitated woman out of the house, and

23   then heard the woman who had then been at that point near the

24   jacuzzi screaming and telling them to stop.

25           MS. SMYSER:  Yes, your Honor.

PC5BALEC

1          THE COURT:  In some respect, Ms. Paul, I feel like

2     you're arguing over facts that are not what the government is

3     putting into evidence.

4          MS. PAUL:  Your Honor, I have the 302 here.

5          THE COURT:  I don't care what the 302 says.  I just

6     asked and confirmed what the witness is going to testify to.  Is

7     that not what I need to rely on?

8          MS. PAUL:  Your Honor, the first time that we heard

9     this was in the government's motion papers.

10          THE COURT:  But you heard it the same time I did,

11     that's what they're saying the witness is going to say.  Your

12     302 gives you grounds to cross-examine here. I am going to rule

13     because on the proffer of what the witness is going to say.  So

14     based on what she is going to say, it connects to the

15     defendant, and it's not just a woman screaming.  It's a woman

16     who is incapacitated being dragged out of the apartment by two

17     of the defendants screaming stop.  Okay.  Go ahead.

18          MS. SMYSER:  Your Honor, it's exactly for these

19     factual reasons that we believe that this is direct evidence of

20     the conspiracy.  It demonstrates two of the defendants working

21     together to physically take a woman who is very intoxicated

22     outside to the jacuzzi where they are intending to sexually

23     assault her.  And witness-1's testimony about what she saw and

24     heard, including the woman's screaming stop is very important

25     evidence of the conspiracy.  This takes place during the time

PC5BALEC

1   period of the conspiracy.  It is the same MO that they are

2   using for other victims, including for minor victim-3, which

3   I'm also happy to touch on.  But this is clear direct evidence

4   of the conspiracy, and that's what we're offering it for.  Your

5   Honor, this witness's testimony is also corroborative of minor

6   victim-3's testimony.

7          THE COURT:  Put those two together for me, please.

8          MS. SMYSER:  Of course.  I'm assuming your Honor that

9   the defense is going to cross-examine minor victim-3 about all

10  aspects of that weekend, and not simply what happened in the

11  room while she was raped.  Of course that will be a large

12  focus, but it's not the entire thing.  So minor victim-3 is

13  going to testify about being invited out to the Hamptons to

14  stay at a big house, taking a bus that was provided from

15  Manhattan out to the Hamptons to a club where the defendants

16  were and then being there that weekend while there was a pool

17  party.  While there, was drinking while the defendants were

18  there.  At which point, she was assaulted.  Witness-1

19  corroborates that, all of those things were happening that

20  weekend.  She too was invited to the Hamptons to stay at a big

21  house which the defendants were renting.  She too was taken by

22  a bus.  She too was there at these parties.

23         THE COURT:  I don't think they are objecting to those

24  aspects of her testimony.  They're focusing on her testimony,

25  well, they didn't focus on the fact she saw Tal and one of the

PC5BALEC

1    other defendants dragging the woman out.  She ignores that.

2    She wants to preclude the testimony that the witness-1 heard

3    that woman screaming "stop" and then wrote on the door "rapist"

4    and whatever the other door said.

5        MS. SMYSER:  "You must apologize."  So the testimony

6    about the hot tub is still corroborative of minor victim-3's

7    testimony because it shows the pattern of the sexual assault

8    that's happening here.  In addition, your Honor, to the

9    knowledge piece that Ms. Paul brought up.  I just want to point

10   out that these photographs were found or taken by Oren's

11   camera, which shows proof of his knowledge that this is how his

12   actions are being perceived or the other defendants' actions

13   are being perceived.  I expect it to be hotly contested at this

14   trial what the defendants' intent was.  I expect them to say

15   whatever the victims thought was going on, this was from their

16   perspective consensual.  And it is important to be able to

17   point out that from the beginning of this conspiracy these

18   defendants were on notice that people understood what was

19   happening to be rape, and I think that's directly relevant to

20   the intent point, and that comes across from witness-1's

21   testimony and the photographs.

22       THE COURT:  Did witness-1 write that on the door --

23   and I just want to make sure I got the facts -- after she had

24   spoken to minor victim-3?

25       MS. SMYSER:  There won't be testimony that those two

PC5BALEC

1   have spoken.  So witness-1, just to put this in a little bit of

2   a timeline I think may be helpful.  So one of the days in the

3   Hamptons there was a pool party, and minor victim-3 will

4   testify at some point that afternoon is when her assault began.

5   She was in and out in her memory because of being drugged or

6   being intoxicated.  And when she came -- really came to, that

7   assault was continuing to go on.  It was the evening.  That

8   same evening is when witness-1 witnessed what she did in the

9   hot tub.  And then early the next morning witness-1 was so

10   disturbed that she wanted to leave on the first Long Island

11   railroad train out.

12         THE COURT:  Witness-1?

13         MS. SMYSER:  Witness-1.  She ordered a cab.  And

14   before she got in that cab is when she wrote "rapist" on the

15   door, and that's what her testimony will reflect.

16         THE COURT:  You get the last word.

17         MS. PAUL:  Yes, your Honor.  I would like the

18   opportunity to submit to the Court, there are photos from the

19   course of this weekend, just so your Honor can have more of a

20   visual of what it is that we're talking about outside.  Because

21   this witness talks about, she was not outside.  She doesn't

22   know who was outside.  And she says that, I believe the

23   government would concede that, there were dozens of people in

24   this house, and the photos of that show that.  There were many

25   people outside.

PC5BALEC

1      And again, your Honor, there were many people

2 drinking.  There are Solo cups all over the house.

3      THE COURT:  With all due respect, you're ignoring the

4 fact that I find the most salient, which is she saw Tal and one

5 of the other defendants dragging an incapacitated woman out to

6 the jacuzzi, and then she heard the woman screaming stop.

7 Look, you got your argument to the jury.  She didn't know if

8 they were just going to splash her in the jacuzzi, and that's

9 why she was yelling stop to protect her hair.  But I think a

10 reasonable jury might well conclude from that, that in fact

11 they were dragging her out there to assault her.  And she was

12 screaming stop because she did not want to be assaulted.

13      MS. PAUL:  Yes, your Honor.  And I think that's why

14 this evidence as direct evidence of the conspiracy is so

15 problematic, and the photos that we have, the videos that we

16 have, from that weekend will give your Honor context as to the

17 fact that to introduce this -- for the government to be able to

18 get up in front of a jury and argue these three defendants

19 drugged and incapacitated women, listen to this woman's

20 testimony.  She saw two people drag her out, saw two of the

21 defendants bring her outside.  She was not incapacitated.  I

22 don't think that's what the witness says.

23      THE COURT:  Again, you can only go with the proffer of

24 the government.  I can only go with the proffer of the

25 government.  Let me read it to you one more time.  The witness

PC5BALEC

1      saw Tal and maybe I didn't quote it directly from the brief,

2      but this was certainly the import of what they said.  The

3      witness saw Tal and one of the twins dragging an incapacitated

4      woman out of the house.

5              Now, you can quarrel with it, and that's what

6      cross-examination is for.  And your pictures that everybody

7      seemed to be having a great time, thereby making it just

8      curious that witness-1 decided to write the word "rapist" on a

9      door in the house when everybody was having a great time,

10     that's great cross-examination.  But it's not going to preclude

11     the testimony.  The view of relevance for the conspiracy I

12     think is too narrow.  The fact that a sexual assault happened

13     in the house is relevant given, or what appeared to have been a

14     sexual assault, what I think reasonable minds would view as a

15     sexual assault, what witness-1 perceived as a sexual assault is

16     relevant given the government's theory that -- the whole theory

17     that the conspiracy involved the defendants enticing woman with

18     material benefits, including things like a weekend in the

19     Hamptons, and then drugging them and assaulting them.  This

20     fits into the entire government theory; therefore, the fact

21     that Tal and one of his brothers appeared to drag a woman out

22     of the house and then she's screaming stop, it seems to me is

23     direct evidence of the conspiracy, and it's admissible.  It's

24     not excludable under rule 403.

25              MR. SREBNICK:  Judge, may we ask for an identification

PC5BALEC

1  of who's the woman being dragged.  I don't think she's ever

2  claimed she was assaulted.  I thought originally the confusion

3  was it was MV-3.

4            THE COURT:  It's not.

5            MR. SREBNICK:  Now I'm hearing it's an unidentified

6  woman who never claim she was assaulted.

7            THE COURT:  She may have claimed she was assaulted.

8            MR. SREBNICK:  We haven't heard anything about any

9  woman being assaulted sexually in a hot tub.

10            THE COURT:  Great argument.

11            MR. SREBNICK:  You're assuming that it happened.

12            THE COURT:  No, I'm assuming what witness-1 believed

13  happen was that they had dragged an incapacitated woman out to

14  the jacuzzi and she yelled stop.

15            MR. SREBNICK:  Why does that suffice to suggest that a

16  sexual assault occurred?

17            THE COURT:  Okay.  You've made your point.

18            MR. SREBNICK:  In any event, if she then writes

19  "rapist" that is a classic hearsay out-of-court statement being

20  offered for the truth that she was raped -- because your Honor

21  seem to suggest that --

22            THE COURT:  It's going to be offered for the truth

23  that that was what witness-1 perceived was happening.

24            MR. SREBNICK:  That's irrelevant.  What she thinks is

25  entirely irrelevant.  What she saw, if you want to let that go

PC5BALEC

1  in, she saw at a pool party two guys dragging a girl towards

2  the hot tub.  Okay.  We object.  You overrule.  She said stop.

3  Okay.  We object.  You overrule.  But then she can give an

4  opinion the woman was raped?  I object.

5      THE COURT:  Overruled.  That brings us to victim-4's

6  testimony of seeing Tal having sex with a crying woman.

7      MS. PAUL:  Your Honor, just one point of

8  clarification. Are you also admitting the photos?

9      THE COURT:  Yes.

10     MS. PAUL:  As to victim-4, yes.  We are moving to

11 preclude a very narrow portion of this woman's testimony. By

12 way of background, the government's seeks to have victim-4

13 testify that after she was allegedly assaulted by

14 Alon Alexander, she went upstairs.  She called her

15 ex-boyfriend.  And just before blacking out due to

16 intoxication, she observed Tal in a bedroom under a blanket

17 with a woman who appeared to be crying who Tal seem to be

18 having sex with and who may have been Tal's girlfriend.

19     As an initial matter, the government's papers misstate

20 the facts. Interview note state -- and I know your Honor is

21 going to say that it's their proffer, so I encourage them to

22 make their proffer again because interview note state that

23 Tal -- she saw Tal in a bedroom after her alleged assault, not

24 before.  And in light of that, the government's theory that

25 this is admissible to show the effects that it had on victim-4

PC5BALEC

1    is factually incorrect.

2              THE COURT:  I'm sorry.  What do you want me to focus

3    on?  The order, whether she saw this before or after she was

4    assaulted?

5              MS. PAUL:  Yes, your Honor.

6              THE COURT:  You say it happened when.

7              MS. PAUL:  After her assault.

8              THE COURT:  So you say victim-4 saw Tal having sex

9    with a crying woman after she was assaulted?

10             MS. PAUL:  Yes, your Honor.

11             THE COURT:  Okay.

12             MS. PAUL:  And observing this after her alleged

13   assault doesn't explain her behavior or have any bearing on her

14   state of mind at the time of the assault, which is what the

15   government alleges is the relevance.  Now as it relates to

16   direct evidence of a conspiracy, the government seeks to

17   introduce this -- and its papers mischaracterize our position.

18             THE COURT:  I'm sorry. And it what?

19             MS. PAUL:  Their papers mischaracterize our position.

20   Of course someone can be sexually assault by a partner, but

21   that's not the issue here.  The issue is, this witness has no

22   idea what it is that she saw.

23             THE COURT:  She saw Tal having sex with a woman that

24   was crying.

25             MS. PAUL:  This witness can't say that she saw Tal in

PC5BALEC

1   a bedroom under a blanket doing what she thinks may have been

2   having sex.  That's very different.  She admittedly was

3   intoxicated to the point of blacking out.  She can't tell the

4   jury she saw anything nonconsensual.  And she's going to

5   testify that she saw Tal under a blanket possibly having sex

6   with a woman who appeared to be crying.

7           Introducing this as direct evidence of a sex

8   trafficking conspiracy and asking the jury to reach the

9   conclusion that Tal was committing a sexual assault, this

10  testimony again is inadmissible as direct evidence, not because

11  assault was impossible; but because there's no basis for the

12  witness or for any juror to conclude that an assault actually

13  occurred.  As to 413 and 404(b) in a footnote the government

14  now says that in the alternative it's also offering this

15  evidence as 413 or under 404(b).  And the Court should deny

16  that. We would request that the Court deny that as well.

17          Again, rule 413 contains explicit definitions for what

18  constitutes sexual assault.  Here, there is nothing more than

19  speculation.  There's no victim.  There's no testimony, no

20  description of force.  There's no lack of consent.  And again,

21  the government cannot introduce an assault under 413 simply

22  because someone speculates or things one might have occurred.

23          THE COURT:  Let me assume that the graphic testimony

24  will establish by a preponderance that what was happening under

25  the blanket was sex.  We're going to assume that.  Let's also

1    assume that the testimony is that the woman was crying. You're

2    telling me that I cannot say by a preponderance that suggest

3    that was an assault, not proof beyond a reasonable doubt.  I

4    get it.  You can cry during sex.  But by a preponderance.

5            MS. PAUL:  Your Honor, no.  This woman was on the

6    verge of blacking out.

7            THE COURT:  That says her testimony is not credible.

8    Don't argue that.  Focus on what I'm asking you.  Assume that I

9    accept her testimony that what she was seeing was sex and that

10   the woman was crying.

11           MS. PAUL:  Your Honor, I stand by my argument.  We

12   don't know what was going on in that room, and neither does

13   this witness.

14           THE COURT:  Again, it's not proof beyond a reasonable

15   doubt.  You don't think I can conclude nothing from a man

16   having sex with a woman who's crying.

17           MS. PAUL:  Your Honor, I don't think the government

18   should be able to get up here and argue to the jury to draw

19   that speculative conclusion.

20           THE COURT:  Okay.

21           MS. PAUL:  And as to 403.  The government tries to

22   waive away any 403 argument by repeatedly claiming -- and

23   explicitly so in its brief -- that victim after victim after

24   victim after victim is going to come into this courtroom and

25   accuse Tal of rape.  And that's simply just not true.  I think

PC5BALEC

1   you saw this last week, of the 17 additional individuals that

2   the government is trying to introduce as 413 and 404(b), one of

3   them is making an allegation against Tal, and that allegation

4   is not for rape.  And while we don't minimize the seriousness

5   of any allegation of rape in this case, in this case there are

6   three women who have made allegations against Tal.  One of whom

7   initially wasn't actually saying that she was being raped.

8   That story has since changed.  So the government's rhetoric

9   exaggerates the record in a way that does not comport with the

10  evidence that's going to come out in this case.

