UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

ALON ALEXANDER,
OREN ALEXANDER, and
TAL ALEXANDER,

Defendants.

**S6 24 Cr. 676 (VEC)**

**GOVERNMENT SENTENCING SUBMISSION**

**[PUBLIC VERSION]**

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
*Attorney for the United States of America*

Kaiya Arroyo
Elizabeth A. Espinosa
Andrew Jones
Madison Reddick Smyser
Assistant United States Attorneys
*Of Counsel*

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT ........................................................................ 1**

**RELEVANT FACTS ..................................................................................... 2**

I. The Offenses Proven at Trial ............................................................................ 2

a. April 2009: Amelia Rosen (Minor Victim-8) (Count Twelve).................. 5

b. May 2009: Isa Brooks (Minor Victim-3) (Count Five) ............................. 7

c. December 2009: Kelly Hudson (Victim-20)............................................. 9

d. May 2011: Lindsey Acree (Victim-1) (Count Two)................................ 11

e. January 2012: Rhonda Stone (Victim-7) (Counts Ten and Eleven) ......... 13

f. June 2012: Katie Moore (Victim-12)...................................................... 14

g. August 2014: Maya Miller (Victim-6) (Counts Eight and Nine) ............. 16

h. March 2016: Ava Wells (Victim-13)...................................................... 18

i. September 2016: Bela Koval (Victim-2) (Counts Three and Four) ......... 20

j. January 2017: Maylen Gehret (Minor Victim-26), Kayley Brown (Minor Victim-25), and Rachel Stevens (Victim-9) ........................................... 22

k. May 2017: Amber Davis (Victim-30)..................................................... 24

II. The Defendants' Broader Conduct ...................................................................... 25

**APPLICATION OF THE SENTENCING GUIDELINES ....................................... 27**

I. Calculation of the Applicable Sentencing Guidelines ......................................... 27

a. All Defendants: Count One...................................................................... 27

b. Alon: Counts One, Three, Four, Five, Ten, and Eleven ........................... 33

c. Oren: Counts One, Three, Four, Ten, Eleven, and Twelve ...................... 36

d. Tal: Counts One, Two, Three, Four, Five, Eight, and Nine...................... 38

II. The Defendants' Guidelines Objections Are Meritless ....................................... 39

a. The Defendants Are Responsible for the Conduct of Their Co-Conspirators Under § 1B1.3 ........................................................................................ 41

b. The Defendants Should Be Held Accountable for the Sexual Assaults of Certain Victims Who Did Not Testify or Were Not Named in the Indictment ........................................................................................................ 46

c. The Use-of-Force Enhancement Applies for Certain Victims................. 57

d. The Physical Restraint Enhancement Applies for Certain Victims and Does Not Constitute Double Counting ..... 61

e. The Vulnerable Victim Enhancement Applies for Certain Victims and Does Not Constitute Double Counting, as Does the Enhancement for a Large Number of Vulnerable Victims..... 68

f. The Use of Computer Enhancement Applies to the Group for Isa Brooks (Minor Victim-3) ..... 76

g. The Chapter 4 Enhancement for a Pattern of Prohibited Sexual Conduct Applies for Alon ..... 81

h. Two Criminal History Points Should Be Applied for Tal ..... 85

**THE PSR'S OFFENSE CONDUCT ..... 86**

I. The Defendants' Factual Objections to the PSR Are Meritless..... 86

**SENTENCING RECOMMENDATION ..... 92**

I. The Defendants' Conduct Warrants a Guidelines Sentence of Life Imprisonment.. ..... 93

a. The Nature and Circumstances of the Offense Warrant a Guidelines Sentence ..... 93

b. The History and Characteristics of the Defendants Weigh in Favor of a Guidelines Sentence..... 108

c. The Scale of the Defendant's Criminal Conduct Is Comparable to That of the Most Serious Serial Abusers and Weighs in Favor of a Guidelines Sentence ..... 109

d. The Need for Specific Deterrence and To Protect the Public Warrants a Guidelines Sentence..... 114

e. The Need for General Deterrence and To Promote Respect for the Law Weighs in Favor of a Guidelines Sentence ..... 117

II. The Court Should Impose the Maximum Financial Penalties ..... 120

**CONCLUSION ..... 127**

## PRELIMINARY STATEMENT

Alon, Oren, and Tal Alexander have been convicted of sex crimes of extraordinary magnitude. They spent years designing, executing, and perfecting their playbook of luring victims with promises of luxury, drugging victims so they could not resist, and then forcibly raping them. The defendants carried out their playbook time and time again, drugging, raping, and assaulting dozens of victims. Over 70 women came forward with harrowing accounts of assault that stripped them of their dignity and autonomy. Eleven of these women recounted their experience at trial. The accounts of these women paint a clear picture of men whose aim was not only (or perhaps not even principally) sexual gratification. Instead, the defendants went to great lengths to degrade their victims, to overpower, dominate, and humiliate the girls and women they targeted. The defendants raped victims together. They held their victims down and ignored pleas for help and attempts to fight back and escape. They recorded their assaults and kept the videos and photographs as trophies. They shared the recordings with friends to celebrate their conquests. They mocked their victims to their faces and behind their backs. And while their victims suffered in silence, the defendants lived with impunity. Having already used their wealth and their clout to attract victims to them with promises of luxury and extravagance that masked sadistic sexual violence, they then hid behind that same wealth and clout and counted on it and on the shame they forced upon their victims to keep them free of accountability.

The defendants' damage can never be undone, but some degree of justice can be achieved through a fair sentence. To account for the scale of the crimes, the harm the defendants caused, the blatant disrespect for the law they exhibited, and the need to prevent future assaults and to keep society safe, as well as the absence of countervailing mitigating circumstances, a severe punishment is required—one that is commensurate with the extraordinary nature of the crimes. Considering all of the circumstances of this case, including the scale of the defendants' crimes and

the violent ways they committed them, the legitimate purposes of punishment demand a lifetime term of imprisonment.

## RELEVANT FACTS

On March 9, 2026, following a five-week trial, a jury returned verdicts of guilty on all counts for each of the defendants: one count of sex trafficking conspiracy from in or about 2008 to 2021; three counts of sex trafficking by force, fraud, or coercion; one count of sex trafficking of a minor; two counts of inducement to travel in interstate commerce to engage in unlawful sexual activity; two counts of sexual abuse on a cruise ship; and one count of sexual exploitation of a minor.[1] Although the Court is familiar with the facts underlying those convictions, having presided over the trial, the defendants' criminal conduct, which destroyed the lives of so many women and girls, is described below.

### I. The Offenses Proven at Trial

The defendants executed a years' long conspiracy to lure women to them with promises of luxury and to then drug and rape them. Beyond the girls and women the defendants trafficked in

---

[1] Alon was convicted of Counts One (sex trafficking conspiracy), Three (sex trafficking by force, fraud, or coercion), Four (inducement to travel to engage in illegal sexual activity), Five (sex trafficking of a minor), Ten (aggravated sexual abuse), and Eleven (sexual abuse).

Oren was convicted of Counts One (sex trafficking conspiracy), Three (sex trafficking by force, fraud, or coercion), Four (inducement to travel to engage in illegal sexual activity), Ten (aggravated sexual abuse), Eleven (sexual abuse), and Twelve (sexual exploitation of a minor).

Tal was convicted of Counts One (sex trafficking conspiracy), Two (sex trafficking by force, fraud, or coercion), Three (sex trafficking by force, fraud, or coercion), Four (inducement to travel to engage in illegal sexual activity), Five (sex trafficking of a minor), Eight (sex trafficking by force, fraud, or coercion), and Nine (inducement to travel to engage in illegal sexual activity).

Counts Six and Seven, which charged Alon and Oren with sex trafficking by force, fraud, or coercion, were not submitted to the jury and were dismissed after a defense investigator's improper conduct caused one of the victims to cease communications with the Government.

this way, the defendants also drugged and raped other women they met, for example, on a cruise ship or while vacationing in Aspen or Tel Aviv. Eleven victims testified at trial: Lindsey Acree (Victim-1), Bela Koval (Victim-2), Isa Brooks (Minor Victim-3), Maya Miller (Victim-6), Rhonda Stone (Victim-7), Amelia Rosen (Minor Victim-8), Katie Moore (Victim-12), Ava Wells (Victim-13), Kelly Hudson (Victim-20), Kayley Brown (Minor Victim-25), and Maylen Gehret (Minor Victim-26). The jury also heard testimony and evidence regarding three additional sexual assaults: those of Rachel Stevens (Victim-9), Amber Davis (Victim-30), and an unidentified woman who was raped by Tal and one of his twin brothers in the Hamptons in or about May 2009, which was witnessed by a woman who testified at trial. (PSR ¶¶ 17-18 (Alon/Oren), PSR ¶¶ 18-19 (Tal)).[2]

The defendants' scheme to rape and assault their victims was direct in its aim, intricate in its execution, and devastating in its effect. To lure victims to places where they were vulnerable, the defendants used exciting and exclusive things—parties at luxury hotels, yachts, mansions, and free flights to beautiful beaches. (GX 1002, 1008, 1009). These crimes, which relied on the defendants' abilities to entice victims to come to them, were woven into every aspect of the defendants' lives. Coming from affluence with all the advantages of their privileged and wealthy upbringing, the defendants leveraged those advantages to build around themselves a brand of wealth, luxury, exclusivity, and privilege—Alon through his family's private security business, and Oren and Tal through their real estate brokerage team—and they capitalized on their wealth and their personas to target and prey on their victims. The scheme required significant planning

[2] "PSR ([defendant first name])" refers to the presentence investigation report prepared by the Probation Office for the corresponding defendant; "Tr." refers to the trial transcript; "GX" refers a government exhibit at trial; "Dkt." refers to an entry on the docket in this case; and "Ex." refers to an exhibit submitted with this memorandum. Unless otherwise noted, case and record text quotations omit all internal quotation marks, citations, and previous alterations.

and preparation to succeed. The defendants secured rental properties in the Hamptons where they could isolate their victims. They arranged for private planes (and commercial ones) to bring victims to them. They hosted extravagant parties. And they maintained a steady supply of drugs to incapacitate their victims. One of the defendants' goals was their own sexual satisfaction, but it was not their only one. They also acted to exert maximum domination over their victims. The defendants felt empowered to take whatever they wanted from any woman or girl who agreed to get on a plane, go to a party, or sit at their table at a nightclub. The defendants made no effort to have consensual sex with the victims; they did not want that. Instead, they slipped drugs into drinks and forced themselves onto their victims. The defendants were unmoved—and, in fact, seemed to prefer—when the women protested, struggled to get free, or lay lifeless in front of them.

The defendants tried to hide the most sinister parts of their conspiracy. The drugs they used not only rendered a victim immobile, but also impacted her ability to remember every detail of her assault. The defendants' pattern of mocking and humiliating their victims served the defendants' goal of maximally dehumanizing these women, and it also shamed the victims into silence. The defendants knew the obvious—drugging and holding down women while raping them is wrong and could get them in trouble. For example, immediately after raping victims, Tal told two of them, "Don't be mad at me," (Tr. 2952), and "It's okay, I care about you. You wanted that." (Tr. 465). And years later Oren texted that only "some Hoe complaining" could bring them down. (GX C-116-13). But even while they tried to hide the darkest parts of their conduct from the world, the defendants still celebrated much of it with each other and their inner circle. In a draft of a speech that he would deliver at his co-defendants' thirtieth birthday party, Tal wrote that, while living with Oren in New York, "Oren and I shar[ed] a bedroom . . . and depending on who was getting lucky that night had the bed, but it didn't always work out that way for her!" (GX 3A-

185). The defendants also recorded many of their assaults and kept the photos and videos as trophies. For instance, Alon shared a photograph of a woman after ejaculating on her face with Oren so that it could be published online. (GX D-105, D-115, 7A-102). And Oren emailed the video of himself raping a nearly comatose 17-year-old girl to the man with whom he had assaulted her. (GX B-301, D-121-1).

The defendants' scheme reached its zenith in their adulthood, but their pattern of serial rape and sexual assault spans more than a decade and traces back to 2001 or 2002, while they were still in high school. (*See* Dkt. 357). As the defendants aged, the sophistication of their conspiracy evolved. The defendants' escalating and predatory conduct, the destruction they left in their wake, and the callous and perverse way they celebrated all of it is evident in the specific accounts of the eleven women who testified at trial.

**a. April 2009: Amelia Rosen (Minor Victim-8) (Count Twelve)**

On April 16, 2009, Oren filmed himself raping a visibly incapacitated 17-year-old girl, Amelia Rosen, inside his Manhattan apartment. (PSR ¶¶ 28-32 (Alon/Oren); PSR ¶¶ 29-33 (Tal)).

During the assault Oren picked up Rosen's legs, positioning her body to suit him, and forced himself on her while she lay limp and unmoving. Before he raped Rosen, Oren took a series of other photographs and videos of Rosen throughout the night and into the early morning that showed her becoming increasingly intoxicated and incoherent as the sun rose. (GX 1001). In the earliest videos, Rosen's voice was already slurred and nearly incomprehensible, while Oren sounded sober. (GX D-121-5, D-121-7, D-121-8, D-121-9). In the final video he filmed before raping Rosen, Oren gave Rosen an Ambien and told her "Did you take that pill? You should've took that pill." (GX D-121-2). Oren told Rosen that the pill was to help her sleep. (GX D-121-2). But Oren did not give Rosen the Ambien so that she could go to bed; he gave her an Ambien so that he could rape her while she was completely helpless.

About 20 minutes after Oren gave Rosen the Ambien, Oren set up his laptop facing the bed, where Rosen was lying limply, naked, while Oren's friend digitally penetrated her. (*See* GX D-121-1). Oren adjusted the laptop to ensure the bed was in frame so that he could film what was about to happen, before taking off his underwear, climbing into the bed, lifting Rosen's limp legs, and raping her. Oren treated Rosen like an inanimate object for his sexual gratification rather than a person worthy of respect. While Oren raped her, the drugged Rosen hardly moved, appearing barely conscious. After he finished raping Rosen, Oren told his friend that he had recorded the attack. (GX D-121-T). Oren saved the video of himself raping Rosen to his laptop with the file name "Miami Passover.mov" and emailed his friend the video that evening. (GX B-301).

Rosen has no memory of that night. Although she recognized herself in the photos and videos, Rosen does not even remember meeting Oren or his friend, let alone what Oren did to her. (*See* Tr. 850-871). And that is because Oren's plan worked. He drugged the already incapacitated Rosen with a sleeping pill so that he could do what he wanted to her and she would not remember and be able to tell anyone. Rosen learned what Oren had done to her after the Government identified her during its investigation, and she testified that watching that video was "one of the hardest moments of my life." (Tr. 865).

In contrast, raping Rosen was a moment that Oren *wanted* to remember. Oren kept the videos and photos he recorded that night, including the video of him raping Rosen. Copies of the email and of the video were found on Oren's computer at his home in Miami and on a hard drive that was seized during a search of Tal's apartment in Manhattan. The hard drive also had on it other evidence of the defendants' pattern of rape and abuse, including photos of a semi-naked, sleeping Isa Brooks (GX D-124-12) and a photograph Alon took after ejaculating on a woman's face that was then posted to the Vent on Bitches blog (GX D-115).

**b. May 2009: Isa Brooks (Minor Victim-3) (Count Five)**

Over Memorial Day Weekend 2009, Alon, Tal, and two of their friends drugged and forcibly raped Isa Brooks, a 16-year-old high school senior, at the home the defendants were renting in Southampton ("88 Peconic"). (PSR ¶¶ 33-46 (Alon/Oren); PSR ¶¶ 34-47 (Tal)).

The summer of 2009 was the first instance proven at trial where the defendants used what would become a hallmark of their conspiracy—trafficking victims to them with promises of a Hamptons vacation. That summer, the defendants rented 88 Peconic, a large house with several bedrooms, a basement, a pool, a hot tub, and a pool house with their friends, David Rabello and James Ferraro, and two party promoters, Mathew Lipman and Ilya ("Mike") Kanevsky. (*See, e.g.*, GX 3A-101, B-303, B-305). The defendants worked with the party promoters to bring people, including women and minor girls, to the house. Before the summer started, Oren emailed Alon, Tal, Lipman, and Rabello with a draft message to send out to people they wanted to come to the house that summer, a copy of which Lipman later shared in Facebook groups named "Hamptons Share House" and "Hamptons 2009." (GX B-303, A-407-3, A-408). Similar Facebook groups were used to recruit girls and women to the defendants' house during Memorial Day weekend. (GX A-409-1). Another message, sent out after Isa Brooks was recruited to and gang raped at the house, described the weekend has having been "pretty insane" and said that for those staying at 88 Peconic, "the girls are included ;)" with their rooms. (GX A-407-3).

Isa Brooks was a 16-year-old high school student when she spent the weekend at the defendants' house in the Hamptons. Brooks went to the Hamptons at the invitation of Lipman (who invited her by text message). She skipped her senior prom to do so and went because the Hamptons were "the place to be" during the holiday weekend, and she wanted to experience that prior to going to college. (Tr. 2920). At the start of the weekend, Brooks and her high school classmate, as well as approximately 20 or so other people, including at least one other minor from

Brooks' high school, boarded a party bus in Manhattan organized by Lipman and traveled to a club in the Hamptons. (Tr. 2920-21, 3046-47, 3051).

When Brooks and the group from the bus arrived in the Hamptons, the defendants were already at the club putting their plan into motion. The defendants started giving Brooks drinks at the club, and at the end of the night everyone went to 88 Peconic, where Brooks slept in a cot at the foot of a bed, alongside Lipman. (Tr. 2922, 2925, 2938-40). While she slept, at least one of the defendants photographed Brooks partially clothed, without her knowledge. (GX D-124-12; Tr. 2938-40).

Brooks remained at the defendants' house the next day, where the defendants hosted a pool party. (Tr. 2943-44). At the party, Rabello gave Brooks one or two drugged mixed drinks and handed her a bottle of tequila, from which she took a sip. These drinks had their desired effect. They made Brooks feel woozy, gave her tunnel vision, and made her feel as if she had heightened senses. (Tr. 2945). When Brooks needed to go inside to recover, Tal went with her. (Tr. 2945-46).

Tal kissed Brooks and told her—not asked her—that his brother was going to join them. (Tr. 2948). After Alon came into the room, he and Tal held down Brooks while, in a drugged state, she struggled to understand what was happening to her. They raped her and alternated between holding her down and forcing themselves on her. The defendants had no concern for Brooks while she was trapped in the room with them. To them, she was not a human worthy of any dignity. They were so rough with her that they hurt her, and while they held her down and violently raped her, they tried to humiliate her by insulting and degrading her. (Tr. 2949). The defendants literally doubled down on their conduct when they had two other men join in on the assault of Brooks. At one point, when Brooks came to from her drugged stupor, there were four

men holding her down and raping her, including Tal, Alon, and Rabello. (Tr. 2950-51). This gang rape was an exercise in total power. Tal, Alon, and the two other men left Brooks feeling "mauled" and treated in a way designed to keep her confused about what was happening to her body. (Tr. 2951). Only when Brooks mustered the energy to kick one of the men did he, Rabello, and Alon leave the room. (Tr. 2951-52). Tal stayed back and told Brooks, "Don't be mad at me." (Tr. 2952).

Brooks was not the only person who was assaulted at 88 Peconic that weekend. Later that evening, Tal, followed by one of the twins, dragged an intoxicated girl outside to the hot tub by her wrists, where the defendants raped her. (Tr. 2585-88). The girl screamed and pleaded with them over and over again to stop, but the defendants were unconcerned with what she wanted. (Tr. 2587-88). A witness who testified at trial saw the assault and heard the woman's screams and was so upset by what she heard and saw that she used her eyeliner to write "Rapists!" and "You need to apologize! Apologize!!!" on doors of the house. (GX D-124-8, D-124-9).

**c. December 2009: Kelly Hudson (Victim-20)**

In December 2009, Oren raped Kelly Hudson in the defendants' parents' condominium in Aspen, Colorado, after he and Alon drugged her at an après ski bar. (PSR ¶¶ 95-100 (Alon/Oren); PSR ¶¶ 96-101 (Tal)).

Hudson met Oren and Alon in Acapulco, Mexico during spring break in March 2008. Hudson thought that Oren was cute and they stayed in touch and met up twice to ski in Aspen, Colorado. The second time that Oren and Hudson skied together was in or about December 2009. (Tr. 3980-81). After skiing, Hudson and her friend went to an après ski bar for a drink. Oren and Alon joined them at the bar and ordered a bottle of wine or champagne for the group. (Tr. 3982). Hudson's friend left early but she stayed at the bar with Oren and Alon where she had a drink or two that Oren and Alon poured for her and, unbeknownst to her, drugged.

The drugs Oren gave Hudson left her vulnerable to his attack. Moreover, because of the drugs that Oren and Alon gave her, Hudson only has flashes of memory from the rest of the night. (Tr. 3984). Hudson remembered Oren kissing her outside of the bar, being in the back of a car sitting between two people, and then lying on her back in a bed with Oren on top of her. (Tr. 3984-86). Hudson told Oren "no" repeatedly and placed her hand over her vagina to try to create a barrier, but Oren kept slapping her hand away, utterly disregarding her attempts to resist. (Tr. 3985). Oren had not been drugged. His memory was not failing. He put Hudson in this compromised state and then capitalized on her defenselessness. The next thing Hudson remembered is being in the shower, where Oren washed her and shoved her up against the shower wall, slamming her head into the wall. (Tr. 3985-86). When he was done with her, Oren dressed Hudson up in a clown costume, including a vest and a little hat, and he shoved her out of the door of the condo into the cold December night in an obvious attempt to humiliate and degrade her even more than he already had by raping her. (Tr. 3986).

The next morning, Hudson woke up at her friend's house in Aspen, with no idea how she got there and big gaps in her memory from the night before. (Tr. 3986-87). Her body ached, the back of her head hurt, and she knew she had been vaginally penetrated. (Tr. 3987). Hudson was missing her underwear and was confused and frightened because she could not remember what had happened to her. Wanting to look for her underwear and desperate to know what had been done to her, Hudson called Oren and told him, falsely, that she had left her credit cards at the condo. (Tr. 3987-88). Hudson picked Oren and Alon up in her car and while she drove them back to the condo, asked Oren what happened the night before. Oren brushed Hudson off, telling her not to worry about it while Alon smirked at her from the back seat. (Tr. 3989). The defendants knew what Oren had done, but they deflected, unsurprisingly, given their blog clearly proclaimed

that, "it's not rape if . . . she doesn't remember." (GX 7A-103). When they got to the condo, Hudson went upstairs and found her underwear in the shower. (Tr. 3989). Hudson again asked Oren what happened, and he told her again, "Don't worry about it," and said that they had "had fun." (Tr. 3989). Scared because she still did not understand what had happened to her, Hudson left, intending to never speak to Oren again. (Tr. 3989-90).

A couple of weeks later, Hudson noticed symptoms of vaginal itching and burning and went to a clinic. Hudson was diagnosed with chlamydia, which she did not have before the night with Oren. (Tr. 3990-91). Now with definitive proof that Oren had raped her while she was blacked out, Hudson called Oren and confronted him again and asked what happened that night. Confronted for the third time about raping Hudson, Oren again denied the truth, saying, "don't worry about it, we had fun." (Tr. 3991). After Hudson told Oren that she knew something happened because she got chlamydia, Oren initially tried to suggest Hudson caught it from someone else. When Hudson made clear there was no other source, Oren agreed to go get tested, effectively conceding that he had sex with her. (Tr. 3992).

**d. May 2011: Lindsey Acree (Victim-1) (Count Two)**

During Memorial Day weekend in 2011, Tal drugged Lindsey Acree and then forcibly raped and sexually assaulted her, with another man, at a rental house in the Hamptons. (PSR ¶¶ 47-52 (Alon/Oren); PSR ¶¶ 48-53 (Tal)).

Tal invited Acree and her friend to the Hamptons rental house for Memorial Day weekend. (Tr. 2164-65). When Acree arrived in the Hamptons on Saturday afternoon by the Long Island Rail Road from Manhattan, Tal and his friend picked the two women up at the train station and drove them to the home that Tal was renting for the weekend. (Tr. 2167-69). At the house, Tal prepared a glass of wine for Acree that was spiked with a sedative-hypnotic drug. Before he could ever figure out if Acree had any romantic or sexual interest in him, Tal gave Acree the drugged

wine, which Acree drank part of while in the home's hot tub. (Tr. 2172-74). Tal did not wait to see if Acree was interested in him because consensual sex was not part of his plan. The drugged wine made Acree lose control of her body, and caused her to feel "heavy and slow," like she was moving in "slow motion." The drugs also created gaps in her memory. (Tr. 2173-74).

After Acree was under the effects of the drug he gave her, Tal took Acree from the hot tub to the home's sauna, where he began to assault her. Tal grabbed Acree by the neck, pinned her against the bench, and then assaulted her from behind while he kept control of her neck. (Tr. 2175). Tal was forceful and acted in a way calculated to make Acree feel hated, confused, and afraid. (Tr. 2175-76). In her drugged state, Acree could not understand what was happening to her or why. At some point after Tal started assaulting Acree, the second man entered the sauna. (Tr. 2176). Acree was still unable to get up and leave. (Tr. 2177).

After assaulting her in the sauna, Tal and the second man took Acree from the sauna to the home's gym, where they assaulted her again. To test Acree's strength and coordination, Tal and the second man had Acree lift a weight in the gym. (Tr. 2178). Acree had no strength, no coordination, and no ability to fight off her attackers and ended up collapsing on the floor. Tal then brought a camera and tripod into the room, which he used to record himself assaulting Acree. (Tr. 2179). Tal and the second man picked up Acree from the floor of the gym, manipulated her body and bikini, and assaulted her at the same time. (Tr. 2180). The second man was behind Acree and forced his penis into her vagina. Tal simultaneously forced his penis into Acree's mouth. (Tr. 2180). While being assaulted by two men, Acree was unable to control her body, support her own weight, speak, or defend herself at all. (Tr. 2181). As they raped her together, the two men laughed at Acree. The attack was calculated to dehumanize Acree, and she described how "it's like I was there but not there . . . like I wasn't even a human being." (Tr. 2181). Even

after the assault ended, the humiliation and degradation did not. The next day, after the drugs wore off, Tal kicked Acree out of the house and blamed her for being assaulted the night before. (Tr. 2183-84).

**e. January 2012: Rhonda Stone (Victim-7) (Counts Ten and Eleven)**

In January 2012, Alon and Oren drugged and forcibly raped Rhonda Stone on the music festival cruise, Groove Cruise, while Stone was on vacation with her sister and friends. (PSR ¶¶ 53-56 (Alon/Oren); PSR ¶¶ 54-57 (Tal)).

On the second night of the cruise, Stone was at a music performance with her friends when she met Oren and Alon. (Tr. 1362-63, 67). Stone's friends were looking for MDMA or "molly," so she asked the defendants if they had any. Alon and Oren told Stone that they had molly back in their cabin and invited her to come with them to get some. (Tr. 1366-78). Stone went with the twins to their cabin, where they gave her a drink that, unbeknownst to her, Alon and Oren had laced with a sedative-hypnotic drug. (Tr. 1370, 1372-76). She lost consciousness shortly thereafter and came to sometime later, lying naked on her back on one of the beds. (Tr. 1377-78). One of the twins was on top of Stone, raping her. (Tr. 1373-74). Stone could not move, she could not speak, and she could not stop him, and recalled that she was going in and out of consciousness while the assault happened. (Tr. 1377-79). At some point, the twins switched places and the second twin climbed on top of Stone and raped her. (Tr. 1377-79).

Before the moment Stone came to—pinned under one of the defendants who was raping her—nothing about her encounter with the defendants had been about sex. Stone went with the defendants to buy MDMA from them, intending to go right back to her friends. (Tr. 1367). The defendants did not flirt with Stone or talk to her about sex at all. They did not need to, and they did not want to. The defendants had what they needed in their cabin, drugs (not MDMA) that would knock Stone out and an isolated place to carry out their attack. (Tr. 1372, 1375). And when

they were done with her, the defendants kicked Stone out of their cabin and left her to wander the ship, even though she could barely stand and was still experiencing her memory in flashes, just as they had done to Kelly Hudson years prior. (Tr. 1379-81).

**f. June 2012: Katie Moore (Victim-12)**

In June 2012, Alon raped Katie Moore in the Manhattan apartment he shared with his brothers, after he and Tal drugged her. Tal watched a portion of the rape and did not attempt to stop Alon or help Moore. (PSR ¶¶ 85-90 (Oren/Alon); PSR ¶¶ 76-85 (Tal)).

During the summer of 2012, Moore was a 20-year-old college student interning at a public relations firm in New York City. (Tr. 132). Tal invited Moore's fellow intern to watch the NBA Finals at a celebrity's Manhattan apartment, and the intern brought Moore as her guest. (Tr. 130-32). There was a small group of people in the apartment for the party, including Tal and Alon. (Tr. 141). At the party, Moore had a drink or two, and Tal gave her a drug that he told her was molly, saying it would make her feel euphoric. (Tr. 142-43). Whatever the drug was, it was not MDMA, and it made Moore feel jittery, not euphoric. (Tr. 144).

After the game was over, the group went to an exclusive nightclub. (Tr. 146-47). At the club, Moore and her friend went to the bar with Tal and Alon, where Tal and Alon got Moore a drink, into which they slipped a sedative-hypnotic drug. (Tr. 147-48). Back at the defendants' table, another man handed Moore a second drink, and after she took it, she started to sway and spilled the drink. (Tr. 149). Moore was losing control of her body while her mind still felt clear. (Tr. 150). Moore testified that she experienced "a real dissonance in how my body was feeling and what was starting to happen to my body and the clarity and the lucidity that I was feeling in my mind at that time"—a combination she had not felt before. (Tr. 150-51). Tal and Alon then pulled Moore and her friend to the side and told them it was time to leave. (Tr. 151).