11          As to its narrow line of testimony from victim-4.  The

12  probative value is low.  The prejudice is extreme.  The

13  government may have charged Tal in Count Six, but victim-4 does

14  not excuse him of any conduct relating to her. So its vague,

15  ambiguous sighting of him again under a blanket doing what she

16  thinks may have been having sex with somebody crying is the

17  government's attempt to tie Tal into a sex trafficking

18  allegation that he otherwise has no connection to.  It invites

19  the jury to engage in pure speculation.  There is no victim

20  corroboration.  There's no corroboration whatsoever, and it

21  raises concerns for unfair prejudice, confusion and issues with

22  reliability.

23          THE COURT:  All right.  Who's arguing this for the

24  government?

25          MS. SMYSER:  I am, your Honor.  So I think here this

PC5BALEC

1    testimony from victim-4 is about, again, what she saw the

2    weekend that she was raped, and she will testify that she saw

3    in the bedroom --

4           THE COURT:  Ms. Paul started with issue of, was this

5    after she was assaulted or before she was assaulted?

6           MS. SMYSER:  I expect that she will testify it was

7    before.  I think as everyone acknowledges, victim-4 at various

8    points was blacked out during this weekend, and the timeline is

9    difficult; but I expect she will testify that it was before.

10   And of course it can be the subject of cross-examination among

11   other things that Ms. Paul has raised.  But what I expect her

12   to testify is that this happened before, and she saw Tal in the

13   bedroom doing what appeared to be having sex with a woman who

14   was crying.  Which I think, your Honor, is certainly by a

15   preponderance that a sexual assault of some kind was happening

16   there.

17          Now the defense can certainly cross-examine victim-4

18   about not knowing the exact reason why the woman was crying or

19   not knowing exactly what was happening under the covers in that

20   room.  That shouldn't preclude victim-4 from testifying about

21   what happened and what she saw this weekend.  It completes the

22   story and explains the circumstances of what was going on that

23   weekend.  And, in addition, part of the force, fraud or

24   coercion for sex trafficking is coercion which you can take

25   into account what people see and the impact that has on them.

PC5BALEC

1   And so what victim-4 saw that weekend is important evidence of

2   the sex trafficking count and to the conspiracy here.

3         THE COURT:  But that would only have an effect if it

4   was before.

5         MS. SMYSER:  That is true, and I expect her to testify

6   that it was before.

7         THE COURT:  That she sees this, and then she's

8   assaulted?

9         MS. SMYSER:  Yes.

10         THE COURT:  Okay.  Ms. Paul.

11         MS. PAUL:  Your Honor, I don't have anything more to

12   add on that.  I do briefly want to return to the government's

13   approach to adding sexual assaults under rule 413.  It's come

14   up now with the witness we spoke about before.  It's also come

15   up with victim-4.

16         THE COURT:  This one they're proposing it as evidence

17   of the conspiracy, correct?

18         MS. SMYSER:  Yes, your Honor, and of this count.

19         THE COURT:  And of this count.  What count is this?

20         MS. SMYSER:  Count Six, your Honor.

21         THE COURT:  Okay.  I find that this evidence is

22   admissible as both direct evidence of Count Six and evidence of

23   the conspiracy.  Again, for all the reasons I've said, you're

24   welcome to cross-examine that just because the woman was crying

25   doesn't mean the sex wasn't consensual, and not to mention the

1    fact that the timing may be off.

2         But that brings us to post-assault mental and medical

3    treatment.  The government has clarified what it wants to admit

4    is only the diagnosis of chlamydia that victim-20 received.

5    They don't want to introduce any other medical or psychiatric

6    diagnoses, but instead just wishes it will come out presumably

7    in the witness's direct testimony about how they felt about the

8    assaults as that relates to the timing of the disclosures and

9    whether the person stayed in contact with the defendant.

10        Do I have that correct in terms of what you want to

11   introduce?

12        MS. ESPINOSA:  Yes, your Honor.

13        THE COURT:  Okay.  So given that clarification, does

14   the defense object?  Do we have a live dispute?

15        MS. GERAGOS:  We still do.

16        THE COURT:  What are you disputing?

17        MS. GERAGOS:  We would still like, with respect to the

18   chlamydia diagnosis, we believe the *Arias* case still -- even

19   though it's not a Second Circuit case, still requires that we

20   should be able to have the diagnosis because we should be able

21   to probe the veracity of that allegation.  And so that's with

22   respect to just the chlamydia part.

23        THE COURT:  Hang on a second.  Does the government

24   even -- does she even know what hospital she went to?

25        MS. ESPINOSA:  Your Honor, we don't have those -- we

PC5BALEC

1    haven't been able to identify the specific doctor she went to

2    in early 2010 on this.

3            THE COURT:  To me it doesn't come in.  It's not

4    admissible as proof that she had chlamydia because that is

5    hearsay, but it does come in as proof for her conversation

6    with -- which defendant was it?

7            MS. GERAGOS:  Oren, your Honor.

8            THE COURT:  The conversation with Oren.  Oren's

9    statements come in as admissions. Her statements come in to

10   show that's what she thought.  She believed.  It was her belief

11   that she had chlamydia, and her statements come in the

12   conversation because otherwise his statements don't make any

13   sense.  So the conversation is admissible notwithstanding

14   hearsay problems.  In terms of the actual medical diagnosis,

15   the government doesn't have it, so I can't order them to turn

16   it over.

17           MS. GERAGOS:  Our motion was that we'd be able to

18   subpoena the medical records.

19           THE COURT:  For the chlamydia diagnosis?

20           MS. GERAGOS:  Correct.

21           THE COURT:  She doesn't know what doctor she went to,

22   so I can't help you on that.

23           MS. GERAGOS:  They're saying they haven't ascertained

24   it. They haven't gone out and gotten them.  I never heard that

25   she doesn't know who she went to, what doctor she went to in

PC5BALEC

1    Texas and when she went to that doctor.

2              THE COURT:  Did I misunderstand what you said?

3              MS. ESPINOSA:  No.  She recalls going to a women's

4    clinic in a particular town in Texas around a particular time.

5    She doesn't remember exactly what clinic she went to.  And

6    given the amount of time that has past and that she never went

7    back to the clinic, even if we are able to identify it, which

8    we have not definitively been able to do, I don't know that

9    those medical records would have been even maintained since

10   2009 for someone who's not an ongoing patient.

11             MS. GERAGOS:  I've never heard of something not being

12   maintained just because they're not an ongoing patient.

13             THE COURT:  This is something from 2009 to now,

14   presumably they have a document retention schedule.  I don't

15   know.  They don't know what clinic it is.  Again, if your

16   request is to be able to subpoena some unknown medical clinic

17   in Texas for records of a visit for a diagnosis of chlamydia

18   for this woman, it's granted.

19             MS. GERAGOS:  Thank you.  With respect to the other.

20   I think there were two request from the government.  The other

21   they want to get in how alleged victims were feeling after the

22   alleged assaults.  We don't believe that any of that's

23   relevant, unless and until we attack the victim's credibility

24   with respect to how something happened, how they felt

25   afterwards, or what they did afterwards.  So I think it could

PC5BALEC

1    be relevant on redirect.  I don't think it's relevant on

2    direct.

3              THE COURT:  Go ahead.

4              MS. ESPINOSA:  Your Honor, I think they already have

5    attacked the victims on that point.  They have made arguments

6    to the effect of, victims didn't behave like victims, that they

7    didn't go to law enforcement, indicating they are lying, that

8    they didn't tell anyone as an indication they are lying.  And

9    the information we are seeking to elicit would directly rebut

10   those arguments they have already made.  And given that they've

11   already made those arguments, we should not have to wait until

12   redirect to elicit the relevant information.

13             THE COURT:  That's the normal rule.  I presume that --

14   it's not clear to me exactly what the defense here is, but that

15   certainly seems like the defense.

16             MS. GERAGOS:  I personally haven't said anything to

17   any jurors about what our defense is.

18             THE COURT:  Of course not.  Look, do you want to wait

19   until after you open and then I rule, or you're going to tell

20   me now whether that's going to be the defense?  Is it, look,

21   these women didn't act like they were raped.  They didn't go to

22   the police.  They didn't do this. They didn't do that.

23             MS. GERAGOS:  I haven't written my opening yet, your

24   Honor.

25             THE COURT:  So I'm going to defer ruling because the

PC5BALEC

1    defense won't tell me.  How about the rest of you?  You want to

2    tell me what your defense is or no?  Okay.  I guess not.  All

3    right.  I will defer that, but you should assume it's probably

4    going to come in.

5         MS. GERAGOS:  I understand, your Honor.  I want to

6    make the point.  I do believe it could be relevant on redirect.

7         THE COURT:  Here's the thing, if that's your defense,

8    which there's every indication that's your defense.  So keep it

9    hidden because it's a secret and it's Christmas time and we

10   don't want to unwrap presents earlier.  But assuming that's

11   your defense, I'm going to let them bring it out on direct

12   because the law is they don't have to wait.  They can take the

13   sting out of your cross-examination.  If that's the defense,

14   which I presume it is, they're gonna be allowed to do it.

15        MS. GERAGOS:  I just think that every alleged victim

16   here is different.  That's why it's hard for me to tell you

17   generally what it is with respect to everybody.  We don't know

18   which of the 413 are coming in ultimately right now.

19        THE COURT:  And you're not going to know that when you

20   open.

21        MS. GERAGOS:  Exactly.  That's why my argument is

22   really that it waits until the end of our cross-examination.

23        THE COURT:  No.  It's not going to wait that long.

24        MS. GERAGOS:  Understood.

25        THE COURT:  Okay. Does that resolve this entire issue?

PC5BALEC

1   There also seem to be like you didn't want it to come out that

2   the woman had an STD because that means he had an STD.  Are you

3   trying to preclude that?

4            MS. GERAGOS:  Yes, we wanted to preclude that.

5            THE COURT:  No, it's evidence of the conspiracy, so

6   I'm sorry that that's gonna come out.  I'm sorry that he had an

7   STD, that she got an STD.  All of that I'm sorry about, but

8   that's evidence.

9            MS. GERAGOS:  That's then assuming that it's for the

10  truth then.  And you're telling me that --

11           THE COURT:  It's not going to come in for the truth,

12  but it will come in that she believed she had an STD.  She had

13  chlamydia.  And he said, Are you sure it's me.  So the jury can

14  conclude from that whatever they conclude.

15           MS. GERAGOS:  This is why we need to do the subpoenas,

16  but your Honor has granted that.

17           THE COURT:  I have.

18           MS. GERAGOS:  That's why we're going to serve the

19  subpoenas on the women's clinics in that town.

20           THE COURT:  Okay.  Go ahead.  Obligation to turn over

21  impeachment evidence.

22           MS. GERAGOS:  Mr. Agnifilo is handling that.

23           MR. AGNIFILO:  Your Honor, this is the rule 16 issue

24  on defense obligations on rule 16 I'm assuming.

25           THE COURT:  Yeah.  This is on the agreement you

PC5BALEC

1    struck, that you said you were going to turn over exhibits that

2    you plan to use on cross-examination.  No. Let's see.  You

3    should not be required to produce on December 22 exhibits that

4    you plan to use on cross-examination before the cross itself,

5    especially when those exhibits would undermine the credibility

6    of the witnesses.

7         MR. AGNIFILO:  This comes down to rule 16 issue in

8    terms of what's the defense obligation.  And we have an

9    obligation in our case in chief, and case in chief has to be

10   defined as when the government rests on its case in chief.  And

11   if we call witnesses in our case in chief, then that's the

12   defense case in chief for the purposes of rule 16.

13        THE COURT:  The stipulation doesn't say doesn't.

14   Doesn't your stipulation say that you'll turn over --

15        MR. AGNIFILO:  I'm getting there slowly.

16        THE COURT:  Okay. Why don't you kind of cut to the

17   chase because I have to say I'm sort of, my view is, that

18   there's a really ancient -- it goes back to Blackburn or maybe

19   even beyond that, own common law rule.  A deals, a deals.

20        MR. AGNIFILO:  I know.  Here's the deal.  The deal is

21   --

22        THE COURT:  I'm looking at the deal you signed.

23        MR. AGNIFILO:  I'm going to figure out what our deal

24   is in a minute.  Let me really understand the deal, and I will

25   have better answers.

PC5BALEC

1      THE COURT:  That's fine, because we're about to take a

2  break.  My understanding of the deal is that you agreed to turn

3  over exhibits on December 22, including exhibit -- as long as

4  they're not going to be used for impeachment.  You're not

5  obligated to turn over impeachment.  And that included the

6  express agreement that you would turn over exhibits that you

7  plan to introduce during the government's case in chief.  So

8  that would be exhibits that you intend to introduce on

9  cross-examination that are not impeachment evidence.  I would

10  take it those are the pictures of the red Solo cups and things

11  like that.  I could be wrong.

12      MR. AGNIFILO:  This is a great time for break.

13      MR. WILLIAMS:  Your Honor, before we take a break I

14  just had one point of clarification.  You mentioned earlier

15  that you don't give the jury the indictment and you don't read

16  it to them.  Does that preclude the defense or any of the

17  attorneys from discussing what's in the indictment?

18      THE COURT:  No.  You're welcome to.  Look.  As we all

19  know, the government tends to write speaking indictments.  They

20  have their own purpose.  I get why they do it, but I tell the

21  jury, it's not evidence.  Don't consider it for anything, and

22  then I send it to them.  That has never made any sense to me.

23  So you are all competent lawyers.  There will be a verdict

24  sheet that will lead the jury through what all the counts are.

25  There will be a detailed charge that tell them what the

PC5BALEC

1   elements are.  They don't need the indictment.

2          MR. WILLIAMS:  I'm just saying we, can refer to it and

3   refer to the allegations during our arguments.

4          THE COURT:  I think that's what they paid you to do

5   Mr. Williams. I could be wrong.

6          MR. WILLIAMS:  I'm just making sure I'm not getting

7   anything confused.

8          MR. AGNIFILO:  Before the break, can I do one other

9   thing I'm getting paid to do?

10         THE COURT:  Yes.

11         MR. AGNIFILO:  And you'll understand why I say this,

12  the nature in a minute.  There's no evidence in this case at

13  all that anybody had chlamydia.  I want to make that clear.  We

14  have our friend press here. There's no suggestion, evidence

15  that any of the defendants had chlamydia.  There was a

16  statement made.  Your Honor said the jury evaluate it the way

17  it ill, so I would be remiss if I didn't say it. And now that

18  I've said it, I can stop saying it.

19         THE COURT:  I think there is going to be evidence that

20  he did, but all right.  Everybody be back in 10 minutes.

21         (Recess)

22         THE COURT:  All right.  Okay.

23         MR. AGNIFILO:  I think your Honor was talking about

24  Blackstone and a deals a deal, and a deals a deal.  And I

25  believe that we've given over three productions of rule 16

PC5BALEC

 1   material to our colleagues at the government.  And it looks

 2   like the deal we struck is that if we're going to use something

 3   not as impeachment, as affirmative evidence as part of a

 4   government witness cross-examination, we would turn that over.

 5   A, when we know we're going to do it; and B, if we know we're

 6   going to do it.  But we can't turn it over if we don't know

 7   we're going to use it.  If we know we're going to use it, we'll

 8   turn it over.  And we'll do it in good faith, just like they're

 9   going to do things in good faith for us.  This might not have

10   been the deal I would have struck, but it was struck, and I was

11   a lawyer, and so it's struck.  And that's that, so a deal is a

12   deal.