The drugged drink caused Moore's memory to cut out at that point in the night, other than a brief flash of getting into a car. (Tr. 151). The next thing Moore remembered was coming to naked in Alon's bed "like a switch" had flipped, with Alon, also naked, standing over her. (Tr. 152). Shocked and desperate to get away, Moore tried to get off the bed, but every time, Alon pushed her back down. (Tr. 152). When Moore told Alon that she did not want to have sex with him, Alon showed no concern or understanding for the scared woman in front of him who was trying to understand what was going on. Instead, he laughed at her and told her she already had. (Tr. 153). Overwhelmed, she collapsed on the bed, abruptly feeling very weak from the drugs. (Tr. 153-54).

While Moore was trying to process what was happening to her and around her, Alon pushed Moore's head to his groin to force her to perform oral sex on him. (Tr. 154). When Moore would not comply, he pushed her onto the bed and digitally penetrated her. (Tr. 154). Moore told Alon "no" multiple times and tried to get away. (Tr. 154-55). Alon did not care. He climbed on top of Moore and raped her. (Tr. 155-56). Moore kept telling him "no" and was crying while Alon raped her, but these pleas had no effect on Alon. (Tr. 156). He ignored her distress and used his size and strength to overpower her and do what he wanted. (Tr. 155). He kept Moore pinned below him until she accepted there was nothing she could do to stop the rape. (Tr. 156-57).

While Alon was raping a tearful Moore, Tal walked in and had a casual conversation with Alon. (Tr. 157-58). Tal was "super nonchalant" as Alon continued to rape Moore; it did not appear that walking in on his brother raping a crying woman gave Tal the slightest pause. (Tr. 158). Tal did not try to stop Alon or help Moore and left when he finished his conversation with Alon. When the rape ended, Alon, satisfied, fell asleep, and Moore was finally able to escape.

(Tr. 158-59). Alon's assault was so brutal that Moore had a bruise in the shape of his handprint on her leg. (Tr. 162).

**g. August 2014: Maya Miller (Victim-6) (Counts Eight and Nine)**

In August 2014, after enticing Maya Miller to the Hamptons and unsuccessfully attempting to drug her, Tal forcibly raped Miller at the waterfront mansion he was renting with Alon and Oren for $50,000 a month, located at 26 On The Bluff in Sag Harbor ("26 On The Bluff"). (PSR ¶¶ 57-64 (Alon/Oren); PSR ¶¶ 58-65 (Tal)).

Miller met Tal on social media in the summer of 2013. (Tr. 411-12). The next summer, Tal invited Miller and a friend to the Hamptons for a weekend. (Tr. 414). Miller eagerly accepted what sounded like a "once in a lifetime" opportunity; at that time, she was living with her parents in Nevada and could not afford a trip like that herself. (Tr. 415). Miller was excited about the trip, thinking that she and her friend would have a fun weekend in the Hamptons with some nice people. But Tal had other plans. When Miller emailed him her flight information, Tal forwarded the email to Alon, writing, "see below these cheap hookers coming to the Hamptons this weekend." (GX 3A-132).

Miller and her friend flew to New York, and, after staying the night in Tal's Manhattan apartment, Tal arranged for a seaplane to transport everyone to the Hamptons. (Tr. 431-33). Miller had never been on a seaplane before and found the experience to be "absolutely amazing." (Tr. 434). In the Hamptons, they stayed at 26 On The Bluff. (Tr. 437-38). One of the twins was also staying there that weekend. (Tr. 437).

The next night, Tal put his plan for the weekend in motion—giving Miller and her friend drugged drinks so that he could rape them when they were unconscious or semiconscious later that night. Tal prepared Miller and her friend shots and drinks and was more intensely focused on them than he had been up until that point, wanting his plan to succeed. (Tr. 453-54). Miller was not a

big drinker, so she did not drink the alcohol Tal gave them, but Miller's friend was not so lucky. The friend drank about half a glass of drugged wine and began acting unlike herself, slurring her words and stumbling. (Tr. 453-55).

Miller was worried and took her friend into their room and put her to bed. (Tr. 455). Miller also got into bed and dozed off. A short while later, Tal opened the door and jumped onto the bed between Miller and her friend, who was asleep. (Tr. 457). Tal asked Miller why they were going to bed and whether she had been drinking, saying he thought he had invited "fun girls." (Tr. 457-58). Miller told Tal that she had been drinking, even though she had not, and Tal left the room. (Tr. 458). Miller was uneasy and sat awake while her friend slept. (Tr. 458). A couple of hours later, the door slid open again, and Miller saw Tal and another man standing in the doorway, who had returned expecting to find both women drugged and helpless. Miller asked the men if she could help them and heard one say, "Oh shit" before they left, after realizing their plan to rape unconscious women had failed. (Tr. 459).

Miller had a pit in her stomach; Tal's behavior made her so uncomfortable that she decided that she and her friend had to leave the next morning, a day earlier than they had planned. (Tr. 459-60). After her friend got up the next morning, Miller told her they needed to leave, and they began to pack and get ready to go. (Tr. 460). While her friend was drying her hair in the bathroom, Tal came into the room again. Seeing that Miller had been packing, Tal asked where they were going. (Tr. 461). When Miller confirmed they were going back to the city, Tal became angry that the woman he had invited to the Hamptons dared to leave early—without having sex with him like a "cheap hooker" as he had planned—and said, "Is this how you thank me for inviting you to a beautiful home? Do you not like me?" (Tr. 461).

Realizing that Miller was about to ruin his plan, Tal pivoted to another strategy—force. He tackled Miller onto the bed, but she managed to push him off. Frightened, Miller ran into the connected bathroom, past her friend drying her hair by the sink, and through a door to the shower area. (Tr. 462). Tal chased Miller into the bathroom and closed the wooden door behind him, trapping Miller in the shower area with him. (Tr. 463). Tal walked over to the shower and turned it on, while Miller stood terrified and started crying. (Tr. 463). Rather than stopping at the sight of Miller's tears, Tal became sexually aroused and took off his swim trunks. (Tr. 463). Tal turned Miller around, bent her over, and held her in place with one hand on the back of her neck and head. (Tr. 463-64). With the other hand, Tal pulled down Miller's underwear and vaginally raped her. (Tr. 464). The rape was so violent that Miller, who was in physical pain, bled for two days after the attack. (Tr. 469). In the moment, Miller was so frightened that she froze and could not move. She tried to scream but could not raise her voice, instead whispering "no, no, no" while Tal raped her. (Tr. 464-65). Just as he ignored her tears, Tal ignored Miller's pleas to stop, holding her down until he had taken what he wanted. When Tal finished raping Miller, he got out of the shower, cleaned himself off, and turned back to Miller. Miller was crying and Tal said to her, "It's ok, I care about you. You wanted that." (Tr. 465). Despite all of Miller's outward signs of non-consent, Tal still tried to convince her that she had wanted it, because just as the blog had said years before, "it's not rape if . . . she secretly wanted it." (GX 7A-103).

**h. March 2016: Ava Wells (Victim-13)**

In March 2016, Alon forcibly raped Ava Wells when they were both visiting Tel Aviv. (PSR ¶¶ 101-04 (Alon/Oren); PSR ¶¶ 102-05) (Tal)).

Wells met Alon in or around September 2012 at an event for Jewish young professionals. (Tr. 3267). The two exchanged some text messages and Facebook messages intermittently afterward but did not meet up again until March 2016. (Tr. 3268-77). That month, when Wells

was visiting Tel Aviv with a friend, she saw a Facebook post indicating that Alon also was there. (Tr. 3277-79). Wells messaged Alon on Facebook, and Alon invited her to the apartment he was renting for drinks that evening. (Tr. 3279-83).

Wells and her friend went to Alon's apartment that night, where they met Alon and two of his friends. (Tr. 3286-88). At the apartment, Wells was offered a drink but declined. (Tr. 3288). In a bedroom in the apartment, Alon flirted with Wells, kissing and touching her breasts over her clothes. (Tr. 3294). A bit later, Alon was standing in front of the dresser, facing away from Wells; she thought he was putting on a watch, so they could head out to dinner. (Tr. 3294-95). But Alon turned around to face Wells with a condom on. (Tr. 3295). There had been no discussion of sex to this point. (Tr. 3295). Wells thought that they were about to leave; the last thing she expected to see in that moment was Alon with his penis exposed and a condom on. Wells was shocked and confused, and she told Alon that she was not having sex with him. (Tr. 3295). Alon pushed Wells back onto the bed, and she tried to push him away, telling him again that she was not having sex with him. (Tr. 3295). Alon ignored her and kept going, so Wells put her hands near his pelvis to try to push him away and said, for a third time, that she was not having sex with him. (Tr. 3295). Again, Alon ignored her attempts to stop him. Instead, he grabbed Wells' hands and pinned them above her head, said, "oh, come on," and then raped her. (Tr. 3295).

Alon had no respect for Wells, who he did not believe deserved any. When she first arrived at the apartment with her friend, Alon texted his friends, "Warms up are here. Not for dinner." (GX C-117-2 at 157). From the moment she stepped into the apartment, Alon, who had just arrived in Tel Aviv, targeted Wells for his "post-flight release." (Tr. at 327-98). When Wells accepted the invitation to the apartment and lightly flirted with someone she had not seen in years, Alon felt entitled to force himself on her because "it's not rape if . . . she secretly wanted it." (GX 7A-103).

Not even Wells's attempt to physically push him away with her hand on his groin could dissuade Alon, who used his size to overcome and rape Wells while she was stunned and in shock. Shortly after he raped her, while Wells was in the room and could overhear him, Alon called a friend and said he could "be a person now." (Tr. 3297).

**i. September 2016: Bela Koval (Victim-2) (Counts Three and Four)**

During Labor Day weekend in 2016, Oren drugged and forcibly raped Bela Koval at 26 On The Bluff—the same mansion in the Hamptons where Tal raped Maya Miller two years before. Oren carried the attack out in coordination with his brothers, who assisted in recruiting and transporting Koval to the Hamptons for the weekend and with leaving the drugged and incapacitated Koval in the bedroom where Oren raped her. (PSR ¶¶ 65-72 (Alon/Oren); PSR ¶¶ 66-73 (Tal)).

Prior to Labor Day weekend, Koval matched with Alon on the dating app Raya, and Koval's friend matched with Oren and Alon. (Tr. 9924-25; GX A-902, B-603). On the Thursday evening before Memorial Day weekend, Koval and her friend were together in Chicago while the friend was communicating with one of the twins. During the conversation, the defendants invited the friend and Koval to the Hamptons for the weekend. (Tr. 926-31). The defendants offered to pay all expenses for the weekend and to house the women in their mansion. Behind the scenes, while this conversation happened, all three defendants texted with each other and agreed to split the costs of bringing the girls to New York for the weekend and to "try to orgy the[m] out" after they arrived. (GX B-121-1). Alon booked flights for Koval and her friend that left the next morning, and the women flew to New York from Chicago and were then driven to 26 On The Bluff. The defendants split the costs of this transportation. (GX 3I-118-R, 3A-154).

On Saturday, the second day Koval was at the defendants' house in the Hamptons, Oren gave Koval a spiked drink during a party. The drug severely incapacitated Koval and left her

feeling unstable, shaky, confused, and unable to control her body. (Tr. 962-63). Koval tried to leave the party and to go rest in her bedroom in the basement, but Alon prevented Koval from making it there and took her to an isolated room instead. (Tr. 965). Alon gave Koval what he told her was a glass of water to drink, and Koval drank some of it. Koval continued to lose motor function and struggled with using her arms and legs before passing out on the bed. (Tr. 966).

A little later, Oren entered the bedroom where Koval lay unconscious. Oren's arrival in the bedroom awoke Koval. The effect of being drugged was so strong that as Oren came into the room Koval felt paralyzed and like she had "no control" over her body. (Tr. 967). Terrifyingly, though she could not control her body, Koval was awake and aware of what was happening to her. (Tr. 967). Koval thought she was having a medical emergency from the drugs Oren put in her drink, and she tried to get his help with what little strength she had. Koval tried to tell Oren, "Something's not right," a desperate plea in the middle of a crisis that asked Oren to see something human in her, something worthy of protecting. (Tr. 968). Oren ignored her. Oren was not there to help Koval. He had come to check on her, but not to protect her or render care. Oren was there to confirm the drugs had worked as he planned.

When Oren saw Koval immobile on the bed, unable to protect herself, he had her where he wanted her, where he had worked all weekend to get her. So, he ignored her struggles and her pleas for help. (Tr. 969). He looked past her and through her as if she was not there. (Tr. 968). Oren pulled down Koval's clothes to expose her, put on a condom, and climbed on top of her. (Tr. 969-70). Oren used his hands to pin Koval to the bed and keep her from escaping while he raped her. Even when Koval managed to bring her hands to her chest and tried to push Oren off her while telling him to stop, Oren ignored her and he kept going. (Tr. 971). And when he was done raping a helpless woman half his size, Oren got up and left without saying a word. (Tr. 971).

**j. January 2017: Maylen Gehret (Minor Victim-26), Kayley Brown (Minor Victim-25), and Rachel Stevens (Victim-9)**

In late January 2017, Alon and Oren met three high school students, Maylen Gehret, Kayley Brown, and Rachel Stevens, at a nightclub in Aspen, Colorado. The defendants then drugged them, enticed them to a hotel room with a false promise of an afterparty, and assaulted them. (PSR ¶¶ 85-90 (Alon/Oren); PSR ¶¶ 86-91 (Tal)).

Gehret (17 years old), Brown (17), and Stevens (18) had traveled to Aspen, Colorado, for the X Games to celebrate their last year in high school. (Tr. 1871-74). Although they had been able to get into the club, Gehret told Alon and Oren that she was a 17-year-old high school student. (Tr. 1879). Instead of being deterred, Alon told Gehret he found her age "hot." (Tr. 1879). Oren was similarly unconcerned, and he pursued Stevens, even trying to kiss her without warning in a way that caused Stevens to jerk away. (Tr. 1880-81).

Alon and Oren gave the girls drinks, which they spiked with sedative-hypnotic drugs. (Tr. 1881-83, 2371-73). The drinks worked quickly and worked well. In fact, they worked so quickly that Gehret struggled to sit up at the table. When Gehret was unable to hold her head up and had to rest it on Alon's leg, he chastised her. (Tr. 1883).

When the nightclub was closing, Alon and Oren invited Gehret, Brown, and Stevens back to their luxury five-star hotel for an afterparty in what the girls thought would be an apartment-style suite. (Tr. 1884-85, 2373). That is not what they found. The defendants brought the girls to a dark, empty, standard hotel room with two beds. Oren took Stevens to one of the beds. Brown, who laid down on the other bed, fell in and out of consciousness, recalling much of the rest of the night in "flashes." (Tr. 2373-77).

Alon went to the bed where Brown had laid down and summoned Gehret to him. Then, with one high school student passed out on the bed next to him, Alon shoved his hand into the

pants of the other. (Tr. 1887-88). There was nothing romantic about what was happening—no kissing; no conversation; no discussion of sex at all. (Tr. 1888-89). Gehret tried to turn away and pull away from Alon, but he did not relent. Instead, he took her to the bathroom where he shut and locked the door behind them. (Tr. 1890). Alon stood in front of the door, leaving Gehret trapped, frightened, and back up against the sink, away from Alon. Alon walked over to her, took off Gehret's shoes, undressed her, and began violently penetrating her with his fingers. Gehret testified between sobs that she could "feel his nails scraping inside of me, and I could feel myself tearing, and it really hurt." (Tr. 1891). Ignoring the blood on the floor, Alon turned Gehret around, pushed her head down onto the sink counter, and raped her from behind. After the rape, Gehret tried to clean up her blood on the floor, while apologizing to Alon. After she cleaned the blood, Alon directed her to take a shower, and she complied. (Tr. 1892-93).

While Alon and Gehret were in the bathroom, in one of her moments of consciousness, Brown saw Oren on top of Stevens. (Tr. 2375). When Gehret returned to the bedroom, she also saw Oren on top of Stevens, assaulting her. (Tr. 1894). Stevens managed to extricate herself from the bed, went to Gehret, and said that "she wanted to leave and that she didn't want to be there anymore" and that "this is bad, this is bad, I don't want to be here, I'm leaving," and then she ran out of the room. (Tr. 1894). Alon then went to the bed where Brown was still laying motionless—the same place she had laid while he began his assault of Gehret. Having just assaulted Gehret on that bed and in the bathroom, Alon was ready to repeat the process with Brown. And while Brown laid there, slipping in and out of consciousness, without speaking to her at all, Alon put his hand down Brown's pants and touched her vagina. (Tr. 1894, 2376-77). Brown was able to wake up enough to remove his hand from her pants, and then Gehret and Brown left the hotel room.

**k. May 2017: Amber Davis (Victim-30)**

In May 2017, Oren, with the help of Alon and Tal, enticed Amber Davis to the Bahamas, where he raped her while she was unconscious. (PSR ¶¶ 91-93 (Alon/Oren); PSR ¶¶ 92-94 (Tal)).

In April 2017, Alon, Oren, Tal, and others pooled resources to transport women to the Bahamas and to rent a yacht to house themselves and the women to attend the failed music festival Fyre Fest. The defendants' goal was to traffic women to the event for sex. As they discussed in a group chat entitled "Fyre Puss," Oren agreed that "girls that do not conform"—meaning do not have sex—would be forced to "[w]alk the plank" and stay in tents, rather than on the yacht. (GX C-109-1). Together, they arranged to have drugs available in the Bahamas. (GX 1009, B-102, B-142-2, C-109-4).

Davis was one of the women the defendants transported to the Bahamas and housed on their yacht. Oren invited Davis and one of her friends to the Bahamas via social media and arranged for Davis's flights and accommodations, flying her by private plane from Los Angeles to the Bahamas. (GX 1009). On the final day in the Bahamas, Oren assaulted Davis by having sex with her while she was asleep. Later that morning, Davis confronted Oren in text messages, saying: "I'm seriously not cool with what happened this morning. I lost all respect for you and [my friend]. You both knew I didn't want it and I hope you know how wrong that is obviously I was not comfortable." Oren feigned ignorance and tried to convince Davis she had wanted to have sex with him. But when confronted one more time by Davis, who said, "You have to ask someone before you have sex with them," and that she had "woke up to a dick inside me," Oren stopped pretending to apologize and instead admitted to the assault by saying, "It was my fingers first." (GX B-124-1).

*   *   *

What came through at trial was the truth about the defendants. They were not party boys, playboys, womanizers, or misguided young men. They were predators. They spent years hunting and preying upon women because they wanted to, because they could, and because they kept getting away with it. They have no remorse for their actions and no sympathy for the women they hurt along the way. At every opportunity the defendants made choices to humiliate their victims and maximize the victims' pain. And because they got away with it for so long, they thought they would forever. They were wrong.

## II. The Defendants' Broader Conduct

The jury listened to sixteen days of harrowing testimony from victims and other witnesses, but still, this failed to capture the magnitude of the defendants' depraved conduct. The Government's investigation, which included interviews with more than 70 women, showed that the defendants' practice of drugging, raping and assaulting women and girls extended back nearly twenty years, to when the defendants were in high school and assaulted victims with each other and with classmates. Before trial, more than 25 potentially testifying victims were the subject of motions and were permitted to testify if called as witnesses by the Government. Even during trial, additional victims who felt empowered to come forward did so. (*See* PSR ¶¶ 105-09 (Alon/Oren); PSR ¶¶ 106-10 (Tal)). The accounts of these women, who largely did not know each other and who met the defendants at different times and in different places, were consistent and told the story of an unbroken pattern of violence against women throughout the defendants' adolescence and adulthood. The Government's motions *in limine* told the accounts of some of these women. (*See* Dkt. 188 at 1-25). Others have written to the Court in impact statements about the harm and destruction the defendants wrought on their lives.

Counted among the dozens of the defendants' non-testifying victims are two victims referred to in this submission as Victim-4 and Victim-5. These women are two victims who were

trafficked by the defendants to the Hamptons in June 2009. The defendants' trafficking of these victims was charged in Counts Six and Seven of the Indictment. These two charges, however, were not submitted to the jury and were dismissed after one of the defendants' investigators caused Victim-4 to stop participating in the case.

The assaults of Victim-4 and Victim-5 in June 2009 in the Hamptons are two more pages out of the defendants' playbook. Just weeks after the defendants raped Isa Brooks, the defendants also trafficked, drugged, and raped Victim-4 and Victim-5 at 88 Peconic. (PSR ¶¶ 73-74 (Alon/Oren); PSR ¶¶ 74-75 (Tal)). Like Brooks, Victim-4 and Victim-5 were invited by a party promoter to take a bus from Manhattan to a club in the Hamptons, where they met the defendants. (3514-001 at 1; 3544-002 at 1-2).[3] There, they had some drinks and learned that the party bus would not be taking them back to Manhattan that night as they had expected. After receiving an invitation from one of the defendants, Victim-4 and Victim-5 went to 88 Peconic to stay the night. (3514-001 at 1; 3544-005 at 2). At the house, the defendants gave Victim-4 and Victim-5 drinks that had been drugged and caused symptoms that so many other victims experienced, which were consistent with ingestion of sedative-hypnotics and inconsistent with drinking only alcohol. (*See* 3514-001 at 2; 3544-002 at 1-2; 3544-009 at 3). Alon took Victim-4 to a hot tub where he cornered her, trapped her with his arms and his body, and raped her as she struggled and failed to get away, just as Tal and one of twins had with the unnamed victim on Labor Day weekend only weeks before. (3514-001 at 2; 3514-009 at 3). Victim-5 later saw Alon and Oren having sex with Victim-4 in a bedroom, and Victim-4 called to her, "[Victim-5], help me," though because of her

[3] References to 3514-### are to notes of interviews with Victim-4, and references to 3544-### are to notes of interviews with Victim-5. References to CN-# are to notes of phone calls with Victim-4's attorney. USAO_00260972 and 00260976 are additional files submitted as sentencing exhibits.

drugged state, Victim-4 does not remember that part of the night. (3544-002 at 2; 3544-005 at 2). Victim-5 was also assaulted by one or both of Alon and Oren that night, though her memory contains only pieces because she was drugged. (3544-005 at 2; 3544-006 at 3; 3544-009 at 3-4).

In December 2025, about a month before trial, a private investigator working for the defendants posed as an insurance investigator and began asking improper questions of Victim-4's neighbors about Victim-4 and, particularly, her young children. (CN-1 at 1; USAO_002060972; USAO_00260976). This conduct caused Victim-4 to stop communicating with the Government, and ultimately Counts Six and Seven were dismissed, despite the significant evidence of the defendants' trafficking and assaults of these two victims that had been developed during the investigation and in the lead up to trial. (*See* CN-1 at 1; CN-2 at 1).

## APPLICATION OF THE SENTENCING GUIDELINES

### I. Calculation of the Applicable Sentencing Guidelines

The Government and the Probation Office agree that each of the defendants' Guidelines ranges are life imprisonment. This calculation is based on a total offense level of 43, which is capped by Chapter 5, Part A of the Guidelines, for each of the defendants, U.S.S.G. Ch. 5, Part A, app. n.2, as well as criminal history category I for Alon and Oren and criminal history category II for Tal. The details of the Government's Guidelines calculation are outlined below for each defendant. The Government's calculation differs only slightly (and as noted) from the Probation Office's calculation.

#### a. All Defendants: Count One

Each defendant was convicted of Count One, conspiracy to commit sex trafficking of multiple victims. As discussed in more detail below, based on their convictions on that count and pursuant to U.S.S.G. § 1B1.3(a), each defendant must be held accountable for all acts and omissions they individually "committed, aided, abetted, counseled, commanded, induced,

procured, or willfully caused," as well "all acts and omissions of others" that were within the scope of their jointly undertaken criminal activity, in furtherance of that activity, and reasonably foreseeable. U.S.S.G. § 1B1.3(a)(1)(A)-(B). The evidence at trial demonstrated that since in or about 2008, the defendants engaged in a sex trafficking conspiracy, working together to entice their victims to locations in the Hamptons, Manhattan, Aspen, and elsewhere, and then using drugs and/or force to rape or sexually assault the victims. (PSR ¶ 131 (Alon/Oren); PSR ¶ 133 (Tal)). Given their pattern of conduct, which included working together by pooling their resources, arranging travel, coordinating lodging, drugging their victims, and carrying out the rapes together, each assault was foreseeable to each defendant, and they are each responsible under the Guidelines for all victims that were raped or sexually assaulted in furtherance of the conspiracy, regardless of whether each defendant participated in each assault. These victims include, at minimum, Lindsey Acree (Victim-1), Bela Koval (Victim-2), Isa Brooks (Minor Victim-3), Victim-4, Victim-5, Maya Miller (Victim-6), Rachel Stevens (Victim-9), Katie Moore (Victim-12), Kayley Brown (Minor Victim-25), Maylen Gehret (Minor Victim-26), and Amber Davis (Victim-30).

Given the Count One convictions and the evidence of each of these victims' sexual assaults, each one of these victims constitutes her own group under the Guidelines. U.S.S.G. § 1B1.2(d) explains that "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." Application Note 4 of that section further states:

> [p]articular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense.

U.S.S.G. § 1B1.2, app. n.4.

The Second Circuit has held that an indictment need not delineate each object of a conspiracy for the district court to apply § 1B1.2(d). *See United States v. Robles*, 562 F.3d 451, 455-56 (2d Cir. 2009). Instead, where there is a general verdict for a conspiracy count, it is sufficient that the district court find at sentencing that the particular objects, which it treats as separate counts for purposes of the Guidelines calculation, have been proven beyond a reasonable doubt. *See id.* at 455-58 (affirming calculation based on district court's findings that certain robberies were objects of the conspiracy even though the jury had acquitted on substantive counts as to those robberies); *see also, e.g.*, *United States v. Cedeno*, 437 F. App'x 8, 10-11 (2d Cir. 2011); *United States v. Jett,* 982 F.3d 1072, 1078 (7th Cir. 2020); *United States v. Jones*, 699 F. App'x 325, 326 (5th Cir. 2017); *United States v. Bradley,* 644 F.3d 1213, 1300-01 (11th Cir. 2011).

Where a conspiracy involves offenses against multiple victims as this one does, courts, including the Second Circuit, routinely apply § 1B1.2(d) to treat each victim of a conspiracy as a separate count. *See, e.g.*, *United States v. Nicolescu*, 541 F. App'x 93, 97-98 (2d Cir. 2013) (affirming sentence where district court treated extortion of two victims as separate counts that should be excluded from grouping and treating as harmless that the district court did not make specific findings as to each victim beyond a reasonable doubt);[4] *United States v. Egbert*, 562 F.3d 1092, 1098-1100 (10th Cir. 2009) (affirming district court's Guidelines calculation that treated conspiracy count as if it were two separate counts based on assaults of two victims); *United States v. Melchor-Zaragoza*, 351 F.3d 925, 928 (9th Cir. 2003) (affirming district court's Guidelines

[4] In *Nicolescu*, the Circuit did not affirmatively hold that the district court was required to find each extortion beyond a reasonable doubt, instead stating that it was "*arguable* that the District Court was required to determine, like the sentencing court in *Robles*, that both extortions had been proven beyond a reasonable doubt" and finding any error, to the extent it existed, to be harmless as the "record [was] replete with evidence that [the defendant] conspired and attempted to extort both victims[.]" 541 F. App'x at 98 (emphasis added).

calculation that treated conspiracy count as if it were 23 separate counts based on holding 23 victims hostage); *cf. United States v. Torrealba*, 339 F.3d 1238, 1242-43 (11th Cir. 2003) (affirming, based on U.S.S.G. § 3D1.2, district court's Guidelines calculation that treated conspiracy count as if it were three separate groups based on kidnapping of three victims); *United States v. Jose-Gonzalez*, 291 F.3d 697, 707 (10th Cir. 2002) ("When . . . the gist of the offense is injury to persons, the offense against each human victim belongs in a different group, even when the offenses arose out of a single event.").

The Court should do the same here, treating each of these victims as a separate count for purposes of the Guidelines calculation, and finding that the defendants conspired to sex traffic each of these victims beyond a reasonable doubt. These victims all fit the same pattern—the evidence demonstrates that the defendants lured each of these victims, either on their own or through friends, to an exclusive event or vacation home and once there, used force and/or drugs to rape them. For each of the testifying conspiracy victims (Acree, Koval, Brooks, Miller, Moore, Brown, and Gehret), corroborating evidence, including electronic evidence and/or testimony of outcry witnesses, was introduced. In closing, the Government argued that the defendants' actions as to each of these victims provided persuasive evidence of the conspiracy. (*See*, *e.g.*, Tr. 4823-24, 4832-52). In Stevens's case, both Gehret and Brown testified about witnessing the incident, its lead up, and its aftermath. For Davis, extensive documentary evidence was presented laying out her trafficking to the Bahamas, including text messages in which Davis confronted Oren about raping her—conduct that Oren admitted. (*See* GX B-124-1; *see also* GX 1009). And for Victim-4 and Victim-5, who are discussed in more detail below, their accounts are corroborative of one another and consistent with that of the other victims, especially Brooks whom the defendants trafficked the same summer (summer 2009), to the same place (88 Peconic), in the same way

(invited to the Hamptons by party promoters, transported via bus, harbored in 88 Peconic, and drugged and raped once there).