13           THE COURT:  Exactly.  So the government proposes that

14   the Court define for the defendants what constitutes

15   impeachment evidence based on the Black Law dictionary

16   definition. I'm not going to do that. The defendants are all

17   experienced able practitioners.  They know what impeachment

18   evidence is and what it's not. If they don't turn over

19   non-impeachment material, they run the risk of the Court not

20   allowing them to use the exhibit.  So all of that said I have

21   to say, putting aside a deal is a deal.  I do like the prospect

22   of you each kind of telling each other the night before what

23   you anticipate putting into evidence the next day.  That will

24   make things go smoother, because it will allow you to alert me

25   in the morning if there's an issue we should resolve so we can

PC5BALEC

1    resolve it before we have jurors sitting in the box.  That is

2    my goal.  So we will do that.

3            That brings us to the Daubert motions.  So the first

4    motion on my list -- let me also tell you all for purposes of

5    everyone.  You all are incredibly articulate.  You've been

6    doing a lot of arguing here today.  I'm the Part 1 judge this

7    week, and it's been a very quiet week, except I now have a TRO

8    and a bail appeal this afternoon.  So my goal is to stop you

9    guys at 5:00 o'clock.  So ideally we can argue the Daubert

10   motions well and be done well before 5:00 o'clock, and I can

11   also tell you where my head is on picking the jury.

12           MR. JONES:  I will do this quickly, your Honor. I

13   think on the rule 16 point.

14           THE COURT:  Yes.

15           MR. JONES:  Everybody agrees that we make exhibit

16   production subject to good faith revision.  I just think

17   defense attorneys typically are not producing exhibits at

18   deadlines or fairly in advance of trial.  I understand the

19   Court will police it.  I just think it's important that this

20   deal be policed.  There are most exhibits here that it talks

21   about, you mentioned the red Solo cups, or kind of the things

22   that we expect --

23           THE COURT:  I assume it's going to be pictures of them

24   and not old dead red Solo cups.

25           MR. JONES:  I hope so.  These are things they've had.

PC5BALEC

1  They've had our witnesses.  They've had the discovery that

2  we've produced to them.  They will have exhibits that we're

3  producing before they're asked to produce themselves.  I think

4  as the rule, as the agreement is being enforced, enforcement is

5  warranted.

6          THE COURT:  Let me just say.  I appreciate everybody's

7  operating in good faith.  Let me also encourage you to air on

8  the side of production.  So if you think you might use it, go

9  ahead and produce it. That doesn't obligate you to use it, but

10  that way the government will not be squawking that you violated

11  the agreement because you had to have known a long time ago

12  that you were going to use the exhibit.

13          With that, the first motion is to exclude doctor -- is

14  it Rocchio or Rokio?

15          MR. JONES:  Your Honor, is there a chance that we

16  could talk about the severance motion before we move to

17  experts?

18          THE COURT:  Sure.  Have you responded yet?

19          MR. JONES:  We did a couple of days ago in a short

20  letter.

21          THE COURT:  Which said no?

22          MR. JONES:  It said no.

23          THE COURT:  You sit down.  Who wants to argue it?

24          MR. AGNIFILO:  That's me, Judge.  So here's the

25  situation.  We get, what, two weeks ago we get a brand new

PC5BALEC

1    indictment with a brand new --

2              THE COURT:  You got one new count.

3              MR. AGNIFILO:  It's a 15-year minimum count, and it's

4    a count that's unlike every other count.  And let me tell the

5    Court what --

6              THE COURT:  Not to play passover, but how is this

7    count different from all other counts?

8              MR. AGNIFILO:  It's different from all other counts

9    because as to every other count, there are -- it's he said.

10   She said.  Counts One through Ten are, he said.  She said.

11   Count One through Ten is, I was drugged.  I was forced.  And on

12   the other hand someone saying, I was having consensual sex.  We

13   were having a nice time in the Hamptons or wherever, wherever.

14   Count 11 is not he said.  She said.  Count 11 is a math

15   equation.  You take the date of the alleged filming.  You take

16   the birthdate.  You subtract one from the other.  And if it's

17   less than 18.0 years, it's child pornography.  In this

18   particular instance, it's 17 years and 10 months.

19             So here's what we're doing just to put it all out

20   there, and I don't want to be too specific for reasons that are

21   obvious.  This birth certificate came from a country that was

22   in the process of no longer being a country and becoming

23   another country, a different country.  We have already started

24   making efforts in terms of people actually on the ground in

25   this other country to try to make sure that the birth

PC5BALEC

1    certificate is not just a legitimate form but when it was

2    reissued and it was reissued.  It was reissued in 2007, and it

3    might have been reissued again -- that the dates are accurate.

4    Because if it's inaccurate by two months, this is not a crime

5    at all.  If it's the way it is, this is a 15 year mandatory

6    minimum.  I would be the worst lawyer in New York -- and I hope

7    not to be that -- if I don't run this all the way to ground.

8    And I've already started running it all the way to ground by --

9    and the government's given us some discovery on this.  And I'll

10   tell you exactly where we are with it cause I'm going to be

11   asking the Court for something, and so I want the Court to know

12   why I'm asking for what I'm asking for.

13            This birth certificate appears to be in the proper

14   form.  It has the stamps where one would expect them.  And I

15   know this because I checked, because since the minute that we

16   got the new indictment with the new count, we've probably been

17   doing, I wouldn't say nothing but this, but we've been doing a

18   lot of this.  There are lots of questions about how this person

19   came to America, why this person might want to change her birth

20   date and appear younger than she actually is.

21            And to try to get to the bottom of this, we have

22   employed someone who is going to try to go to a city that at

23   this point in time -- and might be the single most violent city

24   on earth -- in a war torn country and see if we can get more

25   original documentation because it's that important.  Because if

PC5BALEC

1   it turns out that the date of birth is wrong, this is not a

2   crime, and they're going to have to dismiss it.  If the date of

3   birth is what is said on the birth certificate, then there's

4   some other elements that could be at play. This is a 15 year

5   mandatory minimum.

6           So here's the situation that -- and your Honor will

7   remember that I said this to the Court.  I don't think I'm

8   standing there -- not at the podium.  I said, Judge, if they

9   come up with blockbuster new information -- I don't know what I

10  said -- right before Christmas or right before Thanksgiving or

11  whatever it is, I might be coming back to your Honor and asking

12  for a severance. And that's what I'm asking for.  And here is

13  why.  Count 11 is a three day trial.  It doesn't involve any of

14  the victims of Counts One through Ten.  It doesn't involve all

15  the uncharged crime victims, alleged victims that we've been

16  talking about all day.  It's a super straightforward right to

17  the point allegation.  We all are comfortable.  This is her

18  date of birth.  That is been run down.  A good defense lawyer

19  trying to get to the bottom of stuff is like, that looks like

20  when she was born, or at least I can't really meaningfully

21  contradict that that's the day she was born.  Looks like this

22  is the day this video was made.  There's metadata.  That's what

23  it looks like.  Looks like it might have been emailed.  Looks

24  like it was emailed on a certain day.  I think we probably can

25  do that between Monday and Wednesday, one day.  I'm just not

PC5BALEC

1  going to get to the bottom of this by January 5.  I'm just not.

2  I'm just not.  So I'm ready to go January 5 on everything that

3  I've always expected this trial to be.  I cannot responsibly be

4  ready to go January 5 on Count 11.  So that's my application.

5            THE COURT:  Mr. Jones.

6            MR. JONES:  Thank you, your Honor.  There's kind of

7  a -- the severance question precedes in two steps. Step one was

8  joinder appropriate in the first instance, and here it

9  indisputably was.  So you talked about -- the Court talked

10  about the evidence of Count 11.  The video of the assault last

11  time.  The videos leading up to it where there's obvious

12  evidence of significant physical impairment due to drugging.

13  There's video of Oren Alexander telling the victim to take a

14  pill, and then there's a video of him raping her.  And so all

15  of this is direct evidence of the conspiracy which the Court

16  noticed before.

17            THE COURT:  So he's not contesting -- I think he

18  understands that even if Count 11 is severed, the evidence is

19  still coming in.

20            MR. JONES:  Yes.  But the fact that if Count 11 is

21  severed, the evidence would still come in, shows the harm in

22  doing this twice, the reason not to do it twice.  What we are

23  talking about is a 17-year-old girl raped on video.

24            THE COURT:  Tell me more about -- I got it.  Look.  On

25  the merits, it stays in the case.  But your learned opponent

PC5BALEC

1    makes a point.  So tell me more about the birth certificate.

2    What does the government know?  I presume that you believe that

3    the birth certificate you got is the right one?

4              MR. JONES:  Yes, your Honor.  The birth certificate is

5    the right one.  It gives the age, as do other documents that

6    have been produced in the United States, official documents in

7    the United States for this victim.  They all list the same age.

8    The birth certificate was issued by the Soviet Union, and so --

9              THE COURT:  So kind of give me the chronology.  So

10   she's born in the Soviet Union?

11             MR. JONES:  Yes.

12             THE COURT:  She emigrates to the US when?

13             MR. JONES:  I'm going to let somebody else who knows a

14   little more handle this.

15             MS. ESPINOSA:  Your Honor, I can address that.  She

16   came to the United States at the age of about 14.

17             THE COURT:  So she was born in what year?

18             MS. ESPINOSA:  She was born in 1991, in June of 1991.

19             THE COURT:  And she emigrates about the age of four or

20   five?

21             MS. ESPINOSA:  About 14.

22             THE COURT:  So 2005.

23             MS. ESPINOSA:  More or less, your Honor.

24             THE COURT:  Okay.  What does that file look like?

25             MS. ESPINOSA:  What we have at the moment is a copy of

PC5BALEC

1   it, and it is a handwritten birth certificate with appropriate

2   stamps, as Mr. Agnifilo noted, listing the child's name, date

3   of birth, and the date it was issued, and the other requisite

4   official information.

5           THE COURT:  So that's what immigration INS or ICE or

6   whoever it is.  Is that what's in her A-file?

7           MS. ESPINOSA:  I don't have her A-file at this time.

8   My understanding is that is the birth certificate she brought

9   with her.  It's the birth certificate that she used to get a

10  real ID in the United States.  It's the proof that she has of

11  her date of birth that has been accepted by the government in

12  prior official applications.

13          THE COURT:  Is she now a U.S. citizen?

14          MS. ESPINOSA:  She is now a green card holder.

15          THE COURT:  Is that what the U.S. government is using

16  as her date of birth for purposes of the green card?

17          MS. ESPINOSA:  That's my understanding, yes.  Like I

18  said, I don't have her A-file, but my understanding is this was

19  her identification document that was provided.

20          THE COURT:  And does she have still have a passport

21  from a foreign country?

22          MS. ESPINOSA:  I would have to inquire, your Honor.

23  My understanding is she's a green card holder.  Here she has a

24  state real ID issued here.  I don't know if she still has a

25  foreign passport.  I would have to ask.

PC5BALEC

1    THE COURT:  Did she have a passport when she entered

2 the country?

3    MS. ESPINOSA:  Yes, I believe she did, but I don't

4 know if she maintained her passport.

5    THE COURT:  But that would be in her A-file.  I need

6 more information.  I certainly understand Mr. Agnifilo's

7 argument.  On the other hand, there's a lot about this that

8 seems like not a Hail Mary.  It's a Hail Mary pass where the

9 guy who's throwing it is like on the other side of the other

10 end zone, so like a ridiculous pass because, surely, if this

11 was not a legitimate birth certificate, it would have been

12 picked up in some of this.  But what I would like to see is her

13 original passport should be part of her A-file, not that I'm an

14 immigration specialist, but that would seem to me that it would

15 be.  If the passport matches the birth certificate, then this

16 just seems like beyond a Hail Mary pass, and I'm not inclined

17 to sever the count for this purpose.

18    MR. AGNIFILO:  Your Honor, I think that's a great

19 start.  To raise some of the detailed issues, I would have to

20 say things that I think the government might be coming to close

21 to identifying -- I'm not sure what I'd be identifying, but I

22 think the government thinks that we could have a more fulsome

23 discussion at sidebar.

24    THE COURT:  Well, come on up.

25    (Continued on next page)

PC5BALEC

1          (At the sidebar)

2          MR. AGNIFILO:  This is our first.  We'll get better.

3     So I have someone trying to go to Curzon, which is the most

4     worn torn city in Ukraine, which is where she happens to have

5     been born.  It sounds like she was born there, and the concern

6     is this. She came to the United States.  At some point, she

7     seems to be sponsored by some sort of modeling agency.  And my

8     very preliminary investigation is that sometimes these modeling

9     agencies, it's better for the people to appear younger than

10    they are.  I don't know what the value of that is, but that's

11    what I've been told.  And I've also been told that it's very

12    common --

13         THE COURT:  Them to appear physically younger or for

14    them to appear on paper younger?

15         MR. AGNIFILO:  I want to model.  I'm only this age,

16    and so they say they're younger than they actually are because

17    that's better for -- I don't know.

18         THE COURT:  Okay.

19         MR. AGNIFILO:  So what I'm trying to figure out is

20    what are the -- and, listen, she has a birth certificate.  I

21    ran her down.  The stamps are all in the right place.  It's the

22    right form.  So this is the waning days of the Soviet Union,

23    and it's the Ukraine Republic.  So her birth certificate is in

24    both Ukrainian and Russia.

25         THE COURT:  Didn't it fall in '92?

PC5BALEC

1      MR. AGNIFILO:  It fell I think in December of '91.

2   But I think -- and don't quote me on this -- I think Ukraine

3   claimed independence the same week she was born, so we're

4   trying to run this down.

5      THE COURT:  I get this.  Again, don't misunderstand

6   me.  I completely understand why you're doing it.  I just think

7   if the passport matches what the birth certificate says, the

8   notion that this was a 14-year-old somehow another conniving to

9   get a new birth certificate and faked out the Ukrainians to

10  give her a passport that reflected a false date of birth, it's

11  just all too farfetched.  I'm not saying it's not possible.

12  I'm not saying it's not a good expenditure of your client's

13  money to do it.  I'm just saying it's so farfetched that I'm

14  not inclined to sever the count.

15     MR. AGNIFILO:  I suppose if there's a Soviet -- well,

16  if there's a Soviet passport, Ukraine Republic Soviet Union

17  passport that has the same date of birth, that's certainly a

18  data point.

19     THE COURT:  It should be a Ukrainian passport because

20  by the time she emigrated, she was 14-years-old.  It would be a

21  Ukrainian passport.

22     MR. AGNIFILO:  She seems to have moved around a little

23  bit.

24     THE COURT:  Look, as the Russians will say, they're

25  all Russians anyway.  So if you believe the Russians, who

PC5BALEC

1    knows.  In any event, let's get that.  If at all matches up.

2            MR. AGNIFILO:  I will take whatever help I can get

3    from the Court, from my colleagues with the U.S. Attorney's

4    office.  This is very hard road to travel.