With that background, the Government's Guidelines calculation for Count One for each defendant is as follows:

- Pursuant to U.S.S.G. § 1B1.2(d), because Count One charges a conspiracy to sex traffic multiple victims, the defendants are treated as if they had been convicted of a separate count of conspiracy for each victim of sex trafficking. As discussed above, there are at least eleven victims of this conspiracy: Lindsey Acree (Victim-1), Bela Koval (Victim-2), Isa Brooks (Minor Victim-3), Victim-4, Victim-5, Maya Miller (Victim-6), Rachel Stevens (Victim-9), Katie Moore (Victim-12), Kayley Brown (Minor Victim-25), Maylen Gehret (Minor Victim-26), and Amber Davis (Victim-30). Pursuant to U.S.S.G. § 3D1.2, each of these victims constitutes her own group.[5]

- Pursuant to U.S.S.G. § 2X1.1(a), the base offense level for the conspiracy charged in Count One is determined by calculating the base offense level for the intended offense—here, U.S.S.G. § 2G1.1. As a result, the applicable Guideline for each group is U.S.S.G. § 2G1.1, the guideline for sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. § 1591(b)(1).[6]

- Pursuant to U.S.S.G. § 2G1.1(c)(1), because the offense for each group involved conduct described in 18 U.S.C. § 2241(a) or (b) or 18 U.S.C. § 2242, U.S.S.G. § 2A3.1 is applied. Pursuant to U.S.S.G. § 2A3.1(a)(2), the base offense level for each group is 30.

- For the group for Isa Brooks (Minor Victim-3), the Guidelines calculation is as follows:

    - Pursuant to U.S.S.G. § 2A3.1(b)(1), because the offense involved conduct described in 18 U.S.C. § 2241(a) and/or (b), namely force and drugging, four levels are added.

---

[5] This submission uses the names or pseudonyms of victims who testified at trial or evidence about whom was presented at trial; for all others, it uses victim numbers. For ease of reference, attached as Exhibit 1 to this submission is a chart that provides for each victim, the victim's name and/or pseudonym, the victim's number (as used in the PSRs), and the group numbers used by each PSR.

[6] The PSRs use U.S.S.G. § 2G1.3 to calculate the base offense level for the minor victim groups: Isa Brooks (Minor Victim-3), Kayley Brown (Minor Victim-25), and Maylen Gehret (Minor Victim-26). This has no practical difference, as § 2G1.3, like § 2G1.1, contains a cross-reference to § 2A3.1 for conduct described in 18 U.S.C. §§ 2241 or 2242. *See* U.S.S.G. § 2G1.3(c)(3).

  - Pursuant to U.S.S.G. § 2A3.1(b)(6)(B), because the offense involved the use of a computer to facilitate transportation or travel by a minor to engage in prohibited sexual conduct, two levels are added.
  - Pursuant to U.S.S.G. § 3A1.1(b)(1), because the defendant knew or should have known that a victim of the offense was a vulnerable victim, owing to her drugged state and/or age, two levels are added.
  - Pursuant to U.S.S.G. § 3A1.1(b)(2), because the offense involved a large number of vulnerable victims, two levels are added.
  - Pursuant to U.S.S.G. § 3A1.3, because the victim was physically restrained in the course of the offense, two levels are added.
  - Accordingly, the offense level for this group is 42.

- For the groups for Lindsey Acree (Victim-1), Bela Koval (Victim-2), Victim-4, Katie Moore (Victim-12), and Maylen Gehret (Minor Victim-26) the Guidelines calculation is as follows:
  - Pursuant to U.S.S.G. § 2A3.1(b)(1), because the offense involved conduct described in 18 U.S.C. § 2241(a) and/or (b), namely force and drugging, four levels are added.[7]
  - Pursuant to U.S.S.G. § 3A1.1(b)(1), because the defendant knew or should have known that a victim of the offense was a vulnerable victim, owing to her drugged state and/or age (for Gehret), two levels are added.
  - Pursuant to U.S.S.G. § 3A1.1(b)(2), because the offense involved a large number of vulnerable victims, two levels are added.
  - Pursuant to U.S.S.G. § 3A1.3, because the victim was physically restrained in the course of the offense, two levels are added.
  - Accordingly, the offense level for these groups is 40.

- For the groups for Victim-5, Rachel Stevens (Victim-9), and Kayley Brown (Minor Victim-25), the Guidelines calculation is as follows:

[7] For Gehret, the PSRs apply this enhancement based on the defendants' drugging of Gehret. (PSR ¶ 179 (Alon); PSR ¶ 216 (Oren); PSR ¶ 203 (Tal)). While the enhancement is appropriate based on Gehret's drugging, the evidence demonstrates that the enhancement can also be applied based on Alon's use of force against Gehret. *See infra* pp. 57-61.

- Pursuant to U.S.S.G. § 2A3.1(b)(1), because the offense involved conduct described in 18 U.S.C. § 2241(a) and/or (b), namely force and/or drugging, four levels are added.
- Pursuant to U.S.S.G. § 3A1.1(b)(1), because the defendant knew or should have known that a victim of the offense was a vulnerable victim, owing to her drugged state and/or age (for Brown), two levels are added.
- Pursuant to U.S.S.G. § 3A1.1(b)(2), because the offense involved a large number of vulnerable victims, two levels are added.
- Accordingly, the offense level for these groups is 38.

- For the group for Maya Miller (Victim-6), the Guidelines calculation is as follows:
  - Pursuant to U.S.S.G. § 2A3.1(b)(1), because the offense involved conduct described in 18 U.S.C. § 2241(a) and/or (b), namely force and attempted drugging, four levels are added.
  - Pursuant to U.S.S.G. § 3A1.3, because the victim was physically restrained in the course of the offense, two levels are added.
  - Accordingly, the offense level for this group is 36.
- For the group for Amber Davis (Victim-30), the Guidelines calculation is as follows:
  - Pursuant to U.S.S.G. § 3A1.1(b)(1), because the defendant knew or should have known that a victim of the offense was a vulnerable victim, owing to her unconscious state, two levels are added.
  - Pursuant to U.S.S.G. § 3A1.1(b)(2), because the offense involved a large number of vulnerable victims, two levels are added.
  - Accordingly, the offense level for this group is 34.

**b. Alon: Counts One, Three, Four, Five, Ten, and Eleven**

Alon was convicted of Count One (Conspiracy to Commit Sex Trafficking), Count Three (Sex Trafficking of Bela Koval (Victim-2) by Force, Fraud, or Coercion), Count Four (Inducing Bela Koval (Victim-2) to Travel to Engage in Unlawful Sexual Activity), Count Five (Sex Trafficking of a Minor: Isa Brooks (Minor Victim-3)), Count Ten (Aggravated Sexual Abuse of Rhonda Stone (Victim-7) by Force or Intoxicant), and Count Eleven (Sexual Abuse of a Physically Incapacitated Person: Rhonda Stone (Victim-7)). Alon's Guidelines calculation is as follows:

Counts One, Three, Four, and Five

- Pursuant to U.S.S.G. § 3D1.2(a), because they involve the same victim and acts, Counts Three and Four are grouped with Count One's group as to Bela Koval (Victim-2).

- Pursuant to U.S.S.G. § 3D1.2(a), because they involve the same victim and acts, Count Five is grouped with Count One's group as to Isa Brooks (Minor Victim-3).

Counts Ten and Eleven

- Pursuant to U.S.S.G. § 3D1.2(a), because they involve the same victim and acts, Counts Ten and Eleven constitute a single group for Rhonda Stone (Victim-7).

- The sentencing Guideline applicable to Counts Ten and Eleven is U.S.S.G.§ 2A3.1. Pursuant to U.S.S.G. § 2A3.1(a)(2), the base offense level for this group is 30.

- Pursuant to U.S.S.G. § 2A3.1(b)(1), because the offense involved conduct described in 18 U.S.C. § 2241(a) and/or (b), namely force and drugging, four levels are added.

- Pursuant to U.S.S.G. § 3A1.1(b)(1), because the defendant knew or should have known that a victim of the offense was a vulnerable victim, owing to her drugged state, two levels are added.[8]

- Accordingly, the offense level for this group is 36.

Grouping Analysis

- In calculating the combined offense level, pursuant to U.S.S.G. § 3D1.4(a), the group for Isa Brooks (Minor Victim-3) has the highest offense level (offense level 42) and represents one Unit.

- Pursuant to U.S.S.G. § 3D1.4(a), one additional Unit, for a total of eight additional Units, is added for the groups for Lindsey Acree (Victim-1, offense level 40), Bela Koval (Victim-2, offense level 40), Victim-4 (offense level 40), Katie Moore (Victim-12, offense level 40), Maylen Gehret (Minor Victim-26, offense level 40), Victim-5 (offense level 38), Rachel Stevens (Victim-9, offense level 38), and Kayley Brown (Minor Victim-25, offense level 38), because they are equally serious or from one to four levels less serious than the group for Isa Brooks (Minor Victim-3), which has an offense level of 42.

[8] For the groups for Rhonda Stone (Victim-7) and Amelia Rosen (Minor Victim-8), the Alon and Oren PSRs apply a two-level enhancement for an "offense [that] involved a large number of victims." U.S.S.G. § 3A1.1(b)(2). (PSR ¶ 143 (Alon); PSR ¶¶ 143, 151 (Oren)). Because this enhancement refers to "the offense" and Stone and Rosen are not counted as victims of the Count One conspiracy, the Government has not applied this two-level enhancement to these groups.

- Pursuant to U.S.S.G. § 3D1.4(a), one-half Unit is added, for a total of one-and-a-half Units, for the groups for Maya Miller (Victim-6, offense level 36),[9] Rhonda Stone (Victim-7, offense level 36), and Amber Davis (Victim-30, offense level 34), because they are five to eight levels less serious than the group for Isa Brooks (Minor Victim-3), which has an offense level of 42.

- Pursuant to U.S.S.G. § 3D1.4, there are a total of ten-and-a-half Units, which exceeds five Units, so five levels are added. As a result, the combined adjusted offense level is 47.

Chapter Four Enhancements

- Pursuant to U.S.S.G. § 4B1.5(b), because the defendant's instant offense in Count Five for a violation of 18 U.S.C. § 1591 and in Count One for conspiracy to commit the same, which were perpetrated against a minor, are covered sex crimes, neither §4B1.1 nor §4B1.5(a) applies, and the defendant engaged in a pattern of activity involving prohibited sexual conduct (with Isa Brooks (Minor Victim-3), Kayley Brown (Minor Victim-25), and Maylen Gehret (Minor Victim-26)), five levels are added. As a result, the applicable offense level is 52.[10]

Total Offense Level

- Pursuant to Chapter 5, Part A, application note 2, in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43.

Criminal History Category

- Alon has zero criminal history points. As a result, his criminal history category is I.

Applicable Guidelines Range

- Based on the foregoing, the applicable Guidelines range based on a total offense level of 43 and a criminal history category of I is life imprisonment.

---

[9] For each defendant, the PSRs assign one full unit for the group for Maya Miller (Victim-6), even though the offense level for that group (36) is five to eight levels less serious than the group with the highest offense level (the group for Isa Brooks (Minor Victim-3), at 42). (PSR ¶ 221 (Alon) (Group 5); PSR ¶ 229 (Oren) (Group 8); PSR ¶ 216 (Tal) (Group 4)). These paragraphs should be corrected to add one-half Unit for the Miller groups, according to U.S.S.G. § 3D1.4(a).

[10] The final sentence of paragraph 225 of Alon's PSR says that the adjusted offense level is 50, but this appears to be a typo and should be corrected to an adjusted offense level of 52 (as reflected in the calculation on the right-hand side of the page). (PSR ¶ 225 (Alon)).

**c. Oren: Counts One, Three, Four, Ten, Eleven, and Twelve**

Oren was convicted of Count One (Conspiracy to Commit Sex Trafficking), Count Three (Sex Trafficking of Bela Koval (Victim-2) by Force, Fraud, or Coercion), Count Four (Inducing Bela Koval (Victim-2) to Travel to Engage in Unlawful Sexual Activity), Count Ten (Aggravated Sexual Abuse of Rhonda Stone (Victim-7) by Force or Intoxicant), Count Eleven (Sexual Abuse of a Physically Incapacitated Person: Rhonda Stone (Victim-7)), and Count Twelve (Sexual Exploitation of a Minor: Amelia Rosen (Minor Victim-8)). Oren's Guidelines calculation is as follows:

<u>Counts One, Three, and Four</u>

- Pursuant to U.S.S.G. § 3D1.2(a), because they involve the same victim and acts, Counts Three and Four are grouped with Count One's group as to Bela Koval (Victim-2).

<u>Counts Ten and Eleven</u>

- Pursuant to U.S.S.G. § 3D1.2(a), because they involve the same victim and acts, Counts Ten and Eleven constitute a single group for Rhonda Stone (Victim-7).
- The sentencing Guideline applicable to Counts Ten and Eleven is U.S.S.G.§ 2A3.1. Pursuant to U.S.S.G. § 2A3.1(a)(2), the base offense level for this group is 30.
- Pursuant to U.S.S.G. § 2A3.1(b)(1), because the offense involved conduct described in 18 U.S.C. § 2241(a) and/or (b), namely force and drugging, four levels are added.
- Pursuant to U.S.S.G. § 3A1.1(b)(1), because the defendant knew or should have known that a victim of the offense was a vulnerable victim, owing to her drugged state, two levels are added.
- Accordingly, the offense level for this group is 36.

<u>Count Twelve</u>

- Pursuant to § 3D1.2, Count Twelve constitutes its own group for Amelia Rosen (Minor Victim-8).
- The sentencing Guideline applicable to Count Twelve is U.S.S.G. § 2G2.1. Pursuant to U.S.S.G. § 2G2.1(a), the base offense level for this group is 32.

- Pursuant to U.S.S.G. § 2G2.1(b)(2)(A), because the offense involved the commission of a sexual act, two levels are added.

- Pursuant to U.S.S.G. § 2G2.1(b)(3), because the defendant knowingly engaged in distribution, two levels are added.

- Pursuant to U.S.S.G. § 3A1.1(b)(1), because the defendant knew or should have known that a victim of the offense was a vulnerable victim, owing to her drugged state, two levels are added.

- Accordingly, the offense level for this group is 38.

<u>Grouping Analysis</u>

- In calculating the combined offense level, pursuant to U.S.S.G. § 3D1.4(a), the group for Isa Brooks (Minor Victim-3) has the highest offense level (offense level 42) and represents one Unit.

- Pursuant to U.S.S.G. § 3D1.4(a), one additional Unit, for a total of nine additional Units, is added for the groups for Lindsey Acree (Victim-1, offense level 40), Bela Koval (Victim-2, offense level 40), Victim-4 (offense level 40), Katie Moore (Victim-12, offense level 40), Maylen Gehret (Minor Victim-26, offense level 40), Victim-5 (offense level 38), Rachel Stevens (Victim-9, offense level 38), Kayley Brown (Minor Victim-25, offense level 38), and Amelia Rosen (Minor Victim-8, offense level 38), because they are equally serious or from one to four levels less serious than the group for Isa Brooks (Minor Victim-3), which has an offense level of 42.

- Pursuant to U.S.S.G. § 3D1.4(a), one-half Unit is added, for a total of one-and-a-half Units, for the groups for Maya Miller (Victim-6, offense level 36), Rhonda Stone (Victim-7, offense level 36), and Amber Davis (Victim-30, offense level 34), because they are five to eight levels less serious than the group for Isa Brooks (Minor Victim-3), which has an offense level of 42.

- Pursuant to U.S.S.G. § 3D1.4, there are a total of eleven-and-a-half Units, which exceeds five Units, so five levels are added. As a result, the combined adjusted offense level is 47.

<u>Total Offense Level</u>

- Pursuant to Chapter 5, Part A, application note 2, in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43.

<u>Criminal History Category</u>

- Oren has zero criminal history points. As a result, his criminal history category is I.

<u>Applicable Guidelines Range</u>

- Based on the foregoing, the applicable Guidelines range based on a total offense level of 43 and a criminal history category of I is life imprisonment.

**d. Tal: Counts One, Two, Three, Four, Five, Eight, and Nine**

Tal was convicted of Count One (Conspiracy to Commit Sex Trafficking), Count Two (Sex Trafficking of Lindsey Acree (Victim-1) by Force, Fraud, or Coercion), Count Three (Sex Trafficking of Bela Koval (Victim-2) by Force, Fraud, or Coercion), Count Four (Inducing Bela Koval (Victim-2) to Travel to Engage in Unlawful Sexual Activity), Count Five (Sex Trafficking of a Minor: Isa Brooks (Minor Victim-3)), Count Eight (Sex Trafficking of Maya Miller (Victim-6) by Force, Fraud, or Coercion), and Count Nine (Inducing Maya Miller (Victim-6) to Travel to Engage in Unlawful Sexual Activity). Tal's Guidelines calculation is as follows:

<u>Counts One, Two, Three, Four, Five, Eight, and Nine</u>

- Pursuant to U.S.S.G. § 3D1.2(a), because they involve the same victim and acts, Count Two is grouped with Count One's group as to Lindsey Acree (Victim-1).

- Pursuant to U.S.S.G. § 3D1.2(a), because they involve the same victim and acts, Counts Three and Four are grouped with Count One's group as to Bela Koval (Victim-2).

- Pursuant to U.S.S.G. § 3D1.2(a), because they involve the same victim and acts, Count Five is grouped with Count One's group as to Isa Brooks (Minor Victim-3).

- Pursuant to U.S.S.G. § 3D1.2(a), because they involve the same victim and acts, Counts Eight and Nine are grouped with Count One's group as to Maya Miller (Victim-6).

<u>Grouping Analysis</u>

- In calculating the combined offense level, pursuant to U.S.S.G. § 3D1.4(a), the group for Isa Brooks (Minor Victim-3) has the highest offense level (offense level 42) and represents one Unit.

- Pursuant to U.S.S.G. § 3D1.4(a), one additional Unit, for a total of eight additional Units, is added for the groups for Lindsey Acree (Victim-1, offense level 40), Bela Koval (Victim-2, offense level 40), Victim-4 (offense level 40), Katie Moore (Victim-12, offense level 40), Maylen Gehret (Minor Victim-26, offense level 40), Victim-5 (offense level 38), Rachel Stevens (Victim-9, offense level 38), and Kayley Brown (Minor Victim-25, offense level 38), because they are equally serious or from one to four levels less serious than the group for Isa Brooks (Minor Victim-3), which has an offense level of 42.

- Pursuant to U.S.S.G. § 3D1.4(a), one-half Unit is added, for a total of one Unit, for the groups for Maya Miller (Victim-6, offense level 36) and Amber Davis (Victim-30, offense level 34), because they are five to eight levels less serious than the group for Isa Brooks (Minor Victim-3), which has an offense level of 42.

- Pursuant to U.S.S.G. § 3D1.4, there are a total of ten Units, which exceeds five Units, so five levels are added. As a result, the combined adjusted offense level is 47.

<u>Total Offense Level</u>

- Pursuant to Chapter 5, Part A, application note 2, in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43.

<u>Criminal History Category</u>

- On or about May 17, 2005, Tal was convicted in Nassau County District Court of violating maximum speed limits and driving while impaired by the consumption of alcohol and was sentenced to one-year conditional discharge, a $400 fine, and a license revocation. (PSR ¶ 224 (Tal)). Pursuant to U.S.S.G. §§ 4A1.1(c) and 4A1.2(e)(2), this sentence results in one criminal history point.

- On or about July 16, 2011, Tal was convicted in Southampton Town Court of driving while ability impaired by the consumption of alcohol and was sentenced to a $500 fine. (PSR ¶ 225 (Tal)). Pursuant to U.S.S.G. §§ 4A1.1(c) and 4A1.2(e)(2), this sentence results in one criminal history point.

- In accordance with the above, Tal has two criminal history points and is in criminal history category II.

<u>Applicable Guidelines Range</u>

- Based on the foregoing, the applicable Guidelines range based on a total offense level of 43 and a criminal history category of II is life imprisonment.

## II. The Defendants' Guidelines Objections Are Meritless

Based on the defendants' objections to the PSR and September 18, 2026 letter to the Court (Dkt. 510), it appears that the parties have eight general categories of Guidelines disputes:

- whether each defendant should be held responsible for the conduct of the other defendants under the § 1B1.3 relevant conduct guideline;

- whether groups for certain victims who did not testify or were not named in the indictment should be counted at all;

- whether § 2A3.1(b)(1)'s use-of-force enhancement applies for certain victim groups;

- whether § 3A1.3's physical restraint enhancement applies for certain victim groups, and if so, whether application of both the use-of-force enhancement and physical restraint enhancement constitutes double counting under the Guidelines;
- whether § 3A1.1(b)'s vulnerable victim enhancement and enhancement for a large number of vulnerable victims applies for certain victim groups, and if so, whether application of both the cross-reference to § 2A3.1 and the vulnerable victim enhancement constitutes double counting under the Guidelines;
- whether § 2A3.1(b)(6)(B)'s use of a computer enhancement applies for the group for Isa Brooks (Minor Victim-3);
- whether § 4B1.5(B)'s enhancement for a pattern of criminal activity involving prohibited sexual contact with minors applies for Alon; and
- whether Tal should receive two criminal history points.

For the reasons described below, the Court can and should hold each of the defendants responsible for the rapes and sexual assaults committed by their co-conspirators, as these instances fell within the scope of their jointly undertaken criminal activity and were reasonably foreseeable to all of them. The Court should also take into account the victims who did not testify, as well as Gehret, Brown, and Moore, as the scope of relevant conduct under § 1B1.3 is not limited to victims named in the indictment or victims who testified at trial, and the evidence related to these victims is reliable and fits the defendants' pattern of conduct. In addition, each of the disputed Chapter 2 and Chapter 3 enhancements, including the use-of-force, use of a computer, physical restraint, and vulnerable victim enhancements, are supported by the evidence given the defendants' behavior leading up to and during the sexual assaults, and none of these enhancements double count, given that they account for different aspects of the defendants' crime. Finally, the pattern enhancement is appropriate for Alon as he has at least two occasions of sexually assaulting minors, and the two criminal history points are required for Tal as he has two prior convictions within ten years of the commencement of the instant offense.

**a. The Defendants Are Responsible for the Conduct of Their Co-Conspirators Under § 1B1.3**

The PSRs appropriately hold each defendant responsible for the rapes and sexual assaults committed by his co-defendants that fit the defendants' decade-long pattern of conduct, as that conduct falls within the scope of their jointly undertaken criminal activity and was reasonably foreseeable to all defendants. (*See* PSR ¶¶ 118, 131 (Alon); PSR ¶¶ 120, 131 (Oren); PSR ¶¶ 117, 133 (Tal)).

As discussed above, U.S.S.G. § 1B1.3, the relevant conduct guideline, not only holds defendants responsible for their own acts and those they "aided, abetted, counseled, commanded, induced, procured, or willfully caused," but also for all the acts that fall within their jointly undertaken criminal activity. U.S.S.G. § 1B1.3(a)(1)(A)-(B). In the case of jointly undertaken criminal activity, *i.e.*, "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy," a defendant is responsible for "all acts and omissions of others" that "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense" and were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). In assessing the scope of jointly undertaken criminal activity, courts look to, among other things, "any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and other participants; whether the participants pool their resources, or whether they work independently; whether the defendant assisted in designing and executing the illegal scheme; and what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct." *United States v. Pica*, 106 F.4th 197, 201-02 (2d Cir. 2024) (emphasis omitted).

The jury verdict in this case indicates that the defendants agreed to engage in jointly undertaken criminal activity, *i.e.*, a conspiracy to commit sex trafficking from in or about 2008 through in or about 2021, in which they worked together to entice victims to them and drugged and/or used force to rape or sexually assault the victims. *See Egbert*, 562 F.3d at 1096-98 (holding defendants responsible under § 1B1.3 for assault against non-white victim committed by their co-conspirators where defendants were convicted of a conspiracy to interfere with civil rights with the purpose of injuring and intimidating non-whites and finding that the jury's general verdict "established that the defendants had an agreement to harm 'non-white' persons"). The evidence at trial showed that no later than the spring of 2009—when the defendants worked with each other and others to rent 88 Peconic, when Oren and a second man provided drugs to and then assaulted a largely unresponsive Amelia Rosen, and when Alon and Tal together forcibly raped Isa Brooks (who was drugged) in 88 Peconic, which they rented together with Oren—the defendants had agreed, either explicitly or at minimum implicitly, to engage in this conspiracy. *See* U.S.S.G. § 1B1.3, app. n.3(B) (explaining that in determining the scope of a defendant's agreement, "the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others"); (*see also* PSR ¶¶ 28-46 (Alon/Oren); PSR ¶¶ 29-47 (Tal); GX 1008 (showing as early as April 2009, Oren was emailing Alon, Tal, and others about renting and inviting others to the Hamptons house where Brooks was trafficked)). After this, the defendants engaged in a pattern of conduct involving collectively enticing women to them and using drugs and/or force to rape them. They often worked together to carry out this pattern, including by pooling their resources, drugging their victims, and carrying out the rapes together. For example, in 2011, Tal and Alon drugged Katie Moore, and Tal watched as Alon forcibly raped her in the apartment they shared. (PSR ¶¶ 75-84 (Alon/Oren); PSR ¶¶ 76-85 (Tal); *see* Tr. 147-59). In 2014,

Tal and another taller male stood together in the door to Maya Miller's bedroom in the Hamptons, expecting to find her knocked out and vulnerable to assault, only to be taken aback when she was conscious and alert. (*See* PSR ¶ 61 (Alon/Oren); PSR ¶ 62 (Tal); *see* Tr. 159). Similarly, in 2016, the defendants invited Bela Koval to that same house in the Hamptons and paid for her to travel there, where they drugged her prior to Oren raping her. (PSR ¶¶ 65-72 (Alon/Oren); PSR ¶¶ 66-73 (Tal); *see also* Tr. 926-31, 962-72; GX B-603, B-119-R, A-902 (defendants communicating with Koval's friend on Raya and via text message to invite them to the Hamptons); GX B-121-1 (defendants agreeing to "split and try to orgy" out the women); GX-3I-118-R, 3A-154 (defendants sharing costs of women's travel)). And then in 2017, Oren and Alon targeted Maylen Gehret, Kayley Brown, and Rachel Stevens at a bar in Aspen, gave them drugged drinks, invited them to a (fake) afterparty, and then sexually assaulted them in the same hotel room. (PSR ¶¶ 85-90 (Alon/Oren); PSR ¶¶ 86-91 (Tal); *see* Tr. 1881-94; Tr. 2370-77). From the defendants' conduct year after year, including the assaults they engaged in together, the Court can and should conclude that they had an agreement to engage in jointly undertaken criminal activity to entice, drug, and rape women.

The defendants generally object to being held responsible for the conduct of their co-conspirators where they were not personally present for a particular sexual assault. (*See* PSR pp. 63-64 (Alon); PSR pp. 64-65 (Oren); PSR pp. 63-64 (Tal); Dkt. 510 at 1). But under the Guidelines, there is no requirement that each defendant be present for a particular sexual assault, intend for the others to carry out that assault, or even have "direct knowledge" of the particular sexual assaults committed by the others in order for those assaults to fall within the scope of the jointly undertaken criminal activity. *See United States v. Nall*, 78 F. App'x 158, 159 (2d Cir. 2003) (rejecting the argument that "direct knowledge is a *sine qua non* of acceptable proof of relevant

conduct"); *see also Pica*, 106 F.4th at 202 (holding that it was not necessary for a defendant to intend, or even desire, a victim to die in order for that victim's murder to constitute relevant conduct).[11] Given their pattern of conduct, even where one or more of the defendants was not directly involved in a particular sexual assault, that sexual assault, often carried out via force or drugging, was within the scope of their jointly undertaken activity and was reasonably foreseeable to each of them. For example, Tal's invitation to Maya Miller to come to the defendants' house in the Hamptons, where he forcibly raped her by holding her by the neck after attempting to drug her, would have been foreseeable to Alon and Oren, who had worked with others to invite women and girls to their house in the Hamptons in the summer of 2009, where the defendants drugged and raped Brooks, Victim-4, and Victim-5, and who would two years later all work together to lure Bela Koval and her friend to the same house for the same reason. *See Egbert*, 562 F.3d at 1096-98 (holding defendants responsible under § 1B1.3 for assault against non-white victim committed by their co-conspirators where defendants committed an assault of a non-white victim that "followed the same pattern" two-and-a-half months earlier). The defendants' pattern of recording

[11] This is similar to the analysis often undertaken in drug cases, in which defendants enter into a drug conspiracy but are not aware of all the particular transactions, including the weight of the drugs involved, engaged in by their co-conspirators, yet are held accountable for the transactions that occurred after they joined the conspiracy under § 1B1.3. *See, e.g.*, *United States v. Rawls*, 523 F. App'x 772, 777 (2d Cir. 2013) ("In the case of a narcotics conviction, the defendant is accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook."); *United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006) ("The defendant need not have actual knowledge of the exact quantity of narcotics involved in the entire conspiracy; rather, it is sufficient if he could reasonably have foreseen the quantity involved."); *United States v. Davis*, 682 F.3d 596, 616 (7th Cir. 2012) ("Reasonable foreseeability refers to the scope of the agreement that a defendant entered into when he joined the conspiracy, not merely to the drugs he may have known about. Furthermore, reasonable foreseeability does not require a showing that the defendant was involved in or even had direct knowledge of any particular transaction."), *overruled on other grounds by United States v. Taylor*, 778 F.3d 667 (7th Cir. 2015).

their assaults and sharing photographs and videos of the assaults with each other and with others, as evidenced by the Vent on Bitches blog, furthers the conclusion that the assaults in which a particular defendant did not personally participate were nevertheless within the scope of the agreement and foreseeable to all defendants. (*See* GX 7A-102 (contains photograph of assault provided by Alon), 7A-105 (describing videoing a rape and watching the video afterward)). And Oren's statement to Tal in 2021 that they needed to be careful about their reputations and that "some Hoe complaining" could "bring [them] down" shows that the defendants remained aware of each other's conduct and thus could anticipate and foresee the actions of their co-conspirators, through the end of the charged conspiracy. (GX C-116-13).