5            THE COURT:  I got it.

6            MR. AGNIFILO:  And there's enough indicators that

7    there might be, there might be -- because it's not the original

8    birth certificate.  She got a reissue in 2007, so we know it's

9    not the original.  There's a 2007 stamp on it.  So there's all

10   these possibilities that we have to run down.  I would love to

11   do it as soon as possible, and so I might be coming back to the

12   Court for the A-file.  If they can't get it, I'm sure they can.

13   If they can't, we'll subpoena it.  And we'll do it together.

14   I'm not trying to do anything behind their back.  I want to get

15   to the bottom of it as soon as possible so we know where we

16   are.

17           MS. ESPINOSA:  Your Honor, we'll do everything to

18   facilitate, but I just want to note that an A-file is going to

19   contain an enormous amount of totally irrelevant information.

20           THE COURT:  He's not entitled to the A-file.  What I

21   want you to get is the passport, the original passport.

22           MS. ESPINOSA:  We will work on that immediately.

23           THE COURT:  If the original passport gives right to

24   further questions, then come back together and we can talk

25   about it.  Okay.

PC5BALEC

1          MR. AGNIFILO:  There might be stuff in the A-file

2     that, even though I'm not entitled to other than the passport

3     that could be important.

4          THE COURT:  There could be.

5          MR. AGNIFILO:  We'll cross that bridge when we come to

6     it.

7          MS. ESPINOSA:  For the purposes of this issue, the

8     issue is the date of birth.

9          THE COURT:  For the purpose of this issue, the issue

10    is, get from ICE a copy of the original passport.

11         MS. ESPINOSA:  Understood, your Honor.

12         THE COURT:  All right.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

PC5BALEC

1          (In open court)

2          THE COURT:  Subject to all of that, subject to

3   something new coming up, I'm not severing Count 11.

4          MR. AGNIFILO:  I understand.  I don't believe we have

5   all the discovery on Count 11 yet.  I think there's other

6   materials we are waiting for.  My colleagues with the U.S.

7   Attorney's office will speak to that.

8          And one other thing, and I think this is important

9   too, is because I think Counts One through Ten comes down to

10  two different perspectives of similar events.  There's a much

11  greater likelihood my client would testify in regard to Counts

12  One and Ten. Count 11 being a count of a different nature, it

13  would be less likely.  I'm not saying he is.  I'm not saying

14  he's not.  We're not at that point.  But in terms of like

15  leaning and possibilities and all that, there's a real

16  possibility he could testify on Counts One through Ten. And he

17  would not want to testify on Count 11, so that's a another

18  possible dividing line.  I throw all that out for the Court's

19  consideration.

20         MR. SREBNICK:  On behalf of Alon Alexander, I think

21  Tal Alexander joins, we would also move to have that count

22  severed out. We have raised in the pretrial motions a severance

23  issue as between defendants under *Finkelstein* it's premature.

24  *Finkelstein* is of course the case where one defendant is trying

25  to get the testimony of a co-defendant who would choose to

PC5BALEC

1    remain silent at a joint trial, but would be available to

2    testify at a severed trial.  Mr. Oren Alexander has critical

3    testimony to offer in defense of Counts One through Ten.  He

4    was leaning in favor of testifying.  And so at that point, Alon

5    and Tal would get the benefit of Oren's testimony at a joint

6    trail.

7              But if Oren chooses to remain silent because he

8    doesn't want to have to testify at a trial with Count 11, that

9    would leave Tal and Alon without the benefit of Oren's

10   testimony, so I'm flagging that issue.  Because for some of the

11   counts, most notably Counts Three and Four where both Tal and

12   Alon are charged with participating in a sexual assault where

13   the two defendants Tal and Alon were not the ones alleged to

14   have had a sexual contact with the alleged victim.  The

15   allegation is that Oren did.  He's the one person who can

16   testify that it didn't happen the way the accuser claims it

17   happened.  And we need that testimony by way of example as to

18   that count, and we can go through the others.  Thank you,

19   Judge.

20             THE COURT:  Okay.

21             MR. JONES:  Your Honor, I think just on kind of more

22   of what we discussed at sidebar.  I think there's some time

23   sensitivity here, and the Court had raised we have exhibit

24   deadline on Monday.

25             THE COURT:  You have what on Monday?

PC5BALEC

1          MR. JONES:  Our exhibits to the defense on Monday.

2          MR. SREBNICK:  The parties would like to propose a

3   joint extension until Thursday of their exhibit deadline, and

4   our 412 deadline, I think his colleagues agree to this if

5   that's okay.

6          THE COURT:  I don't care about the exhibits.  That's

7   between you.  I do care about 412.  You need a ruling from me,

8   and there's certain of these motions that you won't talk about

9   because you say it's all going to be answered in 412.  Why do

10  you need to postpone 412?  Why do those two thing go together?

11         MR. SREBNICK:  They don't.  We needed the 412 because

12  I just got set for an emergency hearing in Miami on Tuesday,

13  and I'm spending the whole weekend working on that, and so I

14  needed a little more time, and they were good enough to agree,

15  but I offered them the extension of their exhibits.

16         THE COURT:  Okay. I'm not agreeing on the 412.  I need

17  to get it so I can see what you're talking about.

18         MR. JONES:  Your Honor, I just don't know. We had

19  discussions with the defense about whether or not -- absence

20  severance, they're asking for more time.  And I think that this

21  answer needs to be settled.  There was some preliminary

22  discussion with Ms. Caliendo.

23         THE COURT:  Are you asking for more time if there's no

24  severance?

25         MR. SREBNICK:  I would be.  I would be asking till I

PC5BALEC

1    propose February 2 to accommodate the Court's --

2              THE COURT:  Here's what I'm willing to do.  What I am

3    willing to do is pick a jury on January 5 and start the

4    following week.  That gives you an extra week.  I'm willing to

5    do that.  I'm also willing to pick a jury and start.  But if

6    you need a little more time, I'm willing to give it to you.

7    The problem to pushing it over to February 5, that definitely

8    runs into President's Day weekend which school kids here in New

9    York have off.  And it runs into -- I've got -- what's my date

10   in March that I'm out.

11             THE DEPUTY CLERK:  The 2nd, Judge.

12             MR. SREBNICK:  I think we were told you were tied up

13   starting March 16.  When I had done the math, February 2 would

14   give four full weeks.

15             THE COURT:  That's tight.  That's tight.  Based on the

16   robusticity of everybody, it's very tight.

17             MR. SREBNICK:  Perhaps the week before January 25, as

18   much as time as you can give us.  There's a lot of

19   investigation that's still ongoing.

20             THE COURT:  This case was indicted a year ago.  Again,

21   I'll give you a week.  Are you objecting to the week?

22             MR. JONES:  No, I'm not objecting to the week.  I

23   think given where we are if the Court -- I understand what

24   you're saying about the week.  If that moved to like two,

25   three, pick the jury.  Set a date, pick a jury.  Set a date for

PC5BALEC

1   opening statements that might be apart by a few days or the

2   week.

3          THE COURT:  So it would be, pick the jury on the 5.

4   Are we going to be able to get a jury on the 5th?

5          THE DEPUTY CLERK:  5th or 6th.

6          THE COURT:  The 5th or 6th, which is going to take a

7   day or two, and then you start on the 12.

8          MR. JONES:  I understand the robusticity, including my

9   own right now.  I think if the jury was picked in January and

10  we're starting openings February 2 or if we back it up a week.

11  You're starting around there.  I understand that picking a jury

12  not sitting President's Day week might be a necessary part of

13  being able to pick a jury.  I think we've all been part of that

14  before.  We understand the Court's rulings on the victims that

15  we can testify.  Like everybody's admissible in theory.

16  Collectively everybody's not.  Some of it does turn on

17  cross-examination.  But with a March 16 hard stop, even if

18  we're not sitting the week of February 16, whatever President's

19  Day week is, if we're opening on February 2, certainly if we're

20  opening the week before, I think we can do this, your Honor.

21         THE COURT:  Opening the week of the 26th?

22         MR. JONES:  The 26 to February 2.

23         THE COURT:  This sounds like you're asking for more

24  time too?

25         MR. JONES:  I'm not opposed to more time.  Everybody

PC5BALEC

1   knows that the holidays make this hard.

2            THE COURT:  I understand that. One of the defense

3   attorneys told me he was not getting into the case because I

4   set a schedule that ruined every holiday between February and

5   the start of the trial.  That was you.  That's what you told

6   me.  You said you ruined every holiday.  Why don't we do this.

7   I'm not going to pick a jury on the 5th if we're not starting

8   to the 26th. That's a recipe for disaster, but I would do the

9   same thing.  So pick a jury on the 20th.  MLK Day is the 19th,

10  so pick a jury the 20th or the 21st, with a start of the 26th.

11           MR. SREBNICK:  We accept.  Thank you, Judge.

12           THE COURT:  Okay.

13           MR. JONES:  Your Honor, I just think the question will

14  be -- and it probably is -- if we end up going to February 16,

15  we just have to break.

16           THE COURT:  We'll figure it out.  I'll pick the jury

17  telling jurors we're sitting that week.  I'm just telling you

18  what it means is, it's going to effect your jury. There are

19  going to be people who will not be able to sit on the jury

20  because they have preplanned vacations for that week.

21           MR. JONES:  I think that's our concern for two parts.

22  The first is, it does affect a bunch of jurors, and then the

23  Court must know better than me; but my experience is that

24  jurors come to the jury room kind of making sure they're

25  available for two weeks.

PC5BALEC

THE COURT:  I'll handle that during -- trust me.  I
will handle that during jury selection.  They will well know
that we're talking about sitting that week.

MR. JONES:  I understand that this will probably be
reserved on.  I would ask if we're starting opening statements
on the 26th, that we're not sitting the week of the 16th for
jury reasons, because that still gives us four weeks -- three
weeks on the back end of that.

THE COURT:  I'm really not inclined to do that.  I
don't think it is -- it is not good for anybody to take off a
week in the middle of a trial.  It is not good for the jury.
It's not good for the parties.

MR. JONES:  I understand.

THE COURT:  There are benefits to it.  You can get
your ducks in a row.

MR. JONES:  My true ask is because of the jury and the
ability to pick a jury and the ability of like a complete jury
to sit.  That's why I'm asking.

THE COURT:  I think we can manage.  I'm confident we
will manage.  Okay.

MR. JONES:  Your Honor, I think we also have -- can we
have a second.  Can we have a sidebar right now?

THE COURT:  But again, I got a hard stop at
5 o'clock.  Y'all are powwowing in a way that makes me think
there's something about that week that you don't want to say in

PC5BALEC

1    open court.  Can you tell me at sidebar?

2             MR. JONES:  Your Honor, I think it matters for picking

3    a jury.  I have a supervisor who I rely on to help.  We have

4    individuals who aren't at this table, but are apart of our team

5    that aren't available that week because of schedules that have

6    been made, so those are the issues.

7             THE COURT:  We were going to sitting over that week

8    anyway, even if we picked a jury on January the 5th.

9             MR. JONES:  I tend to think that this trial --

10            THE COURT:  It's going to be faster than you're

11   thinking?

12            MR. JONES:  I think the Court has always assumed that

13   as well because we stand up all the time and say five-week

14   trial.  And you'll like, okay.  Jury verdict in three.  And so

15   I think that that's a real thing too.  And so I think at this

16   point given, we have serious concerns about sitting that week.

17   And so we would oppose kind of the thing I was saying. I back

18   up.  If the Court wants to start -- pick a jury on the 5th,

19   start on the 12th.  We're fine with that. If we can pick a jury

20   to start on the 26th and not sit that week, this table, we're

21   fine with that too, but that's kind of where we are and what

22   we're asking.

23            THE COURT:  Okay. Defense.

24            MS. PAUL:  Your Honor, this is separate and apart from

25   dates.  I know you want to move onto Daubert.

PC5BALEC

1          THE COURT:  I do.

2          MS. PAUL:  And I know you have a five o'clock stop.

3          THE COURT:  I do.

4          MS. PAUL:  We would like to be heard on the 2009 video

5     on behalf of Tal and Alon coming in as direct evidence of a

6     conspiracy in light of Count 11.  So before we end today, that

7     is something that we'd like the opportunity to be heard on.

8          THE COURT:  I think we're going to have to come back

9     on Monday or next week.  Let's move onto Daubert.  I really

10    would like to deal with that.

11         I granted oral argument on Daubert that I would like

12    to hear from the parties on.  If we have enough time after

13    that, I can we can deal with these other hanging chats.  So let

14    me try again.  The first motion is the motion to exclude Dr.

15    Rocchio's testimony.  Who's arguing that for the defense?

16         MR. AGNIFILO:  That's going to me, your Honor.  There

17    are two major issues that we have with Dr. Rocchio's testimony

18    The first is that the original notice was timely.  It was

19    August 15, 2025, which I think was the notice deadline for

20    experts.  The government then gave us another notice on

21    November 21, 2025, which included for the first time

22    considerations regarding teens and adolescents.  So we've had

23    that for just two weeks.  Just the low hanging fruit, I think

24    it's low hanging fruit at least, I don't think she should be

25    prepared to testify about that.  They missed the notice

PC5BALEC

1  deadline by two months, actually more.  Whatever August 15 to

2  November 21 is, three and a half months, and so she should not

3  be able to testify to whatever is in the notice from

4  November 21, 2025.

5          THE COURT:  That would be about teens and adolescents?

6          MR. AGNIFILO:  Correct.  And I assume, I'm sure I'm

7  right, the reason for that is because the previous day they

8  superceded the indictment with superceding information number 4

9  which had Count 11 in it. I don't know if that's related to

10  that or if it was independent, so that's been two weeks since

11  we had that notice.  And I don't see it being fair that after

12  all the pretrial motions are done, all the in *limine* motions

13  are done, they give us for the first time this very

14  substantial.  This is not a slight change in the prior notice.

15  This is an entirely new area, prejudicial area.

16          THE COURT:  What does the report say in terms of what

17  she would say about teens and adolescents?  How does it differ

18  from adults?

19          MR. AGNIFILO:  It talks about how teens and

20  adolescents are at vulnerable points in their lives; that they

21  can be more easily manipulated; that they can be made sexual

22  assault victims because of their vulnerabilities of age and

23  experience differentials between themselves and the abusers,

24  and things along those lines.  And there was none of that in

25  the prior notice.

PC5BALEC

1    And I think, your Honor, set these deadlines for a

2    reason, and they didn't meet the deadlines.  So she should not

3    be allowed to testify about teens and adolescents because they

4    miss the deadline by all that time.  In terms of the things

5    that they gave the notice of on August 15, 2025.  The areas are

6    as follows:  Rape and sexual assault, responses during and

7    after rape and sexual assault, labeling and disclosure of rape

8    and sexual assault, and then memory.  Let's put memory to the

9    side for a second and talk about the first three.

10    Seven of the counts in this indictment charge sex

11    trafficking.  Sex trafficking is about commercial sex. sex

12    trafficking is not about rape and sexual assault.  The

13    government is conflating the two and trying to make it about

14    rape and sexual assault.  And what they want to offer through

15    this expert testimony is in line with that same, what I

16    consider, misguided application of the sex trafficking statute.

17    THE COURT:  What's the statute number of sex

18    trafficking?

19    MR. AGNIFILO:  1591.

20    THE COURT:  Thank you.  Go ahead. I'm listening.

21    MR. AGNIFILO:  So what the government is essentially

22    doing is saying that we don't really have to prove that the sex

23    is on account of something of value.  We're not really going to

24    prove that.