Where the defendants are held responsible under § 1B1.3 for sexual assaults of victims they did not individually commit, they object to the enhancements applied to those groups. (PSR pp. 63-64 (Alon); PSR pp. 64-65 (Oren); PSR pp. 63-64 (Tal)). These enhancements are most commonly applied for the defendants' use of force and drugs with regard to the assaults and are discussed in more detail below. As discussed above, the defendants agreed to enter a conspiracy to sex traffic women using these methods—specifically, force and drugs—to carry out rapes and sexual assaults, and they engaged in a pattern of similar sexual assaults, together and independently, for more than a decade. As a result, each defendant should have known the other(s) would use force and/or drugs to sexually assault victims who were vulnerable, making the enhancements related to the use of force and drugging (*e.g.*, the use-of-force enhancement, the vulnerable victim enhancement, and the physical restraint enhancements, all of which are discussed in detail below) appropriate. *See United States v. Williams*, 428 F. App'x 134, 141-42 (3d Cir. 2011) (affirming enhancements for large number of vulnerable victims and explaining that "the [district court] expressly found that J.K. was vulnerable for any number of reasons and, citing

[the defendant's] connection to the conspiracy in general, deemed as reasonably foreseeable to him his partners' exploitation of large numbers of vulnerable victims and juvenile victims for sex trade via the use of force, coercion, threats, and fear"); *United States v. Phipps*, 319 F.3d 177, 190-91 (5th Cir. 2003) (affirming application of § 2A3.1 based on co-defendant's sexual assault of victim where defendant could have reasonably foreseen assault).

**b. The Defendants Should Be Held Accountable for the Sexual Assaults of Certain Victims Who Did Not Testify or Were Not Named in the Indictment**

In their objections to the PSRs, the defendants contend that the groups for certain victims (specifically, Victim-4, Victim-5, Rachel Stevens (Victim-9), Katie Moore (Victim-12), Kayley Brown (Minor Victim-25), Maylen Gehret (Minor Victim-26), and Amber Davis (Victim-30)) should not be counted at all for purposes of Count One's Guidelines calculation because these victims (i) did not testify at trial, (ii) did not meet all of the elements of substantive sex trafficking, (iii) were not named as victims in the indictment, and/or (iv) did not affirmatively indicate they did not want to engage in sexual conduct with the defendants. (*See* PSR pp. 63-64 (Alon); PSR pp. 64-65 (Oren); PSR pp. 63-64 (Tal)). For the reasons described below, the Court can and should include groups for these victims in the Guidelines calculation.

*First*, the defendants object to being held responsible for the sexual assaults of any victim who did not testify at trial, which includes Victim-4, Victim-5, Rachel Stevens, and Amber Davis. (*See* Dkt. 510 at 1). But there was no requirement that the Government prove any contested fact through any specific type of evidence at trial, and there certainly is none at sentencing. *See* 18 U.S.C. § 3661. Section 1B1.3 itself is not limited to evidence presented at trial, and the Court is permitted to consider any evidence it finds reliable at sentencing. *See, e.g.*, *United States v. Young*, 609 F.3d 348, 357-58 (4th Cir. 2010) ("To the extent that Young suggests the government was estopped from establishing a higher drug quantity at sentencing because it elected not to present

that evidence at trial, the argument is without merit."); *United States v. Broxmeyer*, 699 F.3d 265, 280 (2d Cir. 2012) (holding there was no plain error where district court considered "untried assault accusations" at sentencing "without affording [the defendant] an opportunity to cross-examinate his abusers" and noting that the district court had "largely unlimited discretion" in determining what to consider for sentencing); *United States v. Shonubi*, 998 F.2d 84, 89 (2d Cir. 1993) (explaining, in context of drug weight, that the court "is not bound by jury findings or evidence presented at trial, but may consider any reliable proof" when making determinations about relevant conduct under the Guidelines).

As to Victim-4 and Victim-5, the defendants argue they should not be included because there is allegedly no evidence that they were victims of the offense and because they did not testify. (*See* Dkt. 510 at 1). However, both Victim-4 and Victim-5, who were the victims of the substantive sex trafficking charges in Counts Six and Seven, have described to the Government the circumstances of their sexual assaults, which are consistent with other victims' accounts and evidence at trial, including the defendants' use of drugs to incapacitate and rape victims and the use of homes in the Hamptons (including 88 Peconic specifically) to lure and assault victims. As described in more detail above, both victims explained they were invited to the Hamptons by a party promoter during the summer of 2009 and took a bus to a club where they met the defendants and were invited back to 88 Peconic. (3514-001 at 1; 3514-006 at 1-2; 3544-002 at 1-2; 3544-005 at 1-2; 3544-006 at 1-3). They were given drinks, which caused them to lose consciousness for large portions of the night. (*See* 3514-001 at 2; 3514-009 at 3-4; 3544-002 at 1-2; 3544-009 at 2-4). During the night, Alon pinned Victim-4 to the corner of a hot tub and raped her there while she was in a drugged state (3514-001 at 2; 3514-009 at 3), and Victim-5 later saw Victim-4 being assaulted by both Alon and Oren in a bedroom in an incident that Victim-4 was too drugged to

recall, (3544-002 at 2; 3544-006 at 4). Victim-5 was similarly assaulted by Alon or Oren, though she remembers only flashes of the night because she was drugged. (3544-005 at 2; 3544-006 at 3; 3544-009 at 3).

Victim-4 and Victim-5 both contacted the Government in early December 2024, before charges had been publicly filed and remained engaged with the Government as trial neared. (*See* 3544-001). In December 2025, a month before trial, that changed. Victim-4 had been meeting with the Government in advance of her anticipated testimony at trial, when an investigator working for the defense came to Victim-4's neighborhood, posed as an insurance company employee, and asked her neighbors questions about her minor children, among other topics. (PSR ¶ 74 (Alon/Oren); PSR ¶ 75 (Tal); *see also* CN-1 at 1; CN-2 at 1; USAO_002060972; USAO_00260976). The inquiry about her young children and lies about the nature of the investigation were improper and caused Victim-4 to inform the Government, through counsel, that she no longer wished to participate in the case. (PSR ¶ 74 (Alon/Oren); PSR ¶ 75 (Tal); *see also* CN-1 at 1; CN-2 at 1). Ultimately because Victim-4 stopped participating in the case, and because her account was so intertwined with that of Victim-5, the Government chose not to proceed on Counts Six and Seven.

The defendants claimed, at page 15 of their objections to the Probation Office, that Victim-4 and Victim-5 decided not to testify as a result of an alibi notice served by the defense, but this is not accurate, nor is it even plausible given the order of events. First, Victim-4 stopped speaking with the Government after the investigator asked about her children on or about December 20, 2025—more than a month before the defense provided their first alibi notice on January 22, 2026. (*See* CN-1 at 1; CN-2 at 1). Second, the Government requested that the defense provide notice of any alibi witnesses for offenses occurring at "88 Peconic Hills, Southampton, NY 11968, on or

about June 26-27, 2009." The defense initially provided notice for an alibi the night of June 27, 2009 (*see* ALEXANDER_000030-34),[12] but the rapes, if they occurred that particular weekend, would have occurred on the night of June 26 into the morning of June 27, 2009, so the alleged alibi would not have been inconsistent with any evidence that would have been presented at trial. (*See* GX A-409 (not admitted) (June 26, 2009 message from Mike Kanevsky using the NYC and the Hamptons Hottest Venues group: "Hey Text me at [phone number ending in -2109] if you wanna take the Party bus to Dune in Southampton tonight. Meet me on 33rd st and 3rd ave at 8:30pm if you are down. The bus will come back at 3am from the club. Its only $20 dollars including free drinks all night so text me at [phone number ending in -2109] if you are coming.")). Third, it was not until February 19, 2026—weeks *after* the Government informed the Court and the defense that it was unlikely to be able to proceed on Counts Six and Seven due to the conduct of its investigator (and well into trial, nearing the end of the Government's case) (*see* Dkt. 429)—that the defense informed the Government for the first time it would call two of the defendants' ex-girlfriends in support of an alibi the night of June 26, providing as support a photograph of Oren and one of the ex-girlfriends that had been posted to Facebook on June 26, 2009,[13] though it did not indicate the time it was posted, (*see* ALEXANDER_000038). And it is not even clear that this "alibi" would undercut the charges in any way. To state the obvious, that a photograph was posted to Facebook on June 26 does not indicate that the events depicted in the photograph happened on that date, much less that they happened that evening, and much less that they preclude a rape. Further, if Victim-4 had still been cooperative, an alleged alibi would not have prevented the Government

[12] The references to "ALEXANDER" documents are to sentencing exhibits submitted by the defendants.

[13] The defendants have not submitted written statements or summaries from either witness as sentencing exhibits.

from pressing forward with the charges. The Government would have thoroughly investigated the alibi and potentially presented evidence to combat it. In addition, requesting alibi notice for a particular set of dates does not mean that the Government is limited to proof of offenses that occurred only on those dates. *See United States v. Dupuy*, 760 F.2d 1492, 1499 (9th Cir. 1985) ("The appellants seem to read the Rule 12.1 request as though it were a bill of particulars which limits the charges as to the time, place, and date indicated on the Government's request for notice-of-alibi. This reading is inconsistent with the requirements of the rule, its legislative history, and case law."); *United States v. Vela*, 673 F.2d 86, 88 (5th Cir. 1982) (rejecting defendants' argument that Government was limited to proof of events that took place during the time frame indicated in its request for an alibi notice). To put another way, the Government could have presented evidence at trial that the events in question occurred anytime in or around June 2009, which is what the indictment alleged.

Though Counts Six and Seven were ultimately not submitted to the jury, the defendants' trafficking of Victim-4 and Victim-5 can and should be accounted for at sentencing. Victim-4 and Victim-5 have reliably described the defendants' conduct in interviews with law enforcement agents and in trial preparation meetings, and the Court can and should rely on those statements and the evidence corroborating them. The law is clear that hearsay evidence may be considered during sentencing, where like here, it is reliable, and courts often consider victims' hearsay accounts. *See, e.g.*, *United States v. McBride*, No. 22-814, 2023 WL 4282298, at *2 (2d Cir. June 30, 2023) (district court did not err in relying on victim's hearsay statements contained in police reports to support sentencing enhancement); *United States v. Perez*, 523 F. App'x 842, 844 (2d Cir. 2013) ("Hearsay is admissible in sentencing proceedings. The district court therefore properly considered the victims' statements to investigators."); *Broxmeyer*, 699 F.3d at 279-80 (noting that

"it is well established that a district court need not hold an evidentiary hearing to resolve sentencing disputes, as long as the defendant is afforded some opportunity to rebut the Government's allegations" and holding there was no procedural error where district court considered evidence of sexual assault allegations from "a number of sources" at sentencing, even though those assaults were not the subject of testimony at trial or victim testimony at a *Fatico* hearing); *United States v. Skyfield*, No. 23 Cr. 569 (LJL) (S.D.N.Y. July 22, 2024), Dkt. 71 at 34-35, 48-51 (relying on victim's hearsay statements in police reports and video surveillance at sentencing proceeding when making findings on disputed facts).

The statements given by Victim-4 and Victim-5 are backed up by the other evidence presented at trial, which the jury clearly found reliable. Their accounts of what happened to them align perfectly with the testimony of other victims at trial and with the other evidence, including that Victim-4 and Victim-5 were trafficked to 88 Peconic just weeks after Isa Brooks was trafficked to the same house and were trafficked to the house in the same manner as Brooks, including taking a bus from Manhattan, meeting the defendants at a club, and then being brought back to the house where they were ultimately drugged and raped. The defendants also carried out their assaults of Victim-4 and Victim-5 in ways nearly indistinguishable from how other testifying victims described being raped. Alon's rape of Victim-4 in the hot tub closely resembled the rape in the same hot tub that had been committed by Tal and one of the twins during Memorial Day Weekend 2009. And other than the hot tub setting, it also mirrored the way Alon raped Ava Wells in Tel Aviv years later. Similarly, the way that Victim-5 described having snippets of memory, including of being assaulted by at least one of the twins, also mirrors Rhonda Stone's later experience with Alon and Oren, as does Victim-5's memory of seeing Victim-4 in a similar position with Alon and Oren and asking for help. That these women first contacted the

Government through counsel in early December 2024, before charges were first filed in this case only underscores the independent nature of their memories and descriptions of the assaults. (*See* 3544-001).

Any attack the defendants may levy against Victim-4 or Victim-5, such as Victim-5's lawsuit, inconsistencies in descriptions of peripheral details, a failure to recall precisely all details of being raped while in a drugged state, or even potential misidentification of a witness all reprise arguments that the defendants made at trial about victims who testified, which the jury found unpersuasive. *See Broxmeyer*, 699 F.3d at 280 (noting that defendant crossed other sexual assault victims at trial "to no apparent effect" and "[e]ven now, [the defendant] does not point to any line of cross-examination that he might have pursued at a hearing to undermine his accusers' credibility in a way that went beyond the arguments he presented to the district court"). Moreover, the assaults of Victim-4 and Victim-5 cannot be evaluated in isolation and must be considered alongside the other evidence of the defendants' decade-plus pattern of drugging and raping other victims, including the evidence that the defendants time and again forced themselves on women they invited to their Hamptons homes, without ever giving the victims an opportunity to consent to sex, and while ignoring tears, pleas to stop, and attempts to fight back and escape. Finally, not only are Victim-4 and Victim-5's accounts reliable and corroborated, ignoring their assaults when the defense's conduct caused Victim-4's unavailability at trial would be unjust and create perverse incentives for defendants, their counsel, and their investigators. The defendants' pattern of sex trafficking included these two victims, and they should be included in the Guidelines calculation for Count One.

As to Stevens and Davis, evidence was presented that establishes they were both victims of the sex trafficking conspiracy, so the fact they did not testify is irrelevant. Multiple witnesses

at trial testified about Oren's conduct toward Stevens at the Aspen bar and in the hotel room, which is more than enough to find that she was a victim of the conspiracy. (*See* Tr. 1880-81, 1885-86, 1888, 1894, 1909-11, 2372-73, 2375). This evidence demonstrated that after the defendants gave Stevens drinks that made her appear extremely intoxicated (Tr. 2372-73), they took her back to their hotel room, along with Kayley Brown and Maylen Gehret (Tr. 1885-86, 2374). Once there, Oren got on top of and assaulted Stevens, which both Brown and Gehret observed. (Tr. 1894, 2375). Stevens managed to extricate herself from the bed, went to Gehret, and said that "she wanted to leave and that she didn't want to be there anymore," and that "this is bad, this is bad, I don't want to be here, I'm leaving," and then ran out of the room. (Tr. 1894). Gehret also testified that she observed Stevens crying on the phone with her mother early the next morning and heard her say that "she didn't want to be there any more [*sic*], and that she wanted to go home[.]" (Tr. 1911). As the Court observed at a sidebar, there was no serious doubt that these victims had described seeing Oren assault Stevens in the hotel room. (Tr. 1906-07).

As to Davis, incontrovertible text message evidence presented at trial demonstrated that she too was a victim of the conspiracy. (*See generally* GX 1009). As part of a joint effort with Alon, Tal, and others to recruit women to the Bahamas for the failed Fyre Festival, Oren invited Davis to the Bahamas through a friend. (*See* GX C-109-1 through C-109-8 ("Fyre Puss" group chat in which defendants and their male friends coordinated their trip to the Bahamas, which included, among other things, sourcing drugs, arranging for travel and accommodations, and pooling their resources to transport women, host them for the festival, and house them on yachts); GX B-509-1 (Oren's text messages with Davis's friend, inviting her to Fyre Festival and telling her to "[b]ring a friend"; when she suggested Davis, Oren agreed, observing that "she's fun")). Oren then arranged Davis's travel to the Bahamas on a private jet. (GX B-116-1, B-124-1). While

in the Bahamas, Oren digitally penetrated and then raped Davis by forcing sexual intercourse while she was unconscious, which is reflected in Oren's own text messages. (GX B-124-1). In this conversation, Davis texted Oren that she was "not cool with what happened this morning" and that she had "lost all respect" for Oren and her friend who was having sex with her because they "both knew [she] didn't want it[.]" Davis continued, "I hope you know how wrong that is obviously I was not comfortable." When Oren responded, "Really? Didn't seem like that but I'm sorry," Davis said, "You have to ask someone before you have sex with them. I woke up to a dick inside of me." Oren did not deny the assault, and instead admitted to both digitally and vaginally penetrating Davis, stating, "It was my fingers first." (GX B-124-1).

In addition to the fact Davis did not testify, the defendants argue that Davis should not be included as a victim of the conspiracy because the Government did not interview her and she apparently "has never stated she was a victim of anything." (Dkt. 510 at 1). But, given the evidence presented at trial, it is irrelevant to the Guidelines analysis that Davis was not interviewed—just like there is no requirement under the law that she testify in order for the Court to consider Oren's rape of her at sentencing, there is no requirement that she must be interviewed. *See* 18 U.S.C. § 3661. It is also inaccurate to add that Davis never claimed to be a victim (though this too is not required), because she texted Oren the day of the assault, stating that she had "woke[n] up to a dick inside" of her, that no one had asked to have sex with her, that she was "not cool with what happened," and that Oren "knew [Davis] did not want it"—a clear description of a rape. (GX B-124-1)

Based on the already existing trial record described above, without the need for any testimony, the Court can find that both Davis and Stevens were victims of the conspiracy—the

evidence shows that the defendants enticed these victims and then sexually assaulted them when they were vulnerable (for Stevens, when she was drugged; for Davis, when she was unconscious).

*Second*, the defendants object to Katie Moore, Rachel Stevens, Kayley Brown, and Maylen Gehret being counted as victims for purposes of relevant conduct for Count One, arguing that all of the sex trafficking elements must be proven in order for their rapes or sexual assaults to count as relevant conduct under the Guidelines. (*See* PSR pp. 63-64 (Alon); PSR pp. 64-65 (Oren); PSR pp. 63-64 (Tal)). The defendants cite no authority for this proposition, and § 1B1.3 only requires acts to fall within the scope of jointly undertaken criminal activity (including acts in preparation for an offense or to avoid detection for an offense), not to satisfy all the elements of a substantive offense that was an object of the conspiracy. *See Pica*, 106 F.4th at 201-02 (district court properly found that a conspiracy to commit robbery included a murder committed during the robbery as relevant conduct). But even if the defendants were correct, the evidence presented at trial demonstrates that Stevens, Moore, Brown, and Gehret were victims of substantive sex trafficking offenses. For example, Tal invited Moore, through a friend, to an exclusive party at a celebrity's penthouse (a thing of value). After Moore arrived that night, Alon and Tal drugged her, and Alon later forcibly raped her at their apartment when she was weak and at times incapacitated as a result of the drugs (force and fraud). Moore never would have been in the defendants' apartment that night without the enticement of the celebrity's party. Similarly, after meeting Stevens, Brown, and Gehret at a bar in Aspen, Alon and Oren provided the victims with drugged drinks, invited them to a supposed afterparty in their luxury suite at a five-star hotel (a thing of value), and then proceeded to rape and sexually assault the victims in the hotel room, including at times using force, while the victims were under the influence of the drugs (force and fraud). Without the invitation to the afterparty, the victims never would have been in the hotel room where they were sexually

assaulted. The defendants' assaults of these victims therefore met all the elements of sex trafficking, and as a result, even under the defense's incorrect standard, these victims should be counted.

*Third*, the defendants object to being held responsible for the sexual assaults of victims not named in the indictment, which includes Moore, Stevens, Brown, Gehret, and Davis. (*See* PSR pp. 63-64 (Alon); PSR pp. 64-65 (Oren); PSR pp. 63-64 (Tal)). Again, § 1B1.3's relevant conduct analysis is not limited to victims named in the indictment, and the defendants do not point to any contrary authority. And simply because victims were not named in the indictment does not mean evidence was not presented at trial to demonstrate that they were victims of the sex trafficking conspiracy. The Court permitted evidence related to Moore, Stevens, Brown, Gehret, and Davis to be admitted at trial as evidence of the conspiracy. (Nov. 24, 2025 Tr. at 19-28 (admitting Stevens, Brown, and Gehret); Nov. 24, 2025 Tr. at 33-35 (admitting Moore); Dkt. 419 (admitting Davis)). And this evidence, which is described above, established that each of these individuals was a victim of the conspiracy.

*Fourth*, as to Gehret and Brown specifically, the defendants argued in objections submitted to the Probation Office that they should not be included because Gehret did not affirmatively state she did not want to engage in sexual conduct and because when Brown so indicated, her intentions were respected.[14] But the defendants' argument ignores the full story told by the evidence and is not a reason to set these victims aside. Whether Gehret voiced her discomfort or whether Brown's

---

[14] The defendants' objections to the inclusion of Brown and Gehret in the Guidelines calculation are noted at PSR pp. 63-64 (Alon); PSR pp. 64-65 (Oren); PSR pp. 63-64 (Tal). Page 16 of the defendants' written objections to the Probation Office further claimed "the evidence is clear that MV-25 indicated that she did not want to engage in sexual conduct and that when she stated her intentions, they were followed. As for MV-26, her testimony is that she never stated that she did not want to engage in this conduct."

intentions were followed is irrelevant, given that they were both drugged by the defendants. Alon then took advantage of their drugged state by sexually assaulting them. In addition, Alon should have known Gehret did not want to engage in sexual conduct after, for example, he scraped inside of her with his nails during digital penetration, causing her to tear and bleed, and then proceeded to rape her from behind despite the fact she was bleeding on the floor. (Tr. 1891-92). And although Alon did not continue assaulting Brown once she removed his hand from inside her underwear, this was only after Alon forced his hand down her pants and touched her vagina, as she laid motionless on the bed, going in and out of consciousness as a result of the drugged drinks. (Tr. 1894, 2376-77). Given the drugging and subsequent sexual assaults of these victims, the Court should include them in the Count One calculation.

**c. The Use-of-Force Enhancement Applies for Certain Victims**

U.S.S.G. § 2A3.1(b)(1) provides for a four-level increase "[i]f the offense involved conduct described in 18 U.S.C. § 2241(a) or (b)," *i.e.*, aggravated sexual abuse, which includes engaging in sexual acts with another person as a result of use of force or surreptitious drugging. 18 U.S.C. § 2241(a)(1), (b)(2). The PSRs apply the § 2A3.1(b)(1) enhancement based on the defendants' use of force (the "use-of-force enhancement") against eight victims: Lindsey Acree (Victim-1), Bela Koval (Victim-2), Isa Brooks (Minor Victim-3), Victim-4, Maya Miller (Victim-6), Rhonda Stone (Victim-7), Rachel Stevens (Victim-9), and Katie Moore (Victim-12).[15] In addition, the use-of-force enhancement is appropriate for Maylen Gehret (Victim-26), although the PSRs apply the § 2A3.1(b)(1) enhancement based solely on the defendants' surreptitious drugging of Gehret.

---

[15] For all of these victims, the § 2A3.1(b)(1) enhancement could be based on the defendants' drugging or attempted drugging of these victims, rather than the defendants' use of force. The PSRs also apply the § 2A3.1(b)(1) enhancement to the groups for Victim-5, Kayley Brown (Minor Victim-25), and Maylen Gehret (Minor Victim-26) based on the defendants' drugging of these victims.

The defendants object to the use-of-force enhancement for all of these victims aside from Brooks and Moore (who are denoted with an asterisk when described below).[16] For the reasons described below, the use-of-force enhancement is properly applied.

As this Court explained in instructing the jury, force for purposes of § 2241(a)(1) (and therefore for the application of the use-of-force enhancement) involves "any form of physical violence, compulsion, constraint, or physical pressure directed against another person" and can be satisfied by rape. (*See* Tr. 5253, 5266-67 (jury charge)). For each of these victims, the evidence, as described below, demonstrated that the defendants used physical force, including at minimum physical pressure, in order to carry out their sexual assaults and rapes:

- **Lindsey Acree (Victim-1):** The evidence showed that in the sauna, Tal grabbed Acree by the neck and pinned her against a bench to constrain and assault her. (Tr. 2175-76). Later in the gym, Tal and a second man picked Acree up off the gym floor where she had collapsed, manipulated her body and bikini, and forcibly assaulted her at the same time. (Tr. 2180-81).

- **Bela Koval (Victim-2):** The evidence showed that after Koval, who felt paralyzed as a result of consuming a drugged drink, tried to tell Oren that "something's not right," he used his hands to pin her to the bed while he raped her. (Tr. 967-70). Koval tried to push Oren off and struggled to free herself, but Oren continued to pin her to the bed and continued to rape her. (Tr. 970-71). While raping her, Oren also pressed on Koval's abdomen, which caused her significant pain because of a recent surgery. (Tr. 972).

- **Isa Brooks (Minor Victim-3)*:** The evidence showed that while Alon and Tal raped Brooks, they took turns holding her down and raping her, causing her vaginal pain. (Tr. 2949). As a result of consuming drugged alcohol, Brooks could not stand or lift her head and her body felt limp and heavy, as she went in and out of consciousness. (Tr. 2947-48, 2950). But the defendants continued to use force to physically move her body, and when she regained consciousness, Tal was constraining her by holding down her arms as Alon,

---

[16] At pages 15-16 of their objections submitted to the Probation Office, the defendants raised objections to the use-of-force enhancement as to these particular victims as unsupported by the facts or evidence, if they offered any reasoning at all. The final PSRs do not appear to reflect all of these general factual objections to the enhancement but note specific objections to applying the enhancement for as to Stone, Gehret, Victim-4, Victim-5, and Stevens (*see* PSR pp. 69-71 (Alon); PSR pp. 70-72 (Oren); PSR pp. 69-70 (Tal)), which are discussed below.

Rabello, and another man took turns forcibly raping her. (Tr. 2950-51). Afterward, others held her down so that the assault could continue. (Tr. 2951).

- **Victim-4:** When Alon raped Victim-4, he pinned her in the corner of a hot tub, with his arms stretched over her so that she could not climb out, thus using force to constrain her. (3514-009 at 3). In addition, Alon used physical force, including through his size and strength, to overcome Victim-4's attempts to resist and push him off of her. (3514-009 at 3).

- **Maya Miller (Victim-6):** The evidence showed that after Tal chased Miller into the shower and undressed, Miller cried as Tal turned her around, bent her over, and held her by the back of the neck and head, constraining her as he pulled down her underwear and forced himself on her from behind. (Tr. 463-64).

- **Rhonda Stone (Victim-7):** The evidence showed that after Stone regained consciousness, one of the twins was on top of her and raping her. (Tr. 1377, 1517). Stone felt paralyzed and could not move, but Alon and Oren physically moved her body by positioning her on the bed, climbing on top of her, and then assaulting her by forcing themselves on to and inside of her. (Tr. at 1373-74, 1377-79). Given Stone's physical state, this encounter necessarily involved the defendants moving Stone's body by applying physical force to her. The defendants' use of force continued as they climbed on top of her and pressed themselves on to her body, which in combination with drugging, was calculated to overcome any potential resistance and prevent her escape.

- **Rachel Stevens (Victim-9):** The evidence showed that after the defendants gave Stevens a drink that made her appear extremely intoxicated (Tr. 2372-73), they took her back to their room, along with Kayley Brown and Maylen Gehret. Once there, Oren got on top of Stevens, applying physical pressure to her, and assaulted her. (*See* Tr. 1894, 2375). After Stevens managed to extricate herself from the bed, she went to Gehret and said that "she wanted to leave and that she didn't want to be there anymore" and that "this is bad, this is bad, I don't want to be here, I'm leaving," and then ran out of the room. (Tr. 1894; *see also* Tr. 1911 (Gehret testifying that she observed Stevens crying on the phone with her mother early the next morning and heard her say that "she didn't want to be there any more, and that she wanted to go home"); Tr. 1906-07 (the Court observing that it was clear that Gehret "saw Oren assaulting" Stevens)).

- **Katie Moore (Victim-12)*:** The evidence showed that after coming to in Alon's bedroom, Moore tried to leave a few times, but Alon pushed her back down on the bed, pushed her head to his groin in an attempt to force her to perform oral sex on him, and then, when she did not comply, pushed her back on the bed and digitally penetrated her. (Tr. 152-54). Moore repeatedly said no, fought back, and actively tried to get away during the assault, but she was unsuccessful. (Tr. 154-55). Alon, who was much bigger and stronger than her, then got on top of her, applied pressure to her, and forcibly raped her. (Tr. 155-56).

- **Maylen Gehret (Minor Victim-26):** The evidence at trial showed that after drugging Gehret, Alon pressed her up against the sink in the hotel bathroom and "shov[ed] his fingers inside of [her], really hard, and really fast, and [she] could feel his nails scraping inside of

> [her], and [she] could feel [herself] tearing, and it really hurt, and [being] so scared . . . so scared," before he then pushed her head down onto the vanity, applying physical pressure to constrain her, and raped her from behind as she bled. (Tr. 1891-92).

For all of these victims, the defendants used physical force leading up to or during the sexual assaults, making the use-of-force enhancement appropriate.