25    THE COURT:  Wait, but they also have to prove the

PC5BALEC

1   force threats, coercion, et cetera.  So that's why you get into

2   rape even with the sex trafficking.

3           MR. AGNIFILO:  They're saying that the force -- they

4   have to prove that force, fraud or coercion caused a commercial

5   sex act.  And what they're trying to do in lieu of that is

6   they're trying to make this essentially a trial about rape and

7   sexual assault.  Now they do have one count that's about rape

8   and sexual assault.  The count that took place in the maritime

9   jurisdiction, and so the trafficking government has

10  jurisdiction over that.  But there is no, obviously, there's no

11  freestanding trafficking rape statute.  And so in lieu of that,

12  they're trying to make this a rape case, when this is actually

13  a case about commercial sex under the sex trafficking statute.

14  The problem with the expert though --

15          THE COURT:  But those two things aren't necessarily --

16  it's not like if you're a mop, you can't be a floor cleaner.

17  There can be commercial sex that involves rape, and that's

18  their contention here.

19          MR. AGNIFILO:  I don't know that.  I respectfully

20  disagree.  I think their contention is wrong, and I'd tell you

21  why.

22          THE COURT:  Is wrong?

23          MR. AGNIFILO:  It's wrong.

24          THE COURT:  Factually wrong or legally wrong?

25          MR. AGNIFILO:  It's legally wrong.  And here's why

PC5BALEC

1   it's legally wrong.  What the government is basically saying is

2   that there's something of value was in exchange for the woman

3   coming to a hotel room, coming to the Hamptons.  And that from

4   there, the defendants had this free floating scheme.  Once we

5   get you into Vegas, once we get you to the Hamptons, once we

6   get you to an after party, we're then going to drug you and

7   rape you.  That does not meet the definition of commercial sex.

8   Just flat out.

9           THE COURT:  We've had this argument.  We're not going

10  to have it again.  We're arguing now about the Daubert motion.

11          MR. AGNIFILO:  That's right.  And so, and so, an

12  expert who's going to come in and talk only about -- and in the

13  light most favorable to the government, is gonna talk only

14  about the particular way that force, fraud or coercion was

15  used, but it's not what the statute requires.

16          THE COURT:  She's not going to testify to that.  She's

17  going to testify to what is the reaction of the victim to

18  having been forced to have sex through force, fraud, coercion

19  and drugs.  Correct me if I'm wrong.  Her testimony is about

20  how victims act afterwards.  And this is really to explain why

21  you don't have people going to the police immediately, why

22  you'll have victims of sexual assault continuing to chum around

23  with the guy who raped them.  It's all of that.  So it's

24  responsive to that piece.

25          MR. AGNIFILO:  There's nothing remotely scientific.

PC5BALEC

1    It's anecdotal.

2            THE COURT:  Okay.  You can make that argument, but

3    let's not argue about what constitutes or doesn't constitute

4    commercial sex.

5            MR. AGNIFILO:  Let me address the point that your

6    Honor is bringing up.  What Dr. Rocchio is going to say is more

7    anecdotal -- maybe she has more anecdotes than your average

8    person, but it's anecdotal information about how certain people

9    handle perceived trauma like this.  But it's not across the

10   board.  We have purported victims who do outcry in this case.

11   We have purported victims who don't outcry in this case.  None

12   of the purported victims go to the police, but these are things

13   that we can -- that I'm sure my colleagues will make very

14   compelling arguments to a jury, and the jury will consider

15   them.

16           THE COURT:  So your argument is this is within the ken

17   of an average juror?

18           MR. AGNIFILO:  Absolutely within the ken of an average

19   juror.  And my interpretation of the amendment to rule 702 from

20   about two years ago today, it's December 1, 2023, is really

21   geared at this kind of expert testimony.  And that the court

22   has to closely -- my colleague use the word "police," I'll use

23   the same thing -- has to closely police it to make sure that

24   it's rigorous.  And I know your Honor knows.  I'm not going to

25   tell your Honor what the standard is because your Honor knows

PC5BALEC

1    this stuff very well.  But the problem here is that, it's

2    always going to be cast in terms of "sometimes."  She's not

3    going to say, rape victims do this, because that's just not

4    true.  And she's going to say, sometimes they do this, and

5    sometimes they do this.  There's nothing about that that

6    remotely satisfies the Daubert standard.  There's nothing about

7    that that's remotely testable.  How would one test that

8    premise?  How would one test the premise, sometimes rape

9    victims report it, and sometimes they don't?  It's imminently

10   untestable, and it's imminently unscientific.

11          It might be accurate.  It might be right, because I

12   don't know how it couldn't be right quite frankly.  But how

13   does that help our jury understand, okay, well this person must

14   be telling the truth because the expert say they don't always

15   go to the police.  They don't always go, whatever, because

16   sometimes they do and sometimes they don't.  The problem also

17   as we sit here today, we have no idea what the realm of

18   evidence is going to be that this doctor is going to be

19   testifying about.  We have the statutory victims.  We expect

20   they're going to testify.  We don't know as we sit here today,

21   are we gonna have three uncharged crime alleged victims.  Are

22   we going to have 20.  What are their stories.  How is that

23   going to dovetail with the expert testimony.  So we don't know

24   that.  We've run that down.

25          THE COURT:  She's testifying as a blind witness.

PC5BALEC

1      MR. AGNIFILO:  But she's testifying as a blind witness

2  as to what universe of facts?

3      THE COURT:  As to the universe of facts of how women

4  who are sexually assaulted react, that is without regard to

5  these particular victims.  That is the general information

6  about, which the government will argue is used to dispel what

7  are a lot of misperceptions among people about how a rape

8  victim reacts.  What happens when a woman is being sexually

9  assaulted, or a person.  I suspect it would apply equally well

10  to a male being sexually assaulted.

11      MR. AGNIFILO:  And the testimony is going to be,

12  sometimes they do this and sometimes they don't.

13      THE COURT:  That's correct.  But you know what, a lot

14  of people believe, like they put themselves in the seat of the

15  victim.  And they say, I know what I would do, and that's what

16  people do if they're being sexually assaulted.  They scream and

17  they fight and they do all of that.  Like everybody thinks

18  they're the hero in their own head.

19      MR. AGNIFILO:  That can be dealt with, with argument.

20  That can be dealt with --

21      THE COURT:  It can also be dealt with, with expert

22  testimony.

23      MR. AGNIFILO:  I think it cannot be dealt with, with

24  expert testimony under the amendments from two years ago. I

25  think that's exactly what they're meant to prevent.  I think

PC5BALEC

the 2000 amendment to 702 is the same. I think the problem has always been generally across the country, you know, can't hurt. We'll put the expert in because it can't hurt. Well, that's just not the standard. And I your Honor knows that. I'm not talking in general. I'm talking about I think something that -- the reason for the amendment is things that I think the people who are in charge of keeping these rules of evidence fresh and relevant saw as problems throughout the country. And I think that problem is present in what the government wants to do in this case. Because it's just not scientific. It really is just anecdotal, and it's not as rigorous as 702 requires, and there's no sort of scientific basis for it. And I think it misses the mark.

And I'm not trying to have the Court revisit how the sex trafficking statute works. But at the end of the day, this is still a case where seven of the counts have to do with sex trafficking. And I understand the theory that the force, fraud and coercion led to the commercial sex. That's just not what Dr. Rocchio's expert in. If they wanted to call an expert to talk been how commercial sex works, how people have sex for something of value, that's at least what's in the charge. All of this evidence that we're talking about that's part of the conspiracy or not part of the conspiracy, it's all suppose to be related to Count One, which is a conspiracy to commit sex trafficking with acts of commercial sex.

PC5BALEC

1      And because this witness is talking about, in the best

2  of circumstances a limited sphere of that overall theory of

3  liability, I think that the testimony, A, is not appropriate

4  under 702, certainly with the amendment of 702.  It should be

5  precluded under 403 because it's unduly prejudicial because

6  what this expert is going to do is give the jury a grab bag of

7  things that they can choose from.  If she doesn't go to the

8  police, she's still a sex trafficking victim.  If she goes to

9  the police, then she's a sex trafficking victim. If she

10 probably outcries, she's a sex trafficking victim.  And they're

11 going to have someone who's a doctor, someone who's an expert

12 with the imprimatur of the Court, and the jury is going to be

13 able to pick up these little things out of the sky and hold

14 onto them.  When what the government can always do is make

15 sound, cogent arguments that appeal to a jury of New Yorkers

16 who've been around the block, who know how things are and who

17 can evaluate witnesses without the need of Dr. Rocchio.

18      THE COURT:  Thank you.  Who's arguing for the

19 government?

20      MS. ARROYO:  I am, your Honor.  So the defense starts

21 with the discussion about commercial sex acts on the account

22 of -- I think I'll leave that.  The Court has already made

23 rulings about those issues, and so I think I'll just move on.

24 When it comes to the argument that this type of testimony is

25 not scientific.  Multiple courts in this jurisdiction disagree.

PC5BALEC

1    I could list them off for you.  *Jeffries, Maxwell*, *Paduch,*

2    *Combs*.  This type of testimony is admissible.

3            THE COURT:  Routinely.

4            MS. ARROYO:  Routinely.  You have discussed yourself

5    how blind testimony works to defense counsel, so I won't bother

6    you with that as well.

7            THE COURT:  Why don't you focus on your late

8    disclosure that she's going to testify about teens and

9    adolescents.

10           MS. ARROYO:  Defense counsel notes that the government

11   produce a supplemental disclosure the day after issuing the S4

12   indictment, which relates to sex with a minor.  We believe that

13   it is relevant in this case.  We also updated the indictment so

14   that the count related to minor victim-3 is only a count

15   related to sex trafficking of a minor.  Given that there are

16   now two counts in the indictment that relate specifically to

17   how minors experience sexual assault, how they respond to it,

18   we think it is relevant and important in a way that just like

19   was not readily apparent at the time.  So at this point, we

20   believe, because there are new statutory counts that are

21   focusing on this, we believe that it's important and relevant

22   for us to put in that information.

23           THE COURT:  It might be relevant, but, one, how does

24   it differ from her testimony generally, A?  And B, it's a late

25   disclosure.  I mean, the trial is now a moving target, but a

PC5BALEC

1    month away.

2              MS. ARROYO:  Yes, your Honor.  So the testimony is not

3    that different.  So because the ways that individuals

4    experience sexual assault aren't completely different between

5    minors and adult. What Dr. Rocchio's supplemental disclosure

6    relates to is just certain special considerations about how a

7    minor's brain works that's slightly different than an adults.

8    The disclosure itself is approximately an extra paragraph of

9    the disclosure, and it's a small part of Dr. Rocchio's

10   testimony.  A majority of it -- I mean, rape, sexual assault,

11   explaining that of different things that have already been

12   disclosed.  The other issues that counsel discussed, labeling a

13   disclosure, how memory works, responses.  All of those things

14   also relate to minors as well, so Dr. Rocchio is going to be

15   talking about that in the same way.  There's going to be no

16   differentiation.  There's just going to be limited testimony,

17   two to four questions, about these special considerations with

18   minors.  We wanted to make sure that defense counsel knew

19   exactly what the parameters were, and so we did the

20   supplemental disclosure.  We don't believe that it's opening up

21   an entirely new realm of discussion.  It's really saying, and,

22   by the way, for minors here's some other things to think about.

23             THE COURT:  So what do you intend to have her

24   testimony about?  What are the four questions that would now be

25   appropriate under the amended disclosure that wouldn't have

PC5BALEC

1    been previously?

2         MS. ARROYO:  Certain special considerations -- and

3    it's some of the things defense counsel just raised.  So the

4    way that minors interact with adults and how that power

5    differential can affect the way a minor behaves.  The example

6    we provide in the notice is that, when a minor sees that they

7    might be in danger -- and I'm definitely paraphrasing.  They'll

8    appeal to the person's like protective nature.  And when they

9    realize that that's not going to work in the way that it has in

10   other situations in the minor's lives, they're more likely to

11   shutdown, submit, not fight back.  It's one or two questions

12   related to how a minor's brain kind of works slightly

13   differently.  And really the point that we're trying to get

14   across is that the standard dynamics that a car in a rape or a

15   sexual assault can be exacerbated by youth in a majority, and

16   really that's the sum and substance.

17        THE COURT:  That piece seems clearly within the ken of

18   an average juror.  That a less mature -- it doesn't have to do

19   with age so much.  That sort of less mature people are going to

20   react somewhat -- they're going to have some less sophisticated

21   reaction to stressful environments.

22        MS. ARROYO:  I think it's the specifics of how a minor

23   would engage in the context of sexual assault.  And like the

24   example I provided.  Yes, obviously minors behave differently

25   and less maturely than an adult.  That's why they're minors.

PC5BALEC

1  But the ways in which they can engage in ideas of adultifying

2  themselves or trying to think that they're older, and then

3  finding themselves in a situation and realizing that they're

4  over their heads.  The ways a minor will react in a sexual

5  assault context is specific, and it's not necessarily something

6  that a jury would understand. It's that second piece, not just

7  I'm a kid and I'm in over my head.  It's how specifically as a

8  kid am I going to react in a situation.

9          THE COURT:  I want to see the revised disclosure.

10          MS. ARROYO:  We'll send you a red line.

11          THE COURT:  Are you saying anything further about

12  Rocchio's testimony.

13          MS. ARROYO:  I don't think so, your Honor.

14          THE COURT:  You want to say anything further, Mr.

15  Agnifilo?

16          MR. AGNIFILO:  Only to say, if this was so important,

17  they should have given it to us August 15, the date that your

18  Honor said.

19          THE COURT:  I understand the late disclosure.  This

20  sounds pretty minor, not to use a pun.  It doesn't sound like a

21  substantial difference in terms of her testimony to say, oh,

22  and if it's a teenager or less mature person, they're gonna

23  have this reaction, or what we observe is this reaction when

24  all of a sudden they realize they're in a situation where

25  they're about to be assaulted.

PC5BALEC

1          MR. AGNIFILO:  All the more reason not to allow it.

2          THE COURT:  I get that argument.  That argument which

3  is, that piece is within the ken of a jury.  Understand.  How

4  are you prejudiced by the late disclosure?

5          MR. AGNIFILO:  We're prejudiced because I don't see

6  her specialty being with children.

7          THE COURT:  That's not prejudice.  That says she's not

8  qualified.  How are you prejudiced?

9          MR. AGNIFILO:  We haven't run it down.  One of the

10  things that we do, we get all of her prior testimony.  We see

11  how many times she testified about kids.  We haven't had a

12  chance to do that because we got it two weeks ago.

13          THE COURT:  What's her expertise with teenagers and

14  adolescents.

15          MS. ARROYO:  She has testified about this in both

16  *Paduch* and *Maxwell*, and we provided that testimony as 3500 to

17  defense counsel already.  They have information about what

18  she's going to say, and she's sea been qualified to testify

19  about this.  Also *United States v. Thomas* just a couple of

20  months ago.

21          THE COURT:  Okay.

22          MR. AGNIFILO:  May I have one thing?

23          THE COURT:  Yes.

24          MR. AGNIFILO:  And I know we're pressed for time.

25  I'll make it very quick.  A typical allegation in this case is

PC5BALEC

1    someone goes to the house in Hamptons, goes some place, takes a

2    drink, and then they feel different and then they are raped.