In their PSR objections, aside from simply objecting that the use-of-force enhancement was factually unsupported, the defendants raised a few particular objections to application of the use-of-force enhancement to certain victim groups. First, with regard to Stone and Gehret, the defendants argued that the use-of-force enhancement should not be applied because there was no evidence that the victims physically resisted, attempted to stop the acts, or were held down or restrained. (PSR pp. 69-70 (Alon); PSR pp. 70-71 (Oren); PSR p. 69 (Tal)).[17] But this kind of resistance or restraint, while sufficient to satisfy the use-of-force enhancement, is not required. (*See* Tr. 5253, 5266-67 (jury charge)); *see also United States v. Denjen*, 101 F. App'x 362, 364 (2d Cir. 2004) ("The requirement of force *may* be satisfied by a showing of . . . the use of such physical force as is sufficient to overcome, restrain, or injure a person.") (emphasis added) (quoting *United States v. Lauck*, 905 F.2d 15, 17 (2d Cir. 1990)); Sand, *Modern Federal Jury Instructions*, Instr. 61-5 cmt. (noting that § 2241 "does not require proof of significant violence, or that the victim offered resistance, or that the victim did not consent" and that "[t]he inability [of the victim] to escape is evidence of the use of force sufficient to satisfy [the force] element, but it is not

[17] To this point, about Gehret, the PSRs incorrectly describe that "[a]s to Minor Victim-26, the Government agrees the use-of-force enhancement is not applicable." The Government agrees the use of force enhancement does not apply to Brown (Minor Victim-25) but does not agree it does not apply to Gehret (Minor Victim-26). The Government accidentally swapped the two victim numbers in its first letter to the Probation Office but corrected the error in a follow-up letter. (*See* Ex. 3).

required"). For the reasons described above, the enhancement should be applied for Stone and Gehret.

Second, with regard to Victim-4 and Stevens, the defendants objected to the enhancement being applied because neither testified at trial. (PSR pp. 70-71 (Alon); PSR pp. 71-72 (Oren); PSR pp. 69-70 (Tal)). But as described above, *supra* pp. 46-55, the Guidelines do not require victim testimony for an enhancement to apply. Based on what Victim-4 told the Government in advance of trial and what was presented at trial related to Stevens, both of which are described in the bulleted list above, the use-of-force enhancement is warranted.

**d. The Physical Restraint Enhancement Applies for Certain Victims and Does Not Constitute Double Counting**

U.S.S.G. § 3A1.3 provides a two-level increase "[i]f a victim was physically restrained in the course of an offense[.]" U.S.S.G. § 3A1.3. The PSRs apply this physical restraint enhancement to groups for Lindsey Acree (Victim-1), Bela Koval (Victim-2), Isa Brooks (Minor Victim-3), Victim-4, Maya Miller (Victim-6), and Katie Moore (Victim-12). The physical restraint enhancement is also appropriate for Maylen Gehret (Minor Victim-26).[18] The defendants have raised specific factual objections to the application of the enhancement to certain victims, specifically Acree, Miller, and Moore, and object wholesale to the application of the physical restraint enhancement as double counting with the use-of-force enhancement.[19] The Court should

[18] The Court specifically requested the parties' views on whether the physical restraint enhancement applies for Gehret. (Dkt. 514). Although the Government neglected to file a formal objection to the PSRs about this enhancement for Gehret's group, upon further examination of the record, it believes the enhancement applies for the reasons described below.

[19] The defendants' general factual objections to the physical restraint enhancement as unsupported for specific victims were raised at pages 15-16 of the objections they submitted to the Probation Office. The final PSRs do not appear to reflect these factual objections to the enhancement but do note the universal double counting objection. (*See* PSR p. 66 (Alon); PSR pp. 66-67 (Oren); PSR pp. 65-66 (Tal)).

reject these objections. The physical restraint enhancement is factually justified for each of these victims, and its application does not constitute double counting.

The Guidelines define "physically restrained" as "the forcible restraint of the victim such as by being tied, bound, or locked up." U.S.S.G. § 1B1.1, app. n.1(K); *see* U.S.S.G. § 3A1.3, app. n.1 (defining "physically restrained" by cross-reference to U.S.S.G. § 1B1.1). The Second Circuit has explained that "use of the modifier 'such as' in the definition indicates that the illustrations of physical restraint are listed by way of example rather than limitation." *United States v. Rosario*, 7 F.3d 319, 320-21 (2d Cir. 1993). In determining whether to apply the physical restraint enhancement, this Circuit examines "(1) whether the restraint was physical, (2) whether there was restraint rather than just use of force, and (3) whether the action in question was constitutive of the [offense] or whether it was an additional physical restraint that facilitated the [offense]." *United States v. Taylor*, 961 F.3d 68, 79 (2d Cir. 2020). Restraint is distinct from the mere application of force—"[m]ere physical contact with the victim does not inevitably amount to physical restraint." *Id.* at 78. The restraint enhancement addresses conduct that "depriv[es] a person of his freedom of physical movement." *United States v. Herman*, 930 F.3d 872, 875 (7th Cir. 2019). "In other words, restraint is force that facilitates, as opposed to constitutes, the commission of the offense." *Taylor*, 961 F.3d at 78.

In the context of rape and sexual assaults, the physical restraint enhancement may be applied when the defendant holds a victim down, restricting her movement and preventing her from leaving. *See United States v. Davenport*, 910 F.3d 1076, 1083 (8th Cir. 2018) ("Here, holding down MD's wrists while thrusting constitutes physical restraint because it restricted her freedom of movement and prevented her from leaving."); *United States v. Johnson*, 492 F.3d 254, 257 (4th Cir. 2007) (physical restraint enhancement was met where defendant gripped victim's arms and

held her down while co-conspirator raped her); *United States v. Long Turkey*, 342 F.3d 856, 859 (8th Cir. 2003) (physical restraint enhancement was met where defendant held victim down by her arms and hair and pinned her beneath him during intercourse); *Arcoren v. United States*, 929 F.2d 1235, 1246 (8th Cir. 1991) (physical restraint enhancement was met where defendant pushed and grabbed victims to prevent them from leaving); *see also United States v. Waugh*, 207 F.3d 1098, 1101 (8th Cir. 2000) (physical restraint enhancement met in assault with a deadly weapon case where defendant locked doors and pinned victim with her arms behind her back). For the following victims, the defendants did just that:

- **Lindsey Acree (Victim-1):** The evidence showed that beyond merely using this force to assault Acree, Tal restrained her in the sauna while he assaulted her there. Tal pinned Acree's head to the bench while he stood behind her. This deprived Acree of the freedom of physical movement and kept Acree confined to the sauna while Tal forcibly assaulted her. (Tr. 2175-76). After restraining and assaulting Acree in the sauna, Acree was further restrained in the gym as she was "being flopped around and then manipulated," by Tal and the second man, which kept her confined to the gym for that assault. (Tr. 2181).

- **Bela Koval (Victim-2)*:**[20] The evidence showed that while Koval struggled to free herself from beneath Oren and to stop the assault, Oren continued to pin her to the bed and kept assaulting and raping her. (Tr. 970-72). For much of the time that he was raping her, Koval tried to actively resist and escape, including by bringing her hands to her to chest to try to push him off. (Tr. 971-72). But Oren defeated Koval's attempts to resist by pinning her to the bed, including by using his hands to press down on her, which prevented her from moving or escaping. (Tr. 972).

- **Isa Brooks (Minor Victim-3)*:** The evidence showed that multiple times during the gang rape, the defendants physically held Brooks down, even when ignoring her pleas for them to stop. (Tr. 2949-51). Before Brooks lost consciousness, both Alon and Tal physically held Brooks down, so the other could rape her. (Tr. 2949). And then after she regained consciousness, Tal held her arms down, so that Alon, Rabello, and the fourth male could rape her; they then switched places, and others held her down, so Tal could take his turn.

[20] As with the use-of-force enhancement, the asterisks for Koval, Brooks, and Victim-4 indicate that the defendants have not raised factual objections to the PSRs' application of the physical restraint enhancement to these groups.

(Tr. 2950-51). Holding her down, including by the arms, prevented Brooks from moving and from escaping.

- **Victim-4*:** In order to rape Victim-4, Alon pinned her to the corner of the hot tub, holding the corner so that his arms were stretched over Victim-4. (3514-009 at 3). As a result, despite her attempts to push off Alon, Alon was able to keep Victim-4 constrained to the hot tub and prevented Victim-4 from climbing out of the hot tub to escape. (3514-009 at 3).

- **Maya Miller (Victim-6):** The evidence showed that after chasing Miller into the shower and closing the door behind him, Tal stood between Victim-6 and the door, blocking the door and making it difficult for her to escape. (Tr. 463). Once there, Tal turned her around, bent her over, and held her by the back of the neck—physically preventing her from leaving as he raped her. (Tr. 463-64).

- **Katie Moore (Victim-12):** The evidence showed that when Moore tried to leave and said she did not want to have sex with Alon, Alon pushed her back down on the bed to prevent her from leaving. (Tr. 152-53). He then pushed her head to his groin to try to get her to perform oral sex, and when she did not, he again pushed her back onto the bed, so that he could digitally penetrate her. (Tr. 154-55). Alon then physically got on top of Moore to rape her, which restricted her movement and prevented her from escaping, even as she cried and actively tried to get away. (Tr. 155-56).

- **Maylen Gehret (Minor Victim-26):** The evidence showed that after Alon sexually assaulted Gehret on the bed of the Aspen hotel, he led her to the bathroom, positioned himself between her and the door, and locked the door behind him, which scared Gehret and prevented her from leaving. (Tr. 1890). After violently digitally penetrating her, Alon turned Gehret toward the counter and pressed her head down into towels between the sinks, physically holding her down as he raped her from behind. (Tr. 1891-92).

For these victims, the defendants did not simply use force; they instead used physical restraint to facilitate their assaults and make their rapes easier. As a result, the physical restraint enhancement is appropriate for these victims. *See Taylor*, 961 F.3d at 78 ("[R]estraint is force that facilitates, as opposed to constitutes, the commission of the offense.").

The defendants object factually to the application of the physical restraint enhancement to Acree, Miller, and Moore in pages 15-16 of their objections made to the Probation Office, arguing there was no evidence these victims were "tied, bound up, or locked up." But as explained above, the physical restraint enhancement is not limited to these three categories. *See Rosario*, 7 F.3d at

320 (explaining that the Guidelines' "use of the modifier 'such as' in the definition indicates that the illustrations of physical restraint are listed by way of example rather than limitation"). That the defendants restricted the victims' movement and prevented them from escaping by, among other things, pinning Acree's head to a bench (Tr. 2175-76), holding Miller down by the neck (Tr. 464), and repeatedly pushing Moore onto the bed and physically getting on top of her (Tr. 152-56), is sufficient to apply the physical restraint enhancement.

In addition to objecting to the physical restraint enhancement as to these particular victims, the defendants also argue that application of the physical restraint enhancement and the use-of-force enhancement as to all of the victims is double counting. (*See* PSR p. 66 (Alon); PSR pp. 66-67 (Oren); PSR pp. 65-66 (Tal)). The application notes to § 3A1.3 provide that the physical restraint enhancement should not be applied "where the offense guideline specifically incorporates this factor, or where the unlawful restraint of a victim is an element of the offense itself[.]"). U.S.S.G. § 3A1.3, app. n.2. But aggravated sexual abuse does not require unlawful restraint of the victim as an element and the use-of-force enhancement does not specifically incorporate restraint, at least in the Second Circuit, which has a narrow interpretation of the scope of the physical restraint enhancement.

As noted above, the Second Circuit has adopted a multi-factor test to determine whether the enhancement applies. In doing so, it followed the lead of other circuits that have adopted similar tests in order to "cabin[] the physical restraint enhancement to avoid excessive application." *Taylor*, 961 F.3d at 78. Under the Second Circuit's narrow approach, the use of force necessary to apply the physical restraint enhancement must be more than the force needed to commit the typical offense of aggravated sexual abuse. As discussed above with regard to the use-of-force enhancement, the force element for aggravated sexual abuse requires proof that the

defendants used "any form of physical violence, compulsion, constraint, or physical pressure directed against another person," which can be satisfied by rape. (*See* Tr. 5253; 5266-67 (jury charge)). In other words, proving the force element for § 2241 does not require proof that a victim was physically restrained. *See Johnson*, 492 F.3d at 258 ("Under this definition the force element in § 2241(a)(1) may be satisfied without evidence of physical restraint similar to the examples (being tied, bound, or locked up) in the guidelines' definition of physical restraint. In other words, the use of force does not necessarily entail physical restraint."); *see also id.* ("An offender's ability to commit forcible rape without resort to physical restraint" demonstrates "that unlawful restraint is not an element of § 2241(a) or specifically incorporated into the offense guideline [§ 2A3.1(b)(1)]."). Because the Guidelines contemplate double counting for the physical restraint enhancement only "where the offense guideline specifically incorporates this factor, or where the unlawful restraint of a victim is an element of the offense itself"—neither of which is the case here—there is no double counting problem. *See* U.S.S.G. § 3A1.3, app. n.2.

Although the Second Circuit does not appear to have addressed the potential double counting question for the use-of-force and physical restraint enhancements, at least one court in this Circuit has held there is no double counting, explaining that the "use-of-force adjustment reflects the violence and depravity of [the defendant's] sexual abuse," and "the restraint adjustment reflects [the victim's] helplessness." *United States v. Volpe*, 78 F. Supp. 2d 76, 85-86 (E.D.N.Y. 1999), *aff'd in part, dismissed in part*, 224 F.3d 72 (2d Cir. 2000). Similarly, based on the reasoning described above, the Fourth, Eighth, and Ninth Circuits have found there is no double counting when both enhancements are applied. *See, e.g.*, *Johnson*, 492 F.3d at 258 ("An offender's ability to commit forcible rape without resort to physical restraint leads us to conclude that unlawful restraint is not an element of the § 2241(a)(1) offense or specifically incorporated in the

offense guideline. Accordingly, Johnson is not exempt from the two-level enhancement under guideline § 3A1.3 for his physical restraint of the victim."); *United States v. Begay*, 116 F.4th 795, 803-04 (8th Cir. 2024) ("Begay's position is that it duplicates an element of aggravated sexual abuse, so it 'double counts' the same conduct. We have encountered this double-counting argument before and rejected it. We do the same today."), *cert. denied*, 145 S. Ct. 1933 (2025); *Arcoren*, 929 F.2d at 1248 ("Although section 2A3.1(b) lists 'the means set forth in 18 U.S.C. § 2241(a) or (b)'—i.e., force, threat, or other means—as a specific offense characteristic of Criminal Sexual Abuse, this does not necessarily include the physical restraint that section 3A1.3 covers. . . . [A]lthough 'physically restrained' requires the use of force, use of force does not necessarily entail physical restraint."); *United States v. Star*, 451 F. App'x 708, 709 (9th Cir. 2011) ("Restraint of the victim is not an element of the offense of aggravated sexual abuse nor was it . . . incorporated in the aggravated sexual abuse offense Guideline applied here. *See* 18 U.S.C. § 2241; U.S.S.G. § 2A3.1.").

In support of their double counting objection, the defendants cite to a case from the Tenth Circuit—the only circuit the Government is aware of that has found there to be double counting when the use-of-force enhancement and physical restraint enhancements are applied. (*See* PSR p. 66 (Alon); PSR pp. 66-67 (Oren); PSR pp. 65-66 (Tal)). But unlike the Second Circuit, the Tenth Circuit has adopted a broad interpretation of the physical restraint enhancement. *United States v. Joe*, 696 F.3d 1066, 1071-72 (10th Cir. 2012) (specifically distinguishing the Second Circuit's approach to physical restraint as more limited than the Tenth Circuit's approach). As a result, in the Tenth Circuit, which has a lower threshold for applying the physical restraint enhancement than the Second, Fourth, Eighth, or Ninth Circuits, the force inherent in an aggravated sexual abuse under 18 U.S.C. § 2241(a)(1) was necessarily sufficient to satisfy the use-of-force and physical

restraint enhancements and resulted in double counting. *See id.* at 1072 (Tenth Circuit explaining that its "broad construction of 'physically restrained'" made it "impossible to commit the offense of aggravated sexual abuse under § 2241(a)(1) without also applying force that, in our circuit, constitutes physical restraint of the victim."). Given the Second Circuit's more limited application of the physical restraint enhancement as described above, the Tenth Circuit's double counting concern does not exist here. The Court should therefore apply both the physical restraint and use-of-force enhancements for Acree, Koval, Brooks, Victim-4, Miller, Moore, and Gehret.[21]

#### e. The Vulnerable Victim Enhancement Applies for Certain Victims and Does Not Constitute Double Counting, as Does the Enhancement for a Large Number of Vulnerable Victims

U.S.S.G. § 3A1.1 requires a two-level increase "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim," and an additional two-level increase if "the offense involved a large number of vulnerable victims[.]" U.S.S.G. § 3A1.1(b)(1)-(2). The PSRs apply both enhancements for the groups for Lindsey Acree (Victim-1), Bela Koval (Victim-2), Isa Brooks (Minor Victim-3), Victim-4, Victim-5, Rhonda Stone (Victim-7), Amelia Rosen (Minor Victim-8), Rachel Stevens (Victim-9), Katie Moore (Victim-12), Kayley Brown (Minor Victim-25), Maylen Gehret (Minor Victim-26), and Amber Davis (Victim-30). The defendants argue that the vulnerable victim enhancement does not apply, and that if it does, its application constitutes double counting. But the enhancement factually applies, given that these victims were drugged, or at minimum, were in a state of incapacitation, unconsciousness, or extreme intoxication, and there is no double counting. In addition, given that at least ten victims of Count One were vulnerable, the enhancement for a large number of vulnerable victims applies.

[21] Alternatively, § 2A3.1(b)(1) could be applied based on the defendants' drugging or attempted drugging of each of these victims, rather than the defendants' use of force, eliminating any double counting argument with regard to the physical restraint enhancement.

#### *i. The Vulnerable Victim Enhancement Applies*

The vulnerable victim enhancement applies to victims who are "unusually vulnerable" due to their "age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, app. n.2. The enhancement is appropriate for all the victims at issue (Acree, Koval, Brooks, Victim-4, Victim-5, Stone, Rosen, Stevens, Moore, Brown, Gehret, and Davis) based on their physical and mental condition. The Second Circuit has held that the enhancement is applicable where a defendant drugs his victims, which makes the victims "physically and mentally more vulnerable." *See United States v. Altman*, 901 F.2d 1161, 1165 (2d Cir. 1990). The enhancement also applies where a victim is incapacitated or severely intoxicated—even where that state was not caused by the defendants. *See United States v. Talk*, 446 F. App'x 114, 124 (10th Cir. 2011) (affirming application of vulnerable victim enhancement where "extreme levels of intoxication render an individual unable to defend himself"); *United States v. Betone*, 636 F.3d 384, 388 (8th Cir. 2011) (same where victim "was passed out, incapable of consenting and therefore vulnerable due to his physical condition"). Each of these victims was drugged by the defendants and their friends, or at minimum, was incapacitated, unconscious, or extremely intoxicated, rendering them unusually vulnerable by impairing their "capacity . . . to detect or prevent crime," *United States v. Chin*, 41 F.4th 16, 26 (1st Cir. 2022). Accordingly, the vulnerable victim enhancement should be applied.

The defendants argue that the vulnerable victim enhancement cannot be based on the defendants' surreptitious drugging of the victims, because that is "a condition manufactured by the offense itself," rather than a "pre-existing trait supporting the enhancement." (PSR p. 67 (Alon); PSR p. 68 (Oren); PSR p. 67 (Tal)). That the defendants caused the vulnerability does not make them immune from the enhancement. Indeed, as noted above, the Second Circuit itself has

affirmed the application of the vulnerable victim enhancement based on a defendant's drugging of his victim. *See Altman*, 901 F.2d at 1165.

The defendants also raised specific factual objections to the application of the vulnerable victim enhancement to Rosen, Moore, and Davis in the objections they submitted to the Probation Office. For all three, the defendants argue there was no evidence they were drugged, and as to Rosen and Moore, the defendants also claim that these victims consumed substances of their own volition. Contrary to the defendants' claims, there was ample evidence that Moore was drugged, including her testimony and that of a toxicologist, which established that shortly after Alon and Tal provided Moore with drinks, she began to experience symptoms consistent with drugging via a sedative-hypnotic, including blacking out and coming to "like a switch" flipped, after which she learned that Alon had already raped her once. (Tr. 151-53). The substance Moore willingly ingested that night was allegedly "molly," which Tal provided her, but her symptoms were inconsistent with typical MDMA use, which should have made her feel euphoric (the "molly" did not). (Tr. 143-45). As to Rosen, regardless of whether Oren surreptitiously drugged her, the photographic and video evidence shows that over the course of the night, Rosen became increasingly intoxicated and incoherent. (GX 1001). Prior to going into the bedroom where she was raped, her voice was slurred and nearly incomprehensible. (GX D-121-7). At this point, when she was too incapacitated to make decisions of her own volition, Oren gave her another pill to make her go to sleep, (*see* GX D-121-2 (Oren asking Rosen, "Did you take that pill? You should've took that pill," before going into the bedroom)), and then proceeded to rape her in the bedroom as she lay there limply, (*see* GX D-121-1). As to Davis, setting aside whether she was drugged, the evidence demonstrated that Oren digitally and vaginally penetrated her while she was unconscious. (GX B-124-1 (Davis: "You have to ask someone before you have sex with them. I

woke up to a dick inside of me[.]" Oren: "It was my fingers first.")). Ultimately though, whether the defendants drugged these victims or whether they ingested substances of their own volition is beside the point—in either scenario, the vulnerable victim enhancement applies because the defendants took advantage of each victim when they were clearly in a vulnerable state of incapacitation, unconsciousness, or extreme incapacitation, all of which make this enhancement appropriate. *See Talk*, 446 F. App'x at 124; *Betone*, 636 F.3d at 388.

In addition to these specific factual objections, the defendants argue that application of the vulnerable victim enhancement based on drugging or incapacitation double counts where the base offense level is calculated through a cross-reference to U.S.S.G. § 2A3.1, triggered by conduct involving force or incapacitation in violation of 18 U.S.C. §§ 2241 or 2242. (PSR p. 67 (Alon); PSR p. 68 (Oren); PSR p. 67 (Tal)). But there is no double counting here.[22] While § 2242(2) "does include, as an element, the incapacity of the victim[,] . . . the Guideline provision used to calculate [the defendants'] base offense level" —§ 2A3.1—"does not." *United States v. Schoenborn*, 793 F.3d 964, 967 (8th Cir. 2015). "Instead, § 2A3.1 applies to all sexual abuse offenses under 18 U.S.C. §§ 2241 and 2242. This same guideline provision, with a base offense of 30, would also apply, for example, to a person convicted of sexual abuse through placing another in fear. *See* 18 U.S.C. § 2242(1)." *Id.* Application Note 2 to § 3A1.1 instructs courts not to apply

[22] Even if there could theoretically be double counting where the base offense level under § 2A3.1 is calculated based on drugging or incapacitation and the vulnerable victim enhancement is applied, there is no double counting for Acree, Koval, Brooks, Victim-4, Stone, Stevens, Moore, and Gehret, for whom § 2A3.1 can be applied based on the defendants' use of force. In that case, these two provisions would account for "distinct aspects" of the defendants' conduct: the § 2A3.1 base offense level would account for their use of force against the victims, and the vulnerable victim enhancement would account for their drugging of the victims. *United States v. Morris*, 350 F.3d 32, 37 (2d Cir. 2003); *see United States v. Johnson*, 860 F.3d 1133, 1147 (8th Cir. 2017) (affirming application of vulnerable victim enhancement based on facts that made victim vulnerable in addition to use of force). There is also no double counting for Rosen, whose base offense level is calculated under § 2G2.1, rather than § 2A3.1.

the vulnerable victim enhancement "if the factor that makes the person a vulnerable victim is incorporated in the offense guideline." U.S.S.G. § 3A1.1, app n.2. By the text of the application note, this restriction applies only if there was already an enhancement under the Guidelines that explicitly counted for the victim's vulnerable characteristic, but "§ 2A3.1 does not incorporate an enhancement for a specific offense characteristic based on the incapacity of the victim." *Schoenborn*, 793 F.3d at 967. Consequently, "as the victim[s'] vulnerability in this case was not accounted for in either the base offense level or a specific offense characteristic," there is no double counting, and application of the vulnerable victim enhancement is required. *Id.* at 967-968; *cf. United States v. Perez*, No. 20-1982-Cr., 2022 WL 1421408, at *3 (2d Cir. May 5, 2022) (holding no double counting in applying the base offense level under § 2A3.1(a) and the use-of-force enhancement under § 2A3.1(b)(1) because these adjustments are aimed at different harms, specifically "the base offense level for the aggravated sexual abuse counts—which applies equally to aggravated sexual abuse under 18 U.S.C. § 2241(a) or § 2241(b) and to 'unaggravated' sexual abuse under § 2242, *see* U.S.S.G. App. A—recognized the baseline harm of the conduct of criminal sexual abuse while the use-of-force enhancement recognized the distinct harm of the use of force in the commission of that sexual abuse").[23]

---

[23] The § 2A3.1(b)(1) enhancement for "conduct described in 18 U.S.C. § 2241(a) or (b)" can include the defendant's use of force or surreptitious drugging to facilitate a sexual assault. The PSR largely applies this enhancement based on the defendants' use of force to certain victims, but as indicated in footnote 21 *supra*, for all of these victims, the enhancement would also be applicable based on the victims' drugging or attempted drugging. Even if § 2A3.1(b)(1) were applied based on drugging, there is still no double counting for the same reasons as described with regard to the § 2A3.1 base offense level. In short, this enhancement accounts for the fact that aggravated sexual abuse was involved in the offense, rather than drugging specifically, and the text of the guideline does not specifically incorporate an enhancement for a drugged, intoxicated, or otherwise incapacitated victim. *Schoenborn*, 793 F.3d at 967 ("§ 2A3.1 does not incorporate an enhancement for a specific offense characteristic based on the incapacity of the victim."). That the analysis for double counting under Application Note 2 is limited to explicit enhancements contained within the Guidelines is made more clear by comparing the double counting limitation

General principles of double counting also counsel that no impermissible double counting exists where the § 2A3.1 cross-reference and vulnerable victim enhancement are both applied. The Second Circuit has explained that "multiple adjustments may properly be imposed when they aim at different harms emanating from the same conduct[,]" including where the adjustments "do not serve identical purposes, but rather address separate sentencing considerations." *United States v. Volpe*, 224 F.3d 72, 76 (2d Cir. 2000); *see also United States v. Maloney*, 406 F.3d 149, 153 (2d Cir.2005) ("[D]ouble counting is permissible in calculating a Guidelines sentence where, as here, each of the multiple Guidelines sections applicable to a single act serves a distinct purpose or represents a discrete harm."); *cf. Volpe*, 224 F.3d at 76 ("Impermissible double counting occurs when one part of the guidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been *fully accounted for* by another part of the guidelines.") (emphasis added). The guidelines at issue here do not serve the same purposes. The § 2A3.1 base offense level focuses on the *defendant's* conduct, whereas the vulnerable victim enhancement "focuses on the nature of the *victim*, as opposed to the offender." *United States v. Volkman*, 797 F.3d 377, 399 (6th Cir. 2015) (holding no double counting for vulnerable-victim enhancement and special skill enhancement); *see also, e.g.*, *United States v. Kaye*, 23 F.3d 50, 54 (2d Cir. 1994) (explaining that "[t]he enhancement for crimes committed against unusually vulnerable victims evinces the Commission's concern with the condition of the victim more directly" and holding no double counting for the abuse of position of trust and vulnerable victim enhancements); *United States v. Nunley*, 29 F.4th 824, 831-32 (6th Cir. 2022) (explaining that "[d]istinguishing between

---

in § 3A1.1 Application Note 2, which applies only when "the factor that makes the person a vulnerable victim is incorporated in the offense guideline," with the broader double counting limitation in § 3A3.1 for physical restraint, which applies "where the offense guideline specifically incorporates this factor, or *where the unlawful restraint of a victim is an element of the offense itself*." *See* U.S.S.G. § 3A3.1 app. n.2 (emphasis added).

enhancements based on the characteristics of the defendant or his actions, versus enhancements based on the characteristics of the defendant's victim, is often critical in a double-counting analysis" and holding no double counting for the additional felony and official victim enhancements); *United States v. Martinez-Rojas*, No. 15 Cr. 348 (ERK), 2023 WL 4867433, at *2 (E.D.N.Y. July 31, 2023) (rejecting double counting argument in sex trafficking case for the § 2A3.1 use-of-force enhancement and serious bodily injury enhancement because the enhancements "aim at different harms emanating from the same conduct, namely the use of force or threatening of injury in the first provision, and the actual sustaining of serious bodily injury in the second provision"). As a result, both § 2A3.1 and the vulnerable victim enhancement can and should be applied.

In addition to a victim's physical or mental state, the vulnerable victim enhancement can be applied based on a victim's age. *See* U.S.S.G. § 3A1.1, app. n.2. In this case, the PSR also applies the vulnerable victim enhancement to Brown and Gehret based on the fact they were seventeen at the time Alon sexually assaulted them (PSR ¶¶ 180, 187 (Alon); PSR ¶¶ 210, 217 (Oren); PSR ¶¶ 197, 204 (Tal)), and Brooks and Rosen were similarly minors when they were drugged and assaulted. The defendants object to the vulnerable victim enhancement being applied to Brown and Gehret on this basis. (PSR p. 69 (Alon); PSR p. 69 (Oren); PSR p. 68 (Tal); Dkt. 510 at 2). Specifically, they argue that because the age of consent in Colorado was 17, these women could not have been vulnerable. Colorado law is not relevant for this analysis. Brown and Gehret were minors (i.e., under 18) at the time they were assaulted and thus were minors (and vulnerable) for purposes of the Guidelines.