3    Okay.  I don't see anything in her testimony that sheds the

4    slightest bit of light on helping a jury of savey New Yorkers

5    understand that situation.  This is not a case where there's a

6    relationship or people have known each other where there's a

7    power imbalance.

8            THE COURT:  These aren't all strangers.  Sometimes

9    they knew each other.

10           MR. AGNIFILO:  They knew each other on Instacart.

11           THE COURT:  That's how people know each other these

12   days.

13           MR. AGNIFILO:  I'm not on Instacart, so I don't know

14   these things.

15           THE COURT:  Me either.

16           MR. AGNIFILO:  We don't have the depth of

17   relationship. She's relevant for such a limited realm.

18           THE COURT:  Again, that's a different question.  If

19   you want to say something more about how you were prejudiced by

20   the late disclosure, that she's going to testify in a limited

21   way about teens and adolescents, I'll listen to you.  But the

22   rest of this is just you repeating the same thing.

23           MR. AGNIFILO:  I don't think it is.  I probably didn't

24   say it as directly as I should have said it the first time.

25   The lacking of a relationship really guts, I would say,

PC5BALEC

1  90 percent of her value.  Her value --

2          THE COURT:  That's wrong.  That's just, with all due

3  respect, that's not true.  This testimony is useful because

4  people have a misperception about how victims react to a sexual

5  assault.  People think you run to the police.  People think you

6  run to the emergency room.  You tell your mom.  You tell your

7  best friend.  And the reality is, many, many, many, people

8  don't do that.  And that's the reality.  And because a savvy

9  New York jury is going to have the same misperception that the

10  public generally does, this sort of expert testimony is

11  valuable so that they will understand that these women are not

12  the only women in the world who had -- who according to their

13  testimony were drugged and sexually assaulted, but then did not

14  go to the police, then did not tell people about it.  What she

15  delivers is, this is not unusual.  Now, they may still

16  disbelieve these women, but they should not be operating on the

17  misperception that this is wholly unusual conduct.  If they

18  were really raped, they would have done X.

19          MR. AGNIFILO:  So one of the things -- and it's hard

20  to make this point because the trial hasn't started.  If that

21  was going to be our defense that under no circumstances should

22  you believe a woman who doesn't go to a police, under no

23  circumstances should you believe a woman who doesn't outcry the

24  very next day, there would be more of a reason for the

25  testimony.  Those are losing defense arguments.

PC5BALEC

THE COURT:  I don't know what your defense argument is because it's a Christmas present and I don't get to hear about it until you open.

MR. AGNIFILO:  Christmas comes earlier, and we're opening the presents.  Every single woman -- our best chance at success is treating every purported victim with utmost respect and meeting them on their own terms, and making points to a savey New York jury about that individual person.  And why from what you've seen that person on the stand from one hours or three hours or fours, why that person that you all met would have done this or would have done that based on what you all saw.  General principles lose trials, so we're not going to do any of that.

THE COURT:  But that argument is based on this presumption of them thinking they know what a sexual assault victim would do.  That's the reality.  That argument doesn't work unless they have some internal understanding of how a victim reacts to a sexual assault.  And maybe they will know that in fact many women don't go to the police.  They don't go to the emergency room.  Maybe they do know that.  Maybe.  But I don't think so.  My view is, as many of my colleagues are and that's why they admit this testimony, is that there is widespread misunderstanding about how people react to sexual assault, both from a total stranger and from someone they think they know, someone they think they had a relationship with.  So

PC5BALEC

1    I'm interested in the prejudice of the late disclosure, which I

2    have yet to hear.  There's going to be a written opinion on

3    this.  My inclination, I'm going to deny this motion.  Let's

4    move onto Dr. Hail testimony.  Who's arguing Dr. Hail?  He's

5    the toxicologist.

6           MR. AGNIFILO:  I'm doing Hail too.  So for Hail, I

7    believe we got notice on October 29, 2025 that it should be a

8    rebuttal witness, so that's already a month and a half after

9    the deadline.

10          THE COURT:  But you had earlier notice that somebody

11   else was going to be the toxicologist.

12          MR. AGNIFILO:  So they pulled that person.

13          THE COURT:  Essentially it's just a different person

14   testifying to the second thing.  Don't hang your hat on your

15   prejudice on that.  That's not a good argument.

16          MR. AGNIFILO:  The crux of the argument is essentially

17   what we wrote in our papers which is, without more tangible

18   proof of a particular substance or possible substance being put

19   in a drink, this is unnecessary.  It's unnecessary.  It's

20   prejudicial.  And I know I said last week, there's no evidence

21   of this.  Your Honor pointed out testimony can be evidence and

22   testimony is evidence everyday.  And I get all that.  But it's

23   gonna end up being this sort of random, it could be anything.

24   Is it GHB.  Is it Rohypnol.  Is it something else.

25          And I think what's going to happen is, the expert's

PC5BALEC

1   going to get up there and say, here's the pharmacy of different

2   types of drugs, legal and illegal, that people could use to put

3   in drinks.  And if you mash up the pills and you put it in the

4   drink, it has a hypnotic effect, and this one makes you come in

5   and out of consciousness.  This one makes you feel sleepy and

6   all this blah, blah, blah, having obviously no idea, A that any

7   of these women were drugged.  And honestly, I think that is --

8   if you want to know what the heartland of what our defense is

9   in this case, we didn't drug anybody, not one time, not ever.

10  And there's not going to be compelling evidence that we ever

11  did.  Christmas comes early, that's our defense. And given

12  that, I don't see how this witness is relevant.

13          THE COURT:  That's your defense, but the government

14  does have to prove their case.  And their view is that there is

15  evidence that women were drugged, and so he's not a defense

16  witness.

17          MR. AGNIFILO:  They're going to say, if fifteen years

18  ago I remember I only had a half a glass of wine. That's

19  definitely how much it was.  It wasn't one drop more than that,

20  and I didn't get myself drunk.  That didn't happen.  Okay. I

21  know that's why we have trials.  That's why we're going to have

22  a trial.  To put this sort of expert gloss on this kind of

23  testimony is just unnecessary.  I mean, she has an impressive

24  career.  She's a hands on.  She worked in the emergency room.

25  I think that's wonderful.

PC5BALEC

1          THE COURT:  It's a woman?

2          MR. JONES:  Yes.

3          MR. AGNIFILO:  I'm sure she's a wonderful, dedicated

4    professional, but we just don't need her at this trial.

5          THE COURT:  We do because, again, it's not within the

6    Ken Of a jury to understand if they haven't ever taken the

7    drugs or been exposed to the drug.  The notion that there's a

8    drug that can be put into a drink that will essentially sort of

9    have the lights go out on the person who consumed it is not

10   within the ken of a lay jury.  It's probably within the ken of

11   most young women in college.  These drugs haven't been around

12   for that long.  There are going to be a lot of people who just

13   aren't familiar with them.

14         MR. AGNIFILO:  There are no "these drugs."

15         THE COURT:  That's your position.  Their descriptions

16   are of having been drugged.  Now, maybe they're lying.  Maybe

17   they made it all up.  Maybe they just drank too much and

18   they're just making all this up, but their description makes it

19   seem like they were drugged.

20         MR. AGNIFILO:  So then that's what the evidence should

21   be.

22         THE COURT:  It's helpful to then know from an actual

23   person who knows something about drugs, that there are drugs

24   that operate in this way.  They have this affect on the person

25   who takes the drug.  That tends to make the witness's testimony

PC5BALEC

1    more credible, still subject to cross-examination, and they

2    still may be lying, but it tends to corroborate their

3    testimony.

4         MR. AGNIFILO:  I think the core concern -- and I think

5    she's going to say this -- is that many of these drugs behave

6    much like drinking too much, that it's hard to really tell the

7    difference.  And so here it's just speculation on top of

8    speculation on top of speculation.

9         THE COURT:  Even if they weren't drugged and they

10   drank too much and they were incapacitated --

11        MR. AGNIFILO:  it could still be the same crime.  It

12   could still be the same crime, but it's a different road to

13   getting there.

14        THE COURT:  Correct.

15        MR. AGNIFILO:  And I think it's significant that

16   ultimately, we don't even have the vaguest idea in terms of

17   evidence in the case as to what drug we're even talking about.

18        THE COURT:  Again as I think I said a couple of weeks

19   ago, I don't know how long these drugs show up in your blood

20   system.  But if your argument is without a blood test that

21   shows that this person ingested this drug, or somebody turning

22   and flipping and saying, yeah, I was at the party and I had X

23   drug and I was dropping it in girls' drinks, then this is a

24   get out of jail free card.

25        MR. AGNIFILO:  The women can still get on the stand

PC5BALEC

1  and testify how they felt.  The difference is that we don't

2  have anything in the evidence to say it's GHB as opposed to

3  Xanax as opposed to something else.  It's this free floating

4  this is how I felt.  And then we're going to have a doctor come

5  in here and say, well, this notion of how you felt 15 years ago

6  is consistent with this, or it's consistent with this; and just

7  give the jury this choice of, well, you know this case it might

8  have been.  It might have been this.

9           I know we don't need hard evidence.  I know we don't

10  need hard evidence.  The fear though is in the absence of hard

11  evidence you have a doctor who comes in and gives a check list

12  of all the different drugs that someone can put in a drink, and

13  it's unduly prejudicial.  So the crux of my objection for this

14  particular doctor, A, the disclosure was late, and I'm taking

15  my hat off the hanger.  So it's 403.

16           THE COURT:  Okay.  Thank you.  Who's arguing this?

17           MR. JONES:  Quickly here.  The Court made the point.

18  Testimony is evidence.  There will absolutely be evidence of

19  drugging that comes in, in the form of testimony from victims.

20  That's not it.  We moved on it.  We wrote about it.  There are

21  the scores of text messages among the defendants with each

22  other, with their friends talking about acquiring GHB, Ambien,

23  Xanax, quaaludes, MDMA.  So this idea that we're just throwing

24  like spaghetti against the wall, like which drug is it, who

25  could possibly know.  No, the defendants told us. They've got

PC5BALEC

1  the text messages.  We know the drugs they had.  We know the

2  drugs they were using.  And with that evidence even beyond just

3  the testimony, it's far outside the knowledge of a juror.  What

4  does a quaalude do. What does Ambien do.  What does Xanax do.

5  So this is something that is absolutely helpful to a jury to

6  know how these drugs work and how they facilitate these drugs.

7      THE COURT:  There's going to be a written decision.

8  My inclination is to allow Dr. Hail to testify.

9      Next comes to the government's motion.  Who's going to

10 argue the motion to exclude Dr. Strange testimony.

11     MS. ESPINOSA:  That is me, your Honor.  In the

12 interest of time, if there are particular places that you would

13 like me to start on that, I'm happy to do so.  Otherwise, I

14 will just keep it brief.

15     THE COURT:  Yeah.  My reaction to this is, I hear the

16 government's objection that the studies that she relies on --

17 It's a "she," right?

18     MS. ESPINOSA:  Yes, your Honor.

19     THE COURT:  The studies that she relies on involve

20 people intentionally trying to plant false memories.  But why

21 doesn't that go to weight and to cross-examination; that is

22 her, testimony generally, and what's been established in a lab

23 generally, is that you can in fact -- that a false memory can

24 be implanted.  You got good cross that says, but, yeah, they

25 were really trying to do that, and they did a lot of things to

PC5BALEC

1    do it.  That seems to be your biggest objection to this issue,

2    is that this issue is that -- well, that, and I'll come to the

3    defense on the issue of the sources of suggestive influence.

4    But why is not your beef with the basis for her opinion really

5    something that goes to weight and goes to cross-examination.

6          MS. ESPINOSA:  So I think, your Honor, that typically

7    it is the sort of thing that's addressed through

8    cross-examination.  I think our concerns here as to Dr. Strange

9    fall into two categories.  One, we think the cumulative effect

10   of the lack of fit and the unreliability here tip it behind the

11   simple average case that can be addressed in cross-examination;

12   that the lack of fit between the facts; the lack of fit between

13   the articles upon which she appears to rely and her opinions

14   are so significant that that would require an enormous amount

15   of very detail cross-examination that's not necessarily the

16   best use of the jury's time to address.  We do think there's a

17   cumulative effect of all of these issues.

18          I also think we have a significant concern here that

19   Dr. Strange is not a blind expert, unlike Dr. Rocchio.  She has

20   actually been given all of the 3500 for the victims who are

21   expected to testify in this case.  She has reviewed that 3500.

22   And after reviewing that 3500, she provided a supplemental

23   notice, which I will note was also beyond the expert disclosure

24   deadline for the defendants, that listed a large number of

25   additional suggestive sources of potential false memory.  So

PC5BALEC

1  what is clear here is that Dr. strange is also specifically

2  tailoring her testimony to what she expects the victims to say.

3  And that is a backdoor attempt to opine on victim credibility,

4  which is something that is squarely prohibited as Black Letter

5  law that an expert witness cannot opine as to the veracity of

6  any other witness at the trial.

7          THE COURT:  Give me an example of that.

8          MS. ESPINOSA:  So here, after reviewing the testimony,

9  Dr. Strange is seeking to introduce specific evidence as to

10 suggestive sources that victims may have seen.  And I will also

11 point your Honor to the defendants' opposition to the

12 government's motion on this, during which they say, and in

13 their notice they also say, they're seeking to have Dr. Strange

14 opine on suggestive sources that may have been present in this

15 case.  They have provided Dr. Strange with information about a

16 blog post that appeared to be a Miami Herald article.  She has

17 reviewed it.  They have directed her to particular news

18 coverage in this case.  And Dr. Strange's notice, if I can just

19 find my place here, specifically says that she intends to

20 testify as to the potential sources of suggestive external

21 influence that may have contributed to memory distortion in

22 this specific case.  And they double down on that in their

23 opposition to our motion saying that she would seek to testify

24 that the specific suggestive sources in this case may have

25 influenced the victims' memory distortion.

PC5BALEC

1              THE COURT:  What would be the basis for that opinion?

2              MS. ESPINOSA:  Your Honor, I don't think that there's

3      an adequate basis, but she looked at, for example, this Miami

4      Herald blog post.

5              THE COURT:  She reads a blog post and she says, oh,

6      that could have affected them?

7              MS. ESPINOSA:  Yes, and then she says, based on my

8      research that says that reviewing the media, looking at

9      advertisements and seeing social media, and her opinion that

10     that could implant a false memory, it is possible that this

11     particular blog post could have implanted a false memory in

12     these particular witnesses.  And that is obviously squarely

13     prohibited as opining on victim and witness credibility, and

14     would be completely inappropriate.  And that is something that

15     courts in this district have routinely -- or courts have

16     routinely prohibited Dr. Strange herself from doing, because

17     that is her standard practice in cases like that.

18             Dr. Strange testified in the *Paduch* matter.  In that

19     case, she also reviewed all of the victim 3500, and sought

20     based on her notice to testify as to the specific sources of

21     suggestive influence that may have been present in that case.