In addition, Alon argues there was not evidence that he knew or should have known that Gehret or Brown was 17, and Oren argues that there was not evidence that he knew or should have

known that Brown was 17, so the enhancement should not be applied. (*See* Dkt. 510 at 2). Alon and Oren both knew that Gehret was 17 years old, because at the table at the club, Gehret told the group she was "still in high school and was 17 years old[,]" to which Alon responded, "That's hot." (Tr. 1879). The defendants also both (at a minimum) should have known that Brown was 17. They knew that Brown came to the club with her high school friends, Gehret and Stevens, and that, at the very least, Gehret was under 18. (*See* Tr. 1876-77, 1879). Given Gehret's age and the fact Gehret and Brown were there together, Alon should have known that Brown was a minor, even if she did not specifically tell him her age. Accordingly, the vulnerable victim enhancement may be applied to Brown and Gehret on the additional basis of their age.[24]

#### *ii. The Enhancement for a Large Number of Vulnerable Victims Applies*

An additional two-level enhancement is appropriate where "the offense involved a large number of victims." U.S.S.G. § 3A1.1(b)(2); (*see also* Dkt. 510 at 1 (defense objecting, without argument, to this enhancement)). As described above, there were at least ten vulnerable victims of Count One: Acree, Koval, Brooks, Victim-4, Victim-5, Stevens, Moore, Brown, Gehret, and

[24] Alon also objects to the application of the vulnerable victim enhancement to Brooks based on her age, arguing that there was no evidence he knew or should have known her age at the time he trafficked and raped her in the summer of 2009. (Dkt. 510 at 2). The PSRs apply this enhancement to Brooks based on the fact that she was drugged, rather than her age (*see* PSR ¶ 151 (Alon); PSR ¶ 167 (Oren); PSR ¶ 154 (Tal)), but her age at the time—sixteen—provides an additional basis for the Court to find she was vulnerable. The evidence at trial demonstrated that Alon should have known that Brooks was a minor. Alon was renting 88 Peconic with Mathew Lipman, a party promoter, who blasted out invitations to the house—which Oren had initially drafted and emailed to Lipman, Alon, and others for approval, (GX 2C-104, B-303, B-304)—via several Facebook groups, of which Alon was a part, (GX A-407-3, A-408). Lipman's outreach resulted in multiple minors, including Brooks, being at 88 Peconic the weekend Alon raped Brooks. (*See* Tr. 2920-21). As a result, there was evidence Alon should have known that minors were at 88 Peconic, and the evidence demonstrated that he had plenty of time to observe Brooks personally—who looked very young, (*see* GX 1C-109, 1C-112)—both at the club and at 88 Peconic, prior to assaulting her. (*See* Tr. 2922, 2938, 2943-44, 2948-49).

Davis.[25] The Guidelines do not define what constitutes a "large number," and this question has been "largely uninterpreted" by the courts, including the Second Circuit. *United States v. Anderson*, 349 F.3d 568, 573 (8th Cir. 2003). However, given that § 3A1.1(b)(2) does not provide a rigid cutoff for how many victims are required for this enhancement—as the Guidelines do in other provisions, *see, e.g.*, U.S.S.G. § 2B1.1(b)(2)(B) (four-level enhancement for "substantial financial hardship to five or more victims"); U.S.S.G. § 2G1.1, app. n.6 (2023) (upward departure available "[i]f the offense involved more than ten victims")—the analysis of what is "large" for purposes of the vulnerable victim enhancement should be based on whether "the number of vulnerable victims exceeds the typical number involved in offenses of like kind," rather than an absolute number cutoff. *United States v. Boll*, 3 F.4th 1099, 1101-02 (8th Cir. 2021) (noting that "ten could be a 'large number' for a murder spree, but not for a telemarketing scheme"). In this case, the defendants' hands-on drugging and raping of ten vulnerable victims is sufficient to constitute a large number for purposes of the enhancement. *See id.* at 1102 (conducting context-specific analysis based on the type of crime and way it was committed—there, a nurse tampering with medication for patients—and finding 14 victims to be a "large number" for that "hands-on" offense); *see also United States v. Kaufman*, 546 F.3d 1242, 1269 (10th Cir. 2008) ("[I]n the context of involuntary servitude and forced labor, ten victims is a large number.").

#### f. The Use of Computer Enhancement Applies to the Group for Isa Brooks (Minor Victim-3)

U.S.S.G. § 2A3.1(b)(6)(B) provides a two-level enhancement "[i]f, to persuade, induce, entice, or coerce a minor to engage in prohibited sexual conduct, or if, to facilitate transportation

[25] As indicated in footnote 8, *supra*, the PSRs also apply the large number of vulnerable victims enhancement for the groups for Stone and Rosen, but these two victims are not being counted as victims of "the offense," *i.e.*, the conspiracy charged in Count One, and as a result, the Government is not advocating for the application of the enhancement for their groups.

or travel, by a minor or a participant, to engage in prohibited sexual conduct, the offense involved . . . the use of a computer or an interactive computer service." The PSRs apply this enhancement to the group for Isa Brooks (Minor Victim-3) based on text messages that Mathew Lipman, a party promoter who rented 88 Peconic with the defendants, sent Brooks, which included an invitation to 88 Peconic and information about her travel to the Hamptons. The defendants object to this enhancement on the basis that they were not the ones sending the messages to Brooks. (PSR p. 72 (Alon); PSR p. 72 (Oren); PSR p. 71 (Tal); Dkt. 510 at 2). But because the offense involved these messages and Lipman was the defendants' co-conspirator in the summer of 2009, the enhancement is properly applied.

Lipman's use of a cellphone to text Brooks qualifies as a "use of a computer." For this guideline, "computer" has the meaning given to that term in 18 U.S.C. § 1030(e)(1), *i.e.*, "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device." U.S.S.G. § 2A3.1, app. n.1. Although the Second Circuit has not considered the question, other circuits have held that basic cellphones or the use of cellphones for calls and texts qualifies as use of a "computer" under this "exceedingly broad" definition, which includes electronic data processors and does not "purport[] to exclude devices because they lack connection to the Internet." *United States v. Kramer*, 631 F.3d 900, 902-04 (8th Cir. 2011) (affirming use of a computer enhancement for a "basic cell phone" that was used only to call and text victim); *see also United States v. Mathis*, 767 F.3d 1264, 1283 (11th Cir. 2014) (affirming use of computer enhancement for smartphone used only to call and text victims, not to use the internet in the

commission of the offense); *United States v. Rankin*, No. 23 Cr. 24 (MKB), 2025 WL 1456498, at *6-9 (E.D.N.Y. May 21, 2025) (applying use of computer enhancement under § 2G2.2(b)(6) for smartphone and explaining state of circuit case law).

In his text messages to Brooks, Lipman invited Brooks to the Hamptons house for Memorial Day weekend and facilitated her travel, telling her that a bus would pick her up in Manhattan to take her to the house in the Hamptons for a party. (Tr. 2917-19). This is sufficient to apply the enhancement. *See Sandoval v. United States*, 455 F. App'x 6, 7 (D.C. Cir. 2012) (affirming computer-use enhancement for facilitation of travel where defendant "used a Palm Pilot device to arrange the logistics of the intended meeting"); *cf. United States v. Cramer*, 777 F.3d 597, 602-03 (2d Cir. 2015) (affirming computer-use enhancement where defendant began communicating with the minor victim via a computer but enticed victim to engage in prohibited sexual conduct through other means).

The defendants object to the enhancement on the grounds that they were not the ones to communicate with Brooks. (*See* PSR p. 72 (Alon); PSR p. 72 (Oren); PSR p. 71 (Tal); Dkt. 510 at 2). That Lipman engaged in this communication rather than the defendants does not make the enhancement inapplicable. The text of the enhancement does not require that the defendants themselves use the computer; instead, it only requires that the "offense involved" the use of the computer. *See United States v. Dotson*, 324 F.3d 256, 259 (4th Cir. 2003) (rejecting defendant's argument that similar use-of-computer enhancement under § 2G2.2(b)(5) was "offender, rather than offense, specific"). And that is the case here—Brooks never would have ended up in the Hamptons, where she was drugged and raped, had a cellphone not been involved. The defendants also point to the application note text explaining that this enhancement "is intended to apply only to the use of a computer to communicate *directly* with a minor," arguing that because there was no

evidence the defendants communicated directly with a minor then the enhancement cannot be applied. (PSR p. 72 (Alon); PSR p. 72 (Oren); PSR p. 71 (Tal)) (quoting U.S.S.G. § 2A3.1, app. n.4(B)) (emphasis added)). But the point of that application note is not to ensure that *the defendants* sent the communication at issue. Instead, the note requires that *the minor* was the one to receive the message, explaining that "the enhancement would not apply to the use of a computer or an interactive computer service to obtain airline tickets for the minor from an airline's Internet site," rather than to communicate with the minor herself. U.S.S.G. § 2A3.1, app. n.4(B).

The defendants' objection that Lipman was the communicator is even less persuasive when considering the crucial role that Lipman played in the defendants' sex trafficking scheme. The defendants did not rent their home or plan their Memorial Day festivities on their own. They did so in conjunction with Lipman, a party promoter who worked with them to bring women and girls to the house the defendants and Lipman rented with Mike Kanevsky (another party promoter), David Rabello (one of Brooks' rapists), and James Ferraro. (*See* GX 1008; *see also* GX 2G-104-A (earlier draft of lease in Oren Alexander and Lipman's names), 2G-106-A (final version of lease in Kanevsky and Lipman's names), 2C-112 (Oren Alexander accepting changes to final lease)). In other words, Lipman was the defendants' co-conspirator, and it was his job to recruit and entice women and girls, including Brooks, to their Hamptons' home. He acted in furtherance of the conspiracy by messaging Brooks, a sixteen-year-old, to invite her to the house for Memorial Day weekend, where she would be drugged and raped by Tal, Alon, Rabello, and another of their friends. As the defendants' co-conspirator, Lipman's conduct is relevant conduct for which the defendants are accountable. *See* U.S.S.G. § 1B1.3(a)(1)(B); *see also United States v. Smith*, 895 F.3d 410, 418 (5th Cir. 2018) (affirming computer-use enhancement where defendant was part of

joint undertaking, even though defendant did not personally use the computer); *United States v. Pringler*, 765 F.3d 445, 455-56 (5th Cir. 2014) (same).

The defendants also object that it was not foreseeable to them that Lipman would invite minors to the Hamptons. But the evidence showed that it was foreseeable to the defendants that Lipman would invite women, including potential victims, to 88 Peconic for that weekend. Even before they rented the house, Oren emailed Alon, Tal, Lipman, and Rabello with a draft message to send out to people they wanted to come to the house that summer, which included their view that the "ratio"—*i.e.*, the number of men to women—was "very important." (GX 2C-104, B-303, B-304). Lipman then, fulfilling his party promoter role, blasted out Oren's message to multiple Facebook groups, including those for "Hamptons Share House" and "Hamptons 2009." (GX A-407-3, A-408; *see also* A-407-2 (explaining that Facebook group name was changed from "Hamptons 2009" to "Hamptons 2010" in or about February 2010). Prior to Memorial Day weekend, Lipman, along with Kanevsky, advertised the bus that would take Minor Victim-3 and at least two other high schoolers to the Hamptons that weekend. (GX A-409-1; Tr. 2920-21). And following that weekend, after he and Oren received noise complaints from neighbors (GX 2G-109), Lipman sent out additional Facebook messages to the groups, stating, among other things, that "[a]nyone who was there [Memorial Day weekend] will vouch that a weekend at 88 Peconick [*sic*] will definitely go down as a summer highlight," (GX A-408); that they "still had rooms available on various weekends" at 88 Peconic, (GX A-408); and that "if you take a room, the girls are included ;)[,]" (GX A-407-3). Lipman's participation was key to making the sex trafficking scheme work during the summer of 2009.

Contrary to the defendants' argument, it was also foreseeable to the defendants that some of the women Lipman invited would be minors. The defendants knew the scope of Lipman's

outreach, (*see* GX 1008 (showing that Alon received Lipman's messages to the Facebook groups described above)), and given that large scope, it is unsurprising that minors were invited. Indeed, Brooks was not the only minor on the bus to Memorial Day weekend. (Tr. 2921). As a result, the computer enhancement should be applied.

In any event, the defendants, especially Oren, gave Lipman materials to post online and distribute to advertise rooms and beds that were available in their house in the Hamptons, the point of which included recruiting girls and women to the house. (*See* GX 2C-104, B-303, A-408, A-407-3) (advertising house and describing need for the right "ratio"); GX A-408, A-407-3 (distributing photos of the house, which Oren had received from landlord (GX 3A-101, 3A-101A-C)). The defendants used Lipman to advertise their house and recruit women and girls to it, and thus his actions in doing so were ones that were "aided, abetted, counseled, commanded, induced, procured, or willfully caused [by the defendants] . . . that occurred during the commission of the offense of conviction [or] in preparation for that offense." U.S.S.G. § 1B1.3(a)(1)(A). The defendants are liable for this under relevant conduct rules whether or not they foresaw that the invitations would go to minors. *See* U.S.S.G. § 1B1.3 app. n.3(D) ("The requirement of reasonable foreseeability . . . . does not apply to conduct that the defendant personally undertakes, aids, abets, counsels, commands, induces, procures, or willfully causes[.]").

**g. The Chapter 4 Enhancement for a Pattern of Prohibited Sexual Conduct Applies for Alon**

U.S.S.G. § 4B1.5(b)(1) contains a five-level enhancement where "the defendant's instant offense of conviction is a covered sex crime" and "the defendant engaged in a pattern of activity involving prohibited sexual conduct." For purposes of this guideline, a defendant engages in a pattern of activity "if on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor," regardless of whether the occasion was during the course of the instant

offense or resulted in a conviction. U.S.S.G. § 4B1.5, app. n.4(B)(i)-(ii). The PSR applies this pattern enhancement for Alon, based on his pattern of activity with Isa Brooks (Minor Victim-3), Kayley Brown (Minor Victim-25), and Maylen Gehret (Minor Victim-26). (PSR (Alon) ¶ 225). Alon raises a host of objections to this enhancement, none of which are persuasive.

This pattern enhancement applies because Alon's convictions for sex trafficking of a minor (Isa Brooks) in violation of 18 U.S.C. § 1591 (Count Five) and sex trafficking conspiracy (Count One) are "covered sex crime[s]," (*see* U.S.S.G. § 4B1.5, app. n.2(A)(iv)-(B) (defining covered sex crime to include 18 U.S.C. § 1591 and conspiracy to commit the same), and Alon engaged in a pattern of activity involving prohibited sexual conduct, namely, he sex trafficked Brooks, a sixteen-year-old, in the Hamptons in or about May 2009, and Gehret and Brown, who were both seventeen years old, in Aspen, Colorado, in or about January 2017. For the purposes of this enhancement, "prohibited sexual conduct" includes "any offense described in 18 U.S.C. § 2426(b)(1)(A) or (B)." U.S.S.G. § 4B1.5 app. n.4(A). Alon's sex trafficking of Brooks, Gehret, and Brown is an offense described in § 2426(b)(1)(A), which includes offenses under Section 1591.[26]

[26] Alternatively, Alon's sexual assaults of Gehret and Brown are also offenses described in 18 U.S.C. § 2426(b)(1)(B); that is, they constitute state crimes that would have qualified as "sexual abuse," pursuant to 18 U.S.C. §§ 2241 or 2242 (both offenses under chapter 109A) if the conduct had occurred within the special maritime and territorial jurisdiction of the United States, given that Alon drugged and then sexually assaulted both Gehret and Brown. Under Colorado law, "[a]ny actor who knowingly inflicts sexual intrusion or sexual penetration on a victim" where the actor "know[s] the victim does not consent," "knows that the victim is incapable of appraising the nature of the victim's conduct," or where "the victim is physically helpless and the actor knows that the victim is physically helpless and the victim has not consented" is guilty of sexual assault. C.O. Rev Stat. § 18-3-402(1)(a), (b), (h). It is also a crime where the sexual assault occurs either after "[t]he actor causes submission of the victim through the actual application of physical force or physical violence" or "[t]he actor has substantially impaired the victim's power to appraise or control the victim's conduct by employing, without the victim's consent, any drug, intoxicant, or other means for the purpose of causing submission." C.O. Rev Stat. § 18-3-402(4)(a), (d). Alon digitally penetrated Gehret in the bathroom and on the bed of the hotel room without her consent

In his objections to the PSR, Alon raised a number of objections to the pattern enhancement. (*See* PSR pp. 73-74 (Alon)). *First*, Alon argues that his sexual assaults of Brown and Gehret should not be considered "separate occasions" for purposes of this enhancement because they occurred as part of one encounter. These two instances do constitute separate occasions because Alon first raped Gehret in the bathroom and then sexually assaulted Brown in the bedroom of the Aspen hotel room he shared with Oren. *See United States v. Bullock*, 152 F.4th 108, 117-18 (2d Cir. 2025) (affirming application of similar pattern enhancement under § 2G2.2(b)(5) where the defendant sexually abused one victim in the pastor's office of a church and then abused a second victim in a classroom of the same church on the same day). But even if Alon's sexual assaults of Gehret and Brown were considered a single occasion, that does not matter for purposes of applying this guideline. Application Note 4 explains that for purposes of the pattern enhancement, "the defendant engaged in a pattern of activity involving prohibited sexual conduct if on *at least two separate occasions*, the defendant engaged in prohibited sexual conduct with a minor." U.S.S.G. § 4B1.5, app. n.4(B)(i) (emphasis added); *see also Broxmeyer*, 699 F.3d at 284-86 (holding that "we need identify only two such occasions [of prohibited sexual conduct with minors] to uphold the district court's pattern finding" and rejecting argument that crime of conviction cannot be counted toward these occasions). Alon at minimum has two occasions of prohibited sexual conduct: (i) his rape of Brooks on or about Memorial Day Weekend 2009, and

---

and vaginally raped her in the bathroom after surreptitiously providing her with a sedative-hypnotic drug. (Tr. 1881-83, 1888-92). In addition, under Colorado law, "[a]ny actor who knowingly subjects a victim to any sexual contact commits unlawful sexual contact if" the actor "know[s] the victim does not consent," "knows that the victim is incapable of appraising the nature of the victim's conduct," or where "the victim is physically helpless and the actor knows that the victim is physically helpless and the victim has not consented." C.O. Rev Stat. § 18-3-404(1)(a)-(c). Alon put his hand in Brown's pants and touched her vagina when she was in and out of consciousness, unmoving, and did not consent, after she had been drugged. (Tr. 1894, 2370-71, 2376-77).

(ii) his sexual assaults of Gehret and Brown in Aspen in or about January 2017. As a result, the pattern enhancement must be applied.

*Second*, Alon claims that for purposes of this enhancement, Brown should not be considered because "under a minute" elapsed between him putting his hand in Brown's pants and touching her vagina and Brown removing his hand. But a sexual assault that occurs quickly is still a sexual assault. The Government is aware of no authority—and the defense has cited none—supporting their proposed "under a minute" exception to the pattern enhancement.

*Third*, Alon argues that because the Government has not alleged that he has sexually assaulted a minor since 2017, he is not a "continuing danger," and the pattern enhancement should not be applied. Whether Alon has continued to engage in illegal sexual conduct with minors is unknown, and in any case is irrelevant, for the application of this enhancement, because under the text of the enhancement, and as the Second Circuit has held, the Court "need identify only two such occasions" of prohibited sexual conduct with minors in order to apply the enhancement, and as described above, there are at least two (which Alon does not even appear to dispute). *Broxmeyer*, 699 F.3d at 284. Again, Alon does not cite any authority to the contrary.

*Fourth*, Alon claims that the conduct underlying this enhancement is "unreliable" because Brooks misidentified Alon in a photograph and because Brown and Gehret were not charged in any count of the indictment. Neither of these arguments is persuasive. First, as to Brooks, the jury found specifically that Alon sex trafficked Brooks—that is clearly sufficient to find her testimony reliable.[27] Second, as to Brown and Gehret, they are victims of the sex trafficking conspiracy in

[27] Alon refers to Brooks misidentifying Oren as Alon in a photograph taken over fifteen years ago. It bears noting that even the defense's witness about this photograph, Danielle Epstein, who had dated Alon and spent substantial time with both Oren and Alon over the years, could not be certain that Oren was the individual in the photograph because, as she explained, Alon and Oren are twins. (*See* Tr. 4705).

Count One, for which all of the defendants were found guilty. But even if they were not, the fact they were not named specifically in the indictment does not make their testimony unreliable, and the pattern enhancement can be based on occasions of prohibited sexual conduct "without regard to whether the occasion (I) occurred during the course of the instant offense; or (II) resulted in a conviction for the conduct that occurred on that occasion." U.S.S.G. § 4B1.5, app. n.4(B).

*Finally*, Alon argues that his sexual assaults of Brown and Gehret should not count for purposes of the enhancement because each victim was 17 years old at the time. But as Alon himself notes, the enhancement applies to conduct with "minors," as defined as "an individual who had not attained the age of 18 years"—which is the case for Brown and Gehret. U.S.S.G. § 4B1.5, app. n.1. The Court should therefore apply the pattern enhancement for Alon.

**h. Two Criminal History Points Should Be Applied for Tal**

The PSR applies two criminal history points for Tal based on two convictions in 2005 and 2011 for, among other things, driving while his ability was impaired by the consumption of alcohol. (PSR ¶¶ 224-25 (Tal)). In 2005, Tal, who was driving 70 miles per hour in a 40-mile-per-hour zone with a blood alcohol concentration of 0.14 percent, ran a red light and crashed his car into a curb and a fence. (PSR ¶ 224 (Tal)). He was sentenced to a one-year conditional discharge, a $400 fine, and a license revocation. (PSR ¶ 224 (Tal)). The PSR assigns one point to this conviction based on U.S.S.G. §§ 4A1.1(c) and 4A1.2(e)(2), which provide one point for sentences of less than sixty days that were imposed within ten years of the defendant's commencement of the instant offense, which began in or about 2008. (PSR ¶ 224 (Tal)). In 2011, Tal was driving with a 0.09 percent blood alcohol concentration and changed lanes unsafely. (PSR ¶ 225 (Tal)). As a result, he was sentenced to a $500 fine. (PSR ¶ 225 (Tal)). The PSR similarly assigned one point for this conviction based on U.S.S.G. §§ 4A1.1(c) and 4A1.2(e)(2). (PSR ¶ 225 (Tal)). As a result, Tal falls within criminal history category II under the Guidelines.

Tal acknowledges that these two convictions fall within the applicable time period under § 4A1.2(e), but he nevertheless asks that the PSR apply criminal history category I because of the age and nature of the offenses. (PSR pp. 72-73 (Tal)). While Tal is welcome to make these arguments as to a potential variance, he acknowledges that they are properly applied under the Guidelines and provides no legal basis for why these convictions could be set aside for purposes of his criminal history calculation. Accordingly, the Court should reject his suggestion of a lower criminal history category.

## THE PSR'S OFFENSE CONDUCT

### I. The Defendants' Factual Objections to the PSR Are Meritless

In addition to their Guidelines objections, the defendants have made numerous factual objections to the offense conduct described in the PSRs. The Government responded to each factual objection in letters to the Probation Office and has attached the letters to this submission as Exhibits 2 and 3. Most of the defendants' objections fall into three categories: (1) objections that are contradicted by the evidence presented at trial and by the jury's verdict; (2) objections to conduct that was not proven through victim testimony; and (3) ancillary objections. Each category is addressed below. As described in the letters to the Probation Office, the defendants' objections are generally baseless and are contradicted by the record from trial and other evidence. The Probation Office has evaluated the defendants' objections, found them wanting, and in nearly every instance declined to make changes to the PSR. The Court should do the same.

The defendants' first category of objections are their continued objections to having committed the acts of sex trafficking and sexual violence that were proven at trial. (*See* PSR pp. 62-63 (Alon); PSR pp. 62-63 (Oren); PSR pp. 62-63 (Tal)). Within this broader objection, the defendants specifically object to all references in the PSRs that relate to drugging their victims. They similarly object wholesale to the descriptions in the PSR of them forcibly raping victims.

As described above, the evidence at trial showed conclusively that the defendants raped and sexually assaulted fourteen victims: the eleven women who testified, Rachel Stevens in Aspen in January 2017, Amber Davis at Fyre Fest in May 2017, and the woman in the hot tub who was seen and heard being assaulted by a witness in the Hamptons in May 2009. The jury was asked to find specifically that six of the fourteen victims were subjects of substantive counts (Lindsey Acree, Bela Koval, Isa Brooks, Maya Miller, Rhonda Stone, and Amelia Rosen), and the jury returned guilty verdicts for every substantive count that was submitted to them. The jury also considered the testimony of the victims of the substantive sex trafficking counts (Acree, Koval, Brooks, and Miller), as well as the testimony of additional victims of the conspiracy (Katie Moore, Kayley Brown, and Maylen Gehret) in evaluating the conspiracy charged in Count One and found all three defendants guilty of that conspiracy. For at least these victims of the substantive sex trafficking counts and the sex trafficking conspiracy, the jury's verdict "binds the sentencing court to accept the facts necessarily implicit in the verdict." *United States v. Martinez*, 110 F.4th 160, 174-75 (2d Cir. 2024) (finding clear error where district court "accepted the defense's factual theory" that the defendant and victim engaged in consensual sex after a jury found that the defendant caused the victim to engage in a sexual act using force, threats, or fear); *see also United States v. Hourihan*, 66 F.3d 458, 465 (2d Cir. 1995). Accepting the facts implicit in a verdict is broader than accepting only those that are minimally necessary to support the verdict and depends on the trial evidence and arguments. *See United States v. Harrell*, No. 20 Cr. 239 (BMC), 2026 WL 571256, at *4 (E.D.N.Y. Mar. 2, 2026) (finding the facts implicit in the verdict, considering the evidence at trial, demonstrated a conspiracy defendant's lead role in orchestrating a murder for hire). Here, the victims testified about being drugged, the drinks the defendants gave them, the impairment they suffered, and then the forcible assaults they suffered. *Supra* at pp. 5-23. The jury

then convicted the defendants for crimes encompassing those assaults, so the Court is obligated to accept those facts for sentencing.

Though the Court must accept these facts as true, the issue here is not only one of what the verdict compels. The Court sat through the trial, the same as the jury, and heard and saw the same devastating evidence of the defendants' callousness, abuse, and distain for women that led the jury to convict. For example, with regard to the victims of substantive counts, the Court heard Acree describe how being drugged left her weak and unable to control her body, enabled Tal to assault her with a second man, and made her memory "like a flip book, but one where pages are missing." (*See* Tr. 2172-76). The Court heard Koval describe how she tried to tell Oren something was wrong as she lay functionally paralyzed on a bed in the desperate hope that he would recognize something human about her distress, but that he ignored her plea for help and raped her while she struggled beneath him. (*See* Tr. 968-70). The Court heard Brooks describe how, after being held down and raped by four men, Tal told her, "Don't be mad at me." (Tr. 2952). The Court heard Miller explain how when she tried to run away from Tal, he pursued her into the shower and raped her while she cried and her mascara ran down her face. (Tr. 462-63). The Court heard Stone describe drinking a drink and then coming to with one defendant on top of her raping her, before the defendants switched positions and she was raped again. (Tr. 1373-74, 1377). And the Court watched the videos of Oren discussing giving Rosen an Ambien and then raping her, while she laid there lifelessly, and then heard Rosen testify about her missing memory of the night. (*See* GX D-121-1, D-121-2; Tr. 850-63). Beyond hearing each of these victims of substantive offenses testify individually, through their testimony, and through the testimony of the additional victims of the conspiracy and victims whose testimony was admitted under Rule 413 (Kelly Hudson and Ava Wells), the Court saw the defendants' pattern—which was entirely consistent with the expert

testimony of Dr. Stacey Hail about the impact of sedative-hypnotic drugs (*See* Tr. 1687-97)—and understood how they executed their playbook, time and time again. All of this leads to the same result the jury reached: the defendants drugged and forcibly raped their victims, and they did it in a way to maximize their pain, their humiliation, and their shame.

Although the jury did not deliver specific verdicts as to victims of the conspiracy who were not also victims of substantive sex trafficking counts and victims who testified under Rule 413, the evidence at trial was no less conclusive. These women—Moore, Gehret, Brown, Wells, and Hudson—testified at length about the abuse they suffered, and their testimony was backed up by text messages, photos, outcry witnesses, and the enormous evidence of the defendants' pattern, among other things. Like the victims of substantive counts, these women were raped, in nearly each case after being drugged, by the defendants—the evidence at trial leaves no doubt about it.

The defendants' second set of objections is to the PSRs' descriptions of sexual assaults committed against victims who did not testify at trial. Specifically, this group of objections relates to the assaults of Victim-4, Victim-5, Rachel Stevens (Victim-9), Victim-29, Amber Davis (Victim-30), and the unnamed woman who was assaulted in a hot tub in May 2009. (*See* PSR pp. 62-65 (Alon); PSR pp. 63-65 (Oren); PSR pp. 62-64 (Tal); Dkt. 510 at 1). For the reasons described above, *see supra* pp. 46-55, the facts concerning the sexual assaults of Victim-4, Victim-5, Stevens, and Davis should be included in the PSR because the evidence related to these assaults is reliable and establishes that each of these individuals was a victim of the conspiracy. Similarly, Tal and his co-defendant's assault of the unknown woman in the hot tub during Memorial Day Weekend 2009 was proven via reliable evidence presented at trial. Here, the evidence came from a percipient witness who saw and heard the assault. (Tr. 2587-88). Not only did this witness testify about her own observations, she also memorialized what she saw at the

time by writing "Rapists!" on the door of the defendants' house, a photo of which was found on the hard drive at Tal's apartment and shown to the jury. (GX D-124-8, D-124-9). Accordingly, the facts of this victim's assault also should be included in the PSR.