22     Judge Abrams prohibited that testimony.  In another case in the

23     District of New Jersey, *United States v. Jones*, Dr. Strange

24     sought to -- she reviewed the underlying evidence, that was a

25     case about eyewitness identification, and sought to testify

PC5BALEC

1   based on her expert disclosure that because there was a weapon

2   in the case, the witnesses may have been focused on that

3   weapon, and that may have caused them to inaccurately remember

4   other details.  And that was also prohibited because, again,

5   that was opining on the specific evidence in that case.

6           So I think here we have a concern that because

7   Dr. Strange had the opportunity to review 3500, because she's

8   not going to be speaking just to the principles of the science;

9   which I think in general, while I may disagree and wish to

10  aggressively cross her on the principles of the science, some

11  of them may be appropriate subject for expert testimony.  But

12  because she's reviewed the 3500, because she knows the facts of

13  the case, she is in effect able to very specifically tie those

14  opinions to these facts.  Even if she doesn't do it explicitly

15  in words, she is going to be influenced by that information

16  that she has, and she is not limited to the principles.  She is

17  in fact somewhere between a blind expert and someone who is in

18  fact testifying as to an assessment of a witness in a civil

19  case.

20          THE COURT:  Okay.  Who's arguing this?  I'm sorry.

21  Tell me again who you are?

22          MS. WILSON:  Jenny Wilson on behalf of Oren Alexander.

23  Your Honor, I'll start with the witness credibility, because my

24  sense from your questioning is that's where you are most

25  critical of our position, but if you'd like me to start someone

PC5BALEC

1    else I'd be happy to.

2              THE COURT:  Well, you might want to start where

3    Ms. Espinosa ended, which is on the notion that your expert

4    will testify sort of pulling in these things could have

5    influenced the witnesses' memories, when she hasn't examined

6    them, and that's just --

7              MS. WILSON:  Her expertise in the sources, in the

8    types of sources that create subjective influences.  She has

9    reviewed the 3500 material, and she can identify in that

10   material certain sources that have, in the literature, been

11   deemed to be suggestive.  She is simply seeking to opine on

12   those sources and the extent to which they can be suggestive.

13   That does not in any way opine on witness credibility and that

14   is their argument, my understanding of what Ms. Espinosa was

15   saying was that the reason she can't do that.  There's no rule

16   that an expert cannot examine the evidence in the case and form

17   opinions based on that evidence combined with their

18   understanding of the scientific literature.  That's what she's

19   seeking to do here, look at the evidence in the case, look at

20   potential sources of information.  And there's really two

21   questions here.  I think there's the admissibility of

22   subjective influences that are directly elicited in

23   cross-examination.  That's a 702 issue.

24             Ms. Espinosa in her presentation did not identify a

25   single reason that is not allowed, because that does not opine

PC5BALEC

1   on witness credibility.  The cases that she referenced, the

2   *Paduch* case, that relied on *Maxwell*, which relied on the Second

3   Circuit opinion in *Nimely v. City of New York*.  That opinion,

4   the facts were very unique.  I would say first of all -- and I

5   can give your Honor the citation if you'd like it.  I have it

6   right here.  414 F.3d, 381, Second Circuit 2001.

7           So that case, first of all it was a civil case, so it

8   seems from the record that there were probably at the stage

9   perhaps more record evidence than we have here.  But even if

10  there were not, the expert testimony there directly bore on

11  witness credibility.  You had medical data that showed somebody

12  was shot in the back.  And then the party was trying to

13  introduce expert testimony to say that based on my view of

14  police officer's credibility, this medical data is probably

15  wrong.  It was a direct boltering of police witness testimony.

16  That's a very narrow issue on witness credibility.  And if the

17  witness credibility limitation of expert testimony gets too

18  broad, it's going to swallow, not just the rule allowing, among

19  other things, opinions on ultimate issues, experts to review

20  the facts of the case, experts to make inferences from those

21  facts, but also the constitutional right of the defense to

22  fully rebut the government's evidence.

23          THE COURT:  Let me make sure I understand.  Do you

24  want her to testify that the Miami Herald news article could

25  have influenced these witnesses?

PC5BALEC

1      MS. WILSON:  Only because --

2      THE COURT:  The answer is yes?  Yes, you want her to?

3      MR. WILLIAMS:  Yes, because a witness has viewed the

4  article and said that she reviewed the article.  Is it

5  therefore imminently relevant to the extent that that article

6  could have shaped her current recollection.  We've had the last

7  four hours have revealed that this case is so overwhelmingly

8  built on the reliability of witness recollections of events

9  that occurred up to almost two decades ago.

10      THE COURT:  Look, in principal, the issue of her

11  testifying that external sources; that is, things that

12  witnesses read, movies they see, television, that can.  Now

13  whether she's got much scientific background for that that

14  actually supports that opinion, I think the studies that she

15  relies on are very different from reading a newspaper article

16  and that implanting a false memory, but that's a matter for

17  cross-examination.  That's a matter for cross-examination.

18  That's different.  So saying in general social media, this,

19  that, the other, can influence how someone remembers something,

20  that's expert testimony, and that seems appropriate.  But going

21  to the next level of this Miami Herald could have implanted a

22  false memory in this witness strikes me as a bridge too far

23  That sounds like argument.  That's something a defense attorney

24  argues.  Defense attorney argues, as you remember from

25  Dr. Strange, external sources can influence how people remember

PC5BALEC

1   things.  This woman read the Miami Herald article that says

2   these guys were bad guys. That could have influenced her

3   memory.  Take that into account when evaluating her

4   credibility.

5           MS. WILSON:  But there's no evidentiary principle that

6   prohibits her from testifying as to the specifics.  There are

7   nuances here.  She has a background of 100 years of

8   psychological literature and a thorough understanding of this

9   full tapestry that has been woven as to our understanding of

10  human nature and human memories.  Different type of sources are

11  going to have different degrees of suggestiveness.

12          THE COURT:  She can testify to that in the abstract.

13  That's different from bringing it down to the particular

14  witness.

15          MS. WILSON:  Your Honor, we're not asking her to opine

16  as to a particular witness.  We're asking her to opine as to

17  particular sources that are relevant in this case.  We're not

18  asking her to say, do you find so and so testimony's credible.

19  We're asking her to say, if somebody viewed a blog article

20  indicating this, would that be a source of suggestive

21  influence.

22          THE COURT:  Look, with all due respect, what you're

23  doing is, you're having her comment on the credibility of the

24  witness.  I understand your point at the next level up; that

25  is, these sorts of things can influence memory, again subject

PC5BALEC

1  to cross-examination.  That's legitimate.  But once you bring

2  it down to, this witness read this article, could this article

3  affect that witness's memory.  I don't buy that.  I think

4  that's just a backdoor way to have her comment on the

5  credibility of the witness.

6       MS. WILSON:  there are certain types of sources, so

7  we'd like to be able to get into the certain types of sources.

8       THE COURT:  What do you mean by type of sources?

9       MS. WILSON:  News articles is an extremely broad

10  umbrella category.

11       THE COURT:  No, it's not.  What do mean?  It's news

12  articles.

13       MS. WILSON:  Your Honor, I think that there are

14  different substance, different types of suggestiveness. Let's

15  use therapy; for example, different modes of treatment that

16  have different levels of suggestiveness. All we're asking is to

17  be able to fully extract from her with respect to the specific

18  sources and how these sources could create a suggestive

19  influence.  And we're not asking her to issue an opinion on

20  whether -- and she can't.  She admits that she can't do that --

21  issue an opinion on whether or not the witness is credible or

22  whether the witness's personally memory is false or not.

23       THE COURT:  Okay.  You've heard what my reaction is.

24  There's going to be a written opinion on this.  What you're

25  suggesting to me is a backdoor way of having her comment on

PC5BALEC

1  their credibility.  I'm not going to let her do that.

2          MS. WILSON:  We had asked in our papers for a Daubert

3  hearing, your Honor, and we would ask that her testimony not be

4  excluded without actually putting her on the stand.

5          THE COURT:  I'm not excluding her testimony.  I'm just

6  limiting it.  Okay.

7          MS. WILSON:  Via limiting as well.

8          THE COURT:  It's limited.  Okay.  The influence of

9  therapy, I'm not quite sure about what it is that you want her

10  to testify about.

11          MS. WILSON:  That certain types of treatment can

12  actually contribute to the malleability and the

13  reinterpretation of memory.

14          THE COURT:  Just in general?  Just in the abstract?

15          MS. WILSON:  Yes, in the abstract we might seek to ask

16  about particular modes of treatment.  But, yes, it's primarily

17  in the abstract.  This witness is more of a 30,000 feet up.  I

18  understand where the Court thinks we're going.  That's not

19  really not where we're going with the witness.

20          THE COURT:  And then there was something about having

21  her testify about juror bias and pretrial publicity. Is that a

22  moot point now?

23          MS. WILSON:  I think in our papers we make clear that

24  was just to illustrate the broader concept that external

25  factors can influence thinking.  It's not something we'll

PC5BALEC

1    elicit in front of the jury.

2            THE COURT:  So that's moot.  So how memory fades over

3    time.  I have to say that seems totally within the ken of a

4    jury.

5            MS. WILSON:  It's really a foundational point, your

6    Honor.  I don't want to quarrel over that, but it's the

7    foundational point that leads to the subsidiary expert

8    testimony about reinterpreting.  We're not putting her on the

9    stand to harp on that point.  If we were to address it, it

10   would be very quick and move on, again just as a context

11   foundational point.

12           THE COURT:  And then you want her to testify about how

13   information acquired over time can change how people interpret

14   earlier events.  So tell me more about that, cause this also to

15   me, if I understand what she's saying, it seems self-evident.

16           MS. WILSON:  No, your Honor, it's not.  I think we

17   cited two papers in our initial response, not our supplement

18   response that address why this isn't an issue of common

19   understanding.  It's really the other side of the same coin as

20   the subjective influence issue.  It's that this

21   reinterpretation can occur throughout both normal memory

22   processes and suggestive influence.  There is no way for the

23   jury to measure how much their own -- we haven't studied this.

24   We only have experience with our own memory.  There's no way

25   for any individual to know the nature and degree of how memory

PC5BALEC

1    is reinterpreted and malleable and changed over time.  She has

2    a Ph.D., decades of experience.  I know no one here is

3    contesting her qualifications, but I think to draw the contrast

4    of our own sort of preconceived notions about memory with a 100

5    years of literature on this particular issue.  And again, she

6    can explain it better than I can if I could put her on the

7    stand for a Daubert hearing on that particular issue.

8              THE COURT:  Well --

9              MS. WILSON:  It's supported in the studies that were

10   cited in our briefs that were cited.

11             THE COURT:  I'm not saying it's not supported.  It

12   seems self-evident that one remembers something or one's

13   perception of a person is X.  And then you learn like my

14   perception of this person was, they were really cranky and

15   difficult to get along with.  And then you learn, well, that

16   person's spouse was dying of cancer.  It's like all of a sudden

17   he's like, oh, okay, let me reinterpret how I remember that.

18   That person was going through a lot.  And, you know, she did

19   the best she could.  That seems to be totally within the ken.

20             MS. WILSON:  In an extreme circumstance it is, but

21   there's all these more nuanced areas where this

22   reinterpretation is occurring where we can't consciously

23   realize it. That's an example of where you can consciously

24   realize.  Oh, man, maybe I was kind of a jerk to that person,

25   but now I know they're going to cancer, so I'm going to be more

PC5BALEC

1   forgiving. That's a very obvious example at one end of the

2   scale, but that's just the tip of the iceberg of the extent to

3   which where memory is distorted and manipulated through normal

4   processes and reinterpreted over time.  And that goes really to

5   the core her expertise.

6       THE COURT:  Okay. Ms. Espinosa.

7       MS. ESPINOSA:  Briefly, your Honor.  I just would note

8   that in *Paduch*, which we've talked about a lot, Judge Abrams

9   precluded testimony on memory fades over time as being within

10  the ken of the average juror.  We do think that was correct and

11  would ask for the same here.

12      I want to speak specifically about different types of

13  therapy as a particular suggestive source that defense wishes

14  to elicit.  I think we have two primary concerns as to that.

15  One, there is not really a foundation in the record as to most

16  of the victims to show that they underwent any of these

17  particular types of therapy that Dr. Strange says could be a

18  suggestive source.  And so defense would be seeking to lay a

19  foundation on cross essentially to elicit from victims what

20  type of therapy they had undergone, what kind of treatment they

21  had, et cetera, which is personal and invasive, and protected

22  by psychotherapist patient privilege.

23      The other thing I will note on this is that each of

24  these type of therapy is not inherently always suggestive, and

25  I don't think that the literature upon which Dr. Strange relies

PC5BALEC

1   says that every instance of EDMR causes false or distorted

2   memories.  It is if this therapy is conducted in a suggestive

3   way, which would not comport with standard of care or the

4   training of a typical therapist or psychologist or psychiatrist

5   in the United States, that could lead to a distorted or false

6   memory.  So in order to actually lay a foundation, they would

7   have to get into the details of the victim's therapy, the

8   victim's mental health treatment, and we just don't think that

9   that is appropriate.  There's no basis to believe that your

10  average therapist that a victim may go to see is engaged in the

11  sort of suggestive therapy and treatment that could lead to the

12  false memories like those described in the Italian court case

13  in the article that Dr. Strange cited.  That was an extreme

14  situation.  That resulted in criminal charges for the

15  therapist, and there was absolutely no reason beyond

16  speculation to think that the victims who sought therapy in

17  this case happen to fall upon equally bad therapists or

18  therapist who deviated from the standards in such a way.

19          And to allow them to inquire into the details of

20  treatment, to inquire into what they told their therapist, how

21  the therapist responded, or what the therapist told them in the

22  first instance, would be incredibly invasive, cause them to

23  have to choose between violating their privilege with their

24  therapist or to not answer questions and would result in a

25  sideshow which we just think is just inappropriate.

PC5BALEC

1    MS. WILSON:  Your Honor, I'll first address the last

2    point which is, my understanding is that the government is

3    going to attempt to corroborate these recollections with

4    testimony that they told a therapist contemporaneously.  The

5    government, therefore, is opening the door --

6    MS. ESPINOSA:  That's not true, your Honor.  We're not

7    going to be doing that.

8    THE COURT:  They're not doing that.

9    MS. WILSON:  If the government's not introducing your

10   Honor -- your Honor, the 302s have referenced conversations

11   with therapists and seeing therapist --

12   MS. ESPINOSA:  We will not be eliciting that at trial.

13   THE COURT:  That's it.  Does that resolve this issue?

14   MS. WILSON:  Your Honor, I would like to confer with

15   the team before I concede that therapy is not relevant in this

16   case because my understanding is that it's all over the

17   evidence.

18   THE COURT:  Well, yeah, if you want to inquire into

19   victims' therapy, we're gonna have other conversations about

20   that.  That hasn't been briefed at all.  You haven't said you

21   want to do it.  The government hasn't said they're bringing it

22   out, so.

23   MS. WILSON:  I'll confer with co-counsel and we'll

24   figure it out.

25   THE COURT:  Let's move onto Dr. Aoun.

PC5BALEC

1      MS. WILSON:  Your Honor, there was one other point

2  with respect to the therapy.  Well, I guess it's all wrapped up

3  in the same.  That was all therapist related.  We'll table that

4  for now.