The Court should also find that Tal sexually assaulted Victim-29. (*See* PSR ¶¶ 105-09 (Alon/Oren); PSR ¶¶ 106-10 (Tal)). During the summer of 2016—just weeks before Tal and his brothers lured Bela Koval to their mansion in the Hamptons—Tal met and lured Victim-29, who was 18 years' old at the time, to the same mansion, locked her into a bedroom, and sexually assaulted her. (*See* 3658-001; 3658-009). In early August 2016, Tal was on a date with Victim-29, whom he had met earlier that month. (3658-001 at 1). During the date, Tal invited Victim-29 back to a mansion he claimed was used by celebrities, for what he called an "afterparty." (3658-009 at 2; 3658-016 at 2). Victim-29 rode with Tal to the mansion, where there was no afterparty, and where Victim-29 felt uncomfortable because only one other person was there at all. Under the guise of giving her a tour of the house, Tal isolated Victim-29 in a bedroom and locked the door. (3658-001 at 2; 3658-009 at 2; 3658-016 at 3). Tal and Victim-29 had been on a date, but up to this point, nothing about their interactions had been sexual. But still, Tal began aggressively forcing himself on Victim-29 and furiously tried to unzip and remove her clothes. (3658-001 at 2; 3658-009 at 3). Tal struggled to remove Victim-29's clothes completely, and when he failed to get her jumpsuit off, Tal became angry at Victim-29, yelling at her and yanking at her jumpsuit. (3658-009 at 3). Still failing to get the jumpsuit off, Tal masturbated while pinning Victim-29 down and ejaculated on her face and chest. (3658-001 at 2; 3658-009 at 3). Victim-29 cleaned herself off in the bathroom after being assaulted, and when she broached the topic of getting a ride to leave, Tal said to her something to the effect of, "Bitch, do you think I'm going to get you a ride home? You didn't have sex with me." (3658-009 at 3; *see also* 3658-001 at 2). Victim-29

managed to call an Uber to leave the mansion, and the next day Victim-29 had to call her mom to ask for money because the car had cost Victim-29 most of hers. (3658-016 at 3).

Victim-29 first reported this assault to the FBI during trial after seeing the defendants in the news. (3568-001 at 2). In addition to her clear account of what happened in August 2016, Victim-29 provided corroborating exhibits, including text messages with two friends that reflect that Victim-29 was on the date with Tal and went with him to Sag Harbor (GX 1T-102-TR, 1T-103-TR), Victim-29's text messages with Tal (GX 1T-110-1), a voicemail from her mother corroborating Victim-29 (GX 1T-104-TR), and a copy of the Uber receipt showing Victim-29 leaving 26 On the Bluff (GX 1T-109-TR). There is no serious question that on August 11, 2016, Victim-29 and Tal Alexander were at 26 On The Bluff together.

There is also no serious question that Tal assaulted Victim-29 that evening. Victim-29's account is direct and clear, and what she described is consistent with Tal's conduct with Isa Brooks, Maya Miller, and Lindsey Acree, all of which was found proven by the jury. The entitlement that Tal exhibited with each of these victims was on full display with Victim-29 as well, down to the comments he made to Victim-29 after he assaulted her. Further, there is no reason for Victim-29 to be anything other than honest in describing what happened to her a decade ago. The defendants' usual attacks of shame and money have no applicability to a woman who has not sued, cannot receive restitution, and came forward only during trial. Like with many other victims, it is also not significant that Victim-29—who was 18 years old when she was assaulted by the 30-year-old Tal and who blamed herself for being in the situation where she was assaulted (3658-009 at 3-4; 3658-016 at 4)—did not immediately report the attack to police and sent a text message to Tal years later.

Tal's assault of Victim-29 is very clearly part of the pattern of conduct that was proven at trial. Tal used the promise of a mansion and an afterparty to isolate Victim-29 in a place where she would be vulnerable. And when he had her alone, Tal forced himself on her, assaulted her, and then tried to shame and humiliate her afterwards. By any evidentiary standard, and certainly by a preponderance of the evidence, this assault is proven, too.

The defendants' final group of objections are best described as ancillary objections. The Government has responded to each of these in its letters to the Probation Office, and to the extent the defense maintains its objections at sentencing, we incorporate those letters here and will be prepared to address them at sentencing or at the conference scheduled for October 19, 2026.

For all of the reasons described above and in the Government's attached letters to the Probation Office (*see* Ex. 2 and 3), the Court should reject the defendants' factual objections to the PSR.

**SENTENCING RECOMMENDATION**

The severity of the defendants' crimes is difficult to overstate. For years, the defendants drugged and then violently raped or sexually assaulted dozens of women. Their horrific actions not only caused physical pain; the defendants also inflicted irreparable psychological and emotional injuries on their victims—harm that the victims will contend with for a very long time. And the defendants have demonstrated absolutely no remorse for their crimes. Instead, they mocked and humiliated their victims, laughing at their helplessness and distress. For their crimes, the Government submits that a Guidelines sentence of life imprisonment for each defendant is necessary to provide just punishment, protect the public from future crimes by the defendants, promote respect for the law, and adequately deter the defendants and others from similar conduct.

## I. The Defendants' Conduct Warrants a Guidelines Sentence of Life Imprisonment

### a. The Nature and Circumstances of the Offense Warrant a Guidelines Sentence

The defendants' offenses are among the most serious that can be prosecuted inside a federal courtroom. As demonstrated at trial, the defendants engaged in a shocking pattern of sexual violence for over a decade, working together and with others to drug and rape dozens of women and girls. For each one of the defendants, their orchestration of and participation in this pattern was calculated—far from a one-time mistake or accident—and created unimaginable harm for the victims. The seriousness of each defendants' conduct warrants a Guidelines sentence of life imprisonment.

#### *i. The Defendants' Collective Pattern of Conduct Was Serious and Harmful*

For years, the defendants did whatever they had to do in order to sexually assault or rape women. Their conduct year after year, victim after victim, demonstrates that their actions were an intentional and purposeful scheme designed to exploit women for their own sexual gratification. Often, the defendants went to great lengths to lure their victims to a place where they could drug and rape them, including by using their wealth, power, and access to entice the victims. Once they had isolated their victims, they used whatever they needed to, including drugs and/or force, so they could overpower the victims and carry out their assaults. For example, Tal flew Maya Miller and her friend across the country to the Hamptons, where he violently raped her in the shower after failing in his attempt to drug her into incapacitation. All three defendants flew Bela Koval and her friend from Chicago to New York, where Oren drugged Bela and raped her. And Alon, Tal, and Oren worked with party promoters Mathew Lipman and Mike Kanevsky to ensure there were plenty of girls available at their Hamptons house the weekend Alon and Tal drugged and raped Isa Brooks. But even when they had not planned an extravagant lure, the defendants still found a way to carry out assaults. On some occasions, their rapes were crimes of opportunity, the way Alon

and Oren drugged and took turns raping Rhonda Stone after she asked them if they could help her find molly. Or the way Alon and Oren drugged Maylen Gehret, Rachel Stevens, and Kayley Brown after meeting them at a nightclub in Aspen before luring them back to a hotel room to sexually assault and rape them. But even when the defendants encountered their victims by chance, their conduct was neither spontaneous nor impulsive; they often came prepared with a supply of sedative-hypnotic drugs to incapacitate their victims so that they could sexually assault and rape them while the victims lay helpless.

Whether their sexual assaults were planned weeks in advance or occurred the night they met their victims, the evidence demonstrates that the defendants knew what they were doing and were not going to be derailed. It made no difference to the defendants if their victims were underage, said no, actively tried to resist, or were incoherent. For example, Ava Wells told Alon no less than three times that she did not want to have sex with him, but he pinned her arms above her head and raped her anyway. Amelia Rosen, 17 years' old at the time, was largely lifeless as a result of drugs, when Oren raped her on video. And Maya Miller's tears and whispered pleas for mercy had no effect on Tal, who responded by holding her by the neck and raping her from behind.

The scale of the harm caused by the defendants is difficult to truly comprehend for those who have not lived through it. One rape creates life-changing harm for a victim. Given the scale of their scheme, the full extent of the harm these defendants caused is incalculable. To gratify their own selfish desires, the defendants violated their victims in an incredibly frightening way: they took away the victims' abilities to control their own bodies. They eliminated the victims' opportunity to consent or not consent to what would happen to them. In many cases, they took away the victims' memories, leaving only terrifying gaps and questions that cannot be answered. As Koval put it, the "unknown is terrifying. I am forced to live with the possibility that more

happened to my body while I was unable to protect myself, speak for myself, or fully understand what was being done to me. I cannot recover memories that my mind and body were not capable of forming. That empty space will always exist. I now have to find a way to move forward while carrying questions that may never be answered." (Ex. 13 (Koval Ltr.) at 2).

The defendants damaged the victims' sense of safety, their ability to trust, and their sense of self and confidence—which the victims may never get back despite some of them undergoing years of therapy. Many of the victims have tried to capture this unimaginable harm in their written victim impact statements, which are attached as exhibits to this submission. (*See* Ex. 4-27).[28] Putting it succinctly, Gehret said: "I cannot tell you how this has impacted me because it has impacted everything." (Ex. 11 (Gehret Ltr.) at 2). Miller wrote, "[t]here are moments that fracture a life, dividing everything into what came before and what will never exist again. . . . Since the morning that Tal raped me, I no longer know what it feels like to move through life with complete safety or peace. Without warning, I am pulled back into that bathroom feeling the same helplessness and the same complete loss of control. Those feelings have settled into my nervous system, my relationships, and my sense of safety. What Tal did to me fundamentally changed the way I experience being alive." (Ex. 15 (Miller Ltr.) at 1). Koval said, "There is no way to calculate what this trauma has cost me. I cannot know who I might have become, what choices I might have made, or where my life might have gone if this never happened . . . Physical pain may eventually fade, but emotional trauma can remain in the mind and body. The scars on my mind and heart are forever. I can learn to live with them, and I can continue to heal, but I cannot pretend they do not exist . . . When someone takes away another person's bodily autonomy, they also damage that

---

[28] Given that these letters contain personal and sensitive victim information, the Government respectfully requests that the letters, Exhibits 4-27, be filed and maintained under seal.

person's freedom, confidence, sense of safety, and ability to trust." (Ex.13 (Koval Ltr.) at 2-3). Katie Moore wrote, "But I was not the person I had been before that night. My sense of safety had become so eroded that I could not say the words, 'I am safe' without crying. Intimacy was different for me after that. And there was no way to put what happened to me somewhere outside myself. I carried it into every relationship, every decision, every part of my life. Even when I wasn't thinking about it, it was there, shaping the way I understood myself and the way I moved through the world." (Ex. 16 (Moore Ltr.) at 1).

Beyond the mental and psychological harm caused to the victims, the defendants' pattern of surreptitiously drugging their victims' drinks and violently assaulting them was incredibly dangerous. The defendants slipped sedative-hypnotic drugs into their victims' drinks without their knowledge or consent, not knowing or caring how each victim might react to the substance. Though the defendants became quite skilled at drugging their victims, it is not hard to imagine ways their conduct may have had deadly consequences. The defendants' actions also left their victims in dangerous situations after they were drugged and incapacitated. In just one example, Oren pushed Kelly Hudson out of his family's condominium in Aspen, Colorado, on a cold December night—after drugging her and slamming her head against the shower wall so hard that she was in pain the next day—not knowing or caring whether she would be able to safely find her way back to her friend's apartment. Alon and Oren drugged Rhonda Stone and then, after raping her, left her to find her way back to her friends on a moving cruise ship, although she struggled to even put her clothes on. The defendants' actions towards the victims betrayed an utter lack of humanity.

Each defendant did not do this alone. The seriousness of their actions was compounded by the way they worked together to carry out their crimes for over a decade. *See* U.S.S.G. § 2A3.1,

app. n.6 (2023) ("If a victim was sexually abused by more than one participant, an upward departure may be warranted."). While they each committed sexual assaults and rapes on their own, their cooperation was central to their ability to commit sexual violence as frequently and for as many years as they did. The defendants worked together to obtain sedative-hypnotic drugs, entice women to locations where they could isolate them, and sexually assault and rape them. For example, Oren and Alon worked together to invite Koval and her friend to the Hamptons, both messaging the two women to convince them to come. All three defendants split the costs of flying the women to the Hamptons, housing them in a mansion, and purchasing food and other supplies for the weekend. Then, after Oren gave Koval a drugged drink at the party, Alon escorted her to a room and left her there, where Oren later raped her. Oren and Alon also worked together to convince Gehret, Stevens, and Brown to come back to their hotel room with the false promise of an afterparty. Once there, Alon raped Gehret in the bathroom while Oren sexually assaulted Stevens on one bed and Brown was passed out on the other. Sometimes, the defendants raped women together and with other men—even helping each other to hold their victims down and taking turns raping the victims while they were drugged and helpless. For example, Alon, Tal, and two of their friends took turns raping the barely conscious 16-year-old Brooks, holding her down so she could not escape, and ignoring her pleas for them to stop. Tal and his friend together raped Lindsey Acree in the gym and the sauna when she was too weak to resist. Oren and Alon raped both Victim-4 and Victim-5 together on the same night while the women were blacked out, leaving them with only flashes of memory of what happened. And Oren and Alon took turns raping Stone while she was blacked out and unable to move.

The defendants' relationship with each other and their friends encouraged them to continue committing sexual assaults, alone and together. The defendants and their friends bragged and

laughed about their sexual exploits, egging each other on to drug more women, to humiliate them, and to rape them. They contributed to and shared a blog whose aim was to publicize how to humiliate women. In one particularly chilling post, the blog summed up how the defendants view their rapes and sexual assaults of women and girls:

> [i]magine for a minute that last night you and your boys ran train and clowned on some hoes, straight up mutted em out, maybe got it on video, maybe you came on your hand and rubbed it in their hair... now if you're us you don't have to imagine, but for the moment just imagine. Now I want you to think about how we wake up and how they wake up. They wake up feeling violated, used, low self-esteem, the works. We wake up refreshed, energized, confident, happy, content, laughing all the way into the night, repeating quotes from the night like 'spread em bitch spread em' or 'take me out of balls city' watching the video, putting shit in slow-motion, cheering, and hi-fiving. Good clown sesh boys, wash, rinse, repeat.

(GX 7A-105). Far from being a joke or locker room talk, the defendants lived it out. Alon laughed at Moore when she came to and said, "I don't want to have sex with you." Oren dressed Hudson like a clown and abandoned her in the cold after he raped her and slammed her head into a shower wall. And Tal similarly kicked Acree out of the house after raping her, all while he tried to shame her for being under the influence the night before. All of this demonstrates how serious and harmful the defendants' conduct was, requiring a Guidelines sentence.

#### *ii. The Nature of Each Individual Defendant's Conduct Warrants a Life Sentence*

The defendants' conspiracy was not hierarchical and did not have a leader. They worked together to commit their crimes by participating in the pattern of conduct described above, leaving no material difference in their culpability. The evidence at trial demonstrated that each defendant drugged and raped multiple women over the course of years—sometimes together, sometimes with other men, and sometimes alone. The harm each defendant caused to his victims is immeasurable, and a life sentence is appropriate for each.

*1. Alon Alexander Deserves a Guidelines Sentence*

Alon carried out horrific sexual assaults and rapes of numerous women, often after drugging them, while ignoring tears and pleas to stop. Alon's actions were cruel and callous; he disregarded his victims' wishes, their wellbeing, their safety, and their right to make their own decisions about what happened to their bodies. Alon's actions demonstrate that he did not view his victims as human beings worthy of respect; instead, he used them to fulfill his own desires without a thought for how they might feel. For his actions over years, Alon should be sentenced to life imprisonment.

Based on the evidence introduced at trial, Alon personally sexually assaulted or raped six women and girls, including three minor victims: Isa Brooks, Rhonda Stone, Katie Moore, Ava Wells, Maylen Gehret, and Kayley Brown. Alon also helped his brother, Oren, rape Bela Koval by arranging to transport her and her friend to the Hamptons and leaving her unconscious in a bedroom for Oren to rape her; worked with Oren to lure Rachel Stevens back to their hotel room, along with her friends Gehret and Brown, where Alon and Oren assaulted these victims; and worked with Oren and Tal to transport Amber Davis to Fyre Fest, where Oren raped her. Alon also trafficked Victim-4 and Victim-5 in the same Hamptons house where he had raped Brooks just weeks before. And the Government's investigation showed that these are only some of the victims that Alon raped and sexually assaulted beginning when he was in high school and continuing for well over a decade.

Alon often used drugs to incapacitate his victims, but he also used force when it suited his purpose. For example, in March 2016, after learning that Ava Wells was in Tel Aviv at the same time that he was, Alon invited her to the apartment where he was staying for drinks before going to dinner. Wells ended up in a bedroom alone with Alon, where he pushed her down on the bed, ignored her repeated statements that she did not want to have sex with him, pinned her hands above

her head to prevent her from pushing him off, and raped her. After Alon finished raping Wells, he had a conversation with a friend on the phone and told the friend that he "could be a person now" that he had had a "post flight release." (Tr. at 3297-98). Alon's comments to his friend encapsulate his views of Wells and what he had just done—he saw her as a vehicle for his "post-flight release" and what he needed to "be a person again," without any regard for what Wells wanted, utterly unmoved by her explicit pleas to stop and attempts to escape. As Wells said in her letter, "there is something deeply dehumanizing in being violated by someone who never once saw you as a full person to begin with." (Ex. 26 (Wells Ltr.) at 2). Her words strike directly at the heart of the harm that Alon caused. He did not see her as a full person; instead, he saw her as just an object to use so that *he* could feel like a person. He was willing to destroy her mental and emotional well-being for a momentary benefit to himself. Alon's actions destroyed the woman that Wells was before he raped her, a woman who was "vibrant, loving, trusting, full of vitality and joy for life, before that light was taken from [her] that night." (Ex. 26 (Wells Ltr.) at 1). Alon made Wells feel "completely dehumanized, worthless, powerless, pathetic, unimportant, stupid, humiliated, ashamed, confused and alone." (Ex. 26 (Wells Ltr.) at 1). The harm Alon casually inflicted on Wells was catastrophic.

Alon treated Katie Moore with a similar callous disregard, ignoring her obvious lack of consent. After drugging Moore, Alon raped her while she was blacked out and completely unaware of what was happening to her. When Moore woke up, shocked and frightened to find herself naked in Alon's bed, Alon laughed at her. In response to Moore saying that she would not have sex with Alon, he told her that she already had. And then Alon pushed her down on the bed, ignoring her struggles, preventing her attempts to escape, and raped her again—utterly disregarding her pleas to stop and her tears. That Alon had a casual conversation with Tal while

raping a crying Moore just underscores how routine and unremarkable this event was for the defendants. Neither brother saw Moore's obvious distress as a reason to stop what they were doing or change their behavior. Tal was unmoved by seeing his brother raping a tearful woman and Alon did not view Moore's lack of consent as a reason to stop before he got what he wanted. What Alon did to Moore made her feel as if she was "reduced to nothing by these people." (Ex. 16 (Moore Ltr.) at 2). Her "boundaries, [her] desires, [her] voice, [her] pain, [her] very personhood [was] erased" by Alon. (Ex. 16 (Moore Ltr.) at 2). While Alon raped Moore, inflicting life changing trauma on a 20-year-old girl, he and his brother had a mundane conversation about other things. Their chilling conduct during this incident betrays their humanity, or lack thereof.

Alon viciously raped 17-year-old Maylen Gehret in Aspen after he and Oren drugged her and incapacitated her to the point she could barely hold her head up. Alon knew that Gehret was only 17 years' old and in high school; when she told him her age, Alon responded that her age was "hot." Alon was 29 at the time—12 years older than Gehret—and a successful business executive. Alon and Oren took advantage of the fact that the girls were teenagers on their own in Aspen and lured them back to a dark and empty hotel room so that they could rape and sexually assault them. Alon's rape of Gehret was horrifying. He took a drugged, 17-year-old girl into the bathroom, locked the door behind him, and undressed her. Alon digitally penetrated Gehret so roughly that his fingernails scraped the inside of her vagina and she bled on the floor. Despite making Gehret bleed, despite likely having her blood on his hands, Alon did not stop or consider how his actions could injure her further. Instead, Alon bent Gehret over the sink, pressed her head to the vanity, and raped her. After he finished, Gehret, frightened and overwhelmed and confused, apologized to Alon for bleeding on the floor. After Gehret and her friends all managed to leave the hotel room, Alon sent texts to his friends, bragging that he "took down 17yr old". (GX B-146-1). In

Alon's view, what he had done was something to boast about to his friends, a trophy to hoist. For Gehret, it was a life-altering moment that shattered her sense of safety in her own body and her ability to trust and connect with others. (*See* Ex. 11 (Gehret Ltr.) at 1-2). After she came back from Aspen, she slept with the lights on. (Tr. 2056). Because of what Alon did to her, Gehret moves through life constantly scanning for threats. (Ex. 11 (Gehret Ltr.) at 1).

These are just some of the women who testified at trial about Alon's brutal rapes and assaults that changed their lives and left them with scars that they continue to bear. When Rhonda Stone testified about Alon and Oren taking turns raping her while she could not move as a result of the drug they had slipped her, she was shaking so badly she could barely state her name. Isa Brooks developed anxiety, touch phobias, nightmares, and a lasting inability to trust after Alon and Tal took turns raping her when she was just 16 years old. And Kayley Brown struggled to come to terms with the fact that Alon put his hand down her pants and touched her vagina just minutes after he raped her friend in the bathroom. For Alon, these events were nothing more than a fun weekend in the Hamptons or Aspen, or something to brag about to friends. For the victims, they were a nightmare that they were forced to relive for years. A weight that they will always carry. The seriousness of the assaults and rapes for which Alon was convicted at trial are more than sufficient to warrant a life sentence.

*2. Oren Alexander Deserves a Guidelines Sentence*

Oren carried out numerous horrific sexual assaults, using drugs and violence to prevent women and girls from resisting him. Like his brothers, Oren not only raped and sexually assaulted his victims, he also mocked and humiliated them, dressing them up in costumes, laughing at them, and taunting them if they dared to confront him. Oren's conduct throughout the conspiracy makes clear that not only did he view his victims as disposable objects to be used for his own pleasure,

he also enjoyed their humiliation and found their pain amusing. The nature and seriousness of Oren's conduct weigh strongly in favor of a life sentence here.

At trial, the evidence proved that Oren himself raped or sexually assaulted six women and girls: Amelia Rosen, Kelly Hudson, Rhonda Stone, Bela Koval, Rachel Stevens, and Amber Davis. Oren also worked with Alon to lure Stevens and her two friends, Maylen Gehret and Kayley Brown, back to their hotel room where Alon raped Gehret while Oren sexually assaulted Stevens. In addition, he and Alon trafficked Victim-4 and Victim-5 during the summer of 2009. And the evidence identified during the Government's investigation showed that these rapes and sexual assaults were just the tip of the iceberg; Oren engaged in a pattern of sexual violence in which he victimized dozens of women and girls. Like Alon, Oren acted with a callous cruelty in attacking his victims. Oren ensured that his victims would be helpless by drugging them, taking the possibility of consent entirely out of the question and destroying the victims' ability to control their own bodies and make their own choices.

Oren filmed himself doing exactly that to Amelia Rosen, a 17-year-old girl, when he gave her Ambien and raped her while she lay limp on the bed. The videos that Oren filmed that night paint a disturbing picture of how he treated his victims. In the videos, Oren sounded sober as Rosen became increasingly incoherent. In one of the final videos from that night, Oren told Rosen to take a pill so that she would go to sleep. In contrast to Oren's voice, Rosen slurred her words so badly she was nearly incomprehensible. She was obviously incapacitated and incapable of consenting to any sexual activity. But as the evidence at trial made clear over and over again, Oren was not interested in consensual sex with his victims, including Rosen. Instead, he gave the already intoxicated teenager an Ambien so she would lose any remaining ability to function while he raped her. About 20 minutes after he gave Rosen the Ambien, Oren set up his laptop and

pointed it at the bed, where Rosen lay limply while Oren's friend digitally penetrated her. Oren picked up Rosen's legs, manipulating her like a doll and positioning her body to suit him. And then Oren raped Rosen, having sex with her for several minutes while she lay quietly, appearing at best semiconscious. After Oren finished raping Rosen, he laughed and joked with his friend about how many times Oren had had sex that night. Oren not only raped Rosen after he gave her a sleeping pill, he recorded himself doing it and he emailed that video to his friend. Oren viewed what he did to Rosen as something to brag about, something to share with his friend. And he treated the video like a trophy, one he shared immediately and then kept for 15 years. As Rosen said, it is not "okay for two adult men to look at someone like me and decide that, simply because I had no one to speak on my behalf, they could use me as a sex object and a toy for their entertainment." (Ex. 17 (Rosen Ltr.) at 2). And yet that is exactly what Oren and his friend did.

Later that same year, Oren drugged and raped Kelly Hudson by drugging her after a day of skiing in Aspen. Again, Oren was not interested in consensual sex—he drugged Hudson's drink at the bar, ensuring he would be able to do what he wanted to her. Oren ignored Hudson when she said no and swatted her hand away when she tried to use it as a barrier to prevent him from penetrating her. After Oren finished raping Hudson, he humiliated her further, dressing her up in a clown costume and pushing her out the door into the Aspen winter night. When Hudson confronted Oren about it later, he brushed her off and told her not to worry about it, unmoved at her obvious distress at not remembering what happened. Hudson wrote, "although I have few clear memories of that night, my body remembers. The physical response I experienced throughout this case reminds me that trauma is not only something we remember, it is something we carry." (Ex. 12 (Hudson Ltr.) at 1).

Oren treated his other victims with similar cruelty, taking turns raping Rhonda Stone with Alon, sexually assaulting 18-year-old Rachel Stevens while Alon raped Maylen Gehret in the next room, and climbing on top of Bela Koval, pinning her down, and raping her while she tried as hard as possible to fight the drugs he had given her so that she could push him off. Each of those victims were devastated by Oren's attacks and has struggled to move forward in her own way. The harm that Oren caused and the severity of his criminal conduct calls for a Guidelines sentence of life imprisonment.

*3. Tal Alexander Deserves a Guidelines Sentence*

Tal used drugs and violence to rape and sexually assault women repeatedly over the course of years. As the evidence at trial made clear, Tal slipped drugs into the victims' drinks, pinned them down, and even tried to convince them not to be angry with him after he finished raping them. Like his brothers, the seriousness of Tal's crimes demands a life sentence.

At trial, the evidence proved that Tal raped four victims: Isa Brooks, Lindsey Acree, Maya Miller, and the woman in the hot tub during Memorial Day weekend in 2009. The Government's investigation revealed these were far from the only sexual assaults Tal perpetrated; for example, he sexually assaulted Victim-29, *see supra* pp. 90-92, in 2016, in the same house where he raped Miller in 2014 and where he helped Oren rape Bela Koval mere weeks later. Tal also helped his brothers traffic Koval, as well as Victim-4 and Victim-5 (*see* 3514-001 at 1-2; 3544-002 at 1-2; 3544-006 at 2-4; 3544-009 at 2-4), to the Hamptons, where they were ultimately raped by his brothers; assisted in the "Fyre Puss" planning that brought Amber Davis to the Bahamas where she was raped; and casually stood by during his brothers' rapes, watching, for example, as Alon forcibly raped Katie Moore, without stepping in to help her.

Tal's assaults were particularly cruel and violent. In 2009, Tal, Alon, and their friends took turns pinning down 16-year-old Isa Brooks and raping her while she slid in and out of

consciousness. Brooks testified that the assault was increasingly violent and frightening and that Tal pinned her down while the others took turns raping her. Afterwards, while Brooks struggled to process what had just happened to her and was still under the influence of the sedative-hypnotic drug she had been given, Tal told Brooks, “[d]on’t be mad at me.” (Tr. 2952). Tal recognized that what he had done to Brooks gave her a reason to be mad at him, that it was harmful to her. But that recognition did not prevent Tal from physically restraining a young girl so that he and his brother and friends could rape her. And that recognition was not enough to prevent him from doing the same thing again to others. What Tal and the others did to 16-year-old Brooks, as she put it, “radically altered the trajectory of my life. It entered my body, my nervous system, my worldview, my relationships, my intimacy, my friendships, my ability to trust, my ability to make decisions, my understanding of institutions, my understanding of other people, and my understanding of myself. And I grieve the girl I was—the girl sitting at the side of the pool, unaware of her fate and the lion’s den before her, unaware of the danger she had found herself in until it was too late. The girl who loved people. The girl who wanted to know everyone’s story.” (Ex. 7 (Brooks Ltr.) at 6).

Brooks was far from the only person Tal raped in the Hamptons. After giving Lindsey Acree a glass of drugged wine, Tal and his friend raped Acree multiple times together at another Hamptons house during the summer of 2011, pinning her down and simultaneously raping her orally and vaginally. Beyond the horrific sexual violence, Tal and his friend also mocked and humiliated Acree. They made her lift weights in the gym and laughed at her when she could not do it as a result of the drugs they had given her. They manipulated her body like a doll. Tal’s attack on Lindsey was not merely for his own sexual gratification; it was a prolonged exercise in humiliating and degrading her while she was helpless and unable to stop them, a sadistic act

designed to strip her of her humanity for their own entertainment. After Tal's assault, Acree felt that "I will never be the same person. What these men did to so many women cannot be described as merely 'impact.' They have robbed women of their futures, their dignity, and a part of their souls. We will never recover them." (Ex. 4 (Acree Ltr.) at 2).