5      THE COURT:  Okay.

6      MS. WILSON:  Thank you, your Honor.

7      THE COURT:  Dr. Aoun, who's motion is it.

8      MS. ARROYO:  I have it on authority of counsel that it

9  is Dr. Aoun.  Dr Aoun, the government doesn't take issue with

10  Dr. Aoun's qualifications generally.  We raised three issues in

11  our Daubert motion.  The first was that the notice itself was

12  insufficient.  There was a high level information about the

13  types of drugs that he would testify about, but nothing

14  undergirding that.  And so defense counsel in their opposition

15  on November 18 said that they would be supplementing that

16  expert report or that expert notice.  We haven't yet received

17  it, but the government wants to focus today on the two specific

18  portions of the notice that we have received that we are

19  concerned with.

20      The first is the statement that people experiencing an

21  alcohol induced blackout, quote, may present as if they are

22  sober, or, quote, maybe acting rationally or cognitively appear

23  sober, can have conversations with others, drive cars and

24  appear conscious.  Our concern here is that we do not believe

25  that there's going to be an evidentiary basis in the record to

PC5BALEC

1      say that any of the victims who were experiencing periods of

2      blackouts or can't recall any portion of time were behaving in

3      a way that is inconsistent or consistent with what Dr. Aoun is

4      going to testify about. The government is not aware of a

5      witness who will say, yes, victim X was in this location and

6      she seemed good to me. Now, obviously if there's testimony

7      about that, this might be different. But at this point, we do

8      not see any evidence that there's going to be someone that

9      Dr. Aoun can corroborate in the way that Dr. Rocchio is going

10     to testify about general concepts that are going to be relevant

11     and be testified about by someone else at trial.

12             And so here the defense states that this is important

13     to their argument that either they didn't know someone was

14     being drugged or they never drugged anyone. And the thrust of

15     the argument is that you can't force the defendants to testify

16     that they thought the victims were sober, and we are not asking

17     the defendants to testify. However, rule 702 says that it has

18     to be tailored to the facts of this case. And without

19     something in the record to say that these victims looked good,

20     didn't look knocked out or incapacitated, we don't believe that

21     it's appropriate for Dr. Aoun to testify about something that,

22     without that basis, would be entirely speculative. The second

23     argument --

24             THE COURT: So his testimony is, there are people who

25     are drunk out of their head, but they look sober?

PC5BALEC

1    MS. ARROYO:  Yes, they can drive cars.  They can walk

2    around.  People don't know that they're blacked out even when

3    they are experiencing the blackout.

4    THE COURT:  How does that help the defense?

5    MS. ARROYO:  I would allow the defense to make that

6    argument.

7    THE COURT:  Okay.  What's the other thing?  We've only

8    got a few more minutes.

9    MS. ARROYO:  The second argument relates to GHB.

10   Essentially the statement is that in order to perpetuate the

11   effect of GHB, users of GHB need to redose frequently every

12   hour and hour-and-a-half.  And we don't take issue generally

13   with the idea that GHB metabolizes quickly.  Dr. Hail will

14   testify to exactly the same thing.  Our concern is the

15   specificity of which he is testifying without either examining

16   any witness or providing nuance for the fact that different

17   people experience drugs differently.  Essentially what he's

18   saying is, if you're going to be conked out, you're going to

19   have to be redosed every hour, every hour and a half.  And I

20   believe the purpose of that is to say, well, these victims,

21   somebody would have noticed the victims being redosed, or

22   something like that.  Without the nuance that is necessary, we

23   just believe that it's not a reliable statement.  That doesn't

24   comport with what the science says about metabolism.

25   THE COURT:  Is that a cross-examination point?

PC5BALEC

1          MS. ARROYO:  I think it's so far beyond what the

2    scientific literature says about how pharmacology essentially

3    that unreliable, provides a basis where no other basis would be

4    in the record, because no one is going to say I was dosed once,

5    et cetera, because the victims aren't going to be able to say I

6    know exactly the moment I was dosed.

7          THE COURT:  But the thing that he -- is it he or she?

8          MR. AGNIFILO:  He.

9          THE COURT:  The thing that he refers to says that is

10   quick onset and the clinical symptoms are dose dependent. You

11   don't disagree with that?

12         MS. ARROYO:  No.

13         THE COURT:  Peak plausible concentration and clinical

14   effects are reached between 30 and 60 minutes.  You don't

15   disagree with that?

16         MS. ARROYO:  Generally.

17         THE COURT:  And duration of action is two to four

18   hours.

19         MS. ARROYO:  I think we're taking issue with -- not

20   the entire paragraph.  It's the specific statement that in

21   order to perpetuate the effects of GHB, a person would need to

22   be redosed every hour to hour and a half.  So the general idea

23   of how GHB works. We don't take issue with.  It's this idea

24   that a defendant would need to do a specific action for a

25   specific result in a particular situation.

PC5BALEC

        THE COURT:  Okay.  So who's arguing this for the

defense?

        MR. AGNIFILO:  That's me, Judge.

        THE COURT:  What's the basis for that piece?

Generally my view is he can testify.  He's another

toxicologist.

        MR. AGNIFILO:  Can I make it even easier?

        THE COURT:  Sure.

        MR. AGNIFILO:  He's a rebuttal expert, and he goes

second because he's part of the defense case.  So in just

clicking off the points, because I don't want to leave here

about out a better since of trial dates so I want to leave us a

minute to talk about that.  So if there's no evidence of sort

of certain things in the record by the time he testifies, he

wouldn't render an opinion on it. So we'll take that as it

comes.  In terms of this GHB point.  I don't know exactly what

the government's expert gonna say about that.  If there's no

real live controversy between the government's expert and

Dr. Aoun, I expect we probably would not probably call Dr.

Aoun.  We had to give notice because those are the rules.  This

is kind of a wait and see type thing.

        THE COURT:  So the piece that you would have to redose

every hour.  Before he testifies to that, if we get to that,

I'm going to want to know what the basis for that is.

        MR. AGNIFILO:  Okay.

PC5BALEC

1      THE COURT:  Again, you'll get a written decision on

2  the Daubert motions.  Let me tell you quickly how I intend to

3  do -- first off on jury selection.  Does the government agree

4  that the names of the jurors should be anonymous to the public?

5      MS. ESPINOSA:  Yes, your Honor.

6      THE COURT:  So here's how I intend to do it.  I think

7  we're going to get a panel of 120, 150.

8      THE DEPUTY CLERK:  120.

9      THE COURT:  120 jurors.  They'll be numbered from 1 to

10  120.  We'll take the random sort that jury does. Juror number 1

11  as selected will end up in seat number one.  What we're going

12  to do -- and I'll send you the proposed questions sometime next

13  week.  There's my series of pretty standard questions, but that

14  will include a question that say, you know what the nature of

15  this case is.  Is there anything about that that will make it

16  difficult for you to be a fair and impartial juror.  But my

17  anticipation is that kind of general question can -- we're

18  going to get rid of some people, but there are going to be

19  other people that will qualify on all the general questions.

20  Then we start sort of digging down a little deeper, may not.

21  So my plan is to qualify 50 on the public questions, which

22  everybody will be present for.  Then put the 50 qualified

23  jurors back in the jury room and bring them out one by one.  In

24  open court, we'll ask the more sensitive questions.  My

25  assumption is, we're going to lose some number of them, the

PC5BALEC

1    goal being to end up with 28 so we can strike the jury from

2    that point.  That way I can do it without a questionnaire, but

3    we can still get to greater specificity on questions about

4    experience with sexual assault and the like.

5            So any objection to that as a way to proceed?

6            MS. ESPINOSA:  No, your Honor.

7            MR. AGNIFILO:  Not from us.

8            THE COURT:  Good.  In terms of trial date.  Anybody

9    want to be heard further?

10           MR. JONES:  Your Honor, I think we've tried to make it

11   clear.  I tried to make it a little clear.  To pick a fair

12   jury, we think we need the jurors that we would expect to be

13   excluded if we're sitting on February 16, the week of

14   President's Day.  The type of jurors you're talking about

15   losing are all teachers, parents, school bus drivers.

16           THE COURT:  We're not losing them all.  We're only

17   losing them all if they have planned vacations outside the --

18   they plan to go away.  That's not everybody.  Not everybody

19   goes away for children's winter holidays.  School bus drivers

20   maybe particularly don't.

21           MR. JONES:  Your Honor, I think if we're not -- if the

22   adjournment would cause us to need to screen out any jurors who

23   are unavailable that week, we oppose.  I think that's the short

24   answer.

25           THE COURT:  Okay.  Defense.

PC5BALEC

1    MR. AGNIFILO:  From our perspective, I need -- for the

2    reasons that we discussed at the sidebar specifically, I need

3    as much time as the Court is willing to give me to run down

4    Count 11.  And so if the Court's willing to give me till the

5    end of January, I'll take the end of January.  And I know we

6    have a deadline date in the middle of March.  Those three extra

7    week could make a difference.  I'm probably going to be

8    imposing on your Honor to help me run certain things down, and

9    I'm going to work with the government closely, but I'm going to

10   need the time.

11        THE COURT:  All right.

12        MR. JONES:  Your Honor, I think I've looked at a the

13   calendar while other things are happening.  If the Court picked

14   a jury on January 9 to open on January 26, I'm still making my

15   request about the week of February 16.  But that's three weeks

16   before the week of the February 16th and three weeks after the

17   week of February 16th all before March 16.

18        THE COURT:  Look, that's what we're going to do.

19   Let's see.  Your problems of I'm a supervisor and I don't want

20   to be here that week or whatever the government's problems is

21   with this, I'm not moved by.

22        MR. JONES:  Fair enough.

23        THE COURT:  I am somewhat moved by the fact that it

24   will alter who is available for a jury, but let's see.  So I'm

25   holding open whether we're going to sit that week or not.  If

PC5BALEC

1  we start losing a bunch of jurors because they have preplanned

2  vacations to be away during that week, then I'll reconsider.

3          MR. JONES:  Yes, your Honor.  Then I think you'll do

4  this then, just put the question in the first general

5  questions.

6          THE COURT:  Exactly.  So we'll pick a jury either on

7  the 20th or 21st.  My preference is the 20th, but it's going to

8  depend on how many other jurors, if there are other juries that

9  have to be selected that day, the jury department is going to

10 move me to the 21st, which is fine.  That gives us three days,

11 which I pick a jury pretty quick.  We should have a jury by the

12 end of the week.  We'll open on the 26.  That gives you an

13 additional month.  Okay.  Anything further?

14         MR. JONES:  I think, your Honor, there will be some

15 deadlines that have been set now that perhaps are worth moving.

16 Exhibits we can discuss amongst ourselves.  I take the Court's

17 point on that.  I know 412 --

18         THE COURT:  412.  So talk to each other.  Given those

19 new dates, come back to me with a proposed schedule.  Okay.

20         MS. ESPINOSA:  Your Honor, the government now moves to

21 exclude time from January 5 to whatever day we pick a jury.

22         THE COURT:  I still have open motions pending, so.

23         MS. ESPINOSA:  Of course, your Honor.

24         THE COURT:  -- so the clock is not running.

25         MR. WILLIAMS:  Your Honor, my colleague raised the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

PC5BALEC

1    issue of the 2009 video.  I know time is short.  I don't know

2    whether there will be time next week to discuss that.

3              THE COURT:  I'm sorry.  What's your issue?  Tell me

4    what the issue with the video is.

5              MS. PAUL:  We want to be heard on behalf of Tal and

6    Alon about it being introduced in direct evidence of the

7    conspiracy.

8              THE COURT:  Got it.

9              MS. PAUL:  I could be brief.  I can be brief on it.

10             THE COURT:  You have never been brief in your life.

11   Okay.

12             MS. PAUL:  I can try to be brief.

13             THE COURT:  All of you who are here for.  Ms. Paul has

14   promised that she will be brief, so let's see.  If she doesn't,

15   y'all need to start waiving your hands.

16             MS. PAUL:  Your Honor, last week the Court -- and I

17   will still go slowly.  Last week the Court outlined a framework

18   for what qualifies as direct evidence of a conspiracy.  Your

19   Honor said that whether there's clear evidence that a person is

20   being induced to go somewhere that would constitute a thing of

21   value.  That's one instance.  Obviously that's not the case as

22   it relates to this video.

23             The other time you introduce evidence that's direct

24   evidence of the conspiracy was where a specific incidents had

25   multiple defendants that were working together.  That's also

PC5BALEC

1    not the case with this video.  This video shows the conduct of

2    Oren Alexander, a single defendant in case.  It doesn't explain

3    the background of the conspiracy.  It doesn't explain the

4    development of the conspiracy.  It's not an act in furtherance

5    of the conspiracy.  At best, it's a 413 act against Oren alone.

6             There's also, your Honor, the real prejudice of this

7    video stems from the purpose that the government wants to

8    introduce it for.  And in their papers they mention several

9    things, but I want to focus particularly as it relates to Tal.

10   Using it to show that the defendants recorded their victims

11   when they allegedly sexually assaulted them.  Using Oren's

12   conduct in this way is notably problematic for Tal because

13   victim-1 says she has a vague memory of there being a camcorder

14   during her alleged assault. There's no other corroboration for

15   this claim whatsoever. No other witness is going to testify

16   that Tal recorded her during a sex act.  And of the thousands

17   of videos that we have reviewed in discovery, Tal I can

18   probably count on one hand, maybe two hands, the number of

19   videos that he appears in.

20            THE COURT:  The number of what?

21            MS. PAUL:  The number of videos that Tal appeared in.

22            THE COURT:  Slow down.

23            MS. PAUL:  Video that Tal appears in.  So admitting

24   the 2009 video for this purpose enables the government to

25   manufacture corroboration for victim-1, where it otherwise does

PC5BALEC

1    the exist.

2              THE COURT:  Okay.

3              MS. PAUL:  The other thing.  The prejudicial effect of

4    this video against Tal and Alon is even more severe in the

5    conspiracy didn't exist at the time the 2009 video was created.

6    Now prior to the most recent superseding indictment, the

7    conspiracy began in the summer of 2009 with minor victim-3,

8    victim-4, victim 5, in the Hamptons where all three brothers

9    were there together.  The new superceding indictment moved the

10   conspiracy start to 2008.  That allowed the government to admit

11   victim-20's testimony that your Honor admitted last week in

12   Acapulco about Oren putting drugs allegedly into people's

13   mouths and drinks.

14             THE COURT:  Okay.  So, it wasn't short.  It's now 10

15   after five. You're talking way too fast.  We're adjourning

16   this.  I'll schedule something next week so you can come in and

17   argue it.  Thank you.

18             Anything further from you, Mr. Srebnick?

19             MR. SREBNICK:  Your Honor, I'm out in court all day on

20   Tuesday in Miami for an emergency hearing. I would ask that we

21   have any hearing after Tuesday, please.

22             THE COURT:  Anything other than Tuesday.  Okay.

23             MR. SREBNICK:  And not Monday either obviously.

24             THE COURT:  Or Monday.  Anything further from you?

25             MR. AGNIFILO:  No.

PC5BALEC

1    THE COURT:  Anything further from you, Mr. Williams?

2    MR. WILLIAMS:  No.

3    THE COURT:  Anything further from the government?

4    MS. ESPINOSA:  No.

5    (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25