Tal's rape of Maya Miller in the Hamptons in 2014 was equally cruel and violent. After Tal failed to get Miller to consume a drink that he had drugged, he chased her into the bathroom and cornered her in the shower. As Miller testified, when she began to cry, Tal became sexually aroused at the sight of her tears. Tal took pleasure from her distress. He pinned Miller down by her neck and raped her so violently that she bled for two days. And when he had finished, while Miller was sobbing in the shower, Tal told her, "[y]ou wanted that. Don't worry, I still like you." Again, Tal's own words make clear that he knew that what he was doing was wrong, that it had hurt his victims. But he did it anyway, getting enjoyment from their pain, and then, in the case of Miller, trying to gaslight her into thinking she enjoyed the experience. To Miller, "every second that Tal raped me in that shower was an eternity of terror, while my body was desecrated and my basic dignity ripped away." (Ex. 15 (Miller Ltr.) at 1).

Each of Tal's victims suffered incredible trauma and lasting harm as a result of his sadistic and violent attacks. Tal's own words and actions make clear that he knew he was hurting them and did it anyway; in fact, he enjoyed the fact that he was causing his victims pain and fear. As Brooks wrote, "I believe they enjoyed torturing terrorizing and extinguishing me. Like my confusion and disorientation fed them—like it gave them the power and strength needed to break me—someone they viewed as less worthy or deserving of a good life." (Ex. 7 (Brooks Ltr.) at 2). He reveled in the cruelty of his rapes. For his crimes, Tal should be sentenced to life imprisonment.

**b. The History and Characteristics of the Defendants Weigh in Favor of a Guidelines Sentence**

The history and characteristics of the defendants also weigh in favor of a Guidelines sentence of life. In contrast to many defendants this Court has sentenced, these defendants did not experience difficult upbringings or poverty and are unable to point the Court to any compelling mitigating factors at sentencing. Indeed, the defendants have led remarkably privileged lives. By all accounts, they were raised in a loving and supportive home by parents who built successful businesses that created significant wealth for the family. Each of the defendants had every opportunity to live a law-abiding and successful life. All three graduated from college, and Alon has a law degree. Each built a successful, lucrative career.

The defendants' personal histories and characteristics are immensely aggravating as the Court considers what sentence to impose. This goes beyond the point, made above, that the defendants can point to nothing mitigating about their upbringings. The defendants actively weaponized their privilege, their wealth, and their access to power and celebrity to carry out their attacks. Like the savvy businessmen they held themselves out as, they leveraged their status and wealth to lure their victims to them. To entice them with fancy things. To gain their victims' trust. And to lay the trap for a violent assault. As the defendants' wealth increased, their pattern evolved to take greater advantage of their increased resources. The house where the defendants trafficked and raped numerous girls and women in the summer of 2009 cost $40,000 for the summer. The house where they trafficked and raped Miller, Victim-29, and Koval years later cost $50,000 for a month. At every opportunity, the defendants relied on the advantages they had in life to make their scheme as effective as possible, to devastating effect.

It is impossible for the Court to consider the defendants' "history and characteristics" without acknowledging that their histories are ones of persistent serial rape. The defendants'

pattern of sexual violence goes back to their adolescence, before they could get their drivers' licenses, and it continued and grew for nearly two decades. They have violently attacked women for years. They used their wealth and the shame they caused their victims to escape accountability for too long. And the lesson they learned with each attack they committed and got away with was that they were entitled to keep going, and so they did. It does not matter that Alon and Oren have no prior convictions or that Tal has only two prior DUIs; the defendants are violent criminals many times over. Rather, it shows how they perfected their playbook of drugging and raping and then deflecting and denying; how they weaponized their victims' incomplete memories of the assaults to evade responsibility; and how their immense resources served as a deterrent and cudgel for any victim considering going public about their assaults. The defendants are unrepentant serial rapists. That is their history.

#### c. The Scale of the Defendant's Criminal Conduct Is Comparable to That of the Most Serious Serial Abusers and Weighs in Favor of a Guidelines Sentence

As the evidence makes clear, the defendants are serial rapists who violated woman after woman and girl after girl for years upon years. After the first brave victims filed lawsuits, dozens of women learned that they were not alone in being victimized by the defendants, and they too began to speak up. The Government's investigation identified at least 70 victims who were raped or sexually assaulted by at least one the defendants. Women and girls whose mental and physical wellbeing were sacrificed for the defendants' sexual gratification and amusement. Women and girls who remembered what the defendants had done to them, who carried the weight of those memories. That is an extraordinary number. And these women and girls were just the victims who could both remember a portion of their assault and were at a place mentally and emotionally where they could speak to federal law enforcement about their worst moments. Tragically, 70 victims may be only part of the trail of destruction that the defendants left in their wake. *See*

*United States v. Hadden*, No. 23 Cr. 6822, 2024 WL 4456203, at *5 (2d Cir. Oct. 10, 2024) ("[T]here is no doubt that the district court had broad discretion to consider the extensive harm that [the defendant] caused over many years to numerous uncharged victims, in the context of the sentencing factors listed in 18 U.S.C. § 3553(a).").

For many victims, the knowledge that they were not alone helped them to come forward to hold the defendants accountable. Maya Miller wrote, "I stand here today not only for myself, but as part of a choir of voices that he could not silence." (Ex. 15 (Miller Ltr.) at 2). And Ava Wells said, "It's taken me ten years, and only now, with the full scope and truth of their crimes surfacing from the shadows, that I'm just beginning to metabolize what he did. What I once believed was an isolated night has turned out to be so much bigger than just me. . . . I know now that I was never alone. That I am one woman, one of many other women." (Ex. 26 (Wells Ltr.) at 2).

That choir of voices encouraged women to keep coming forward—and this happened through the trial and even after it ended. Indeed, the Court ruled that one of those victims who reached out to law enforcement in the middle of trial, Victim-29, could testify under Rule 413 (Tr. 3260-61), although the Government ultimately decided not to call her. As laid out above, Victim-29's experience with Tal is strikingly similar to many of the other victims. Tal lured her to 26 On The Bluff, isolated her in a bedroom, and tried to violently undress her so that he could rape her. When Tal failed to get Victim-29's clothing off, he masturbated, ejaculating on her face and chest. Like many of the other victims, Victim-29 was shaken and frightened and horribly ashamed of what Tal had done to her, believing that she was to blame for putting herself in a situation where Tal could assault her. And this is one of the central reasons that Tal and his brothers were able to commit their egregious crimes for so long—their victims were terrified that they would be blamed

for the defendants' actions. Tal and his brothers took advantage of that feeling to continue committing sexual assaults with impunity for years.

The scope of the harm caused by the defendants places them in a very small group of the most egregious abusers charged and convicted in federal courtrooms. Similarly extreme sexual predators, like Larry Ray, Keith Raniere, and Darius Paduch, have received sentences of life imprisonment or the functional equivalent of life. Each of those defendants exploited and abused a large number of vulnerable victims for their own sexual gratification and benefit. And for their crimes, Ray, who was in his late 50s at the time, was sentenced to 60 years, Raniere was sentenced to 120 years, and Paduch was sentenced to life. In each of those cases, the judges imposing lengthy sentences emphasized the lasting harm and pain that each abuser caused to his numerous victims, finding that sentences that ensured that these defendants would never be released were required. In sentencing Paduch to life imprisonment, Judge Abrams said, "if there is a case where a life sentence is justified, this is that case, because of the harm you so knowingly caused so many." *United States v. Paduch*, No. 23 Cr. 181 (RA) (S.D.N.Y. Nov. 20, 2024), Dkt. 192 at 68. Of Keith Raniere, Judge Garaufis found that considering the nature of the offenses and history and characteristics of the defendant, "makes abundantly clear that a significant sentence is not just appropriate, but necessary" and went on to say, "though I have highlighted today particularly egregious aspects of Mr. Raniere's campaign of manipulation, exploitation, and abuse, no words can adequately communicate the lasting pain, trauma, and hardship he has caused so many." *United States v. Raniere*, No. 18 Cr. 204 (NGG) (E.D.N.Y. Oct. 27, 2020), Dkt. 1002 at 149, 152. And as for Larry Ray, Judge Liman found, "Mr. Ray's conduct in this case was particularly aggravated, his crimes particularly heinous. . . . His crimes spanned years and it destroyed families. More than that, however, there was a particular cruelty in the defendant's ways and a particular

sophistication in his actions. He preyed on his victims' vulnerabilities and he took pleasure in degrading them." *United States v. Ray*, No. 20 Cr. 110 (LJL) (S.D.N.Y. Jan. 20, 2023), Dkt. 611 at 46, 48. While the specific details of their criminal conduct differed from those defendants, Alon, Oren, and Tal caused harm on a similar scale. Their actions irreparably damaged the lives of dozens of victims, and for that, they deserve a sentence of the utmost severity.

Indeed, the Probation Office recognized the severity of the defendants' conduct in this case, recommending that the Court sentence each defendant to a term of 15 years to run consecutively for each victim whom they raped individually or were responsible for as a member of the conspiracy, resulting in a recommendation of 180 years' imprisonment each for Alon and Tal and 195 years' imprisonment for Oren. That recommendation, which effectively amounts to a life sentence for each defendant, recognizes the enormity of the harm caused by the defendants and that it merits a commensurate sentence. In its recommendation for Alon and Tal, the Probation Office wrote,

> The defendant's conduct was prolific, heinous, and predatory, as he and his co-conspirators fostered a culture of abuse and provided alcohol and drugs to adult and minor victims to facilitate their sexual assaults. Their notoriety, wealth, and influence not only enticed their victims but also implicitly protected them from detection throughout their decade-long offense. The gravity of the defendant's conduct is immense and undoubtedly caused substantial and irreparable psychological harm to the victims, as evidenced by their trial testimony and victim impact statements. Further, throughout the pendency of this case, the defendant has demonstrated little, if any, remorse or acknowledgement of the harm caused by his actions. At its core, the defendant's conduct reflects that his sexual gratification and abuse of power outweighed any regard for the dignity of his victims.

(PSR at 81 (Alon); PSR at 79 (Tal)). The Probation Office recognized similar factors for Oren, writing that his "conduct reflects a persistent willingness to exploit his power, privilege, and

influence for his own sexual gratification, without meaningful regard for the consequences to his victims." (PSR at 80 (Oren)).

As the Probation Office states in its recommendations, such a sentence would not result in unwarranted sentencing disparities "while giving appropriate consideration to the defendants' individual history and characteristics and the totality of the circumstances presented in this case." (PSR at 80 (Oren); *see also* PSR at 81 (Alon), PSR at 79 (Tal)). The life sentence for each defendant recommended by the Government would similarly not result in unwarranted sentencing disparities. The Sentencing Commission reports that almost a third of defendants sentenced for criminal sexual abuse (pursuant U.S.S.G § 2A3.1) with a final offense level of 43 and a criminal history category I[29] were sentenced to life imprisonment. (PSR at 59 (Alon/Oren/Tal)). This statistic even includes defendants who received a Section 5K1.1 substantial assistance departure—defendants clearly not comparable to the defendants in this case. More importantly, the median sentence for defendants who did not receive a Section 5K1.1 departure is 454 months' imprisonment and an average sentence of 397 months' imprisonment. (PSR at 59 (Alon/Oren/Tal)). These statistics are significant for two reasons. First, the Commission reports a life sentence "as 470 months, a length consistent with the average life expectancy of federal criminal defendants." (PSR at 59 (Alon/Oren/Tal)). Accordingly, a median sentence of 454 months' imprisonment—just over one year shy of the 470-month life sentence equivalent—indicates that half of similarly situated defendants were sentenced at or near life imprisonment. Second, because the Commission reports sentences "of greater than 470 months" as only "470 months" (PSR at 59 (Alon/Oren/Tal)), the 470-month cap necessarily skews down the average

[29] While the PSR for Tal also compares him to defendants in criminal history category I, as discussed above, Tal is in criminal history category II.

sentence by excluding the true sentences of similarly situated defendants. Thus, the average sentence length is likely significantly *higher* than 397 months.

But as discussed above, and as made clear during the trial and throughout this case, there is nothing average about these defendants or their crimes. The scale of their crimes, the enormity of the harm they caused, and the callous depravity with which they carried out vicious sexual assaults and rapes puts them in a category of their own and merits a life sentence for each.

**d. The Need for Specific Deterrence and To Protect the Public Warrants a Guidelines Sentence**

A Guidelines sentence is necessary here to provide specific deterrence and protect the public from future harm at the hands of the defendants. There is absolutely no basis for the Court to conclude that the defendants understand the gravity of their crimes, the harm they caused, or even believe that they should have acted differently. Given the magnitude and breadth of their conduct in this case, coupled with their persistent refusal to acknowledge the wrongfulness of their conduct, these sentencing factors are best served by a life sentence for each defendant.

Specific deterrence warrants a significant sentence. Here, the fact that each defendant raped and sexually assaulted multiple victims over the course of years demonstrates that a significant sentence of incarceration is needed to deter them from future criminal conduct, if they can even be deterred. The defendants' actions over the course of the conspiracy should give the Court no comfort. They continued to engage in their pattern of raping and drugging women and girls, even after victims told them no or otherwise confronted them. As early as 2009, 16-year-old Isa Brooks voiced her discomfort and told Alon and Tal to stop raping her, but they did not. Later that same year, Kelly Hudson confronted Oren and repeatedly asked him what had happened between them, only to have him brush her off. The defendants knew from the beginning that what they were doing was wrong, and that did not stop them. And they did not listen to other women

over the years either. For example, Katie Moore said no in 2012, Maya Miller said no in 2014, Ava Wells said no in March 2016, and Bela Koval said no in September 2016. But none of these very clear indications of non-consent deterred the defendants further acts of violence. Neither did public allegations about sexual assaults committed by them, regardless of whether those allegations were true. (*See* Tr. 165-67 (Moore describing blog post she read in 2012 alleging that Alon and Oren committed sexual assaults)). None of this deterred Alon and Oren, who were nearly 30 years old, from drugging and sexually assaulting high schoolers in Aspen in January 2017, or Tal, who was 30 years old when he assaulted 18-year-old Victim-29 in August 2016. In fact, the defendants actively ignored when women said no; Oren and his friend even explicitly agreed that "no is not an option" when it comes to sex. (*See* GX 2D-101-1).

The defendants and their friends went even further than ignoring verbal resistance, justifying and excusing their conduct as laid out in a post on their blog that reads, "It's Not Rape If...She's sleeping....She doesn't remember.... You use her tears as lube." (GX 7A-103). Many of the rapes and sexual assaults proven at trial had one or more of these elements—for example, the defendants raped unconscious or sleeping victims, such as Amber Davis and Amelia Rosen; the defendants drugged many of their victims so that they would not remember what happened; and they ignored victims' tears, such as Maya Miller's and Katie Moore's. Given this pattern, the Court can have no confidence that the defendants have learned from their conduct and decided to change. The trial evidence alone demonstrates a true need for specific deterrence. Throughout that time, the defendants acted with impunity. They thought that they would get away with raping and sexually assaulting women and girls and that they would never be held accountable. They thought that their victims would never have the courage to speak up, and that if any tried, the defendants could intimidate or threaten them into silence. Koval wrote, "I carried this secret as if

it were my responsibility to guard it for the rest of my life. I felt powerless because I knew how much influence their family had. I was afraid that if I spoke out, I would be silenced or worse, especially after I later learned they had faced a similar situation before and had managed to make it disappear." (Ex. 13 (Koval Ltr.) at 2).

Even now, the defendants have shown no acceptance of responsibility or acknowledgment that their actions were wrong and harmful. Even without acknowledging guilt for the charged offenses, the defendants could—but have not—show remorse for the pleas and warnings that they have ignored over the years, including being confronted with the word "rapists" written on the wall of their Hamptons rental house in 2009 and the text messages that Amber Davis sent to Oren in 2017, along with woman after woman and girl after girl telling them "no" and "stop." Instead, in their objections to the PSR, despite proclaiming respect for the jury's verdict, the defendants dispute and relitigate the jury's findings. The defendants' unwillingness to express remorse for their actions is deeply troubling and suggests that a Guidelines sentence is particularly important for specific deterrence and protection of the public. *See Broxmeyer*, 699 F.3d at 295 (stating that defendant's "lack of remorse for, or even appreciation of, the seriousness of the totality of his conduct . . . further expand[s] the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public"); *United States v. Kaziu*, 559 F. App'x 32, 39 (2d Cir. 2014) (holding that "the district court properly referenced [the defendant's] lack of remorse because the fact that [the defendant] did not believe that his actions rose to the level of any crime also evinced future dangerousness"); *accord United States v. Martinucci*, 561 F.3d 533, 535 (2d Cir. 2009) (lack of remorse is a pertinent sentencing factor under Section 3553(a)). Without acceptance of responsibility or remorse, the Court should be concerned that the defendants will recidivate, especially considering that Congress has found that

"sex offenders," like the defendants, "are four times more likely than other violent criminals to recommit their crimes" and that "recidivism rates do not appreciably decline as offenders age." *See* H.R. Rep. No. 107-527, at 2 (2002).

Throughout their lives, the defendants have demonstrated an utter lack of respect for the law, the norms of a civilized society, and the bodily autonomy, the dignity, and the safety of others. They have used women and girls for sexual gratification, treating them like sexual objects to be humiliated and mocked for the defendants' entertainment. Their pattern of sexual violence should be met with a punishment that holds them accountable for the full measure of their criminal conduct and the lasting trauma they caused.

**e. The Need for General Deterrence and To Promote Respect for the Law Weighs in Favor of a Guidelines Sentence**

The need to promote respect for the law and to deter others from committing similar crimes also warrants a life sentence. Sexual violence is far too prevalent, and many perpetrators have historically been able to escape accountability. The Department of Justice estimates that in 2024, 560,890 rapes and sexual assaults of people age 12 and older occurred in the United States. Only a fraction of those rapes and sexual assaults—about 24 percent—were reported to law enforcement, meaning the majority are never even investigated.[30] That is particularly true where perpetrators have power, wealth, and influence, which help them avoid accountability and keep victims quiet. The Court's sentence should send the message that no one—even wealthy, connected, and successful defendants like these—are above the law. *See United States v. Kelly*, No. 19 Cr. 286 (AMD) (E.D.N.Y. June 29, 2022), Dkt. 375 at 90 (finding that sentence "must deter

[30] Department of Justice - Office of Justice Programs, Bureau of Justice Statistics, "Criminal Victimization, 2024" at 3, 7 (Sept. 2025), https://bjs.ojp.gov/library/publications/criminal-victimization-2024 (last accessed Oct. 9, 2026).

other people, any important person or celebrity, a powerful person who thinks, like you, that he or she is above the law because of who that person is"); *United States v. Maxwell*, No. 20 Cr. 330 (AJN) (S.D.N.Y. June 28, 2022), Dkt. 737 at 92-93 ("the rule of law demands, and this Court must ensure that, whether you are rich or poor, powerful or entirely unknown, nobody is above the law"). Katie Moore made this point in her letter to the Court, writing that the sentences "have the power to make clear that what happened to me, and what happened to so many other women and girls, will not be tolerated. That wealth, power, and social standing cannot shield someone from the consequences of their actions. I hope the sentences you impose on these brothers send that message to every man who believes he can use his power to hurt a woman and get away with it." (Ex. 16 (Moore Ltr.) at 2).

A Guidelines sentence is also important to send a message to victims that exploitation of and violence against women is taken seriously. These cases are extraordinarily difficult to investigate and to prosecute, in no small part because of the societal stigmas that still weigh on victims of sexual violence. Victims frequently do not speak up because they feel ashamed, worried that no one will believe them, or are frightened of retaliation from their attacker. Too often, sexual predators have been able to use these stigmas to their advantage to continue abusing others with impunity. *See United States v. Ray*, No. 20 Cr. 110 (LJL) (S.D.N.Y Jan. 20, 2023), Dkt. 611 at 53 ("Crimes such as the one that Mr. Ray committed are difficult to detect and difficult to prosecute. As I've mentioned before, it takes the courage of victims willing to subject themselves to the public glare to unravel crimes such as Mr. Ray's. . . . It is for that reason that just punishment and general deterrence requires a sentence of decades in prison, to send a message to others who think that they might be able to get away with crimes such as these.")

Indeed, the process of participating in a criminal trial like this is incredibly painful for victims, requiring them to relive the trauma of what happened to them over and over while preparing for testimony, to tell a courtroom full of strangers about their most painful moments, and to endure cross examination designed to destroy their credibility. Yet the victims here did it not only to bring justice for what the defendants did to them personally, but to stand up for other victims. As Kelly Hudson said, "reliving what happened, preparing for cross-examination, and sitting only a few feet away from the men who caused so much fear was among the hardest things I have ever done. I testified because I believed that remaining silent would allow them to continue harming other women. I also knew I would regret my silence for the rest of my life if they walked free." (Ex. 12 (Hudson Ltr.) at 1). Maya Miller similarly wrote, "the past eleven years have been agonizing, but the past year and a half has been among the hardest of my life. It opened a wound that had never truly healed. Ripping off a scab and having to be vulnerable enough to re-bleed in front of a room full of strangers. Reliving it has been horrific and deeply retraumatizing, but it was necessary as silence only protects those who choose to do harm." (Ex. 15 (Miller Ltr.) at 2). Ava Wells said, "the two years spent reopening this wound, having my character, career, and credibility viewed under a microscope as though I was the one on trial, was deeply damaging to me, both psychologically and physically . . . . I'm so proud of myself for bravely testifying, in hopes these men would be held accountable for their crimes. But it didn't come without a cost. Some days I couldn't even get out of bed . . . needing to relive that night, and having every detail of our interaction picked apart and scrutinized, kept my nervous system stuck in fear and hypervigilance." (Ex. 26 (Wells Ltr.) at 2). A lenient sentence in this case would send the message to victims that, even if they have the courage to report their abusers and undergo the excruciating experience of testifying in court, there will be no meaningful accountability.

Many people dismiss a drugged drink followed by sexual assault as just "date rape," as if rape under those circumstances is somehow less serious. Indeed, at earlier stages of the case, Oren's counsel described the accusations as "social context sexual misconduct," implying that such sexual assaults were too trivial for federal prosecution. (*See* Dkt. 21). The tendency to dismiss rape under these circumstances is rooted at least in part in the idea that the victim bears some responsibility for what happened to her, that because she had a drink at a party or on a night out that was drugged unbeknownst to her, she on some level deserved what came next. The prevalence of this belief increases victims' reluctance to come forward, as many worry that they will be blamed for their own sexual assault. A serious sentence of imprisonment sends the message that rape and sexual assault is an extraordinarily serious crime, regardless of whether it was set in motion at a party, and that giving a woman a drugged drink and raping her after enticing her to a vacation home or an exclusive event is federal sex trafficking and leads to serious consequences.

## II. The Court Should Impose the Maximum Financial Penalties

In addition to a lifetime sentence of imprisonment, the Court should impose the maximum financial penalties for the defendants' convictions.

The Court should fine Alon and Oren, who were each convicted of six counts, the maximum fine of $1,500,000 and should fine Tal, who was convicted of seven counts, the maximum fine of $1,750,000. These fines will hardly impact the assets of the defendants who are multimillionaires many times over[31] but will nevertheless send the message that defendants who

[31] The defendants appear not to have given complete financial pictures to the Probation Office, but public reporting reflects that collectively they have made more than $100,000,000 from selling real property in the past three years, in addition to their other assets. *See* https://therealdeal.com/miami/2023/06/01/alexander-brothers-sell-waterfront-miami-beach-mansion-for-27-5m/ (describing 2023 sale of home jointly owned by all three defendants for $27.5 million); https://therealdeal.com/miami/2025/06/20/oren-alexander-sells-waterfront-miami-beach-mansion/ (describing 2025 sale of Oren's home for $52 million);

use wealth to accomplish criminal activity will suffer financial losses in addition to the loss of liberty. *See* 18 U.S.C. § 3752 (describing factors to be considered when imposing a fine). Although no amount of money can undo the vast harm the defendants caused, the defendants should not be allowed, to the extent the law allows, to maintain the wealth that was at the heart of their crimes. As Lindsey Acree put it succinctly while testifying, "If there's a kid with a stick that keeps hitting people, right, what do you do? You take that stick away. Well, that—money is their stick, so we take it away so they can't hurt people anymore." (Tr. 2210).

In addition to a fine, the Court must order the defendants to pay restitution to their victims. Victims of all offenses of conviction, including victims of the substantive offenses and the Count One conspiracy offense, are entitled to compensation for the "full amount" of their losses resulting from the defendants' offenses, including expenses for medical and psychological treatment, transportation, child care, lost income, attorneys' fees and costs, and all other relevant expenses, *see* 18 U.S.C. § 2259; *see also* 18 U.S.C. §§ 1593(b)(3), 2248(b)(3), including reasonably ascertainable future costs within these categories, *United States v. Pearson*, 570 F.3d 480, 486-87 (2d Cir. 2009).[32] Unsurprisingly, the defendants' violence led to significant financial costs to their victims who have lost hundreds of thousands of dollars, if not more, because of the defendants' crimes. Attached as sealed exhibits to this submission are the restitution claims and supporting documentation for [redacted]

https://www.crainsnewyork.com/real-estate/residential/cny-tal-alexander-sells-miami-home-after-conviction/ (describing 2026 sale of Tal's home for $33 million).

[32] The defendants argued in their objections submitted to the Probation Office that awarding restitution to victims would be unconstitutional because the issue of restitution was not submitted to the jury. (*See* PSR p. 76 (Alon); PSR pp. 74-75 (Oren); PSR pp. 73-74 (Tal)). However, the defendants' argument is foreclosed by binding precedent, as they acknowledge. *See United States v. Reifler*, 446 F.3d 65, 113-20 (2d Cir. 2006).

[redacted] The claims these victims have made are covered costs under the law and should be awarded.

[redacted]

[33] If additional claims for restitution are made, they may still be awarded after sentencing. *See* 18 U.S.C. § 3664(d)(5) (sentencing court has 90 days from date of sentencing to order restitution); *see also United States v. Dalicandro*, 711 F. App'x 38, 41 (2d Cir. 2017) ("a sentencing court maintains its authority to impose restitution outside of the 90-day window in § 3664(d)(5)") (citing *Dolan v. United States*, 560 U.S 605 (2010); *United States v. Gushlak*, 728 F.3d 184 (2d Cir 2013)).

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

The Court should order the defendants to pay the restitution amounts claimed by these victims because the claims are for covered losses that were caused by the defendants' offenses. For victims of the Count One conspiracy [redacted] the Court should hold each defendant jointly and severally liable for the full amount of each victim's losses. *See United States v. Nucci*, 364 F.3d 419, 422 (2d Cir. 2004). The Court should also order the defendants, who have the means, to pay the ordered restitution (as well as their fines) immediately. *See* 18 U.S.C. § 3572(d)(1) ("A person sentenced to pay a fine or other monetary penalty, including restitution, shall make such payment immediately, unless, in the interest of justice, the court provides for payment on a date certain or in installments.").

The parties have conferred about restitution, and the Government understands that the defendants are objecting to every component of every restitution claim. The principal objection about which the defendants have informed the Government is that the defendants argue they did not cause any of the victims' losses. In other words, the defendants argue, absurdly, that despite being convicted of ten counts of sex trafficking, sexual assault, and sexual abuse offenses, they are not responsible for any of their victims' financial losses. But the losses the victims have claimed

are those that are expected from victims of violent rape: therapy bills, lost income or tuition payments while working to process trauma, and attorneys' fees. The defendants caused these losses, and the law requires that they compensate the victims for them.

[redacted] At bottom this claim is just one more example of the defendants blaming anyone but themselves for their conduct and shows how even a conviction at trial for multiple counts of sex trafficking and related offenses cannot cause them to reflect on their conduct, accept responsibility, or make changes to their own actions. In their own minds, the defendants will always be the true victims of this case.

In any event, arguments that the defendants are not financially responsible for losses victims incurred because of the prosecution of their crimes, rather than the bare commission of the offenses, fails not only as a moral matter but also as a legal one. Federal law authorizes victims of the defendants' offenses to recover the "full amount" of their losses that are "a proximate result of the offenses involving the victim." 18 U.S.C. § 2259(c)(2); *see also* 18 U.S.C. §§ 1593(b)(3); 2248(b)(3). This requires defendants to pay restitution for "any . . . relevant losses incurred by the victim." 18 U.S.C. § 2259(c)(2)(F). Expenses incurred because of a victim's involvement in a criminal investigation and prosecution of an offense are costs that are foreseeable as a result of the

defendants' crimes and covered under the law. *Cf. United States v. Afriyie*, 27 F.4th 161, 166-70 (2d Cir. 2022) (affirming restitution award for attorneys' fees associated with subpoena compliance and trial preparation under 18 U.S.C. § 3663A). Accordingly, the defendants cannot shift financial responsibility for their crimes to the Government and must pay full restitution to all their victims.

Finally, the Government is seeking forfeiture of certain of the defendants' electronic devices. We are discussing the issue with the defense and expect to submit a consent order of forfeiture before sentencing.

**CONCLUSION**

The scale and duration of defendants' sex trafficking scheme was immense. So was the harm they caused their victims. These crimes demand justice, and the defendants must be held accountable. The Government urges the Court to sentence Alon Alexander, Oren Alexander, and Tal Alexander each to a Guidelines term of life imprisonment.

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York

By: /s/
Kaiya Arroyo
Elizabeth A. Espinosa
Andrew Jones
Madison Reddick Smyser
Assistant United States Attorneys